Exhibit A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                )
                               )
          Plaintiff,           )
                               )
v.                             )    Civil Action No.
                               )      05-477-SLR
ELECTRONIC DATA SYSTEMS         )
CORPORATION,                   )
                               )
          Defendant.           )

          Deposition of HESTAL LIPSCOMB taken pursuant to
notice at the offices of Richards, Layton & Finger, One
Rodney Square, Wilmington, Delaware, beginning at 10:00
a.m. on Tuesday, February 21, 2006, before Anne L. Adams,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          LAURENCE V. CRONIN, ESQ.
          SMITH, KATZENSTEIN & FURLOW
            800 Delaware Avenue
            Wilmington, Delaware  19899
            for the Plaintiff,

          THOMAS J. PIATAK, ESQ.
          BAKER HOSTETLER
            3200 National City Center
            1900 East 9th Street
            Cleveland, Ohio  44114-3485
            for the Defendant.
ALSO PRESENT:  Lance Rogers, EDS

------------------------------------------------------------

                    WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters
COPY

Hestal Lipscomb

12

1    A.    No.

2    Q.    Do you know what their policy on absenteeism is

3    at the Delaware Psychiatric Institute?

4    A.    Yes.

5    Q.    And what is it?

6    A.    You have a certain amount of days that you can be

7    out.  I believe it's three days if you are sick.  And

8    then after three days, you would have to have a note from

9    your doctor or you can put in for your sick time or use

10   vacation time depending on the situation.

11   Q.    Now, do you know what the policy is if there is

12   an unexcused period of unexcused absence?

13   A.    No, I don't.

14   Q.    Do you know what their policy is on the Family

15   Medical Leave Act or FMLA?

16   A.    I might have the policy.  I did read through it.

17   I'm not exactly familiar because I have never had to

18   actually use it.

19   Q.    Do you know what the policy would be if you are

20   out for three days or more and do not have a note from

21   your doctor?

22   A.    Well, I know you get a verbal warning.  Then you

23   would get a written warning and they would reprimand you.

24   Q.    So being without a medical excuse can lead to

Hestal Lipscomb

13

1    discipline?

2        A.    Yes.

3        Q.    Has that been true for other places that you've

4    worked as well?

5        A.    No, with the exception of EDS.

6        Q.    Are you currently attending any form of school?

7        A.    No, sir.

8        Q.    Other than your work at the Delaware Psychiatric

9    Center, have you had any other employment of any kind

10   since you left EDS?

11       A.    Yes, I have.

12       Q.    Where else have you worked?

13       A.    I have had temp assignments, two temp

14   assignments.  One was for one week and that was at

15   Nationwide Insurance.  Then I had another assignment.

16   And that lasted a month.  And it was at Citigroup.

17       Q.    What was the temporary agency?

18       A.    One was, the first one was Careers.  The second

19   one was Randstad.

20       Q.    Rand --

21       A.    R-A-D-S-T-A -- think it is Randstad.

22             MR. CRONIN:  I think it's in our

23   interrogatory responses.

24   BY MR. PIATAK:



Hestal Lipscomb

25

1          MR. CRONIN:  Yes, big, big part of our

2    economy.  At least they have been.  We will see what Bank

3    of America does.

4    BY MR. PIATAK:

5        Q.    When did you start working at EDS?

6        A.    That would have been July 29th of 2002.

7        Q.    And was that after your assignment had ended at

8    AIG?

9        A.    Yes.

10       Q.    Were you unemployed at the time you applied at

11   EDS?

12       A.    For about two weeks or so.

13       Q.    And why did you accept employment at EDS?

14       A.    I needed a job for one.  And I was accepted as to

15   be an employee there and I qualified.

16       Q.    So you went to EDS because you needed a job and

17   they were willing to take you on as a permanent position?

18       A.    Yes.

19       Q.    Any other reasons?

20       A.    I was looking for a permanent position.  I didn't

21   want to do temp for the rest of my life.

22       Q.    Anything else that led you to go to EDS?

23       A.    No.

24       Q.    And who did you meet with before you started



Hestal Lipscomb

26

1    working at EDS?  Who did you meet with from the company?

2    A.    Barb Jackson interviewed me.  And I spoke with

3    Nicky, who is the, I believe the administrative

4    secretary, she gave me instructions where to get my drug

5    test done and fingerprints and things of nature.

6    Q.    Do you remember speaking to anyone besides Barb

7    and Nicky before coming to work at EDS?

8    A.    No.

9    Q.    Do you remember what you and Barb talked about?

10    A.    During the interview?

11    Q.    Yeah, during the interview.

12    A.    No, I don't remember exact conversation.

13    Q.    Was Barb the only person that you interviewed

14    with prior to being hired at EDS?

15    A.    I can't recollect.  I'm not sure.  Tracy Eddy

16    might have came in while she was doing the interview.

17    Q.    Anyone that you remember interviewing with before

18    starting at EDS other than Barb and possibly Tracy?

19    A.    No.

20    Q.    Did you turn down any job offer to come to EDS?

21    A.    No.

22    Q.    Hestal, during the time that you worked at EDS, I

23    want you to tell me about any complaints that you made

24    during that period of time about EDS or any of its



Hestal Lipscomb

27

1    employees.

2        A.    I didn't have any complaints.

3        Q.    What was your initial job when you were hired in

4    at EDS?

5        A.    Specialized support clerk.

6        Q.    And is that the position that you retained during

7    your whole time at EDS or did that change in any way?

