Exhibit C

Lance Rogers

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                    )
                                   )
          Plaintiff,               )
                                   )
v .                                )    Civil Action No.
                                   )      05-477 SLR
ELECTRONIC DATA SYSTEMS            )
CORPORATION, a Delaware            )
Corporation,                       )
                                   )
          Defendant.               )

          Deposition of LANCE ROGERS taken pursuant to
notice at the offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 3:05 p.m. on Wednesday, April 12, 2006,
before Robert Wayne Wilcox, Jr., Court Reporter and
Notary Public.

APPEARANCES:

          LAURENCE V. CRONIN, ESQ.
          SMITH, KATZENSTEIN & FURLOW LLP
            800 Delaware Avenue - 7th Floor
            Wilmington, Delaware  19801
            for the Plaintiff,

          THOMAS J. PIATAK, ESQ.
          BAKER HOSTETLER
            3200 National City Center
            1900 East 9th Street
            Cleveland, Ohio  44114
            for the Defendant.


                    CORBETT & WILCOX
             Registered Professional Reporters
          1400 French Street     Wilmington, DE 19801
                    (302) 571-0510
                  www.corbettreporting.com

Lance Rogers

Page 7

1          A.   In July of 2002?  Approximately 80 to 85.

2          Q.   Okay.  Was there a single individual who was

3     in charge of the entire facility?

4          A.   In July of 2002 --

5          Q.   Yes.

6          A.   -- that was Robin Connor.

7          Q.   What was her position?

8          A.   She was the client delivery executive.

9          Q.   Okay.  Who were your direct reports in July of

10    2002?

11         A.   Jose Tieso, Karen Jennings, who was at the

12    time Karen Kilby, Sandra Foulk, Bridget Wilson, Jamie

13    Laporte, Iris Borders and Michael Moore.

14               How many am I up to?

15         Q.   Seven.

16         A.   I would have to check the records on the rest

17    of the names.  I don't recall each of them.

18         Q.   Okay.  That was in July 2002?

19         A.   Correct.

20         Q.   Okay.  What about July of 2004?  Who were your

21    direct reports?

22         A.   It would be Kay Wasno, Barbara Jackson, Jose

23    Tieso, Gina Perez.  There's one more.  I cannot remember

24    their name.

Lance Rogers

Page 8

1      Q.    Okay.  Now, in July of 2004, in what

2    situations were you involved in personnel matters

3    involving the people who ultimately reported to you?

4      A.    Personnel matters related to Hestal Lipscomb

5    and Barbara Jackson.  I was involved in a personnel

6    matter related to Roberta McWilliams with Kay Wasno.  And

7    potentially -- I don't recall the rest.

8      Q.    Okay.  They were both in July of 2004.

9    Correct?

10      A.    They were over periods of time leading up to

11    July of '04, yes.

12      Q.    Okay.  Did you make the decision to terminate

13    any employees other than Roberta McWilliams and Hestal

14    Lipscomb?

15      A.    Not that I recall during that time frame.

16      Q.    All right.  What time frame are you using

17    here?

18      A.    July of '04.

19      Q.    What about during the entire time that you

20    held that particular position?

21      A.    Throughout my various leadership positions

22    with EDS, I have separated probably anywhere from five to

23    ten different people or have been involved in those

24    personnel matters.

Lance Rogers

Page 48

1    decision that you were going to terminate her on

2    July 9th, 2004.  Correct?

3        A.    Correct.

4        Q.    All right.  You informed Ms. Lipscomb that she

5    was being terminated four days later.  Correct?

6        A.    Correct.

7        Q.    How long had Ms. McWilliams worked for you?

8        A.    Fourteen, fifteen years.

9        Q.    She had cancer.  Didn't she?

10       A.    I'm not aware.

11       Q.    Do you know how old she was?

12       A.    I do not.

13       Q.    Okay.  Do you remember ever discussing her age

14   in any of your discussions regarding her employment while

15   at the same time you were having ongoing discussions

16   about Ms. Lipscomb?

17       A.    No.

18                MR. CRONIN:  Okay.  All right.  I have

19   no further questions.

20                MR. PIATAK:  Okay.  I just have one or

21   two.

22   BY MR. PIATAK:

23       Q.    Lance, if you could turn back to the e-mail on

24   July 13th.

CORBETT & WILCOX

Lance Rogers

Page 49

1       A.    Okay.

2       Q.    If you could read the sentence beginning in

3    the second paragraph "Barb confirmed..."  Could you read

4    that out loud, please?

5       A.    "Barb confirmed with Hestal that Barb had

6    requested that Hestal follow up and get the documentation

7    on three different occasions."

