Exhibit E

# EDS

# Delaware Healthcare Services

# Account Handbook

 ▪ ▪ ▪ The recognized global leader in ensuring clients achieve superior value in the digital economy.

# EDS DELAWARE HEALTHCARE SERVICES ACCOUNT HANDBOOK ACKNOWLEDGEMENT FORM

I hereby acknowledge that I have received a copy of the EDS Delaware Healthcare Services Account Handbook, and have read and understood it.

Printed Name of Employee: _HESTAL LIPSCOMB_

Signature of Employee

Date _12/12/03_

EDS II 00032

# Attendance Guidelines

EDS provides general attendance guidelines. The guidelines may be modified to meet the business requirements for each team.

The Delaware Healthcare Services Account adheres to corporate guidelines as described in the following paragraphs.

## Audience

This guideline applies to all employees working in the EDS/USGS organization.

## Purpose

The purpose of this guideline is to ensure consistency in the administration of attendance for all employees within the EDS/USGS organization. Overall attendance can be a significant factor in continued employment, performance reviews, salary reviews and in evaluating advancement possibilities. Regular attendance is a requirement of each person's job. Remember that attendance at work is vital to your success at EDS/USGS and to the success of our business.

## General Guidelines

Specific work hours are established based on business needs and contractual obligations, as determined by EDS/USGS leadership. Each employee is expected to be at his/her workstation at the designated start time and at the scheduled return time from breaks and lunches. Each employee is expected to comply with his/her assigned schedule as determined by his/her leader in order to meet the requirements of his/her position.

| Note: | The requirements of these guidelines exclude any qualifying Family Medical Leave Act (FMLA) absences or other protected leave. |
|---|---|

Personal activities, including but not limited to telephone calls, should be confined to lunch and breaks, when possible. Employees should make every reasonable effort to schedule personal appointments (e.g., doctor, dentist, etc.) before or after their shift to ensure minimal disruption of the workload.

EDS leadership on a case-by-case basis determines disciplinary action for violation of these guidelines.

## Absences

If any employee is absent for three (3) or more days consecutively due to a medical reason, they may be required to provide a health care provider's certification to their manager upon return to the workplace. Further, a health care provider's certification may be required to validate any other illness or time away from work due to medical reason, if deemed appropriate by EDS/USGS leadership. Excessive absenteeism may result in disciplinary action up to and including separation from EDS.

## Tardiness & Reliability

Tardiness is defined as an employee not being at his/her workstation at the designated start time and at scheduled return times from lunch and breaks. In addition, if an employee leaves early (unexcused), the time away from work may be considered an absence. Excessive tardiness may result in disciplinary action up to and including separation from EDS.

## No call/no show

A no call/no show is defined as an employee who did not report to work as scheduled and did not follow the EDS/USGS established notification procedure. The EDS/USGS notification procedure is discussed with all new and transferred employees to ensure they have appropriate contacts to notify if they are unable to report to work. Failure to follow the account's established notification procedures may result in disciplinary action up to and including separation from EDS

Exhibit F

Hastel Lipscomb 2003                     Start Date 7/29/02

**Vacation:**

1 January 2
2 January 3
3 January 16 - family emergency
4 February 10 - appt.
5 February 28 - funeral
6 March 26 - doctor appointment - PA
7 May 27 - vacation
8 July 31 - day before surgery
9 Sept 12 - vacation.
10 Sept 15 - vacation.
11 October 13 - vacation
12 October 14 - vacation
12 1/2 Nov 14
free      Oct 20 - funeral

**Late:**

January 8th - Electric went out overslept in @ 10-117
January 23 - Overslept in at 10?
January 27 - Late - not feeling well in @ 8:30
February 21 - Called in. @ 6:51 said would be here @ 8:30
February 27 - Late sick in @ 8:30?
March 27 - blood work called at 5:50 in at 9:15
July 9 - Late - Yolanda flat tire in at 8:05

