# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HESTAL LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  05-477 SLR |
| | ) | |
| ELECTRONIC DATA SYSTEMS | ) | |
| CORPORATION, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Laurence V. Cronin (ID No. 2385)
SMITH, KATZENSTEIN & FURLOW LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Telecopy: 302-652-8405
Email: LVC@skfdelaware.com
Attorneys for Plaintiff

July 3, 2006

10015179.WPD

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    There Is A Genuine Dispute Of Material Fact With Respect To Whether Lipscomb's Termination By EDS Interfered With Her Attempt To Exercise Her Rights Under The FMLA. . . . . . . . . . . . . . . . . . . . . . . . . . 15

        i.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        ii.    The FMLA's Regulatory Framework Clearly Sets Forth An Employer's Obligations When It Decides To Require A Medical Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        iii.    EDS' Written FMLA Policy And The Two Letters From SHPS Are Insufficient As A Matter Of Law To Satisfy EDS' Obligation Under The FMLA To Advise Its Employees Generally (Or Lipscomb Specifically) About Medical Certifications. . . . . . . . . 19

        iv.    EDS' Attempt To Avoid The Consequence Of Failing To Advise Lipscomb Of The Anticipated Consequences Of Not Providing A Medical Certification Ignores Its Own Practices With The Same Employee In 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        v.    EDS Is Not Entitled To Rely On A "Mailbox Presumption" Or "Mailbox Rule" To Prove That It Complied With The Applicable FMLA Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        vi.    Given That She Did Not Receive The May 20 Letter From SHPS, It Became Virtually Impossible For Lipscomb To Satisfy Her Employer's Urging That She Provide "Documentation" To CIGNA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.     There Is A Genuine Dispute Of Material Fact As To Whether EDS
        Retaliated Against Lipscomb For Seeking Medical Leave Potentially
        Covered By The FMLA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                  <u>Page(s)</u>

*Baltuskonis v. U.S. Airways, Inc.*,
      60 F. Supp. 2d 445 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Brown v. SBC Commc'ns, Inc.*,
      No. 04-C-0290, 2005 WL 2076584 (E.D. Wisc. Aug. 23, 2005) . . . . . . 22, 25, 26

*Chenoweth v. Wal-Mart Stores, Inc.,*
      159 F. Supp. 2d 1032 (S.D. Ohio 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Collier v. Target Stores Corp.*,
      No. CUV. 03-1144-SLR, 2005 WL 850855 (D. Del. April 13, 2005) . . 15, 35, 36

*Conoshenti v. Pub. Serv. Elec & Gas Co.*,
      364 F. 3d 135 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Farrell v. Planters Lifesavers Co.*,
      206 F. 3d 271 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Kachmer v. SunGard Data Systems, Inc.*,
      109 F. 3d 173 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Marrero v. Camden County Bd. of Social Services*,
      164 F. Supp. 2d 455 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 35

*McDonnell Douglas Corp. v. Green*
      411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 35

*Myers v. Dolgencorp, Inc.*,
      No. 04-4137-JAR, 2006 WL 408242 (D. Kan. Feb. 15, 2006) . . . . . . . . . . . 27-29

*Pa. Coal Ass'n. v. Babbitt*
      63 F.3d 231 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Peter v. Lincoln Technical Inst., Inc.*,
      255 F. Supp. 2d 417 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 21

*Reeves v. Sanderson Plumbing Products, Inc.*,
      530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rodriguez v. Ford Motor Co.*,
  382 F. Supp. 2d 928 (E.D. Mich. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*St. Mary's Honor Center v. Hicks*,
  509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Texas Dept. of Cmty. Affairs v. Burdine*,
  450 U.S. 248, 255 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Torre v. Casio*,
  42 F. 3d 825 (3ʳᵈ Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Waddell v. Small Tube Products, Inc.*,
  799 F. 2d 69 (3ʳᵈ Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Wilson v. Lemington Home for the Aged*,
  159 F. Supp. 2d 186 (W.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Statutes and Other Authorities                                                          Page(s)

29 C.F.R. § 825. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. 2611 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

60 Fed. Reg. 2180, 2220 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Hestal Lipscomb ("Lipscomb" or "plaintiff") filed this action on July 8, 2005 alleging that her former employer, defendant Electronic Data Systems Corporation ("EDS" or "defendant") violated her rights under the Family and Medical Leave Act ("the FMLA") by terminating her employment on July 13, 2004.  (D.I. 1).  After completion of discovery, EDS filed a motion for summary judgment along with an opening brief  on June 15, 2006.  (D.I. 34, 35).  This is plaintiff's answering brief in opposition to defendant's motion.

## SUMMARY OF ARGUMENT

1.     The FMLA does not mandate that all eligible employees support their requests for leave with a medical certification.  Rather, the FMLA provides that it is the responsibility of the employer to (1) properly advise its employee in writing that a medical certification is required in connection with a specific leave request; and (2) explain in writing the anticipated consequences of failing to provide the requested medical certification.  In this case, there is a genuine dispute of material fact as to whether the plaintiff was advised by defendant (or by either of its two third party administrators) that she needed to submit  a medical certification, separate and apart from defendant's earlier requests that she provide doctor's notes before being allowed to take leave, and before being allowed to return to work.  Furthermore, since there is no evidence in the summary judgment record that Lipscomb was advised in any manner as to the anticipated consequences of not submitting a medical certification, she is entitled to have a jury decide whether EDS interfered with her attempt to exercise her rights under the FMLA.

2.      Retaliation claims under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In this case, there is no dispute plaintiff has satisfied the first two elements of a prima facie case by seeking medical leave and being terminated for failing to submit a medical certification. With respect to the issues of causation and pretext, plaintiff is entitled to have a jury decide whether she was terminated in retaliation for having sought leave potentially covered by the FMLA given that: (1) Lipscomb was given medical leave a year earlier by providing the same amount of medical information from her physicians; (2) defendant has offered no evidence to show that it has ever previously terminated an employee for allegedly violating its attendance policy; and (3) defendant's only subsequent termination of an employee pursuant to its attendance policy may have been done in violation of its obligations under the FMLA.

## STATEMENT OF FACTS

Lipscomb worked for EDS from July 29, 2002 until July 13, 2004. (Schwartz Aff., Ex. B)[1]. EDS is a global information technology that employs about 120,000 people around the world. (Cronin Aff.[2], Ex. A at EDS II 00005). The EDS Delaware Healthcare Services Account is the fiscal agent for the Delaware Medical Assistance Program providing support to certain of its programs. (Cronin Aff., Ex. A at EDS II 00008). When Lipscomb was first hired by EDS, it had approximately 80 - 85 employees at the Delaware facility. (Cronin Aff., Ex. B at 6-7) (Cronin Aff., Ex. A at EDS II 00008). In the two years she was there, plaintiff worked in the mail room. (Cronin Aff., Ex. C at 27-28).

Lipscomb periodically suffers from a medical condition known as granular cell tumors. (Cronin Aff., Ex. C at 43-44) (Lipscomb Aff. at ¶ 10)[3]. Generally, these are non-malignant tumors that often require surgical removal. (Id.). Lipscomb had surgery to remove these tumors twice (April of 2003 and April - May of 2004) during her employment with EDS. (Cronin Aff., Ex. C at 36, 40). In both instances, her physician put her out of work for one to two weeks. (Cronin Aff., Ex. C at 38, 44) (Lipscomb Aff., ¶ 10, Ex. D).

Since it meets the statutory definition of "employer," EDS is subject to the requirements of the FMLA. (Complaint, D.I. 1, ¶ 21; Answer, D.I. 3, ¶ 21). At some point

---

[1]     The Affidavit of Alyssa M. Schwartz ("Schwartz Aff.") (D.I. 36) was filed with Defendant's opening brief in support its motion ("Op. Br.") on June 15, 2006 (D.I. 35) and will be referenced herein.

[2]     Copies of referenced documents are included in the Affidavit of Laurence V. Cronin ("Cronin Aff.") filed herewith.

[3]     The Affidavit of Hestal Lipscomb ("Lipscomb Aff.") is being filed concurrently herewith.

in time, defendant decided to use third party administrators to comply with its obligations as an employer subject to the requirements of the FMLA.  From when she was hired until December 31, 2003, it appears that EDS used "MetLife/Synchrony" to perform that function. (Schwartz Aff. at Ex. H).  According to the EDS 2004 Benefits Handbook (that may or may not have been given to some of its Delaware employees), "CIGNA AbilityReturns" took over that function on January 1, 2004.  (Cronin Aff., Ex. D at EDS I 00230).  Lipscomb was never given a copy of the EDS 2004 Benefits Handbook. (Cronin Aff., Ex. C at 47-48) (Lipscomb Aff. at ¶ 11).