8        A.    No, that was it except for I was back-up for

9    Linda Jackson, who was the team leader, when she wasn't

10   there.  I was like team leader for them when she wasn't

11   there.

12       Q.    So the whole time you were at EDS your position

13   was specialized support clerk?

14       A.    Yes.

15       Q.    But after a certain point, you became a back-up

16   for Linda Jackson when she was out?

17       A.    Yes.  She would leave directives for me to pass

18   on for her or something like that.

19       Q.    Do you remember when it was you started acting as

20   a back-up for Linda Jackson?

21       A.    No.

22       Q.    As a specialized support clerk, what were your

23   duties and responsibilities?

24       A.    We processed the Medicaid claims, sorted and



Hestal Lipscomb

28

1  scanned, the monthly bulk mailing and daily stuffing and

2  mailing of benefit information.

3      Q.   Any other duties or responsibilities that you

4  remember having?

5      A.   Inventory, basically keeping the shelves stocked.

6      Q.   Anything else?

7      A.   Just sign for UPS packages, sort mail.  I left

8  that out.  And I would put postage on the mail when I

9  mailed them out after stuffing them.  I would do the

10 monthly report for the meter machine, the stamping

11 machine and turn it in.  That's about it.  Answer the

12 phone.

13     Q.   And were you working in the mailroom area

14 primarily?

15     A.   Yes.

16     Q.   And the EDS facility in Delaware, was it your

17 understanding that most of what it did was process

18 Medicaid claims?

19     A.   Yes.

20     Q.   And who was your supervisor?

21     A.   Tracy Eddy.

22     Q.   Was that true the whole time you were there?

23     A.   Yes.

24     Q.   What was your salary or compensation?



Hestal Lipscomb

30

1    A.    To the best of my ability, I would say, yes, she
2   was.

3    Q.    Was she fair?

4    A.    Yes.

5    Q.    Did you consider her to be a friend?

6    A.    Yes.

7    Q.    Did you have a good working relationship with
8   her?

9    A.    Yes.

10   Q.    Did you have a good working relationship with
11  Linda?

12   A.    Yes.

13   Q.    Barbara Jackson, you mentioned she interviewed
14  you before you came to EDS.

15   A.    Yes.

16   Q.    In your dealings with Barbara Jackson, was she
17  honest?

18   A.    I would believe so.

19   Q.    Was she fair?

20   A.    Yes.

21   Q.    Did you have a good working relationship with
22  her?

23   A.    Yes.

24   Q.    Lance Rogers, who's sitting next to me, did you



1   ever have any dealings with him when you were an EDS

2   employee?

3       A.   Yes, I did.

4       Q.   In your dealings with Lance, was he honest?

5       A.   Yes.

6       Q.   Was he fair?

7       A.   Yes.

8       Q.   Did you have a good working relationship with

9   him?

10      A.   Yes.

11      Q.   Is there anyone at EDS with whom you did not have

12  a good working relationship?

13      A.   No.

14      Q.   Did you have discussion with either Tracy Eddy or

15  Linda Jackson concerning tardiness?  Do you remember

16  that?

17      A.   Yes.

18      Q.   Who do you remember having that discussion with?

19  Was it Tracy or Linda or can't you remember?

20      A.   I believe both of them mentioned it to me, said

21  something about when I was late like 20 minutes, said I

22  couldn't be late.

23      Q.   So you had had some tardiness and they warned you

24  about the need to improve that?



Hestal Lipscomb

32

1    A.    Yes.

2              (Lipscomb Deposition Exhibit No. B, EDS

3    Delaware Healthcare Services Account Handbook

4    Acknowledgment Form, was marked for identification.)

5    BY MR. PIATAK:

6      Q.    Hestal, I handed you what's been marked Exhibit

7    B.   It's an EDS Delaware Healthcare Services Account

8    Handbook Acknowledgment Form.   Is that your handwriting?

9      A.    Yes, it is.

10     Q.    And you certified that you had received a copy of

11   the EDS Delaware Healthcare Services Account Handbook and

12   that you had read it and understood it?

13     A.    Yes.

14             (Lipscomb Deposition Exhibit No. C,

15   Attendance Guidelines, was marked for identification.)

16   BY MR. PIATAK:

17     Q.    Hestal, I have handed you what's been marked as

18   Exhibit C.   This is from the EDS Delaware Healthcare

19   Services Account Handbook.   If you could turn to the

20   section on Page 2 on absences, and you will see the first

21   sentence, "If an employee is absent for three or more

22   days consecutively due to medical reason, they may be

23   required to provide healthcare provider certification to

24   their manager upon returning to the workplace."   Do you

1    see that?

2    A.    Yes.

3    Q.    And you were familiar with that policy?

4    A.    Yes.

5    Q.    And it states further, "Healthcare provider's

6    certification may be required to validate any other

7    illness or time away from work due to medical reason if

8    deemed appropriate by EDS/USGS leadership."  Do you see

9    that?

10    A.    Yes.

11    Q.    And you were familiar with that policy?

12    A.    Yes.

13    Q.    It says, "Excessive absenteeism may result in

14    disciplinary action up to and including separation from

15    EDS."  Do you see that?

16    A.    Yes.

17    Q.    And you were familiar with that as well?

18    A.    Yes.

19    Q.    And on the previous page there is a note, "The

20    requirements of these guidelines exclude any qualifying

21    Family Medical Leave Act, FMLA, absences or other

22    protected leave."  Do you see that?

23    A.    Yes.

24    Q.    And you knew that absences covered by the FMLA



Hestal Lipscomb

34

1    were considered excused absences?