8       Q.    Read the next sentence.

9       A.    "Hestal confirmed that for three days in a row

10   Barb had requested and provided advice on how to get the

11   documentation turned in and that she had been

12   unsuccessful in securing the information."

13      Q.    Is that consistent with your recollection of

14   what Hestal told you?

15      A.    That is correct.

16               MR. PIATAK:  Nothing further.

17               MR. CRONIN:  I have nothing further.

18               We don't waive.

19               (The deposition concluded at 4:15 p.m.

20   this same day.)

21               - - - - -

22

23

24

CORBETT & WILCOX

Exhibit D

Barbara Jackson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )      Civil Action No.
                                    )         05-477 SLR
ELECTRONIC DATA SYSTEMS             )
CORPORATION, a Delaware             )
Corporation,                        )
                                    )
        Defendant.                  )

        Deposition of BARBARA JACKSON taken pursuant to
notice at the offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 9:20 a.m. on Wednesday, April 12, 2006,
before Robert Wayne Wilcox, Jr., Court Reporter and
Notary Public.

APPEARANCES:

        LAURENCE V. CRONIN, ESQ.
        SMITH, KATZENSTEIN & FURLOW LLP
          800 Delaware Avenue - 7th Floor
          Wilmington, Delaware  19801
          for the Plaintiff,

        THOMAS J. PIATAK, ESQ.
        BAKER HOSTETLER
          3200 National City Center
          1900 East 9th Street
          Cleveland, Ohio  44114
          for the Defendant.




                CORBETT & WILCOX
          Registered Professional Reporters
    1400 French Street    Wilmington, DE 19801
                (302) 571-0510
              www.corbettreporting.com

CORBETT & WILCOX

Barbara Jackson

Page 12

1    BY MR. CRONIN:

2         Q.   Did you understand the question?

3         A.   No.

4         Q.   Okay.  Let's break it down and make it easier

5    for you.  In reviewing the transcript, did it appear that

6    there were any errors in transcription made by the person

7    who typed the transcript?

8                   MR. PIATAK:  Objection.  You may answer.

9         A.   I need to review them again.

10        Q.   Please do.

11                  As I said, your testimony appears to be

12   contained on pages 7 through 23, but if you would like to

13   take the time and read the whole transcript, please be my

14   guest.

15        A.   (The witness complied with counsel's request.)

16        Q.   Okay.  Ms. Jackson, you had an opportunity to

17   read through the transcript?

18        A.   Yes.

19        Q.   At least the portion of the transcript

20   relating to your testimony.

21        A.   Yes.

22        Q.   Now, is there any portion of your testimony

23   that you think is either incorrect or incomplete?

24                  MR. PIATAK:  Objection.  You may answer.

Barbara Jackson

Page 13

1    BY MR. CRONIN:

2           Q.    Do you understand the question?

3           A.    Yes.

4                       MR. PIATAK:  Objection.  Go ahead.  You

5    may answer.

6    BY MR. CRONIN:

7           Q.    Go ahead.

8           A.    On page 9.

9           Q.    Yes.

10          A.    On page 9 in the first response where it says

11   I terminated her position.

12          Q.    Yes.

13          A.    That should say we terminated her position.

14          Q.    Okay.  By "we," who would you be referring to?

15          A.    That would be myself in discussion with my

16   account manager, Lance Rogers.

17          Q.    Okay.  Anything else?

18          A.    On page 19 --

19          Q.    Okay.

20          A.    -- in the first response where it says I had a

21   conversation with our human relations department.  That

22   would be with our human resources.

23                       (Ms. Lipscomb entered the conference

24   room.)

CORBETT & WILCOX

Barbara Jackson

Page 15

1    Q.    What did you do for them?

2    A.    I was their marketing manager.

3    Q.    What positions have you had with EDS?

4    A.    Supervisor, claims supervisor, claims manager

5    and deputy account manager.

6    Q.    Okay.  You started as a claims supervisor?

7    A.    Yes.

8    Q.    That would have been what?  Around 2000?

9    A.    Yes.

10   Q.    What did that job entail?  What did you do?

11   A.    I managed a group of people that were

12   responsible for claim adjudication, as well as the mail.

13   Q.    How many people did you manage in that

14   position?

15   A.    Approximately 12.

16   Q.    Okay.  Then you got a promotion to claims

17   manager?

18   A.    Yes.

19   Q.    When did that occur?

20   A.    In June of 2003.

21   Q.    Okay.  How did your position change?

22   A.    My responsibilities broadened, and I had other

23   teams that reported to me as well.

24   Q.    So how many people did you supervise as claims

Barbara Jackson

Page 16

1    manager?

2         A.   Approximately 30.

3         Q.   Okay.  Then you got a promotion to deputy

4    account manager?