**Sick**

January 29 - went home sick 10:15?
January 30 - called out sick @ 8:05
April 4 - surgery - worked 4 - 10 hour days - FMLA.
April 7 - surgery - called out on Friday
April 8 - surgery called out 9pm Monday
April 9 - surgery - called out on Tuesday
April 10 - surgery - called out on Wednesday
April 11 - surgery - called out on Wednesday

**Misc**

2/3/03 - Talked with Hastal on latenesses. Was told we keep a record of this and did not want to see it continue.
2/11/03 - Talked with Hastal on putting the time on your time card of when you start, not when you get here.
4/4/03 - Had off - worked 4 10hour days.
5/23 - Had off - worked 4 10 hours days.
6/23 - Had off - worked 4 10 hour days
8/1 - went out for surgery, may be back 8/19
October 13 - left at 1:30 - sick - MU
12/8 - funeral day - grandmother
Dec 1 - leave at 10:15 - tooth - MU
Dec 2 - leave at 2:00 - tooth -MU

**Leave Entry**

February 26- left at 3:30 - license
April 21 - leave at 1:30 for follow-up to surgery PA
Dec 5 - leave 1:30 dr.

Dec 10 - leave 1:30 dr
Dec 12 - leave 1:30 dr
Dec 16 - leave 1:30 dr

EDS II 00053

Exhibit G

Hestal Lipscomb 2004

Start Date 7/29/02

|  | | 136 |
|---|---|---|
| **Vacation:** | | **Hours** |
| 1 | January 7 | 8 |
| 2 | January 8 | 8 |
| 3 | January 9 | 8 |
| 4 | March 10 | 8 |
| 5 | March 11 | 8 |
| 6 | March 12 | 8 |
| 7 | March 24 | 8 |
| 8 | June 14 | 8 |
| 9 | June 15 | 8 |
| 10 | June 21 | 8 |
| 11 | July 9 - emergency day off | 8 |

**Late**
January 12 - late - In at 9:30-10?- just got back from NY
January 22 - late - power went out
February 19 - late - alarm didn't go off in at 10:30
April 16 - late - missed the bus
May 25 - late - getting a ride

**Sick**
February 4 - called out sick
March 3 - called out sick

**Total:**                88

**Leave Early**
January 13 - drs. Appt leave at 1:30 - MU
January 30 - drs. Appt leave at 1:30 - MU
February 6 - drs. Appt leave at 1:30 - MU
March 19 - drs. Appt leave at 1:30 - MU
March 22 - drs. Appt leave at 1:30 - MU
April 7 - drs. Appt leave at 1:30 - MU
April 28 - drs. Appt leave at 1:30 - MU
July 2 - emergency - daughter locked out - leave at 2:45

**Misc**
April 16 - verbal warning for latenesses
April 29 - May 17 - Surgery on FMLA
June 29 - Linda, Hestal & I met - vacation request not approved for 7/16 - 7/20/04
June 30 - Met with Barb - also not approved
July 13 - Hestal's last day

EDS II 00270

Exhibit H

Travelers/MetLife
Synchrony® Integrated Disability Services
P O Box 650753 Dallas, TX 75265-0753
Tel 800-842-1949



April 10, 2003

Hestal Lipscomb
3111 W. 2nd Street 1st Floor
Wilmington, DE 19805

Re: Federal Family and Medical Leave Act
Claim #: FM0304109739
Employer: EDS
Report#: 300513

Dear Ms. Lipscomb:

Your request for a leave of absence beginning April 7, 2003, under the
Federal Family and Medical Leave Act of 1993 (FMLA) is denied because
you do not meet the definition requirements.

The Federal & State eligibility requirements state that you:

☒ Must have worked for your employer for a period of at least 12 months, and
☒ Must have worked at least 1250 hours prior to a leave

Our information indicates that you had not worked at least 12 months for your employer prior
to the leave.

You may refer to the document entitled "Your Rights under Family and Medical Leave Act of
1993", which was included in your employee packet, for details on the FMLA. You should
contact your employer to determine the availability of any other leave options

If you have questions, please call our customer service unit at the toll-free number.