While "CIGNA AbilityReturns" is described in the benefits handbook as the entity that would administer the FMLA claims of EDS employees as of January 1, 2004, it appears that this is simply a  registered service mark, similar to others used by subsidiaries of CIGNA Corporation.  (Cronin Aff., Ex. D at EDS I 00230) (Schwartz Aff. at Exs. K, O and S).  There was no actual company named "CIGNA" that was serving as third party administrator for EDS' employees' FMLA claims.  Rather "CIGNA," "CIGNA Group Insurance" and "CIGNA Leave Solutions" (and apparently "CIGNA AbilityReturns") are all just registered service marks designed for use by subsidiaries of CIGNA Corporation. From correspondence in this case, it appears the relevant subsidiary was the Life Insurance Company of North America ("LINA").  (Schwartz Aff. Exs. K, O and S).  Although LINA is identified in both the EDS 2004 Benefits Handbook and correspondence as the relevant CIGNA Corporation subsidiary authorized to use the various CIGNA registered service marks (Cronin Aff., Ex. D at EDS I 00231) (Schwartz Aff. Exs. K, O, and S), through

discovery plaintiff has learned it was *not* the company that was actually in charge of administering the FMLA leave of EDS employees in April through July of 2004.

Subsequent to her company's assumption of the responsibility on January 1, 2004, Kimberlee Rudeen of LINA has been the senior claim manager in charge of the EDS account.  (Cronin Aff., Ex. F at 5-7).  Unbeknownst to any EDS employee who may have obtained and read the 166 page EDS 2004 Benefits Handbook, however, that did not include having any responsibility for administering the FMLA rights of EDS employees.  As Rudeen testified:

> Q.    How are FMLA claims handled on behalf of EDS?
>
> A.    There is a separate vendor that handles them in a completely different company.

(Cronin Aff., Ex. F at 9).  This testimony  contradicts defendant's assertion in its initial disclosures that Rudeen had "knowledge regarding plaintiff's application for short term disability  ***and FMLA  Leave.***" (Cronin Aff., Ex. G at 3) (emphasis supplied).  Instead, as Rudeen explained, the administration of FMLA leave for EDS employees was performed by SHPS, Inc. ("SHPS"), based in Louisville, Kentucky.  (Cronin Aff., Ex. F at 9 -10).  SHPS was first identified by defendant during Rudeen's deposition on May 4, 2006.  (Cronin Aff., Ex. F at 9).  SHPS has no corporate affiliation with CIGNA Corporation (Cronin Aff., Ex. F at 9), and is not otherwise identified in any of the documents: (1) allegedly sent to Lipscomb; (2) produced by defendant or CIGNA in this case (Cronin Aff., Ex. GG at 10-21, Ex. HH, Ex. II and Ex. JJ); or (3) otherwise made available to EDS employees.  According to Rudeen, LINA would typically have no contact with SHPS regarding EDS employees covered by both short term disability (which LINA did administer) and the FMLA. (Cronin

Aff., Ex. F at 9-10). In fact, when asked by EDS counsel at her deposition whether she

believed that EDS had "endeavored to comply with the terms of the Family Medical Leave

Act," Rudeen candidly responded: "I don't know the terms of the Family Medical Leave

Act." (Cronin Aff., Ex. F at 44).[4]

While she was employed by EDS, Lipscomb's "team leader" in the mail room was

Linda Jackson, while her immediate supervisor was Tracey Eaddy. (Cronin Aff., Ex. C at

27 - 29). Eaddy reported to Barbara Jackson, who was claim manager at the Delaware

facility in 2004. (Cronin Aff., Ex. E at 15 - 16). At all times relevant, Barbara Jackson

reported to Lance Rogers, whose title in 2004 was client delivery executive. (Cronin Aff.,

Ex. B at 7 - 9). The practice at EDS in 2003 and 2004 was that when an employee needed

to be out of the office for medical reasons, she would tell her team leader, who would then

inform the supervisor. (Cronin Aff., Ex. H at 18 - 19). If Lipscomb was expected to be out

five or more days, her supervisor Eaddy would then contact "CIGNA." (Id.).

Patty Harrington, EDS' manager of disability services, testified as defendant's Rule

30(b)(6) witness regarding its relationship with CIGNA for administration of its employees'

FMLA leave. (Cronin Aff., Ex. I at 6 - 9) (D.I. 30). In her deposition, she described the

company's responsibilities with regard to FMLA leave as follows:

---

[4]    Despite Rudeen's testimony, EDS continues to assert in its brief that CIGNA is EDS'
"third party administrator for its FMLA and STD plans..." (Op. Br. at 5). While EDS states
that CIGNA "sub-contracted a portion of its FMLA administration duties to an entity known
as 'SHPS,' that was known to EDS employees as CIGNA Leave Solutions," (Op. Br. f.n. 4),
at no point do they explain (1) what portion of EDS' FMLA administration duties remained
with CIGNA in light of Rudeen's testimony; or (2) how EDS employees such as Lipscomb
were made aware that a non-EDS and non-CIGNA company was actually the entity making
decisions as whether they would be entitled to the protections of the FMLA.

> Q.    ...what does EDS view to be its continuing obligation with respect to an individual's claim for FMLA leave after the initial call [to CIGNA] has been made?
>
> A.    At that point, it's the employee's responsibility to provide the required requested documentation back to CIGNA.
>
> Q.    So EDS doesn't have any further responsibility?
>
> A.    Not according to our procedures back in 2004.

(Cronin Aff., Ex. I at 24).  She went on to explain that this procedure changed in 2005 so that EDS would "provide more assistance" to its employees.  (Cronin Aff., Ex. I at 32).  This was done to "remove[e] the burden from the employees to providing assistance to the employees."  (Id.).

In April 2004, Lipscomb told Eaddy that she would need to be out for surgery. (Cronin Aff., Ex. C at 40-43) (Cronin Aff., Ex. H at 29).  In contacting Eaddy, Lipscomb followed what she understood was the procedure from the year prior, when she asked for and received leave for same type of surgery. (Lipscomb Aff. at ¶ 8).  As Eaddy explained, to her knowledge the change in third party administrators from Synchony to CIGNA had caused no change in what was required of her or Lipscomb.  (Cronin Aff., Ex. H at 25).  Since Lipscomb did nothing in connection with her leave in 2003 other than contact Eaddy and submit a note from her doctor excusing her absence, she did not understand that she had to do anything else in 2004.  (Cronin Aff., Ex. C at 43-45).  With respect to Lipscomb's obligations to her employer in the event that her medical leave was not approved as being covered by STD or the FMLA, Eaddy said nothing.  (Lipscomb Aff. at ¶¶ 8-9).  As Eaddy testified:

> Q.    What did you tell employees with respect to medical leave when they were not covered by either short-term disability or FMLA?
>
> A.    I had never had a case before where it wasn't approved through either, so I didn't tell them anything.  I just told them they needed to work with the vendor.
>
> Q.    ...But did EDS have a policy for dealing with sick leave in a situation where somebody was not entitled to either short-term disability or the FMLA?
>
> A.    I'm not sure that would have ever reached my level.  I don't know.

(Cronin Aff., Ex. H at 26).

In addition to contacting CIGNA, Eaddy told Lipscomb she would need to provide a note from her doctor supporting her need for the leave.[5]  (Cronin Aff., Ex. C at 40-42) (Lipscomb Aff., at ¶ 8).  In response, Lipscomb contacted the surgery department at Wilmington Hospital and had them fax a note from Jonathan Kraut, M.D.  (Cronin Aff., Ex. C at 42).  On April 19, 2004, a nurse at Wilmington Hospital faxed Dr. Kraut's note to Lipscomb at EDS offices.  (Cronin Aff., Ex. C at 42) (Cronin Aff., Ex. O).  As Dr. Kraut's

---

[5]    Throughout its brief, EDS makes various insinuations about plaintiff's conduct, plainly in an attempt to denigrate her level of cooperation in the process of being approved to take medical leave.  Most, if not all, of these attacks have no record support.  For example, when describing her conversation with Eaddy regarding her need for surgery in 2004, EDS states: "Lipscomb refused to provide any other details regarding her forthcoming absence. (Lipscomb Dep., p. 41)." (Op. Br. at 5).  Lipscomb's actual testimony was as follows:

Q.    So you told Tracy that you were going to be going out on a surgical procedure?
A.    Yes.
Q.    Anything else you told her about that?
A.    No.