2    A.    Yes.

3    Q.    And that unexcused absences could lead to

4    discipline?

5    A.    Yes.

6    Q.    Including termination?

7    A.    Could you repeat that, please?  I'm sorry.

8    Q.    Sure.  As I said, if I ask you questions you

9    don't understand or I mumble something, let me know.

10            And you knew that unexcused absences could

11   lead to discipline, including termination?

12   A.    Yes.

13   Q.    And you took some time off of work in August of

14   2003.  Do you remember that?

15   A.    Vacation?

16   Q.    No, not vacation.  I think it was health related.

17   Do you remember being off work for a time in August,

18   2003?

19   A.    No.

20            MR. PIATAK:  That's fine.

21            (Lipscomb Deposition Exhibit No. D, Letter

22   from Metlife Synchrony dated August 7, 2003, was marked

23   for identification.)

24   BY MR. PIATAK:



Hestal Lipscomb

37

1    A.    Yes, I did.

2    Q.    Who did you let know?

3    A.    Tracy Eddy.

4    Q.    And what did you tell Tracy in 2003?

5    A.    That I had to go out for a surgical procedure.

6    Q.    Did you tell her anything else?

7    A.    No.  I told her the day that the surgery would be

8    on.

9    Q.    So you told her you had to go out for a surgical

10   procedure and the date of the surgery?

11   A.    Yes.

12   Q.    And you didn't tell her anything else about that?

13   A.    No.

14   Q.    And then what happened once you told Tracy that

15   you were going to be out for a surgical procedure and you

16   gave her the date?

17   A.    She said she would take care of the FMLA papers

18   and she picked up the phone and made a phone call.

19   Q.    And what did you understand her to mean when she

20   told you she would take care of the FMLA papers?

21   A.    That she would take care of it.

22   Q.    And you knew that your leave potentially was

23   covered by the family medical Leave Act, the FMLA?

24   A.    Yes.



Hestal Lipscomb

38

1    Q.    And you knew if your leave was covered by the

2    FMLA, it was counted as an excused absence under EDS's

3    policy?

4    A.    Yes.

5    Q.    And if it was not covered, it might be counted as

6    an unexcused absence?

7    A.    Yes.

8    Q.    And so do you remember talking to Tracy and her

9    saying she would take care of the FMLA paperwork?  Did

10   you have your doctors submit any medical information in

11   connection with the time you were off in 2003?

12   A.    To whom?

13   Q.    To anybody, to EDS or to MetLife Synchrony?

14   A.    I went out.  I had the surgery.  I was out two

15   weeks.  And I went back for my checkup and they released

16   me back to work.  I didn't have any paperwork or anything

17   that I had to submit to anyone or anything like that.

18   Q.    And do you remember receiving a letter, this

19   letter from MetLife Synchrony?

20   A.    No, I don't.

21   Q.    There is a paragraph on there that's in bold

22   language, bold print.  Do you see that?

23   A.    Yes.

24   Q.    "If your absence extends beyond August 18, 2003,



39

1    you must provide clinical documentation of the medical

2    reasons for your continued absence and how they will

3    impact ability to return to work.  Although we will

4    attempt to contact you and your physician, it is your

5    responsibility to ensure Synchrony is provided the

6    additional information which may include office notes,

7    laboratory data and other pertinent tests needed to

8    evaluate your condition and your functionality."

9              This letter is indicating that you might

10   have to provide medical information directly to

11   Synchrony; is that correct?

12       A.    That's what you are reading.

13       Q.    Had you received such a letter, how would you

14   respond?

15       A.    I would have submitted it to my doctor so it

16   could be filled out and sent to the proper destination.

17       Q.    And why would you do that?

18       A.    Because it was sent to me.

19       Q.    And because they were asking you to get them the

20   medical documentation?

21       A.    If that's what it stated.

22       Q.    And if someone acting on your employer's behalf

23   is asking you to provide medical documentation, you

24   understand that it's your job to get that medical



Hestal Lipscomb

40

1  documentation to them?

2      A.    Yes.

3      Q.    And as a responsible employee, you would take

4  care to do that, right?

5      A.    If they requested it.

6      Q.    You were also away from work at EDS for a time in

7  late April, early May of 2004, correct?

8      A.    Say that again, please.

9      Q.    Sure.  You were also away from work for a time in

10  late April and early May of 2004, correct?

11     A.    Yes, I was.

12     Q.    And why did you take time off work then?

13     A.    I had a medical procedure that needed to be taken

14  care of.

15     Q.    And before you went out, did you tell anyone that

16  you would be missing from work?

17     A.    Yes, I did.

18     Q.    And who did you tell?

19     A.    I spoke with Tracy Eddy.

20     Q.    And what did you tell Tracy?

21     A.    That I would have to go out to have a surgical

22  procedure done.  She then, in turn, requested that I get

23  some type of document from the doctor stating which day I

24  was going out to have the procedure done.  She also



Hestal Lipscomb

41

1    wanted it to state how long I was going to be out, but

2    that couldn't be done until after the procedure was done.

3        Q.    So you told Tracy that you were going to be going

4    out on a surgical procedure?

5        A.    Yes.

6        Q.    Anything else you told her about that?

7        A.    No.

8        Q.    And she asked you for some documentation about

9    how long you were going to be out?

10       A.    Yes.

11       Q.    What else happened?

12       A.    Nothing.  I called the doctor and asked him could

13   they fax me a letter stating which day I was going to

14   have surgery and how long was I going to be out.  They

15   said they were unable to put that part on there because

16   they would not know until after I had the procedure done.