5         A.   Yes.

6         Q.   When was that?

7         A.   I'm going to say June or July of '05.

8         Q.   Okay.  So it would have been after

9    Ms. Lipscomb was terminated?

10        A.   Yes.

11        Q.   Okay.  So you were claims manager at the time

12   she was terminated.  Is that correct?

13        A.   Yes.

14        Q.   All right.  You said you supervised about 30

15   people?

16        A.   Yes.

17        Q.   All right.  Who were your direct reports?

18        A.   I had two supervisors.

19        Q.   Who were they?

20        A.   Tracey Eaddy, Kristen Goulet.

21        Q.   Okay.  They were your only direct reports?

22        A.   Well, then there were another line of team

23   leaders.

24        Q.   How many were there?

Barbara Jackson

Page 17

1       A.    Four.

2       Q.    Who were they?

3       A.    Linda Jackson, Judy Ackerman, Liz Counselor,

4   and Denise Ouly.

5       Q.    Okay.  So Linda Jackson was also one of your

6   direct reports?

7       A.    Yes.

8       Q.    Now, did you have any contact with Hestal

9   Lipscomb while she was employed there?

10      A.    Yes.

11      Q.    Okay.  Was it daily?  Once a week?  Once a

12  month?

13      A.    I don't think it was on any regular basis.

14      Q.    Okay.  What would be the context in which you

15  would have contact with Ms. Lipscomb?

16      A.    Seeing her deliver the mail on occasion,

17  having an occasion to go into the mailroom myself to

18  either take a look at some reports, deliver something to

19  be going out.

20      Q.    Okay.  Now, during the period she was employed

21  there, was she considered a salary or hourly employee?

22      A.    Salary.

23      Q.    Okay.  It was that way the entire time she was

24  there.  Correct?

CORBETT & WILCOX

Barbara Jackson

Page 23

1      A.   Yes.

2      Q.   Okay.  Now, I'd like you to take a look at

3  where it says Sick Time.  Do you see the Sick Time entry?

4      A.   Which document are we looking at?

5      Q.   We're looking at EDS II 0027.

6      A.   Yes.

7      Q.   All right.  Now, it lists, as I read it, eight

8  days.

9      A.   Yes.

10     Q.   Okay.  Were those the only eight days she was

11  out for sickness during 2003?

12     A.   Yes.  It would that appear that would be

13  correct.

14     Q.   Okay.  So the practice is to list in these

15  three categories the actual days that they're missing for

16  work, for vacation and sick.  And the days that they're

17  late, those get listed there?

18     A.   Yes.

19     Q.   What's the purpose of the miscellaneous entry.

20  I assume MISC means miscellaneous.  Is that a fair

21  assumption?

22     A.   Yes.  These would be other -- would be either

23  requests to leave early or reported for work late.  Any

24  kind of conversation that the supervisor or the team

CORBETT & WILCOX

Barbara Jackson

Page 29

1    myself at the time of the annual review.

2        Q.    Okay.  So do you recall the annual review for

3    2003 with Ms. Lipscomb?

4        A.    I know that there was a review, yes.

5        Q.    Do you recall what occurred during that

6    review?

7        A.    Not specifics, no.

8        Q.    Do you know when it took place?

9        A.    I do not.

10       Q.    Okay.  Who was involved in the decision to

11   terminate Ms. Lipscomb?

12       A.    It would be myself, the account manager, Lance

13   Rogers, our human resource folks.

14       Q.    Who are those folks?

15       A.    Christine Cornwell would be our

16   representative.

17       Q.    Anybody else from HR?

18       A.    Yes.  I believe it was a Donna Yeardsley.  And

19   she's from employee relations.

20       Q.    Okay.  How is that different from HR?

21       A.    I really don't know that I can give you a

22   distinct difference between the two.

23       Q.    HR and ER?

24       A.    (The witness indicated.)

CORBETT & WILCOX

Barbara Jackson

```
Page 31
 1          Q.   Okay.  What discussions with Tracey Eaddy are
 2     you talking about?
 3          A.   Discussions specifically around the attendance
 4     record for 2004.
 5          Q.   Okay.  How many times did you talk about that?
 6          A.   I don't know specifically.
 7          Q.   When did you have those discussions?
 8          A.   I don't know specific dates.
 9          Q.   What was the substance of those discussions?
10          A.   Review of the 2004 attendance record.
11          Q.   What conclusion did you draw from those
12     discussions?
13          A.   That Ms. Lipscomb was not being very
14     cooperative.
15          Q.   In what way not being cooperative?
16          A.   She was -- had -- did not provide
17     documentation that was requested of her.  I requested
18     that documentation myself.
19          Q.   Okay.  So you're talking about the leave she
20     actually took in 2004?
21          A.   Yes.
22          Q.   She was not being cooperative because you
23     requested documentation from her that she wouldn't give
24     you?
```

Barbara Jackson

Page 32

1      A.    Yes.

2      Q.    Okay.  What documentation did you request from

3   her?