Sincerely,

Susan Helliker
Disability Case Manager

1-800-842-1949 extension 4617

cc:    EDS Disability Analyst
cc:    Tracey Eaddy

Synchrony is integrated absence management, which includes group disability insurance or services from MetLife; workers' compensation insurance or services from The Travelers Indemnity Company and/or its property casualty affiliates, and may include family and medical leave administration from MetLife. Synchrony is a service mark of Travelers Property Casualty Corp. and MetLife.

EDS II 00078

Travelers/MetLife
Synchrony° Integrated Disability Services
P O Box 650753 Dallas, TX 75265-0753
Tel 800-842-1949



April 10, 2003

Hestal Lipscomb
3111 W. 2nd Street 1st Floor
Wilmington, DE 19805

Claim Number: 590304108950
Policyholder:   EDS

Dear Ms. Lipscomb:

We have received your claim for Short Term Disability benefits. The EDS Short Term Disability Plan eligibility requirement states you must be out of work for 5 consecutive business days before Short Term Disability benefits can begin.

Our records show that you were off work from April 7, 2003 through April 13, 2003, a total of 5 business days  You have been released to return to work on April 14, 2003. Because you returned to work on the date benefits would begin, you will not require a claim.

**If any of the above information is incorrect, or if you disagree with this decision, in whole or in part, you may request a review of the claim in writing.  This request for review should be sent to MetLife, at the address noted above, no more than 15 days from the date of this letter. You may also submit additional medical or vocational information and any facts, data, questions, or comments you deem appropriate for us to give your file proper consideration.  MetLife will evaluate all the information and advise you of our determination in a timely manner.**

If you have any questions or concerns, please contact us at 1-800-842-1949

Sincerely,

Susan Heliker
Disability Case Manager

CC:  EDS Disability Services
CC:  Tracey Eaddy

EDS II 00077

Synchrony is integrated absence management, which includes group disability insurance or services from MetLife, workers' compensation insurance or services from The Travelers Indemnity Company and/or its property casualty affiliates, and may include family and medical leave administration from MetLife.  Synchrony is a service mark of Travelers Property Casualty Corp. and MetLife.

Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                          )
                                          )
          Lipscomb,                       )
                                          )
v.                                        )   C.A. No. 05-477-SLR
                                          )
ELECTRONIC DATA SYSTEMS                   )   JURY TRIAL DEMANDED
CORPORATION,                              )
                                          )
          Defendant.

## DECLARATION OF BARBARA JACKSON

I, Barbara Jackson, do hereby declare that:

1.      I am employed as Deputy Account Manager for Defendant Electronic Data System Corporation's ("EDS") Title XIX Account in Newark Delaware.  I have personal knowledge of the matters stated herein.

2.      I supervised Plaintiff Hestal Lipscomb ("Lipscomb") during her employment at EDS from July 29, 2002 through July 13, 2004.

3.      In April 2003 Lipscomb took a leave of absence to undergo an unspecified medical procedure.  Lipscomb's leave did not qualify for Family Medical and Leave Act ("FMLA") status because she had not been employed by EDS for at least one year.

4.      Despite the fact that Lipscomb's April 2003 leave did not qualify for the FMLA, Lipscomb was not terminated because, pursuant to the Account's attendance policy, she provided medical documentation substantiating her absence.  Because Lipscomb provided medical documentation, her April 2003 absence was excused

5.      I contacted CIGNA on or about June 30, 2004 to determine if Lipscomb had submitted any medical documentation or a certification supporting her April 29, 2004 through

May 15, 2004 absence. I was again told that CIGNA had not received anything from Lipscomb.

6.    I contacted CIGNA on or about July 1, 2004 to determine if Lipscomb had submitted any medical documentation or a certification supporting her April 29, 2004 through May 15, 2004 absence. I was again told that CIGNA had not received anything from Lipscomb.

7.    I contacted CIGNA on or about July 2, 2004 to determine if Lipscomb had submitted any medical documentation or a certification supporting her April 29, 2004 through May 15, 2004 absence. I was again told that CIGNA had not received anything from Lipscomb.

8.    From June 30, 2004 through July 2, 2004, I met with Lipscomb three times to ascertain whether she had submitted any medical documentation to CIGNA supporting her leave. Each time I emphasized to Lipscomb the importance of submitting the medical documentation. I told Lipscomb that her leave would not be covered by the FMLA if she failed to provide a medical certification to CIGNA.