(Lipscomb at 41).  It is disingenuous for EDS to suggest that this testimony indicates that Lipscomb was not  being cooperative in the process, particularly when its own witnesses (Eaddy and Harrington) testified that Eaddy's role was to put the employee in touch with CIGNA and do  nothing more. (Cronin Aff., Ex. H at 25) (Cronin Aff., Ex. I at 24).

note indicated, Lipscomb was scheduled for surgery ten days later. (Id.) (Cronin Aff., Ex. C at 44-46) (Cronin Aff., Ex. O). Dr. Kraut invited the recipient to call if there were any questions. (Id.) A fax confirmation sheet produced by Wilmington Hospital reflects that this letter was successfully transmitted to the number 454-1074 from "Mary Beth's Office" on April 19, 2004. (Id.). The letter was given to Eaddy, and Lipscomb was allowed to be absent from work for the surgery. (Lipscomb Aff. at ¶ 8).

While she was out, Lipscomb spoke with Linda Jackson and reported that her physician had cleared her to return to work on May 17, 2004. (Cronin Aff., Ex. DD). She understood she would need to provide a note from her physician in order to be allowed to return to work. (Lipscomb Aff. at ¶ 8) (Cronin Aff., Ex. H at 49). Once again, plaintiff complied with her employer's practice and returned to work on May 17, 2004 with a note from Dr. Kraut. (Cronin Aff., Ex. K at EDS II 00033). Nobody at EDS made any other requests to Lipscomb that she bring in any type of note or report from her physician. (Lipscomb Aff. at ¶ 9) (Cronin Aff., Ex. H at 48-49) (Cronin Aff., Ex. E at 65-71) (Cronin Aff., Ex. Q at 14-15).

In response to Eaddy contacting CIGNA, both LINA and SHPS allegedly began sending out letters to Lipscomb. There are five letters at issue in this case that were allegedly sent to Lipscomb by LINA or SHPS. SHPS' letters are dated April 21, May 20 and June 17, 2004. (Schwartz Aff. Exs. K, O and S). LINA's letters are dated May 4 and June 2, 2004. (Schwartz Aff. Exs. M and P). The first letter was from SHPS, dated April 21,

2004. (Schwartz.Aff. Ex. K).[6]  Lipscomb never saw this letter until after her termination.

(Cronin Aff., Ex. C at 50, 52).[7]  The letter dealt with the issue of medical certifications by

stating as follows:

> Your leave has been preliminarily designated as FMLA, and in
> accordance with the Company's policy, you will not be required to
> submit separate FMLA medical certification providing your claim for
> short-term disability benefits and/or workers' compensation claim
> under your company's plan is approved.

The letter also stated:

> If for any reason your short-term disability or workers' compensation
> is not approved, we will provide you with a Certification of Health
> Care Provider Statement to be completed by you and the attending
> Health Care Provider to certify your leave under FMLA.  A final
> determination will be based on the medical information outlined by
> the attending Health Care Provider.

Allegedly enclosed with the April 21 letter were three documents described as follows: (1)

Impact of FMLA on EDS Benefits; (2) Fitness for Duty Certification; and (3) Your Rights

under the Family and Medical Leave Act of 1993.  (Cronin Aff., Ex. P).  EDS produced the

---

[6]    Like all three of the SHPS letters at issue, this letter is unsigned and the actual author
and/or sender is unidentified.

[7]    Undoubtedly, EDS will argue that Lipscomb is not telling truth when she testified
that she did not receive the letters from SHPS that were allegedly sent to her home address
from April through June, 2004.  As explained in her affidavit filed herewith, Lipscomb had
no reason to believe that documents were being sent to her home that required her to take
action or otherwise lose her job.  If she had known that, she would have taken additional
measures to obtain copies of these documents, particularly given the type of neighborhood
she lived in. (Lipscomb Aff. at ¶¶ 2-6).  Needless to say, CIGNA, SHPS and EDS elected
to provide these notices by mail, and could have proven receipt by sending then certified,
return receipt requested.  They also could have handed the letters to her at work, where she
was on four of the five days the letters were allegedly mailed, and all three of the days that
SHPS allegedly mailed their letters.  In each case, they chose not to do so.

first two of those allegedly enclosed documents in this litigation. (Id.). Neither the April 21 letter nor the two attachments produced by EDS indicate that Lipscomb would be terminated if she failed to provide a completed certification. In fact, the first attachment to the letter states only that "if your LOA [leave of absence] ceases to qualify under FMLA, other EDS LOA may apply." (Cronin Aff., Ex. P).

The second letter was from Charlene Crowder of LINA in Dallas. The letter is dated May 4, 2004, and acknowledges receipt of a claim for STD. (Schwartz Aff. Ex. M). The letter does not mention the April 21 letter from SHPS, but states that CIGNA was requesting information from Dr. Johnathan (sic) Kraut. (Id.). In her deposition, Lipscomb could not recall if she had received this letter or not. (Cronin Aff., Ex. C at 52).

On May 7, 2004, CIGNA faxed a request for medical information form to Dr. Emily Jane Penman, another physician at Wilmington Hospital involved in plaintiff's care. (Schwartz Aff. Ex. W). Records from Wilmington Hospital indicate that the form from CIGNA was completed by Dr. Kraut on May 19, 2004, and faxed out twice by the hospital. (Cronin Aff., Exs. R, S and BB). It was faxed for the first time on May 20, 2004. (Id.). Despite the fact that the form indicated it should be faxed back to 800-325-7016, Wilmington Hospital staff faxed it back to 302-454-1074, the same number that had been used to send Lipscomb the note from Dr. Kraut of April 19. (Cronin Aff., Ex. C at 88-91). Unlike the note of April 19, however, the fax from May 20 never made its way to Lipscomb or into the EDS files.[8] (Cronin Aff., Ex. C at 87-90).

---

[8]    As explained in the Affidavit of Laurence V. Cronin, the only "CIGNA form" produced by Christiana Care in response to requests for plaintiff's records from 2004 was the document attached as Ex. T to the Schwartz affidavit. (Cronin Aff. at ¶ 40).

As explained above, Lipscomb returned to work on May 17, 2004 with a note from Dr. Kraut. (Schwartz Aff. Ex. N). Although it was not in the form allegedly included in the April 21 letter from SHPS (Cronin Aff., Ex. P), it was accepted by EDS and she returned to work on that date. As in 2003, Lipscomb was not aware at that point of anything wrong with her medical leave. (Lipscomb Aff. at ¶¶ 7-9). Unlike some employers, EDS does not have sick time, nor does it have PTO ("paid time off"), used by some employers as a means of combining each employee's allotment of vacation, sick and personal leave. (Cronin Aff., Ex. B at 40). Instead, for its salaried employees, EDS simply "monitors" all absences due to illness not covered by FMLA or STD, but does not otherwise subject them to any particular limitation. (Id.). There was no reason for Lipscomb to believe from April through her termination in July 2004 that she had exceeded the amount of sick days she had been allotted, since there was no such limitation. (Lipscomb Aff. ¶ 9). Furthermore, as in April 2003, she had no reason to believe that EDS had not approved her absence, since she submitted to her employer the same information from her doctors as she had done the year before. (Cronin Aff., Ex. M at EDS III 00034) (Lipscomb Aff. at ¶ 8).

The second letter from SHPS to Lipscomb is dated May 20, 2004. (Schwartz Aff. Ex. O). The letter stated that "according to our records, your claim for short-term disability benefits and/or workers' compensation under your company's plan has not been approved or has otherwise been closed. You should receive information regarding your STD or workers' compensation claim under separate cover." The letter went on to explain:

> Enclosed is a Certification of Health Care Provider Statement to be completed by your Health Care Provider. Final determination of your FMLA and/or state leave will be based on the medical information outlined by the attending Health Care Provider. Failure to provide

this medical certification within 15 days of the date of this letter may
result in denial of FMLA protection.

Neither the letter nor the enclosed form advised Lipscomb (even if she had received the

letter) that she would be terminated if she failed to submit the completed form.  Lipscomb

testified that she never saw this document prior to her termination.  (Cronin Aff., Ex. C at

58).  In addition, contrary to the statements in the letter, LINA had not "closed" her STD

claim as of May 20, as their own records indicate they were trying to obtain information

from Lipscomb's physicians and EDS more than a week later. (Cronin Aff., Ex. F at 40-42;

Ex. JJ at pp. 14, 18, and 20 of 32).