17   They could only state what day the procedure was to be

18   done.

19       Q.    And which doctor did you ask to fax this?

20       A.    The doctor at Wilmington Hospital Surgical

21   Clinic.

22       Q.    Do you remember the doctor's name?

23       A.    I think it's Dr. Kratz.

24       Q.    Dr. Kraut?



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

51

1    time?

2        A.    Yes, it is.

3        Q.    And this letter also states, "If, for any reason,

4    your short-term disability or Workers' Compensation claim

5    is not approved, we will provide you with the

6    Certification of Healthcare Provider Statement to be

7    completed by you and the attending healthcare provider to

8    certify your leave under FMLA."  Do you see that

9    language?

10       A.    Yes, I do.

11       Q.    "And a final determination will be based on the

12   medical information outlined by the attending healthcare

13   provider."  Do you see that?

14       A.    Yes.

15       Q.    And as we discussed earlier, if received a

16   request for medical information, as a responsible

17   employee, you would take care to see to it that it was

18   fulfilled?

19       A.    Yes.

20            (Lipscomb Deposition Exhibit No. H, Letter

21   from Cigna Group Insurance dated May 4, 2004, was marked

22   for identification.)

23   BY MR. PIATAK:

24       Q.    Hestal, I've handed you what has been marked as



Hestal Lipscomb

54

1    that language?

2        A.    Yes, I do.

3        Q.    Again, as we've discussed, you understood that if

4    you were requested to provide medical information, it was

5    your responsibility to provide it, correct?

6        A.    If it was requested of me, I did try to supply it

7    to Cigna.

8        Q.    And you knew that was your responsibility to do

9    that?

10       A.    When I found out it was my responsibility, that's

11   when I took the go ahead and called and tried to have it

12   faxed over to Cigna when Barbara Jackson came to me and

13   said that they didn't receive it.

14       Q.    And you don't remember what, if any, action you

15   took with respect to this letter; is that correct?

16       A.    No, I don't.

17                (Lipscomb Deposition Exhibit No. I, Fax from

18   Cigna Group Insurance dated May 7, 2004, was marked for

19   identification.)

20   BY MR. PIATAK:

21       Q.    Hestal, I've handed you what's been marked as

22   Exhibit I.  Are you familiar with this document?

23       A.    Yes.

24       Q.    And when was the first time that you saw it?



Hestal Lipscomb

55

1    A.    When I went and obtained papers from my hospital,

2    I seen it was one of the papers that was faxed or faxed

3    to Cigna.

4    Q.    Do you know who Dr. Emily Penman is?

5    A.    No, I don't.

6    Q.    Do you know who Charlene Crowder is?

7    A.    No, I don't.

8    Q.    Did you have any discussions with Charlene

9    Crowder?

10    A.    No.

11    Q.    Do you know whether Dr. Penman ever completed

12    this form and returned it to Cigna?

13    A.    To the best of my knowledge, it was faxed over.

14    This was what they faxed when I called and asked them to

15    please fax the documentation to Cigna in regards to my

16    surgery.

17    Q.    And that was after you had a discussion with

18    Barbara Jackson?

19    A.    I didn't see the paper until after I was

20    terminated.  I didn't never put my eyes on it filled or

21    blank until after I was terminated.

22    Q.    So you never saw Exhibit I either in this form or

23    a completed form until after you had been terminated by

24    EDS?

Hestal Lipscomb

56

1    A.    Yes.

2    Q.    And at the time you were terminated by EDS, you

3    were not aware that this was ever filled out?

4    A.    I had no knowledge of the paper because I had

5    never seen it.

6    Q.    And you didn't know at that time that this had

7    been filled out?

8    A.    No, I didn't know whether it was filled out or

9    not.

10   Q.    Or sent to anyone at Cigna?

11   A.    No, I didn't know.

12   Q.    And at the time you had been terminated, you

13   weren't aware of any documentation having been sent to

14   Cigna; isn't that correct?

15   A.    I wasn't aware of anything other than the fact

16   that Barbara Jackson said to me that it needed to be

17   done.  And I called them and I did get a verification.

18   One of the nurses did call me and said it had been faxed

19   to Cigna.  And that was the only thing.  And that was

20   told to me over the phone.

21   Q.    But at the time you were terminated, you weren't

22   aware of anything that, whether Cigna had actually

23   received anything, correct?

24   A.    No, I wasn't aware if they received it or not.

**W&F**

Hestal Lipscomb

57

1    Q.    And at the time you were terminated, you are not

2  aware of anyone at EDS who was aware of Cigna having

3  receiving information?

4              MR. CRONIN:   Object to the form.

5    A.    Not to my knowledge.

6              (Lipscomb Deposition Exhibit No. J, Letter

7  from Cigna Group Insurance dated May 20, 2004, was marked

8  for identification.)

9  BY MR. PIATAK:

10   Q.    Hestal, I handed you what's been marked as

11  Exhibit J.   This is a May 20th, 2004, letter from Cigna,

12  correct?

13   A.    Yes, that's what it says.

14   Q.    And it's addressed to the address that you had at

15  the time?

16   A.    Yes.

17   Q.    What action did you take as a result of this

18  letter?

19   A.    I didn't receive this.  This has pages that have

20  to be filled out on it.  If I was to have received this,

21  I would have taken it to the proper destination and had

22  it filled out.  I've never received this paper with

23  anything on it that had to be filled out by me or a

24  doctor.

Hestal Lipscomb

1          MR. CRONIN:   Object to the form.   You can

2    answer.

3      Q.   What action, if any, did you take as a result of

4    this letter?