4      A.    I requested that she contact our provider,

5   CIGNA, and supply them with the documentation with

6   regards to her unexcused leave of absence.

7      Q.    Okay.  So you wanted her to send documents to

8   CIGNA?

9      A.    That is correct.

10     Q.    Okay.  You didn't ask her to give documents to

11   you.  Correct?

12     A.    I did not.

13     Q.    All right.  You felt she was uncooperative

14   because she didn't provide documents to CIGNA?

15     A.    Yes.

16     Q.    When did you reach the conclusion that she was

17   not being cooperative because she didn't provide

18   documents to CIGNA?

19     A.    At the conclusion of requesting them on three

20   different occasions and then a follow-up with CIGNA to

21   ultimately find out that she still had not provided them.

22     Q.    Okay.  So the three conversations you're

23   talking about is the last day of June and the first two

24   days of July.  Correct?

CORBETT & WILCOX

Barbara Jackson

Page 33

1       A.   Yes.

2       Q.   All right.  So you had no prior conversations

3    with her before that when you believed that she was being

4    uncooperative.  Is that correct?

5       A.   I don't understand the question.

6       Q.   Well, you said through the conversations with

7    Tracey Eaddy that it became clear to you that

8    Ms. Lipscomb was not being cooperative in terms of

9    getting the documentation to CIGNA.  Correct?

10       A.   Yes.

11       Q.   And that factored in your decision to

12    terminate her.

13       A.   Yes.

14       Q.   Is that correct?

15       A.   That is correct.

16       Q.   All right.  I'm trying to get a sense as to

17    when you reached the conclusion that she was not being

18    cooperative.  You mentioned there were three

19    conversations with her on June 30th, July 1 and July 2.

20    Correct?

21       A.   Yes.

22       Q.   Okay.  Was there any indication that she was

23    not being cooperative prior to June 30th, 2004?

24       A.   I'm not clear on the definition of not being

CORBETT & WILCOX

Barbara Jackson

Page 37

1        A.    I don't remember the exact date.

2        Q.    Did you ever discuss Ms. Lipscomb's situation

3    with Mr. Rogers other than this time when you presented

4    your recommendation?

5        A.    Yes.

6        Q.    How many times?

7        A.    I believe twice.

8        Q.    When were they?

9        A.    I don't know exact dates.

10       Q.    Okay.  So you recall having three

11   conversations with Mr. Rogers about Ms. Lipscomb.  Is

12   that correct?

13       A.    Yes.

14       Q.    All right.  Would it be fair to say that the

15   last one was around July 12th or July 13th, 2004?

16       A.    I don't know that.

17       Q.    Was it close in time to the date of her

18   termination?

19       A.    Yes.

20       Q.    All right.  Now, the two earlier ones, were

21   they within days or weeks of that conversation?

22       A.    I would say within days.

23       Q.    All right.  Tell me what you can about the

24   three conversations that you had with Mr. Rogers starting

Barbara Jackson

Page 38

1    with the first one.

2        A.    Well, I'm just notifying Mr. Rogers that in

3    fact we had a situation where we had someone out for 14

4    days.  The vendor had indicated that the paperwork had

5    not been provided and that the FMLA and short-term

6    disability had been denied.

7        Q.    Okay.  So you're just putting him on notice of

8    the issue?

9        A.    Yes.

10       Q.    Did you identify Ms. Lipscomb?

11       A.    Yes.

12       Q.    All right.  What did Mr. Rogers say in

13   response?

14       A.    To keep him apprised as to whether or not

15   CIGNA had received the documentation.

16       Q.    Okay.  Now, when you say the "vendor," you're

17   referring to CIGNA.  Correct?

18       A.    That is correct.

19       Q.    All right.  Now tell me about the second

20   conversation.

21       A.    The second conversation was to let him know

22   that now the appeal process had expired.

23       Q.    What appeal process are you talking about?

24       A.    When the claim is denied and Ms. Lipscomb

Barbara Jackson

Page 39

1    received a letter from CIGNA advising her that her claim

2    or her request for FMLA or short-term disability had been

3    denied for lack of providing the necessary medical

4    documentation.  And in that letter -- I believe that it

5    indicates in the letter that they have 15 days to appeal.

6         Q.    Okay.  All right.  Now, between the first time

7    that you spoke with Mr. Rogers and put him on notice that

8    CIGNA had not received documentation and the second

9    conversation when you advised him that the appeal period

10   had run, did you do anything to talk to Ms. Lipscomb?