9.    Each time I met with Lipscomb, I urged her to contact CIGNA herself, rather than relying on her physician. I also instructed her to contact CIGNA directly to confirm that it had received her medical documentation.

10.    I contacted CIGNA on or about July 5, 2004 to determine if Lipscomb had submitted any medical documentation or a certification supporting her April 29, 2004 through May 15, 2004 absence. I was again told that CIGNA had not received anything from Lipscomb.

11.    I contacted CIGNA on or about July 13, 2004 to determine if Lipscomb had submitted any medical documentation or a certification supporting her April 29, 2004 through May 15, 2004 absence. I was again told that CIGNA had not received anything from Lipscomb.

12.    I contacted CIGNA a total of five times to determine whether Lipscomb had submitted any documentation supporting her FMLA leave. Five of these contacts occurred after

June 21, 2004.

13.    I met with Lipscomb a total of three times to determine whether she had sent any documentation to CIGNA supporting her FMLA leave. Each of these meetings occurred after June 21, 2004.

Pursuant to 28 U.S.C. § 1746, I certify, declare, and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on _____ 6-14-06 _____                    _____

             Date                                  BARBARA JACKSON

501092382 1

Exhibit J

Tracey Eaddy

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )    Civil Action No.
                                   )      05-477 SLR
ELECTRONIC DATA SYSTEMS            )
CORPORATION, a Delaware            )
Corporation,                       )
                                   )
        Defendant.                 )

        Deposition of TRACEY EADDY taken pursuant to
notice at the offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 12:25 p.m. on Wednesday, April 12, 2006,
before Robert Wayne Wilcox, Jr., Court Reporter and
Notary Public.

APPEARANCES:

        LAURENCE V. CRONIN, ESQ.
        SMITH, KATZENSTEIN & FURLOW LLP
          800 Delaware Avenue - 7th Floor
          Wilmington, Delaware  19801
          for the Plaintiff,

        THOMAS J. PIATAK, ESQ.
        BAKER HOSTETLER
          3200 National City Center
          1900 East 9th Street
          Cleveland, Ohio  44114
          for the Defendant.


                CORBETT & WILCOX
        Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
              (302) 571-0510
          www.corbettreporting.com

Tracey Eaddy

Page 19

1    Barbara Jackson.  Is that correct?

2         A.    That's correct.

3         Q.    All right.  Now, during that time period, did

4    you have any type of role with respect to Ms. Lipscomb's

5    requests for leave of any kind?

6         A.    I was notified when she was going to be out by

7    the team leader.  And if it was anything to do with being

8    out for an extended period of time, I would have been the

9    one to contact Synchrony or CIGNA.

10        Q.    Okay.  Now, what's an extended period of time

11   through that period of time you held that position?

12        A.    More than five days.

13        Q.    Okay.  So the process was that Ms. Lipscomb

14   would tell Ms. Jackson she was going to be out a certain

15   number of days.  If it was five or more, Ms. Jackson

16   would then come see you?

17        A.    Ms. Jackson would tell me of all the days she

18   was going to be out.  I was notified by e-mail of any

19   days that she was going to be out of the office.  But if

20   anything was going to be more than five days, I would

21   contact Synchrony or CIGNA.

22        Q.    Okay.  How was vacation handled?  How did

23   Ms. Lipscomb make requests for vacation?

24        A.    Through Ms. Jackson.

CORBETT & WILCOX

Tracey Eaddy

Page 25

1    Jackson.  I never did anything with them.  I mean, I

2    forward them on to her.

3            Q.    Okay.  Do you remember what you told

4    Ms. Lipscomb you would do in connection with her request

5    for medical leave?

6            A.    Anytime anyone tells -- whenever we call

7    Synchrony or CIGNA, I tell them that all I do is the

8    initial call.  Then I'm out of it.  I'm not medically

9    trained.  I don't know if someone needs to be out.  They

10   need to work with CIGNA to get it -- or Synchrony to get

11   it approved.