In a letter dated June 2, 2004 from Charlene Crowder, LINA purportedly informed

Lipscomb that her claim for STD had been denied. (Schwartz Aff. Ex. P).  Lipscomb

testified that she did not recall receiving the letter. (Cronin Aff., Ex. C at 69).  The fifth and

final letter is from SHPS and is dated June 17, 2004. (Schwartz Aff., Ex. S).  Through this

letter, Lipscomb was supposed to have been advised that her FMLA leave had been denied.

(Id.).  Both the fourth and fifth letters state that Lipscomb had fifteen days to file an appeal.

(Schwartz Aff. Exs. P and S).  Lipscomb testified that she never saw the June 17 letter until

her termination. (Cronin Aff., Ex. C at 72-74).

EDS was advised of the denials of STD and FMLA on June 2 and 17, 2004, the same

dates as the last two letters.  (Cronin Aff., Ex. EE) (Schwartz Aff., Ex. Q).  However, EDS

did nothing in response to advise Lipscomb that her job was in jeopardy if she did not

provide the medical support for that leave.  Rather, Barbara Jackson conferred with a EDS

Human Resources representative on June 17, and then made no attempt to speak with

Lipscomb until the last three days of the appeal period set forth in the June 17 letter. (Cronin Aff., Ex. E at 72-75). During those three short meetings, it appears that Jackson encouraged Lipscomb to submit the medical information to CIGNA, but did not discuss with her the consequences if that information was not submitted. (Cronin Aff., Ex. U at 9-23).[9] Instead, Lipscomb was brought into a meeting with Jackson and Lance Rogers on July 13, 2004 and summarily fired. (Cronin Aff., Ex. N). Not surprisingly, the termination came as a surprise to the plaintiff, who confirmed that she had called CIGNA and her physicians to get the unspecified "documentation" transmitted. (Id.). Rogers responded that EDS felt that it had "no choice" but to terminate her because "the time for providing proof of her absences had passed." (Id.).

---

[9]    Jackson has given sworn testimony three times in connection with the termination of Lipscomb. EDS has also produced a two page document created by Jackson that describes her actions leading up to Lipscomb's termination. (Schwartz Aff., Ex. Q). She testified at Lipscomb's unemployment hearing on September 14, 2004 (Cronin Aff., Ex. U) and her deposition in this case on April 12, 2006. She has also signed an affidavit in connection with this motion on June 14, 2006. (Schwartz Aff., Ex. I). As will be discussed below, Jackson's recollection appears to be evolving about what she told Lipscomb about her need to submit documentation to CIGNA. Nevertheless, it is undisputed that at no time did Jackson (or anyone else at EDS) do the one thing they could have done at any point from when Lipscomb returned to work on May 17, 2004 until she was fired on July 13, 2004: simply hand her a copy of the medical certification form and tell her to have her doctor fill it out.

## ARGUMENT

### A.    Standard of Review

The standard to be applied by the Court on a motion for summary judgment is well established.  A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Collier v. Target Stores Corp.*, No. CUV. 03-1144-SLR, 2005 WL 850855 (D. Del. April 13, 2005) *quoting  Fed. R. Civ. P. 56(c).*  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Collier*, *quoting Pa. Coal Ass'n. v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).

### B.    There Is A Genuine Dispute Of Material Fact With Respect To Whether Lipscomb's Termination By EDS Interfered With Her Attempt To Exercise Her Rights Under The FMLA.

#### i.  Introduction

There are two types of claims an employee can bring against an employer under the FMLA, "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Collier at *4.*

When an employee seeks leave because of serious health condition that precludes them from working, the employer *may* require the employee to submit a certification completed by a health care provider.  *Peter v. Lincoln Technical Inst., Inc.*, 255 F. Supp. 2d

417, 438 (E.D. Pa. 2002) *citing* 29 U.S.C. § 2613(a) (2002)(emphasis supplied). If the employer exercises this right, it (1) must provide written notice to the employee that it requires such certification and (2) must advise the employee of the consequences of a failure to provide certification. *Peter* at 439*, citing* 29 C.F.R. § 825.305. In addition, the employer must provide the employee with at least 15 calendar days to submit the medical certification. *Id.* The failure to provide such notice and opportunity constitutes "interfering with, restraining, or denying the exercise of rights provided by the Act." *Id., quoting* 29 C.F.R. § 825.200.

In its brief, EDS makes several arguments as to why it believes it was appropriate to terminate Lipscomb based upon her failure to provide a FMLA medical certification.[10] In making those arguments, however, EDS fails to address its own responsibility for failing to conform to the relevant FMLA statutory and regulatory provisions.

> ### ii.    The FMLA's Regulatory Framework Clearly Sets Forth An Employer's Obligations When It Decides To Require A Medical Certification.

First, defendant asserts that "to qualify for FMLA protection, Lipscomb was required to submit a medical certification substantiating her leave." (Op. Br. at 11). This argument presumes, of course, that consistent with 29 U.S.C. § 2613(b), EDS properly advised Lipscomb she was required to provide a FMLA medical certification substantiating her leave. EDS also alleges that "[t]he undisputed facts show that Lipscomb never submitted

---

[10]    Plaintiff understands that defendant is making the argument that Lipscomb was not terminated for failing to provide the requested medical certification; but rather, for excessive absenteeism in violation of its Delaware attendance policy. (Op. Br. at 15). As will be discussed in greater detail below, since plaintiff submitted (and EDS accepted) the only two physician notes she was asked to provide, there is no support for the assertion that she is in violation of the company's written attendance policy.

any medical certification to CIGNA as required by the terms of EDS' FMLA leave policy."
(Op. Br. at 16). This argument presumes an additional fact, i.e., that EDS, in fact, has such
a policy that required submission of a medical certification. As will be shown, EDS cannot
establish that it complied with § 2613(b) and the relevant regulations by properly advising
Lipscomb that she needed to submit a FMLA medical certification, nor can it prove that it
otherwise has a "policy" that requires submission of medical certifications to support any
leave that could be covered by the FMLA.

It is undisputed that the FMLA does not require all covered employees seeking leave
pursuant to that statute support that entitlement with a medical certification. As § 2613(b)
provides: "[a]n employer *may* require that a request for leave ... be supported by a
certification issued by a health care provider of the eligible employee..." The procedure that
an employer must follow when it decides to require one or more of its employees to provide
a medical certification is outlined for the employer in 29 C.F.R. §§ 825.301 and 825.305.
*See Marrero v. Camden County Bd. of Social Services*, 164 F. Supp. 2d 455, 465 (D.N.J.
2001).

Section 825.301describes the manner in which an employer is obligated to give
notice to its employees with respect to its expectations and the employee's obligations.
Section 825.301(a) discusses an employer's obligations to provide written guidance to its
employees generally about the FMLA either in its employee handbook or once an employee
has indicated a need for leave that may be covered by the Act. Notably, there is nothing in
EDS' FMLA policy that states medical certifications are mandatory in all cases. (Schwartz
Aff., Ex. L). Section 825.301(b), however, deals with the written notice that the employer

must provide to the employee with respect to certain issues dealt with elsewhere in the regulations. Section 825.301(b)(1) states that the written notice must detail "the specific expectations and obligations of the employee and *explaining any consequences of a failure to meet these obligations*." Section 825.301(b)(1)(ii) reiterates that such specific notice must include (as appropriate) "any requirements for the employee to furnish medical certification of a serious health condition *and the consequences of failing to do so...*" (emphasis supplied). Section 825.301(c) provides that "[t]he notice shall be given within a reasonable time after notice of the need to leave is given by the employee – within one or two business days if feasible. *If leave has already begun, the notice should be mailed to the employee's address of record.*" (emphasis supplied). As explained in the legislative history, "[t]he intent of this notice requirement is to insure employees receive the information necessary to enable them to take FMLA leave." 60 Fed. Reg. 2180, 2220 (1995) (Cronin Aff., Ex. V) *accord Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 935 (E.D. Mich. 2005). Consistent with this objective, the legislative history also reflects that § 825.301(c) was "revised to permit the employer to mail the notice to the employee's address of record if leave has already begun." *Id.* Finally, § 825.301(f) provides that "[i]f an employer fails to provide notice in accordance with the provisions of this section, the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice."