5          MR. CRONIN:   Object to the form.

6      A.   There wasn't any action taken, to my knowledge.

7    I don't recall receiving this letter.

8      Q.   Okay.   That's fine.   Did you ever speak to anyone

9    at Cigna about your request for short-term disability or

10   FMLA leave in 2004?

11     A.   No.

12     Q.   And do you have facts or evidence showing that at

13   the time this letter was sent on June 2nd, Cigna had

14   received information regarding confirmation of the

15   surgical procedure you underwent, medical information

16   from Dr. Kraut to support your time off work, or your

17   signed authorization to release medical information and

18   proof of loss form?

19         MR. CRONIN:   Object to the form.

20     A.   Could you repeat the beginning of that one?

21     Q.   Oh, sure.

22     A.   You are saying -- I lost part of it.

23     Q.   Of course, that's fine.   Do you have any facts or

24   evidence showing that as of June 2nd, the date of

Hestal Lipscomb                                    71

1    Exhibit K, Cigna had, in fact, received confirmation of

2    the surgical procedure you underwent?

3        A.    I didn't receive anything personal, personally,

4    faxed to me stating that they received it.

5        Q.    Do you have any facts or evidence showing that as

6    of June the 2nd Cigna had received medical information

7    from Dr. Kraut supporting your time off of work?

8        A.    No, not personally.

9        Q.    Okay.  And do you have any facts or evidence

10   showing that as of June the 2nd Cigna had received signed

11   authorization to release medical information and proof of

12   loss form?

13       A.    No.  The only thing that I had with anything in

14   regards to this is when Barbara Jackson spoke to me and

15   said something about them not receiving it and I

16   contacted the hospital.  They in turn faxed -- said that

17   they faxed the information over to Cigna.

18       Q.    Okay.

19       A.    And that was the only thing that I know in

20   regards to anything being faxed to them.

21       Q.    Okay.  And do you remember who you spoke with at

22   the hospital?

23       A.    Oh, it was a nurse in the surgical department.  I

24   don't recall her name.

1   your leave considered for FMLA protection, please submit

2   a Medical Certification within 15 days."  Do you see that

3   language?

4       A.   Yes.

5       Q.   What action did you take as a result of this

6   letter?

7       A.   I didn't take any action as a result of this

8   letter.  I seen this letter after I was terminated.

9   There was no action to be taken then.

10      Q.   Okay.  Do you recall whether you received this

11  letter at the time?

12      A.   Barbara Jackson showed it to me in the office on

13  the day of the termination.  She showed me this letter.

14      Q.   Okay.  Do you recall whether you also received a

15  copy in the mail?

16      A.   I did receive a copy, but it was after I was

17  terminated.

18      Q.   You received a copy from whom after you were

19  terminated?

20      A.   I would believe Cigna.

21      Q.   Do you recall whether you also received a copy of

22  this letter in the mail in the June 2004 time frame?

23      A.   No, sir.

24      Q.   Is it possible that you received one and you just



Hestal Lipscomb

1    don't recall?

2        A.    I don't recall receiving one in June.  I did

3    receive the letter in July, but it was after I was

4    terminated.

5        Q.    Did you return to work after your April 2004

6    surgery?

7        A.    Yes, I did.

8        Q.    When did you return to work?

9        A.    I don't recall.  I believe it was the 14th, 14th,

10    15th, something around there.

11        Q.    Could it have been --

12        A.    Of April.

13        Q.    Of April or May?

14        A.    I mean, I'm sorry, that was April -- wrong year.

15    It was May 17th when I returned.

16        Q.    Of 2004?

17        A.    And '4.

18        Q.    Okay.  Did you speak to anyone at EDS about your

19    absence from work when you returned?

20        A.    No, I didn't.  I spoke -- only thing I had did

21    was give my return to work slip to Tracey Eaddy.

22        Q.    And other than giving that return to work slip to

23    Tracey, you didn't have any conversation with anyone at

24    EDS about your absence?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1      A.   No.

2              MR. PIATAK:   Can we take a break just for a

3   moment.

4              (Recess taken.)

5              (Defendant's Exhibit M was marked for

6   identification.)

7   BY MR. PIATAK:

8      Q.   Hestal, I've handed you what has been marked as

9   Exhibit M.   Is that a copy of the note that you gave to

10  Tracey Eaddy?

11     A.   Yes, it is.

12     Q.   Is there any other document that you gave to

13  anyone at EDS after you returned to work concerning your

14  time off work other than Exhibit M?

15     A.   No.   Nothing was requested.

16     Q.   That's fine.   And you didn't give them anything

17  in addition to Exhibit M?

18     A.   No.

19     Q.   Did you have any discussions with Barbara Jackson

20  about your request for FMLA leave after you returned to

21  work?

22     A.   No.

23     Q.   Did you have any discussions with Barbara Jackson

24  concerning any aspect of your leave after you returned to



1    work?

2        A.    Aspect in which, which sense are you referring?

3        Q.    Anything, did you have any discussions with

4    Barbara Jackson relating at all to your leave request

5    after your return?

6        A.    Only when she came in and told me that they did

7    not receive the medical form.

8        Q.    Okay.

9        A.    That was the only time that I had any

10   conversation in regards to the medical leave.

11       Q.    Okay.  And so after you returned to work Barbara

12   Jackson came to you and told you that Cigna had not

13   received the medical information?

14       A.    Yes.

15       Q.    Do you remember approximately when that was?

16       A.    It was about a month or month and a half after I

17   returned to work.