11        A.    I spoke to Hestal on June the 30th, July the

12   1st and July the 2nd.

13        Q.    Okay.  But those dates were all at the end of

14   the appeal period.  Correct?

15        A.    Yes, they were.

16        Q.    All right.  So this first conversation would

17   have been before that.  Correct?

18        A.    Yes.

19        Q.    All right.  So did you, between the time that

20   you spoke with Mr. Rogers, put him on notice of what was

21   going on with respect to Ms. Lipscomb's failure to

22   provide the records?  Did you do anything before the

23   appeal period had end to contact Ms. Lipscomb?

24        A.    No.

CORBETT & WILCOX

Barbara Jackson

Page 52

1    Ms. Lipscomb's termination?

2        A.    No.

3        Q.    All right.  You mentioned a fourth person was

4    involved that you had communications with leading up to

5    Ms. Lipscomb's termination -- Ms. Yeardsley in ER.  When

6    did you first have contact with her?

7        A.    Around the same time frame that I would have

8    spoken to Christine.

9        Q.    Okay.  What did you do?  Did she call you?

10    Did you call her?  How did you make contact?

11        A.    I called her.

12        Q.    Okay.  Why did you call her?

13        A.    To let her know that we had received

14    notification from the vendor that the documentation had

15    not been provided.

16        Q.    Okay.  Would this have been after the appeal

17    had expired?

18        A.    Yes.

19        Q.    Okay.  So it would have been after the three

20    meetings with Ms. Lipscomb?

21        A.    Yes.

22        Q.    Why did you contact her?

23        A.    I wanted to validate that we were -- that

24    there was -- that the vendor absolutely did not get it,

Barbara Jackson

Page 54

1    would have been made would have been by the EDS vendor,

2    CIGNA, to Ms. Lipscomb's medical providers?

3        A.    Yes.

4        Q.    Did CIGNA have a role with respect to the

5    decision to terminate Ms. Lipscomb's employment?

6        A.    No.

7        Q.    What was CIGNA's role with respect to

8    Ms. Lipscomb's leave in April and May of 2004?

9        A.    Through the vendor that EDS contracts with to

10   handle a request for short-term disability and FMLA.

11       Q.    When did they start in that role?

12       A.    I don't know.

13       Q.    Who was their predecessor?

14       A.    I believe it was a company called Synchrony.

15       Q.    Okay.  That's part of MetLife?  Travelers?

16       A.    I don't know that.

17       Q.    Okay.  Do you provide documents to your

18   employees with respect to their benefits?

19       A.    Yes.

20       Q.    Do you provide -- and I mean you personally --

21   provide to your employees information regarding how they

22   go about seeking various types of leave?

23       A.    Personally, no.

24       Q.    Who does?

CORBETT & WILCOX

Barbara Jackson

Page 57

1        Q.    Yes.

2        A.    When the employee is aware that they need to

3    go out for a procedure or need to utilize FMLA, they

4    usually meet with their team leader first to let them

5    know that they need to have a leave of absence, at which

6    time they then sit with their supervisor who makes a

7    joint call either with them or for them to the vendor at

8    the time to start the paperwork.  And that documentation

9    that's provided to the vendor at that point is very high

10   level -- name, Social Security number, employee's job

11   code and the period of time at which the employee

12   believes they're going to be out.  At that time the

13   vendor then has all further communication with the

14   employee and with the employee's physician.

15       Q.    Okay.  So the employees are not given any

16   documents with respect to how the process proceeds with

17   respect to getting FMLA or short-term disability?

18       A.    Well, they are given -- they do have access to

19   those documentation.  EDS maintains a website called the

20   Info Center.  And by virtually just typing in FMLA or

21   short-term in there takes them right to a website that

22   tells them what the procedures are -- to follow that.

23       Q.    Okay.  Is there any written document anywhere

24   contained at the facility that employees can look at to

Barbara Jackson

Page 58

1    have an understanding of the process for applying for STD

2    or FMLA?

3        A.    The employee handbook that I have here in

4    front of me also takes them -- guides them to a website

5    at which they can go ahead and pull down the

6    documentation.

7                        MR. CRONIN:   Okay.  Mark this, please.

8                        (EDS Deposition Exhibit No. 5 was marked

9    for identification.)

10    BY MR. CRONIN:

11        Q.    Ms. Jackson, you've had handed to you what's

12    been marked as EDS No. 5.  Do you recognize this

13    document?

14        A.    Yes.

15        Q.    Okay.  What is it?

16        A.    It is the 2004 benefits handbook.

17        Q.    Okay.  Where can an employee at the Newark

18    facility find a copy of this document to review?