12           Q.    Okay.  Did the procedure change at all when

13   EDS changed vendors from Synchrony to CIGNA?

14           A.    Not with regard to my part.  My part is just

15   to call it in.  And then it's up to the employee after

16   that.

17           Q.    Okay.  Well, what part of the procedures did

18   change other than your role?

19           A.    I'm not aware of any change procedures.

20           Q.    Okay.  Were there procedures set forth in any

21   booklets or anything that were given to employees?

22           A.    I mean, we just tell employees that they will

23   receive information from our vendor and they are to work

24   with the vendor with any questions.  They need to

CORBETT & WILCOX

Tracey Eaddy

Page 28

1      Q.   Okay.  Do you know whether Ms. Lipscomb was

2  actually out for more than a day in August of 2003?

3      A.   I mean, I wouldn't have called Synchrony if

4  she was out just one day.

5      Q.   Okay.  What records would there be in

6  existence showing exactly what days Ms. Lipscomb was out

7  in August of 2003?

8      A.   I mean, normally it would be the attendance

9  sheet.

10     Q.   Was there any other way of verifying whether

11 she was there or not?

12     A.   She would have submitted a time card.

13     Q.   Okay.  When are those time cards submitted?

14     A.   They should be submitted every week.

15     Q.   Okay.  What happens to them after they're

16 submitted?

17     A.   They go to our corporate office for payroll.

18     Q.   Okay.  Where do they go from there?  Are they

19 thrown away?

20     A.   I'm not sure.

21     Q.   In 2004 were you involved in Ms. Lipscomb's

22 request for medical leave in April?

23     A.   I had contacted CIGNA to report that she was

24 going to be out.

Tracey Eaddy

Page 29

1      Q.   Okay.  How did you find out that she needed to

2    be out?

3      A.   From what I remember, the team leader told me

4    that she was going to be out.  She reported to the team

5    leader.  The team leader reported it to me.

6      Q.   Okay.  That would have been Linda Jackson?

7      A.   Correct.

8      Q.   Okay.  So you would have then contacted CIGNA.

9           Do you remember who you spoke with?

10     A.   No.

11     Q.   Did you contact her on your own or did you

12   contact her with Ms. Lipscomb?

13     A.   I know on one of the two cases she was with

14   me, and we contacted them together.

15     Q.   Okay.  So there were two occasions that you

16   contacted --

17     A.   Well, Synchrony was one and CIGNA was the

18   second.

19     Q.   So you just recall the two.

20          One was Synchrony and one was CIGNA?

21     A.   That's correct.

22     Q.   Okay.  You just can't remember whether you

23   were on the phone with her with Synchrony or CIGNA.

24   Correct?

Tracey Eaddy

Page 30

1      A.    I believe it was CIGNA.

2      Q.    Okay.  Why do you think it was CIGNA?

3      A.    Because it seems like it was closer to it

4   happening.  It seems -- like I remember it better.

5      Q.    Okay.  Did you ever have any discussions,

6   other than that call that you may have made with

7   Ms. Lipscomb, with Ms. Lipscomb about her need for leave

8   or anything else in relation to her request for leave

9   prior to her termination?

10      A.    I didn't meet with her personally.  I met with

11   Barb Jackson and her.

12      Q.    Okay.  That would have been on June 30th,

13   2004?

14      A.    I don't know the exact date right offhand.

15      Q.    Well, tell me about that meeting.

16            What happened?

17      A.    Barb had called her in.  And we had told her

18   that we had received the denial notice and that it was

19   really important that she file the appeal, to get the

20   information to CIGNA, that if she needed to use a

21   conference room, if she needed to leave early, if she

22   needed to use the manager fax -- that way she could

23   intercept it and then give it to CIGNA to make sure that

24   the doctor had completed it -- that we would help her any

CORBETT & WILCOX

Tracey Eaddy

Page 31

1    way we needed but that it was very important that she get

2    this done.

3         Q.   Okay.  So, basically, you folks offered a

4    conference room, a fax machine, if she wanted to use it?

5         A.   Mm-hmm.  Yes.  We told her she could leave

6    early if she needed to to go down to the facility to get

7    the paperwork she needed.