Section 825.305 provides additional requirements with respect to the relative obligations of the employer and employee in those situations when the employer has attempted to exercise its right to seek a medical certification. Section 825.305(a) restates the

employer's obligation under § 825.301(c) that any request for a medical certification be in writing.  Section 825.305(b) requires the employee to provide the medical certification before leave begins if more than 30 days notice has been given, or within the time frame requested by the employer, as long as it is "not practicable under the circumstances to do so despite the employee's diligent, good faith efforts."

Section 825.305 (c) states that "the employer should request that an employee furnish certification from a health care provider at the time the employee gives notice of the need for leave or within two business days thereafter, or in the case of unforseen leave, within two business days after the leave commences."  The regulation also provides that "[t]he employer may request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration."  Section 825.305(d) states (for the third time in these regulations), that "[a]t the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification."  In addition, if the employer "finds a certification incomplete," it must "provide the employee a reasonable opportunity to cure any such deficiency."

Finally, § 825.305(e) provides that if the employer has a sick or medical leave plan which imposes a less stringent certification requirement, and either the employer or employee elects to substitute paid sick, vacation or personal or family leave for unpaid FMLA leave, then only the employer's less stringent sick leave certification requirements may be imposed.

### iii.    EDS' Written FMLA Policy And The Two Letters From SHPS Are Insufficient As A Matter Of Law To

**Satisfy EDS' Obligation Under The FMLA To Advise Its Employees Generally (Or Lipscomb Specifically) About Medical Certifications.**

In its brief, EDS asserts that "[t]he undisputed facts show that Lipscomb never submitted any medical certification to CIGNA as required by the terms of EDS' FMLA policy." (Op. Br. 16). In support of that argument, defendant cites to three documents attached to the Schwartz affidavit accompanying its brief: (1) Ex. K, a letter from SHPS to Lipscomb dated April 21, 2004; (2) Ex. L, the EDS FMLA policy (and first page of its Short Term Disability Policy) contained in its 2004 Employee Benefits Handbook; and (3) Ex. U, a Fax confirmation sheet dated June 21, 2004.[11] Despite plaintiff's broad proclamation, none of these documents, nor even the SHPS letter of May 20, 2004 (Schwartz Aff. Ex. O), set forth an EDS policy that mandates medical certifications.

First, with respect to the actual EDS policy at issue (Schwartz Aff. Ex. L), the policy is silent as to the need for a medical certification in any situation. In fact, the four paragraph policy does not even refer to medical certifications in any manner. Second, while the April 21 letter from SHPS[12] make reference to medical certifications, it specifically provides that one would not be necessary at that time, and that a medical certification would not be required providing that her claim for STD or worker's compensation under the company's plan was approved. The letter goes on to explain that if the STD or worker's compensation claim was not approved, only then would a Certification of Health Care Provider Statement

---

[11]    Plaintiff assumes the reference to Ex. U is a mistake and that instead, defendant meant to refer to the May 20 letter from SHPS. (Schwartz Aff. Ex. O).

[12]    As noted above and as will be discussed in further detail below, Lipscomb has testified that she never received any of the three SHPS letters at issue.

be sent to her.  The obvious  purpose of this letter was an attempt by EDS to comply with § 825.305(e), in that EDS was precluded from seeking a FMLA certification that was more stringent than that imposed for STD.  Regardless of the intent, however, it is also plain that the letter does not set forth an EDS policy mandating submission of a medical certifications in connection with FMLA leave.

Finally, assuming that the May 20 letter is the third document on which EDS relies as evidence of its policy of when it requires medical certifications for FMLA leave, it too does not identify an EDS policy.  Rather, it simply encloses a medical certification because Lipscomb's "claim for short-term disability benefits and/or workers compensation" ... "has not been approved or has otherwise been closed..."  It goes on to state that "[f]ailure to provide this certification within 15 days of the date of this letter may result in denial of FMLA protection."

Even assuming that Lipscomb actually received either or both of the April 21 or May 20 SHPS letters, those letters do not fulfill EDS' obligations under the FMLA, such that it can terminate Lipscomb consistent with 29 C.F.R. § 825.301(f).  First, despite the fact that the relevant regulations provide on three separate occasions that for any specific notice required by § 825.301(b) and § 825.305 the employer must explain in writing the anticipated consequences of failing to provide a medical certification, the only information provided by any of the documents with respect to consequences is the ambiguous statement that the failure to provide the information within fifteen days "may result in denial of FMLA protections."  As explained in *Peter v. Lincoln Technical Inst., Inc.*, 255 F. Supp. 2d  417, 444 (E.D. Pa. 2002), "evidence that an employer neglected to inform an employee that

failure to provide adequate medical certification could result in termination could lead a jury reasonably to conclude that the employer has interfered with the employee's FMLA rights." *Accord, Chenoweth v. Wal-Mart Stores, Inc.,* 159 F. Supp. 2d 1032, 1039 (S.D. Ohio 2001); *Wilson v. Lemington Home for the Aged*, 159 F. Supp. 2d 186, 194 (W.D. Pa. 2001). In this instance, EDS' repeated failure to advise Lipscomb of the anticipated consequences of failing to submit a medical certification demonstrates that she is entitled to a trial on her interference claim.

> **iv.    EDS' Attempt To Avoid The Consequence Of Failing To Advise Lipscomb Of The Anticipated Consequences Of Not Providing A Medical Certification Ignores Its Own Practices With The Same Employee In 2003.**

In an attempt to excuse its failure to follow the requirements of § 825.305(d), EDS constructs an argument based on its desire to fit within the facts of an easily distinguishable case, *Brown v. SBC Commc'ns, Inc.*, No. 04-C-0290, 2005 WL 2076584 (E.D. Wisc. Aug. 23, 2005). (Op. Br. 15). In essence, EDS argues that it did not need to tell Lipscomb that it might terminate her if she did not submit a medical certification, because it did not terminate her because of her failure to provide an FMLA medical certification. (Op. Br. 14-15). Rather, EDS asserts it fired her because she violated the EDS "attendance policy" that applied to the Delaware facility. (Id.). The attendance policy on which EDS relies demonstrates not only that this case is distinguishable from *Brown v. SBC Communications, Inc.*, but that EDS' motivation in attempting to use this policy demonstrates why Lipscomb's retaliation claim should also be decided by a jury.

The EDS (Delaware) attendance policy first made its appearance in this case during the plaintiff's deposition. The defendant had previously had the opportunity to explain the reasons for plaintiff's discharge during her unemployment hearing. Despite being represented by counsel (or other non-employee legal representative) at that hearing (Cronin Aff., Ex. W), the attendance policy was never mentioned. (Cronin Aff., Ex. U). Instead, they argued that because plaintiff had not submitted the necessary paperwork to their vendor (CIGNA) for her applications for FMLA and STD, she was terminated. (*Id.* at 19-20) (Cronin Aff., Ex. U).

EDS had a second opportunity to disclose the alleged importance of its attendance policy in its initial disclosures served on October 7, 2005, when it was required to disclose the existence of all documents that it may use to support its defenses. (Cronin Aff., Ex. G). Despite identifying eleven different documents (including the EDS FMLA policy and the SHPS April 21 and May 20 letters), no mention was made of the attendance policy that EDS now claims was the real reason for her discharge. Pursuant to plaintiff's document request, the eleven documents identified in the initial disclosures were then produced (at least in part). (Cronin Aff., Ex. X).

EDS had a third opportunity to disclose the importance of its attendance policy prior to Lipscomb's deposition when the decision was made to use it as an exhibit. Once again, defendant chose not to disclose it, despite the fact that the fax line on the copy of the attendance policy used at plaintiff's deposition showed it to have been faxed on August 15, 2005 from an EDS office in Delaware. (Cronin Aff., Exs. X and Y). The date it was sent

to EDS is significant, because Lipscomb was terminated thirteen months earlier, while the complaint in this action was filed on July 8, 2005.[13]

In addition to the late and suspicious manner in which the attendance policy was first raised by EDS in connection with Lipscomb's termination, a careful examination of that policy indicates that it offers no safe harbor for the defendant with respect to the claims in this case. First, by its express terms, the policy does not apply to "any qualifying Family Medical Leave Act (FMLA) absences or other protected leave." As Barbara Jackson explained at her deposition, "other protected leave" would include leave covered by short term disability. (Cronin Aff., Ex. E at 65-66).