18       Q.    How many times did Barbara Jackson discuss that

19   with you?

20       A.    Twice.

21       Q.    Let's take the first one.  What happened the

22   first time?

23       A.    I told her I would follow up with the clinic, and

24   I called them and told them that if it wasn't -- that

Hestal Lipscomb                                    77

1   Cigna didn't receive the fax, and she said that it was

2   sent and they were faxing it.

3        Q.   And what had Barbara Jackson told you?

4        A.   Initially, before I made the phone call?

5        Q.   Correct.

6        A.   She said that Cigna never received my papers.

7        Q.   And did Barbara Jackson urge you to get the

8   medical documentation into Cigna?

9        A.   She said that I needed to call to get -- to call

10  the hospital and get them to send the papers to Cigna.

11       Q.   And didn't she tell you that your absences would

12  be considered unexcused if that documentation wasn't

13  received?

14       A.   No, she didn't.

15       Q.   But she did come and urge you to get that

16  documentation into Cigna?

17       A.   Yes, she did.  She said that it needed to be

18  gotten into Cigna, and I told her I would follow up and

19  do it.  I made one phone call and then an additional

20  phone call when she came back and said that they still

21  didn't receive it.

22       Q.   So tell me about the second time.  What did she

23  tell you the second time?

24       A.   She came and said that she got an e-mail, or

1  something to that nature, that they still did not receive

2  the document.

3      Q.   And was there anyone present besides you and

4  Barbara Jackson the first time you discussed this?

5      A.   I don't recall.

6      Q.   Was there anyone present the second time you

7  discussed this with Barbara Jackson besides you and her?

8      A.   No, I don't think no one else.

9      Q.   Okay.  So Barbara Jackson came back and said

10  Cigna still had not received it?

11      A.   Yes.

12      Q.   Did she urge you to get the documentation in?

13      A.   Yes.

14      Q.   Did she offer to give you time off in order to do

15  this?

16      A.   No.

17      Q.   Did she offer to let you use one of the

18  conference rooms in order to do this?

19      A.   Yes, she did say I could use the conference room.

20      Q.   And she would let you use the conference room so

21  you could get the information yourself and fax it to

22  Cigna yourself, correct?

23      A.   She said -- I never used the conference room,

24  though.  I just called the head nurse in the surgery



1   department.  She in turn said that it was faxed and that

2   she -- no problem, she would re-fax it.

3       Q.   Barbara Jackson told you, encouraged you to

4   personally get the information and send it to Cigna, and

5   she offered to let you use a conference room in

6   connection with that, correct?

7       A.   She didn't say for me to personally get the

8   document myself and get it to Cigna.  She said to get it

9   faxed over to Cigna.

10      Q.   Did you have any other meetings or discussions

11  with Barbara Jackson regarding the documentation to

12  Cigna?

13      A.   No, not after that, not until she called me on

14  Tuesday, July 13th, and her and Lance terminated me.

15      Q.   You understood from your meetings with her that

16  she was urging you to get the documentation in with

17  Cigna?

18      A.   Yes, I was aware of that, and I did follow up and

19  call the hospital, as I did twice, so the document could

20  be sent to Cigna and you.

21      Q.   You understood from her visits to you that it was

22  important for you to send the documents to Cigna?

23      A.   I understood the importance of it.  That's why I

24  called the hospital to try and have them -- make sure

1    they send the document to Cigna.

2        Q.   Did anyone from EDS prevent you from submitting

3    that medical documentation to Cigna?

4        A.   Excuse me?

5        Q.   Did anyone from EDS do anything to prevent you

6    from submitting that medical documentation to Cigna?

7        A.   No.

8        Q.   Did anyone from EDS do anything to interfere with

9    your ability to submit that medical documentation to

10   Cigna?

11       A.   No.

12       Q.   And in fact, Miss Jackson offered to let you use

13   a conference room to facilitate your sending that medical

14   information to Cigna, correct?

15       A.   Again, yes, she did.

16       Q.   When were you terminated from EDS?

17       A.   4:30, July 13th, 2004.

18       Q.   Do you know why you were terminated from EDS?

19       A.   They stated that it was due to 14 day I guess no

20   show, no call.

21       Q.   Any other reason you are aware of behind your

22   termination?

23       A.   No.

24       Q.   How did you find out you were being terminated?



1       A.    I was notified by Barb Jackson and Lance Rogers

2  when I was called into the office that afternoon.

3       Q.    And whose office were you called into?

4       A.    Barbara Jackson's.

5       Q.    Was the meeting conducted in a businesslike and

6  professional manner?

7             MR. CRONIN:  Object to the form.  You can

8  answer.

9       A.    We weren't sitting at a table as we are now.  We

10  basically were standing up.  She was standing up.  Lance

11  was standing up, as well as I.  And she said that I was

12  called in to be terminated.

13      Q.    At that meeting did Lance or Barbara yell at you?

14      A.    No.

15      Q.    Did they raise their voices?

16      A.    No.

17      Q.    Did they behave professionally?

18      A.    I would say so.

19      Q.    What was said at the meeting?

20      A.    Barb Jackson made me -- notified me that I was

21  being terminated.  I asked her why, and she said it was

22  due to a 14-day no show or 14-day absent -- absence.

23            And I asked her when was I absent 14 days,

24  because I didn't put the days I was out for the medical

1   leave in the place of these 14 days that she was

2   referring to, because I wasn't aware that, you know, that

3   was the actual reason.

4           So then she explained to me that I was being

5   terminated because Cigna never received the paperwork,

6   so, therefore, there was no proof that I had surgery or

7   anything like that, and the reason for my absenteeness.