19        A.    Well, they can find it one or two places.

20    They can either go out on-line to get it or at the time

21    they become an EDS employee -- I believe I received mine

22    in the mail.

23        Q.    Okay.  But you don't know whether employees

24    get theirs in the mail or not -- other employees?  Is

CORBETT & WILCOX

Barbara Jackson

Page 62

1      Q.    Mm-hmm.

2      A.    -- it indicates that if an employee is absent

3   for three or more days consecutively due to a medical

4   reason they may be required to provide a health care

5   provider certification to their manager upon return to

6   the workplace.

7               And then it says:  Further, a health

8   care provider certification may be required to validate

9   any other illness or time away from the work due to

10  medical reason if deemed appropriate by EDS leadership.

11     Q.    Okay.  But you're talking about things that

12  would be submitted to the workplace.  Correct?

13     A.    Correct.

14     Q.    All right.  Nothing gets submitted to the

15  vendor for purposes of determining whether it's FMLA

16  leave until somebody has been out at least five days?

17     A.    Yes.

18     Q.    Okay.  How long has this document been in

19  effect, EDS No. 4, this account handbook?

20     A.    I don't know.

21     Q.    Okay.  Do you ever recall discussing with

22  anyone at either EDS or CIGNA the significance of this

23  document in connection with the decision to terminate her

24  employment?

Barbara Jackson

Page 63

1        A.    No.

2        Q.    Okay.  Now, we've talked a little bit about

3    this policy that's contained in pages 16 and 17.  Was

4    this the policy that was relied upon to terminate

5    Ms. Lipscomb's employment?

6        A.    Yes.

7        Q.    Okay.  What provision in this policy did EDS

8    rely on to terminate her employment?

9        A.    Under Absences, again, the paragraph that

10   begins:  If any employee is absent for three or more days

11   due to a medical reason, they may be required to provide

12   a health care provider certification to their manager

13   upon return to the workplace.  Further, a health care

14   provider certification may be required to validate any

15   other illness or time away from work due to a medical

16   reason if deemed appropriate by EDS/USGS leadership.

17   Excessive absenteeism may result in disciplinary action

18   up to and including separation from EDS.

19       Q.    Okay.  So in your view she violated the whole

20   provision?

21       A.    Yes.

22       Q.    Okay.  Let's break it down and deal with it

23   sentence by sentence.  Is it your view that she did not

24   provide health care provider certification to her manager

Barbara Jackson

Page 70

1        A.    Sir, can you ask the question again, please?

2        Q.    What I asked for was the documentation that

3   reflected the fact that CIGNA, as EDS's vendor, was

4   asking for medical certification from Ms. Lipscomb

5   separate and apart from any application for either

6   short-term disability or FMLA.

7                I mean, if it will help you, why don't

8   you take a look at EDS II 145?

9        A.    This is CIGNA's letter asking them for -- to

10  review the packet that they had sent her and asking for

11  documentation.

12       Q.    The letter is what it is.

13               I'm just trying to turn you to a letter

14  that came from CIGNA in response to counsel's request in

15  order to save a little bit of time.  I'm trying to find

16  some letter as you've described from CIGNA which

17  indicates that they told Ms. Lipscomb to provide medical

18  certification separate and apart from her applications

19  for FMLA leave or short-term disability.

20       A.    I don't know of one.

21       Q.    Okay.

22       A.    I'm not familiar with that.

23       Q.    All right.  Do you know how employees at the

24  company were advised that CIGNA was also administering

CORBETT & WILCOX

Barbara Jackson

Page 71

1    non-FMLA and non-short-term disability leave for the

2    employees?

3         A.    I know that when they -- when she would have

4    met with her supervisor -- when someone meets with their

5    supervisor to discuss short-term disability or FMLA

6    leave -- at that time when the call is made, they are

7    told who the vendor is.

8         Q.    Right.

9              But I'm asking more specifically when

10   EDS advises its employees that the vendor is not only

11   handling applications for short-term disability and FMLA

12   leave.  They're also handling other requests for medical

13   leave which are not covered by either STD or FMLA.

14        A.    I don't know.

15        Q.    Okay.  Let's turn to EDS II 254 and 254-A.

16        A.    (The witness complied with counsel's request.)

17        Q.    Do you recognize this two-page document?

18        A.    I do.

19        Q.    What is it?

20        A.    These were my notes of the time period leading

21   up to the termination of Ms. Lipscomb.

22        Q.    When did you create this document?

23        A.    The day of her termination.

24        Q.    For what purpose did you create it?

Barbara Jackson

Page 76

1    of the appeal period -- the end of June.  Correct?