8         Q.   Okay.  What did Ms. Lipscomb say in this

9    meeting?

10        A.   She said okay.

11        Q.   Did you say anything in this meeting?

12        A.   Not that I recall.

13        Q.   Okay.  So prior to this meeting with you and

14   Ms. Barbara Jackson, is it fair to say that you had no

15   other conversations with Ms. Lipscomb about this request

16   for leave other than possibly this first call that the

17   two of you would have made to CIGNA?

18        A.   I do not recall any other conversations.

19        Q.   Okay.  Now, between when you first received

20   word from Linda Jackson about the need that Ms. Lipscomb

21   expressed to be out and when you had this meeting with

22   Ms. Jackson and Ms. Lipscomb, tell me about what else you

23   did during that time period in connection with

24   Ms. Lipscomb's request for medical leave.

CORBETT & WILCOX

Tracey Eaddy

Page 54

1      A.   Yes.

2      Q.   Okay.  You weren't present in those meetings

3   on July 1 and July 2, 2004.  Correct?

4      A.   Barb had come back to the mailroom where I was

5   working.  I assisted the mailroom every morning with

6   getting the mail opened.  And I was opening mail.  And I

7   overheard Barb asking Hestal if she had done that.

8      Q.   Okay.

9      A.   But I wasn't a participant.  I just overheard.

10     Q.   On which date?  July 1 or July 2?

11     A.   Both.

12     Q.   Okay.  Tell me what you heard or what you

13  overheard from those two conversations.

14     A.   I heard Barb come back, and she -- of course,

15  she said "Good morning" and all that first.  And then she

16  had asked her if she had followed up with her doctor.

17  And Hestal said that they were working -- she was working

18  with her physician's office and they were going to get it

19  faxed over.

20     Q.   Okay.  What about on the next day, July 2nd?

21  Or was it the same conversation?

22     A.   It was pretty much the same conversation.

23     Q.   Okay.  That's all you remember from those

24  conversations?

CORBETT & WILCOX

Tracey Eaddy

Page 62

1        A.    Not that I can think of.

2        Q.    Okay.  All right.  You've also testified about

3    the circumstances of which you were involved in doing an

4    attendance improvement plan in the weeks and days leading

5    up to her termination.  Do you recall any discussions you

6    had with anyone else regarding Ms. Lipscomb or her

7    possible termination in the last two months of her

8    employment other than what you have testified to today?

9        A.    No.

10       Q.    Okay.  You did give Ms. Lipscomb a verbal

11   warning on April 16th regarding her attendance, right,

12   2004?  Do you want to take a look at EDS II 0025?

13       A.    I know that it was delivered to her.  I'm just

14   not sure if I did it, Linda did it or we both did it.

15       Q.    When you say it was delivered to her --

16       A.    We just reviewed her attendance.

17       Q.    Actually, it's 0025.

18                  April 16th, verbal warning for lateness.

19   You don't know whether you gave it or Linda Jackson gave

20   it?

21       A.    That's correct.  I don't remember.

22       Q.    It would have been you or Linda Jackson?

23       A.    Or it could have been both of us.  We could

24   have done it together.

CORBETT & WILCOX

Tracey Eaddy

Page 63

1    Q.   Okay.  It was because she had been late on how

2    many occasions?  Was this also viewed as a three

3    incidents that you give a warning situation?

4    A.   She was late five times.

5    Q.   Okay.  So how many times were required before

6    she got a warning?

7    A.   Again, there's not a certain number.  It's

8    just based on trends and what we see.

9    Q.   Okay.  What was she told in this warning?

10   Recognizing that you weren't there, did you have an

11   understanding of what she was going to be told?

12   A.   We review the sheet and say this is the many

13   times as you've been late and that it could lead to a

14   written warning if it continues.

15                MR. CRONIN:  Okay.  All right.  I have

16   no further questions.

17                MR. PIATAK:  We won't waive.

18                (The deposition concluded at 2:15 p.m.

19   this same day.)

20                - - - - -

21

22

23

24

CORBETT & WILCOX