The relevant portion of the policy on which EDS apparently relies is entitled "Absences." The first sentence of that section states that "[i]f any employer is absent for three (3) or more days consecutively due to a medical reason, they may be required to provide a health care provider's certification to their manager upon return to the workplace." (Schwartz Aff., Ex. E). There is no dispute that Lipscomb complied with that portion of the policy by providing a note from her doctor when she returned to work on May 17, 2004. (Schwartz Aff., Ex. N). The second sentence of "Absences" states that "a health care provider's certification *may be required* to validate any other illness or time away from work due to medical reason, *if deemed appropriate by EDS/USGS leadership.*" (emphasis

---

[13]    After plaintiff's deposition was adjourned, plaintiff directed interrogatories to defendant requesting information with respect to the sender and recipient of this policy in August 2005. (Cronin Aff., Ex. Y). While plaintiff has learned that it was a fax machine at the EDS facility in Delaware that transmitted the document (Cronin Aff., Ex. Y, Resp. to Int. No. 2), the defendant has claimed attorney/client privilege with respect to the recipient and otherwise refused to identify the lawyer or law firm that received the fax. (Cronin Aff., Ex. Y, Resp. to Ints. 3, 5 and 7).

supplied).  It is undisputed in the summary judgment record that apart from the medical

certification forms sent out by CIGNA (for the STD) and allegedly sent out by SHPS (for

FMLA), EDS leadership never requested from Lipscomb any health care provider's

certification.  Therefore, since the EDS attendance policy by its terms does not apply to

FMLA and STD, Lipscomb did nothing to violate this policy.

We expect that EDS will argue that even if there was no violation of the attendance

policy *per se*, Lipscomb admitted that she understood that pursuant to the terms of that

policy she could be terminated for "unexcused absences."  (Op. Br. 15 - 16).  Such an

argument ignores a critical fact.  Lipscomb had no reason to believe prior to her termination

that her absences in this instance would be viewed as "unexcused."  Contrary to what she

now states in her affidavit, there is nothing in Jackson's testimony at the unemployment

hearing (Cronin Aff., Ex. U, pp. 6-23) or her written summary of the three conversations she

had with Lipscomb in late June and early July 2004 that supports the assertion that plaintiff

was told that if she could not satisfy CIGNA's need for "documentation" her already

approved absence would now be deemed "unexcused." (Schwartz Aff., Ex. Q).  Lipscomb

was asked by her managers to do only two things: bring in a note from her doctor before she

left for the surgery, and then bring a note from her doctor when she was able to return to

work.  Lipscomb delivered both of the doctor's notes as requested and her employer never

objected.  Instead, two months after she returned to work, she was terminated because her

claims for STD and FMLA had been denied.  It is simply not credible for EDS to argue now

that Lipscomb was terminated for violating an attendance policy as opposed to failing to

provide an FMLA certification.

In *Brown v. SBC Commc'ns, Inc.*, 2005 WL 2076584, the Court was presented with facts far different than those in the case at bar. In *Brown*, the employer had a detailed attendance policy that set forth specific thresholds that required discipline be imposed once those thresholds were met. (*Id.* at * 2). Likewise, the plaintiff in that case had a history of discipline being imposed for unexcused absences. (*Id.* at * 3). Conversely, in the case at bar, defendant has no similar policy with respect to how often an employee would need to be out before he would be subject to discipline. Likewise, while defendant tries to portray plaintiff as an employee with substantial attendance problems, their own records (and testimony) belie that assertion. For example, EDS asserts that Eaddy gave Lipscomb a "verbal warning" on April 16, 2004 telling her "that if her tardiness issues continued, she would be placed on a written warning which could ultimately lead to her separation." (Op. Br. 4). In fact, Eaddy testified that she could not remember if she was even at the meeting when the so-called verbal warning was given. (Schwartz Aff. Ex. J at 62). When asked what would typically occur at such a meeting, Eaddy said: "We review the sheet and say this is the many times as you've been late and that it could lead to a written warning if it continues." (Schwartz Aff. Ex. J at 63). Contrary to the assertion in the EDS brief, Eaddy never testified that she told Lipscomb that continued tardiness "could ultimately lead to her separation."

Likewise, the notion that Lipscomb was a bad employee on the verge of being terminated is belied by her employment evaluation of March 23, 2004 when Eaddy states in the performance summary portion of the evaluation that: "Hestal is a great employee. She takes a challenge and runs with it. She has great quality and does whatever it takes to get the job done." (Cronin Aff., Ex. Z at EDS II 00186). Finally, the notes from CIGNA's

telephonic initial intake call with Eaddy on April 20, 2004 contradict the assertion that whatever occurred on April 16, 2004 between Lipscomb and either Eaddy or Linda Jackson could even be regarded as disciplinary.  When asked by CIGNA whether in the last twelve months Lipscomb had any attendance warnings, performance warning or conduct warnings, Eaddy responded in the negative, despite the fact that the verbal warning during which she allegedly raised the issue of termination only occurred four days earlier.  (Cronin Aff., Ex. F at 26-28, Ex. JJ at 26-32 of 32).

> ### v.    EDS Is Not Entitled To Rely On A "Mailbox Presumption" Or "Mailbox Rule" To Prove That It Complied With The Applicable FMLA Regulations.

In its brief, defendant asserts that "[a]s of June 17, 2004, Lipscomb had received four letters from CIGNA emphasizing the need and importance of sending it her medical certification."  (Op. Br. at 8).  Notably, defendant does not cite to any evidence in the summary judgment record to support that statement.[14]  Plaintiff believes that the defendant will argue it is entitled to a "mailbox presumption" to support its argument that the Court find that Lipscomb did receive the SHPS letters at issue, particularly the letter of May 20, the only one that enclosed the medical certification.  For several reasons, the Court should not adopt such a presumption, particularly on a motion for summary judgment.

As discussed in *Myers v. Dolgencorp, Inc.*, No. 04-4137-JAR, 2006 WL 408242 at * 7 (D. Kan. Feb. 15, 2006), "[u]nder the common law mailbox rule, proper and timely

---

[14]    At several points in its brief, defendant asserts as a matter of "fact" that Lipscomb was aware of the contents of the three letter from SHPS prior to termination.  *See* Op. Br. at 5-8, 10, 14 and 16.  There is no evidentiary support for the assertion that Lipscomb was aware of the contents of those letters.  In fact, the summary of her termination meeting with Rogers reflects the fact that she was surprised that she was being terminated. (Cronin Aff., Ex. N).

mailing of a document raises a rebuttable presumption that it is received by the addressess."
(citations omitted). The Court went on to explain, "[a]s a general rule, evidence of
nonreceipt of mail matter does not nullify the presumption, even though it consists of the
addressee's positive denial of receipt, but merely creates an issue of fact for the jury, with
such weight given to the presumption as the trier of fact thinks it is entitled to, with the
burden of proving receipt on the party asserting it." *Id.*

In *Myers v. Dolgencorp,* the Court was asked to apply the mailbox presumption to
an FMLA case dealing with a medical certification. In that case, it was the
plaintiff/employee who attempted to rely on the rule to account for the fact that the employer
claimed not to have received a medical certification which she said she mailed. While
recognizing the general rules set forth above, the Court rejected plaintiff's reliance on the
mailbox rule and granted summary judgment because there was no corroboration that a
medical certification was sent.

In this case, there is no corroboration that any of the three unsigned SHPS letters
were sent to Lipscomb on the dates indicated on those letters. There is also no evidence that
they were actually received by Lipscomb on any date. Copies of the three letters were
produced from the files of EDS, since even LINA (the purported third party administrator
for FMLA claims) was apparently never sent copies, since none were produced in response
to a subpoena directed to that entity in Texas. (Cronin Aff., Exs. HH and JJ). Furthermore,
although Lipscomb was unaware of any specific problems with her mail at the time, she
states in her affidavit that her neighborhood was such that delivery of mail was less than
dependable. While it is unknown in this instance whether this mail was stolen, mis-

delivered, not sent or returned to sender, there is no evidence that it was actually received by the plaintiff.