8       Q.   Anything else you remember being said at the

9   meeting?

10      A.   I was told that there was other options on,

11  instead of me being terminated.

12      Q.   And who told you that?

13      A.   Lance Rogers.

14      Q.   Anything else you remember being discussed at

15  that meeting?

16      A.   No, not other than -- not other than I asked why,

17  I just asked why wasn't the -- why was termination the

18  option and the others weren't considered, and I wasn't

19  given an answer.

20      Q.   Other than asking why EDS chose termination as

21  opposed to another option, did you make any other

22  comments in response to what Miss Jackson described to

23  you as the reason for your termination?

24      A.   No, I didn't.



Hestal Lipscomb                                    83

1      Q.   Do you remember telling her anything other than

2  basically why, asking why this is happening?

3      A.   I basically just took it well.   There was nothing

4  else I could do about it.   I'm being terminated from a

5  position.   There is no need to get, you know, crazy about

6  it.   You are just terminated and just go ahead and leave.

7            The only -- I left the office and then I did

8  turn back, and I believe I met Lance in the hallway, and

9  I asked him, "Could I get something stating why I was

10  being terminated?"

11           Then I was escorted back to my office, where

12  I packed my things and I left.

13     Q.   So you remember asking Barb Jackson what the 14

14  days absence she was referring to?

15     A.   Yes.

16     Q.   You remember asking why termination was the

17  option that was chosen, and you remember asking Lance on

18  your way out, again, why was termination chosen as the

19  option?

20     A.   No, that's not what I said.

21     Q.   What did you ask Lance?

22     A.   What I said was, on the way back to my cubicle to

23  get my things, I turned around and I met Lance Rogers in

24  the hallway and I asked for something in writing stating

Hestal Lipscomb

84

1  why I was being terminated.

2      Q.    Okay.   Let me go back.   Sorry for misremembering

3  that.   At this meeting you asked what were the absences

4  that Barb Jackson referred to.   You asked why termination

5  was being chosen as the option.   And then on the way out

6  you asked Lance Rogers for something in writing regard

7  the termination?

8      A.    Yes.

9      Q.    And that's all that you remember saying at that

10 meeting in response to what Lance and Barb told you?

11     A.    Yes.

12     Q.    And then after you were told that you were

13 terminated, then what happened?

14     A.    I was escorted back to my cube.   I was given a

15 box, which I turned down and said, "I never brought

16 enough stuff in here that I would need a box for."   And I

17 was leaving.

18          Tracey Eaddy tried to escort me out the back

19 door.   I then in turn asked her, "Could I use the ladies'

20 room?"   Which I would have to go out the front door for

21 that before I go and stand outside to get on the bus to

22 go home.   And she did.   She walked me to the front door.

23 I went to the rest room.   And I left the building.

24     Q.    Any other meetings or discussions with EDS people



1  about your termination, the reason for your termination

2  that day that we haven't discussed?

3      A.   I didn't speak with anybody at all.  I haven't

4  actually spoke to anyone there.

5      Q.   Okay.  So we have discussed all of the

6  conversations you had with EDS personnel about your

7  termination or the reason for your termination?

8      A.   Yes.

9      Q.   Do you remember Lance Rogers asking you in the

10  meeting whether Barb Jackson had met with you and urged

11  you to get to Cigna the medical documentation?

12      A.   Yes, he did ask me, did Barb Jackson -- yes, he

13  did ask me that.

14      Q.   Do you remember confirming to Lance that Barb

15  Jackson had met with you and urged you to get the medical

16  documentation to Cigna?

17      A.   Yes.

18      Q.   Hadn't Barb met with you three times about that?

19      A.   To my recollection, I only remember twice.

20      Q.   If other people remember it was three times, is

21  it possible that that is what happened and you just don't

22  remember the third occasion?

23                MR. CRONIN:  Object to the form.

24      A.   It is a possibility.



1          (Defendant's Exhibit N was marked for

2     identification.)

3     Q.   Hestal, I've handed you what has been marked as

4     Exhibit N.   Is this a document that you were referring to

5     that the nurse told you had been faxed to Cigna?

6     A.   Yes, it is.

7     Q.   Other than this, are you aware of any other

8     document that was faxed to Cigna?

9     A.   No.

10    Q.   I want you to take a look at what previously was

11    marked as Exhibit J in the earlier setting of your

12    deposition.

13    A.   Okay.

14    Q.   Attached to that there is a certification of

15    healthcare provider.   I want you to let me know whether

16    what we have now marked as Exhibit N is the same as or

17    different from the Certification of Healthcare Provider.

18    A.   They are two different forms.

19    Q.   Okay.   Hestal, do you have any facts or evidence

20    showing that you or anyone acting on your behalf ever

21    sent a completed Certification of Healthcare Provider to

22    Cigna?

23          MR. CRONIN:   Object to the form.

24    A.   The only forms that I know about are the ones



Hestal Lipscomb                                                87

1    that I actually went to the hospital, after I was

2    terminated, and went in my record to find out whether or

3    not -- and this is the form that was faxed, with a fax

4    cover sheet, stating it was faxed to Cigna.

5         Q.   And that form is Exhibit M?

6         A.   Yes, Exhibit M.

7         Q.   You will see that Exhibit M says in bold print,

8    "Please send copies of all current test results and

9    office notes from April 2004 through the present."  Do

10   you see that language?