2         A.   Yes.

3         Q.   All right.  You had those three conversations

4    with her at the very end of that period.  Correct?

5         A.   Correct.

6         Q.   Is it fair to say that during those three

7    meetings with her you never told her that she was going

8    to be terminated if she did not provide a medical

9    certification?  Correct?

10        A.   Correct.

11        Q.   Okay.  What do you recall of those three

12   conversations?

13        A.   I remember the first one.  Tracey and I met

14   with Ms. Lipscomb to tell her that -- to ask her did she

15   get the paperwork from CIGNA, that CIGNA had not received

16   the paperwork from the doctor and that these would be

17   considered unexcused absenteeism days and that she needed

18   to have her provider get the documentation to CIGNA.

19                   I also asked that she contact the doctor

20   herself to be sure that that happened and also to contact

21   CIGNA so that CIGNA would know that she was working on

22   it.  She said that she would.

23                   I -- the very next morning when I came

24   in, I went looking for Hestal, and I asked her if she had

Barbara Jackson

Page 77

1   made contact with the doctor.  And she said she was

2   unable to reach him.  I think she said she got as far as

3   the nurse.  I suggested to her that she use one of the

4   conference rooms and to pursue that as best she could

5   because the documentation was important to document her

6   14 days of unexcused absence.

7                On 7/2 I followed up with Hestal a third

8   time.  She said that the doctor had communicated to her

9   that it had been faxed.  I suggested that she contact

10  CIGNA and also that she have the documentation faxed to

11  her so that she herself could intercept it and then fax

12  it off to CIGNA and be assured that in fact her

13  caseworker at CIGNA did have the documentation.

14       Q.   Okay.  What did she say?

15       A.   She said she would do that.

16       Q.   Okay.  Do you remember anything else of those

17  three conversations?

18       A.   I do not.

19       Q.   Okay.  Ms. Eaddy was present in only the first

20  one?

21       A.   I believe she was.

22       Q.   Okay.  Now, you've mentioned that during the

23  first two meetings you referred to it as unexcused

24  absentee days.  Did you explain to Ms. Lipscomb what that

CORBETT & WILCOX

Barbara Jackson

Page 78

1    meant?

2        A.    No.

3        Q.    Okay.  Did you explain to her what the

4    consequences were of unexcused absentee days?

5        A.    No.

6        Q.    Okay.  Now, according to EDS II 254-A, you

7    checked with CIGNA the following Monday and they told you

8    that nothing had been received.

9        A.    That is correct.

10       Q.    Who did you speak with?

11       A.    It would have been the person -- whoever

12   signed the letter.  Whoever the caseworker was at the

13   time.

14       Q.    You don't know who it is?

15       A.    I don't remember.

16       Q.    Do you have any notes regarding that

17   conversation?

18       A.    The letter in here from CIGNA should have the

19   person's name on it.

20       Q.    All right.  But leaving that aside for the

21   moment, did you memorialize this conversation?  Did you

22   write any notes regarding this conversation?

23       A.    No other than the two lines that I wrote here.

24       Q.    Okay.  So tell me about that conversation.

Barbara Jackson

Page 79

1       A.    I called to say:  Did you get any

2    documentation from the physician?  Have you heard from

3    the employer herself?  Because I had requested Hestal to

4    do that.  On at least two of the occasions, I spoke

5    with -- she said she had not heard from the employee and

6    had not heard from the doctor nor had she received any

7    documentation.

8       Q.    Okay.  Now, did you then go to Ms. Lipscomb

9    and tell her about your conversation with CIGNA?

10      A.    I did not.

11      Q.    Why not?

12      A.    She had not complied with the three times that

13   I had already met with her to ask her and prompt her and

14   beg her to get that documentation in.  At that point I

15   felt she was being noncompliant.

16      Q.    Right.

17      A.    There was no reason to follow up.

18      Q.    Because that's what CIGNA was telling you.

19   Correct?

20      A.    Excuse me?

21      Q.    You were relying on what CIGNA was telling

22   you.  Correct?

23      A.    That they had not received the documentation.

24      Q.    That's correct.  Correct?

Barbara Jackson

Page 80

1      A.   No.  I was relying on what CIGNA had told me

2   as well as the fact that I had specifically asked

3   Ms. Lipscomb to have the documentation faxed to her at a

4   secure fax number where she could get it and fax it off

5   to CIGNA herself in assurance that in fact the vendor had

6   it.  And she had not done that either.

7      Q.   Okay.  Did you ask her about that -- why she

8   didn't do that?

9      A.   Each time I asked her she said she would do

10  it.

11     Q.   Okay.  But on the day that you talked to

12  CIGNA, you had received word from them that they didn't

13  receive it.  Correct?