This case is also distinguishable from *Myers v. Dolgencorp* based on what each of the plaintiffs knew at the relevant time.  Unlike the case at bar, it was undisputed in *Myers* that:  (1) the plaintiff was actually given the correct form; (2) she had a date certain for returning the form; and (3) she did not allege that the company failed to apprise her of the consequences of failing to timely return the required medical certification. (*Id*. at * 8).  In this case, Lipscomb denies having received the form and letter, therefore making it impossible for her to know when it was due.  Equally obvious, even if she had received the May 20 letter, she would not have been advised of the anticipated consequences of failing to return it by a date certain.[15]

More importantly, however, plaintiff submits that the mailing of a medical certification by  an employer (or its agent) should be found insufficient to satisfy §§ 825.301 and 825.305, if the employer intends to terminate an employee on the basis of not submitting a completed form, unless the employee has actual notice of the anticipated consequences of his failure to provide a medical certification.  As the legislative history provides, the language in § 825.305 that allows for the mailing of medical certification forms was only added in response to the concern expressed by some groups about the negative impact a request for a medical certifications could have on employees who were already out of the workplace due to their medical leave. (Ex. V, 60 Fed. Reg. at 2220).  In this case, Lipscomb was already back at work when SHPS allegedly sent its letter of May 20 telling her to submit

---

[15]    Since it is impossible to know when the May 20 letter was actually mailed, it is also impossible to know whether it provided the 15 days required by § 825.305.

the medical certification enclosed with that letter. She then remained at work for almost two months before her abrupt termination. Nothing prevented EDS from simply handing her a copy of the May 20 letter with the enclosed medical certification form and advising her that she would be terminated if she did not return the completed form by a date certain. Likewise, nothing prevented SHPS, LINA, CIGNA and/or EDS from sending her a certified letter to make sure that she understood the importance of having this form filled out by a particular date. Therefore, a jury should decide if EDS' failure to properly give notice to Lipscomb of its request for a medical certification constitutes interference with her rights under the FMLA.

> **vi.      Given That She Did Not Receive The May 20 Letter From SHPS, It Became Virtually Impossible For Lipscomb To Satisfy Her Employer's Urging That She Provide "Documentation" To CIGNA.**

Despite not receiving the three letters from SHPS, Lipscomb made substantial efforts to provide to CIGNA the "documentation" that she understood needed to come from her doctors. While Barbara Jackson's affidavit testimony about calling CIGNA on five separate occasions is not corroborated by any contemporaneous records (compare Schwartz Aff. Ex I, ¶ 12 with Schwartz Aff., Ex. Q and Cronin Aff., Ex. U, pp. 6-23), it also ignores the simple fact that CIGNA would not have known whether a medical certification form had been submitted by Lipscomb because they did not sent it to her and they did not receive copies of what was allegedly sent to her by SHPS. (Cronin Aff., Ex. HH and JJ). In fact, with respect to the one call to CIGNA reflected in her notes that she was asked about at her deposition, Jackson could not even identify who at CIGNA she spoke to. (Cronin Aff., Ex. E at 53) (Schwartz Aff., Ex. Q).

What is striking about Lipscomb's attempts to comply with Jackson's request at the end of June and early July was the sheer futility of the effort. If Lipscomb did not have the form enclosed with the May 20 letter in her hands when she called her doctors, there was no way she could have satisfied EDS, regardless of how many times she called CIGNA or went to her doctor's offices at Wilmington Hospital. As the record makes clear, Lipscomb had never even seen any medical certification or insurance form that she was supposed to submit to CIGNA or anyone else until sometime after her termination. All she knew was that she was supposed to contact her doctors and get them to submit "documentation" to CIGNA. Unbeknownst to Lipscomb, her doctors were faxed a medical form on May 7 by CIGNA. (Schwartz Aff., Exs. T and W). From the documents produced by Wilmington Hospital, it appears that a completed version of that form was sent out on two separate occasions. First, it was sent to EDS's Delaware office on May 20, 2004. (Cronin Aff., Ex. R). Then, the same document was apparently sent to Texas to the fax number indicated on the form on June 21, 2004. (Cronin Aff., Ex. S) (Cronin Aff. at ¶ 40).

In its brief, defendant makes several arguments as to why the apparent attempt by Wilmington Hospital to send the form to CIGNA on June 21, 2004 should be ignored by the Court. However, the purpose for introducing evidence as to what likely occurred with respect to the STD medical certification on May 20 and June 21, 2004 is not to satisfy this plaintiff's alleged obligation to provide a medical certification, since no such request for a certification was properly made by the employer. For the reasons set forth above, EDS did not satisfy its obligation if it intended to take action based on the absence of completed medical certification. What the evidence regarding the June 21, 2004 fax transmission does

show is that CIGNA, the purported administrator of EDS' FMLA leave, had defective procedures in place for purposes of an employee attempting to comply with its STD provisions.  In other words, according to the April 21 letter to Lipscomb from CIGNA, if an EDS employee qualifies for STD, they automatically are covered by the FMLA. (Schwartz Aff., Ex. K).  Thus, the STD form is important, because it provides another way for EDS employees to become entitled to the protections of the FMLA.

In support of its motion for summary judgment, EDS offers an affidavit from a claims manager at CIGNA, Billie Andrade, with respect to the form that the parties agree was sent to Wilmington hospital on May 7, 2004.  In her declaration, Andrade discusses two fax numbers that appear on a fax confirmation sheet dated June 21, 2004. (Schwartz Aff., Ex. V).  While she does not specifically discuss the CIGNA form of May 7, she does discuss the fax number on that form which is identified twice on the document as being the fax number where  the completed form and medical records should be sent.

In her declaration, Andrade makes the surprising admission that the fax number listed twice on the CIGNA form sent to Lipscomb's physicians on May 7, 2004 (to which the completed form was supposed to be sent) was invalid because it contained transposed digits. (Schwartz Aff., Ex. V, ¶¶ 6, 7).  As EDS and CIGNA well know, if Lipscomb's physicians had satisfactorily completed that CIGNA form, then Lipscomb would not have had to submit any kind of medical certification in order for her leave to be considered FMLA leave. (Schwartz Aff., Exs. K and T).  Likewise, under 29 C.F.R. § 825.305(d), if EDS has received what it considered an "incomplete" certification, then it was obligated to provide plaintiff with an opportunity to cure any deficiency.  Therefore, just as it was important for EDS to

insure that its employee was aware of what she had to do to comply with her obligations under the FMLA, it was equally important that its agent, CIGNA, not make it more difficult for Lipscomb by providing a form to her physicians that contained incorrect information on how to provide the necessary information.

In her declaration, Andrade testifies about a second fax number that she also disowns on behalf of her employer. Specifically, she states that: "1-800-377-4286 is not a valid facsimile number for LINA to receive incoming facsimiles" and that "LINA is not able to receive documents faxed to 1-800-377-4286." (Schwartz Aff., Ex. V, ¶¶ 4 and 5). That fax number appears on the fax confirmation sheet that Lipscomb testified about in her deposition (Cronin Aff., Ex. C at 115-118), and which defendant includes with the Schwartz affidavit in support of its motion. (Schwartz Aff., Ex. U). Lipscomb testified that she was shown that confirmation sheet by a nurse at Wilmington Hospital after her termination, along with the document that was sent on June 21, 2004, i.e., the STD medical certification signed by Dr. Kraut on May 19, 2004 (Schwartz Aff., Ex. T) and a cover sheet from Wilmington Hospital dated June 21, 2004. (Cronin Aff., Ex. S and Ex. C at 90-95).

Consistent with the fax confirmation sheet for the April 19 note that was sent to Lipscomb directly at the EDS facility (Cronin Aff., Ex. O), the June 21 fax confirmation indicated that it came from the same machine and that it was transmitted successfully. (Cronin Aff., Ex. S). However, as EDS correctly notes in its brief, while it was sent to the correct number on the CIGNA form (the one with the transposed numbers), it was apparently received by a phantom number, i.e., 1-800-377-4286.

Through discovery directed to CIGNA in this case, Lipscomb attempted to find out whether this was another CIGNA or LINA fax number to which the form had been forwarded. In response to a subpoena and follow up telephonic and letter requests, CIGNA steadfastly denied it was their number. (Cronin Aff., Exs. II and KK). Finally, Lipscomb's attorneys sent a letter to the phantom number to see if anyone would respond. (Miller Aff., Ex. A)[16]. Two different individuals responded to that fax, identifying themselves as employees of CIGNA Group Disability. Both individuals telephoned plaintiff's law firm and left voice mail messages asking for the name of the claimant. (Miller Aff., Exs. C and D). While CIGNA witnesses Rudeen and Gracie Gunther denied knowing the two people who left messages, the second individual (Janice Cook) identified the number she had received the fax at as being 1-800-642-8553. (Cronin Aff., Ex. F at 47-51; Ex. GG at 24-30). While Rudeen did not recognize that facsimile number either, she did agree that this same number was listed on a website for "CIGNA Disability Management Solutions," apparently another registered service mark used by CIGNA Corporation's subsidiaries. (Cronin Aff., Ex. F at 50-51, Ex. J). As she also admitted, CIGNA Disability Management Solutions is "the name our customers know us as." (Cronin Aff., Ex. F at 50). Finally, Rudeen admitted that according to printout from that same website, the entity described on the website works out of the same street address in Dallas, Texas as her group. (Id. at 50-51) (Cronin Ex. J).