11        A.   Yes.

12        Q.   Do you have any facts or evidence showing that

13   you or anyone acting on your behalf had sent to Cigna

14   copies of all current test results and office notes from

15   April 2004 through the present?

16        A.   I only know what I was told by the hospital that

17   was sent.

18        Q.   Okay.  And what you were told by the hospital was

19   sent was what has been marked as Exhibit N?

20        A.   Yes.

21        Q.   And that's a one-page document?

22        A.   Yes.

23             (Defendant's Exhibit O was marked for

24   identification.)



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    Yes.

2      Q.    Then the other page is a fax transmission sheet

3   stating at the top "Message Confirmation"?

4      A.    Yes.

5      Q.    Do you know what the document was, the one-page

6   document that accompanied this fax cover sheet marked as

7   Exhibit P?

8      A.    It would be -- it would have been the, what is

9   your Exhibit N.

10     Q.    Okay.  And Exhibit N was not the Certification of

11  Healthcare Provider statement, correct?

12     A.    Excuse me?

13           MR. CRONIN:    Object.

14     Q.    Exhibit N is not the same document as the

15  Certification of Healthcare Provider statement, correct?

16           MR. CRONIN:    Object to the form.

17     A.    Is that what you showed me in the other book?

18     Q.    Yes.

19     A.    No, it is not the same as that.

20     Q.    And the message confirmation sheet refers, says

21  "Mary Beth's office" on it.  Do you know what that refers

22  to?

23     A.    No, I don't.

24     Q.    At any point did you directly, yourself, send any

1       A.    Once.

2       Q.    And you also took time off work for surgery in

3    2004 at EDS?

4       A.    Yes.

5       Q.    Was there anyone there who made any disparaging

6    comments about your taking time off for surgery on either

7    occasion?

8       A.    No.

9       Q.    Is there anyone at EDS who ever made any

10   disparaging comments about your health?

11      A.    No.

12      Q.    Are you aware that other EDS employees also took

13   time off for medical reasons while you worked there?

14      A.    I have -- I believe there were people that took

15   off for whatever, various reasons.  I wasn't really into

16   everyone's business, so I don't know who was out, for

17   what reason they were out.

18      Q.    Are you aware of any employee at EDS being

19   terminated as a result of taking time off for medical

20   reasons?

21      A.    No, I'm not aware of anyone.

22      Q.    And you indicated Barb Jackson came to you twice

23   and urged you to get medical documentation into Cigna,

24   correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

Hestal Lipscomb

1    Q.   Right.

2    A.   Do you mean after I was terminated or before I

3    was terminated?

4    Q.   At any time?

5    A.   Any time?

6    Q.   At any point in time did you contact the post

7    office concerning problems receiving mail --

8    A.   No, I didn't.

9    Q.   Just for the record, let me finish my question

10   before you answer.  Did you contact the post office

11   concerning problems receiving mail at any time at the

12   3111 West 2nd Street address?

13   A.   No, I didn't.

14   Q.   Did you contact anyone else at any time

15   concerning problems receiving mail at the 3111 West 2nd

16   Street address?

17   A.   No, I didn't.

18   Q.   Before you went out in 2003 did you participate

19   in a telephone call with Tracey Eaddy setting up an

20   account with the vendor to cover your leave?

21   A.   In 2003?

22   Q.   Yes.

23   A.   Tracey set up the, whatever she did, the thing so

24   that I could go out and have the surgery then.

Hestal Lipscomb                                    100

1     Q.   Okay.   And Tracey was helpful in doing that?

2     A.   Yes.

3     Q.   Do you remember if you participated in that

4  telephone conversation?

5     A.   No, I don't.

6     Q.   Is it possible that you did and you just don't

7  remember?

8     A.   That's possible.   I don't remember making any

9  phone calls in regards to it.

10    Q.   Okay.   In 2004 when you went out, Tracey also set

11 up an account for your leave; is that correct?

12    A.   Yes.

13    Q.   Did you participate in a conference call or a

14 phone call to the vendor on that occasion?

15    A.   No.

16    Q.   Was Tracey helpful in that regard as well?

17    A.   Yes.

18    Q.   Generally speaking, did you find your

19 co-employees at EDS helpful in facilitating your seeking

20 medical treatment?

21         MR. CRONIN:   Object to the form.

22    A.   Yes.

23    Q.   Hestal, after leaving EDS did you continue to

24 participate in the normal activities of daily life?

Exhibit B



| | | | |
|---|---|---|---|
| Empl Status | TERM | - Term | 07-14-2004 |
| CAS Pyrl Ee Sts | T | - Terminated | 07-13-2004 |
| CAS Hr/Sal Cd | P | - Salary | 04-01-2004 |
| Hire Date | HIREDT | - Hire Date | 07-29-2002 |
| CAS LOA Reason | 999 | - None | 05-15-2004 |
| CAS Term Reason | 102 | - Unauthorized or | 07-13-2004 |
| CAS Employ Type | 4 | - All Benefits | 07-29-2002 |
| CAS Job Code | 070980 | - SPECIALIZED SUP | 07-29-2002 |
| CAS Pay Group | 029 | - Semimonthly Sal | 07-29-2002 |
| CAS Benefits Pd | 999 | - None | 07-29-2002 |
| CASTransitioner | N | - NotTransitioner | 01-01-1900 |
| CAS US Citizen | 1 | - U.S. Citizen | 07-09-2002 |
| CAS Inpat Ind | N | - Not Inpat | 07-29-2002 |
| Control Group | USCASO | - US EDS | 07-29-2002 |

Statuses – LIPSCOMB, HESTAL

07-27-2005    Inquiry

Show History

EDS I 00025