14     A.   Correct.

15     Q.   You formed the belief that Ms. Lipscomb had

16  disobeyed your direction.  Is that correct?

17     A.   I don't know that I would use the word

18  "disobeyed" my direction.

19     Q.   Well, you've just described what you

20  specifically told her to do.  To your knowledge, she

21  didn't do it.  Correct?

22     A.   She did not do it.

23     Q.   Right.

24          So why didn't you confront her with

Barbara Jackson

Page 81

1    that?

2        A.    Because I had already confronted her three

3    days in a row specifically asking her to do something.

4    She had done none of that.

5        Q.    But as of the date that you received that

6    confirmation from CIGNA, you don't know what efforts she

7    had made to try and get it to CIGNA.

8        A.    I knew by day three she still had done

9    nothing.  So I had nothing to lead me to believe that she

10   had done something on day five.

11       Q.    But according to what CIGNA was telling you.

12   Correct?

13       A.    Well, according to what Ms. Lipscomb had told

14   me on the third day that I met with her that still no

15   contact had been made.  I had no reason to believe there

16   was any contact made.

17       Q.    Okay.  So you gave her a direct order to call

18   CIGNA?

19       A.    To call CIGNA herself.  That is correct.

20       Q.    You felt because she told you she had not

21   called CIGNA that she had disobeyed your order?

22       A.    Yes.

23       Q.    Okay.  Why didn't you terminate her or

24   discipline her for that?

CORBETT & WILCOX

Barbara Jackson

Page 82

1    A.    I don't have the authority to terminate

2    someone on the spot.

3    Q.    Why didn't you --

4    A.    Nor would I do that.

5    Q.    I don't see anywhere in the paperwork any

6    indication that it was Ms. Lipscomb's failure to follow a

7    direct order of yours that factored into the decision to

8    terminate her.  Is it somewhere in the record that I just

9    don't know about?

10    A.    It's just reflected in my notes of the up

11    to -- leading to the termination.

12    Q.    Okay.  So it would just be what's in 254 and

13    254-A?

14    A.    To the best of my knowledge, yes.

15    Q.    Okay.  All right.  Let's take a look at EDS II

16    0043 to 51.  As of July 5th when you spoke to CIGNA, you

17    had decided that an attendance improvement plan was no

18    longer an option, correct, based on Ms. Lipscomb's lack

19    of cooperation?

20    A.    Not as of July 5th, no.

21    Q.    When did you decide that she had shown a lack

22    of cooperation?

23    A.    I believed that as of July 5th she had shown a

24    lack of cooperation, but no decision had been made at

CORBETT & WILCOX

Barbara Jackson

Page 110

1       Q.    Did Hestal ever tell you that she had in fact

2  contacted CIGNA herself?

3       A.    She did not.

4       Q.    If she didn't, would she had been cooperative

5  with your instructions?

6       A.    No.

7       Q.    These notes also indicated that you told her

8  to use a conference room and an EDS fax so she could have

9  the doctor fax information to her at EDS and so she could

10  intercept the paperwork and fax it to CIGNA herself.  Did

11  Ms. Lipscomb tell you that she had done that?

12       A.    She did not.

13       Q.    If she did not do it, was she cooperative with

14  your instructions?

15       A.    She was not.

16       Q.    Counsel many times asked you to assume that a

17  document had been sent to CIGNA on June 21st.  June 21st

18  is before your three conversations with Ms. Lipscomb, is

19  it not?

20       A.    Yes.

21       Q.    Okay.  If Ms. Lipscomb after June 21st did not

22  fax the information to CIGNA, would she have been

23  cooperative with your instructions?

24                  MR. CRONIN:  Object to the form.  You

Barbara Jackson

Page 111

1    can answer.

2         A.    I'm sorry.  Can you repeat the question?

3         Q.    Sure.

4               Counsel asked you several questions

5    to assume that something had been sent to CIGNA on

6    June 21st.  June 21st precedes your three conversations

7    with Ms. Lipscomb.  Correct?

8         A.    Yes.

9         Q.    On July 2nd you asked Ms. Lipscomb to contact

10   the doctor herself, have the doctor fax the information

11   to her at EDS so that she could intercept the paperwork

12   and fax it to CIGNA herself.  Correct?

13        A.    Yes.

14        Q.    If she didn't send anything after June 21st

15   despite your instructions on July 1st, would she have

16   been cooperative with your instructions?

17               MR. CRONIN:  Object to the form.

18   BY MR. PIATAK:

19        Q.    You can answer.

20        A.    No.

21        Q.    Okay.  If you would turn your attention to

22   EDS II 00103.

23        A.    (The witness complied with counsel's request.)

24        Q.    This is a letter to Ms. Lipscomb from CIGNA.