While EDS obviously has the right to hire companies such as LINA, CIGNA and SHPS to administer FMLA leave on behalf of its employees, equally apparent is that they cannot hide behind the incompetence of its agents as a defense to its obligations as an

---

[16] The Affidavit of Victoria K. Miller ("Miller Affidavit") is being filed concurrently herewith.

employer under the FMLA.  As least on this issue, the parties seem to be in agreement. (Cronin Aff., Ex. I at 25).  Even more importantly, however, if Lipscomb or her physicians had been able to convey a deficient medical certification to CIGNA on June 21, 2004, defendant was required to advise the plaintiff that it found it to be incomplete, and provide her a reasonable opportunity to cure any deficiency.  *See* § 825.305(d); *accord Marrero v. Camden County Bd. of Social Services*, 164 F. Supp. 2d 455, 466 (D.N.J. 2001) ("Regardless, termination is not an appropriate response for an inadequate certification. Section 825.305(d) provides that where an employer finds a certification incomplete, it must give the employee a reasonable opportunity to cure any deficiencies.").  Having made it virtually impossible for Lipscomb to submit even a deficient medical certification to CIGNA is one more reason a jury must decide whether EDS interfered with her attempt to exercise her rights under the FMLA.

### C.    There Is A Genuine Dispute Of Material Fact As To Whether EDS Retaliated Against Lipscomb For Seeking Medical Leave Potentially Covered By The FMLA.

Retalation claims under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Collier v. Target Stores Corp.*, at * 5.  The *McDonnell Douglas* framework sets forth a three step analysis for retaliation claims.  First, the plaintiff must establish a *prima facie* case of retaliation.  A *prima facie* case of retaliation under the FMLA is established by showing: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and the

employer's adverse employment action. *Collier* at * 5; citing *Conoshenti v. Pub. Serv. Elec & Gas Co.*, 364 F. 3d 135 (3ʳᵈ Cir. 2004).

After establishing a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Collier* at * 5; citing *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004). If a legitimate, non-discriminatory reason is provided, the plaintiff must present evidence to show that the defendant's proffered reasons were not its true reasons, but merely a pretext for its illegal action. *Collier* at * 5, quoting *Baltuskonis v. U.S. Airways, Inc.*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999). In order to survive summary judgment, a plaintiff must "either (I) discredit the proffered reasons or (ii) adduce evidence that discrimination was more likely than not motivating or determinative cause of the adverse employment action." *Collier* at * 5; quoting *Torre v. Casio*, 42 F. 3d 825, 830 (3ʳᵈ Cir. 1994). "Although the presumption of discrimination (or retaliation) 'drops out of the picture' once the defendant meets its burden of proof, the trier of fact may still consider the evidence establishing the plaintiff's *primia facie* case and inferences properly drawn therefrom. . . .on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000), citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) and *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 (1981).

In this case, there is no dispute that plaintiff availed herself of a protected right under the FMLA and that she suffered an adverse employment action. Not only did she request leave that EDS considered as possibly covered under the FMLA by submitting it to CIGNA, they terminated her as a result of her absence from work for the period covered by the leave

request. With respect to the issue of causation, as stated by the Third Circuit, "[a]lthough timing and ongoing antagonism have been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence." *Farrell v. Planters Lifesavers Co.*, 206 F. 3d 271, 280-281 (3rd Cir. 2000). One such way to show the connection is by showing the employer gave inconsistent reasons for the termination. *Farrell* at 281, citing *Waddell v. Small Tube Products, Inc.*, 799 F. 2d 69, 73 (3rd Cir. 1986). As the Court in *Farrell* also explained, "we have been willing to explore the record in search of evidence, and our case law has set forth no limits on what we have been willing to consider." *Id.* at 281. The Court concluded, quoting from *Kachmer v. SunGard Data Systems, Inc.*, 109 F. 3d 173, 178 (3rd Cir. 1997):

> "[i]t is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's *prima facie* case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which the inference can be drawn."

*Farrell* at 281.

In this case, there are several reasons why a jury could reasonably find that defendant intended to retaliate against plaintiff for invoking her rights under the FMLA. First, defendant was asked through discovery to identify all individuals who had been terminated since 2000 for violating the attendance policy that defendant relies on to support the lawfulness of Lipscomb's termination. (Cronin Aff., Ex. Y at Int. and Resp. No. 17). In response, after asserting various objections, the defendant identified only one other employee, Roberta McWilliams, who was terminated at approximately the same time as

Lipscomb.  If (as appears to be the case) defendant has never previously terminated an employee for violation of its attendance policy, that raises a reasonable inference that these terminations were in retaliation for requesting leave potentially covered by the FMLA, particularly since, as discussed above, she did not violate the terms of that policy.

Second, defendant asserts that Lipscomb's April 2003 leave is a "striking example" of why she was not terminated then, but was terminated in 2004. (Op. Br. at 15).  In support of that argument, defendant offers Barbara Jackson's affidavit in which she states that Lipscomb was not terminated in 2003 because "she provided medical documentation substantiating her absence." (Schwartz Aff., Ex. I at ¶¶ 3-4).  Notably, EDS does not identify that medical documentation.  However, as Lipscomb states in her affidavit, the only medical document that she submitted in 2003 was her return to work note. (Lipscomb Aff. at ¶ 8, Ex. A).  In 2004, she did exactly the same thing, although it was in the form of two notes.  After handing in that second note on May 17, 2004, no one on behalf of EDS said anything prior to or at her termination to the effect that these two notes were deficient in any respect.  In fact, e-mails from Lance Rogers and Barbara Jackson on the date of the termination are silent as to the inadequacy of those two notes as being the basis for the termination.  (Cronin Aff., Exs. L and N).  A jury should decide whether EDS' post-termination decision to find Lipscomb's return to work note from 2004 deficient is pretextual.

Finally, the facts surrounding the termination of Roberta McWilliams suggest that Lipscomb was fired solely to make the company look like it had a uniform policy with respect to employees with potential FMLA leave in the event that EDS was sued by McWilliams.  From her obituary of approximately one year after termination by EDS, certain

things are known about McWilliams: (1) she had worked for EDS for fifteen years; (2) she was approximately 53 years old; and (3) she apparently died from cancer. (Cronin Aff., Ex. AA). What is known from the documents produced by EDS in this case, is that: (1) McWilliams was terminated while she still had at least one appeal pending with respect to her right to FMLA leave; and (2) EDS apparently misled her at her termination meeting with respect to the status of that application for FMLA leave. (Cronin Aff, Ex. T) (Cronin Aff., Ex. B at 14-16, Ex. T).

In addition, on July 9, 2004, the day that Rogers made the decision to terminate McWilliams, Tracey Eaddy, Barbara Jackson and Christine Cornwell of EDS Human Resources were discussing an Attendance Improvement Plan for Lipscomb in light of her alleged unexcused absences. (Cronin Aff., Ex. BB). There is no contemporaneous evidence produced to date that suggests that EDS even considered termination as an option for Lipscomb prior to the decision on July 9, 2004 to terminate McWilliams. The decision to terminate Lipscomb was made only three to four days after the termination of McWilliams. A reasonable jury could infer from the timing of these events that EDS, in an effort to protect itself, fired Lipscomb to establish a "comparator" in the event that McWilliams filed suit under the FMLA or any anti-discrimination statute. Once again, a jury should decide whether the stated reasons for the decision to fire Lipscomb were genuine, or simply a pretext to protect itself in the event of possible litigation involving another employee.

## CONCLUSION

For the reasons stated and upon the authorities cited above, plaintiff Hestal Lipscomb respectfully asks that defendant's motion for summary judgment be denied in its entirety and that this case proceed to trial.

SMITH, KATZENSTEIN & FURLOW LLP


_____/s/ Laurence V. Cronin_____
Laurence V. Cronin (ID No. 2385)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Telecopy: 302-652-8405
Email: LVC@skfdelaware.com
Attorneys for Plaintiff

Date:   July 3, 2006