**Affidavit of Laurence V. Cronin**                    **Exhibit A**

# EDS

# Delaware Healthcare Services

# Account Handbook



■ ■ ■ The recognized global leader in ensuring clients achieve
superior value in the digital economy.



DEPOSITION
EXHIBIT

EDS-4

Rawsir 4.12-06

EDS II 00001

# EDS - Our History

When EDS started in 1962, people didn't know or care much about computers. They were just beginning to see that the information amassed and generated by computers was the future of commerce. Nearly 40 years later, the world has caught on to what we meant when we said long ago, "Without information, nothing happens".

Even in the beginning, we understood the promise of managing information to improve our clients' businesses. In the 1960s, we did not necessarily foresee digital supply chain management or online grocery shopping. We did foresee that information technology would fundamentally change people's lives and the way enterprises and governments work. We evolved from this idea — with one man, one $1,000 check and one extraordinary vision — to a $19.2 billion, global business leader with about 120,000 people who help clients solve their toughest business challenges.

## Winning in the Digital Economy

In today's digital economy, companies that understand when and how to apply technology to solve critical business imperatives win. From our inception, we have understood how to help companies manage their data. EDS established the information technology outsourcing industry and established the trust of our clients by pioneering the systems management and integration industries in the 1960s and 1970s. Many of these companies are still EDS clients. We built the world's largest private voice and data network in the 1980s, connecting disparate islands of data to create a new world of information that expanded beyond borders for our clients.

Today, EDS offers sophisticated Web, mobile or storage-hosting services for hundreds of enterprises worldwide, helping businesses embrace speed and innovate quickly in the digital environment. And by collaborating in new ways with suppliers, clients and even competitors, we have used technology to create new offerings, new insight and new opportunities on every continent. Every day, we are engaged in the global, ubiquitous transmission, processing, distribution and storage of information that make the digital economy possible.

## Helping our Clients Succeed

As the digital economy emerged like a bullet train, we, and the thousands of clients we serve, were already on track. We did not race to implement a global infrastructure. We already had one. We did not frantically create data centers. We had capacity. We did not scramble to fend off hackers. We had already developed one of the most comprehensive information assurance methodologies including privacy and security in the world. We did not have to ramp up to embrace e-business. We were there. And today, we have gone beyond "e" to help our clients transform their businesses to compete effectively in the digital economy.

# Delaware Healthcare Services

## Our Account

The EDS Delaware Healthcare Services Account ("Account") is the fiscal agent for the Delaware Medical Assistance Program (DMAP).

Through its two contracts, Delaware Healthcare Services and Health Benefit Manager (HBM), the Delaware Account team supports the following programs:

- The Delaware Medical Assistance Program (DMAP)
- Health Benefits Manager (HBM)
- Delaware Healthy Children Program (DHCP)
- Diamond State Partners (DSP)
- Delaware Prescription Assistance Program (DPAP)

The Account staff currently totals approximately 85 employees, which includes managers, supervisors, pharmacists, provider and client service representatives, financial staff, technical staff, and specialized support clerks. The account is divided into several departments such as document control, claims processing, client/provider services and systems.

## Contract Terms

Our relationship with the state of Delaware began in 1989 and has continued as described below:

| | |
|---|---|
| Original MMIS Contract- | November 1, 1989 to June 30, 1998 |
| MMIS Contract Extensions | July 1, 1998 to June 30, 2002 |
| Original HBM Contract | July 1, 1996 to June 30, 1997 |
| HBM Contract Extensions | July 1, 1997 to June 30, 2004 |
| New MMIS Contract | July 1, 2002 to June 30, 2012 |
| New HBM Contract | July 1, 2004 to June 30, 2005 |
| Original DSP Contract | July 1, 2002 to June 30, 2003 |
| DSP Contract Extensions | July 1, 2004 to June 30, 2004 |
| New DSP Contract | July 1, 2004 to June 30, 2005 |

EDS II 00008

**Affidavit of Laurence V. Cronin**                    **Exhibit B**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                  )
                                  )
            Plaintiff,            )
                                  )
v.                                )    Civil Action No.  - =
                                  )       05-477 SLR
ELECTRONIC DATA SYSTEMS           )
CORPORATION, a Delaware           )
Corporation,                      )
                                  )
            Defendant.            )

        Deposition of LANCE ROGERS taken pursuant to
notice at the offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 3:05 p.m. on Wednesday, April 12, 2006,
before Robert Wayne Wilcox, Jr., Court Reporter and
Notary Public.

APPEARANCES:

        LAURENCE V. CRONIN, ESQ.
        SMITH, KATZENSTEIN & FURLOW LLP
          800 Delaware Avenue - 7th Floor
          Wilmington, Delaware  19801
          for the Plaintiff,

        THOMAS J. PIATAK, ESQ.
        BAKER HOSTETLER
          3200 National City Center
          1900 East 9th Street
          Cleveland, Ohio  44114
          for the Defendant.


                CORBETT & WILCOX
          Registered Professional Reporters
    1400 French Street     Wilmington, DE 19801
                (302) 571-0510
            www.corbettreporting.com

Lance Rogers

3 (Pages 6 to 9)

## Page 6

1  position?
2      A.  I was the implementation manager.
3      Q.  Okay.  What does the implementation manager
4  do?
5      A.  We implement the medical management
6  information system for the State of Delaware.
7      Q.  Okay.  In that role did you have final
8  authority as to hiring and firing of employees at the EDS
9  Delaware facility?
10      A.  Those employees related to the systems
11  engineering group?
12      Q.  Yes.
13      A.  Yes.
14      Q.  Okay.
15      A.  Are you referring to as client delivery
16  executive or implementation manager?
17      Q.  Implementation manager.
18      A.  My answer is correct.
19      Q.  Okay.  How many people reported to you in July
20  2002?  Not direct reports but --
21      A.  Approximately 19.
22      Q.  Nineteen people?
23      A.  Yes.
24      Q.  How many people worked at the facility?

## Page 7

1      A.  In July of 2002?  Approximately 80 to 85.
2      Q.  Okay.  Was there a single individual who was
3  in charge of the entire facility?
4      A.  In July of 2002 --
5      Q.  Yes.
6      A.  -- that was Robin Connor.
7      Q.  What was her position?
8      A.  She was the client delivery executive.
9      Q.  Okay.  Who were your direct reports in July of
10  2002?
11      A.  Jose Tieso, Karen Jennings, who was at the
12  time Karen Kilby, Sandra Foulk, Bridget Wilson, Jamie
13  Laporte, Iris Borders and Michael Moore.
14          How many am I up to?
15      Q.  Seven.
16      A.  I would have to check the records on the rest
17  of the names.  I don't recall each of them.
18      Q.  Okay.  That was in July 2002?
19      A.  Correct.
20      Q.  Okay.  What about July of 2004?  Who were your
21  direct reports?
22      A.  It would be Kay Wasno, Barbara Jackson, Jose
23  Tieso, Gina Perez.  There's one more.  I cannot remember
24  their name.

## Page 8

1      Q.  Okay.  Now, in July of 2004, in what
2  situations were you involved in personnel matters
3  involving the people who ultimately reported to you?
4      A.  Personnel matters related to Hestal Lipscomb
5  and Barbara Jackson.  I was involved in a personnel
6  matter related to Roberta McWilliams with Kay Wasno.  And
7  potentially -- I don't recall the rest.
8      Q.  Okay.  They were both in July of 2004.
9  Correct?
10      A.  They were over periods of time leading up to
11  July of '04, yes.
12      Q.  Okay.  Did you make the decision to terminate
13  any employees other than Roberta McWilliams and Hestal
14  Lipscomb?
15      A.  Not that I recall during that time frame.
16      Q.  All right.  What time frame are you using
17  here?
18      A.  July of '04.
19      Q.  What about during the entire time that you
20  held that particular position?
21      A.  Throughout my various leadership positions
22  with EDS, I have separated probably anywhere from five to
23  ten different people or have been involved in those
24  personnel matters.

## Page 9

1      Q.  How long have you been employed with EDS?
2      A.  Seventeen years.
3      Q.  Tell me again your position in 2004.
4      A.  Client delivery executive.
5      Q.  Okay.  How many employees did you terminate as
6  client delivery executive?
7      A.  I don't recall.
8      Q.  Can you recall any other than Ms. Lipscomb and
9  Roberta McWilliams?
10      A.  I don't recall.
11      Q.  Okay.  I may not have asked you this.
12          Have you ever been deposed before?
13      A.  I have not.
14      Q.  Have you ever given testimony under oath
15  before?
16      A.  I have not.
17      Q.  I'd like you to look at what's been marked
18  today as EDS No. 1.  Can you find that there in your
19  stack?  It's the collection of documents that Mr. Piatak
20  gave me yesterday.
21      A.  EDS 1?
22      Q.  Yes.
23      A.  Okay.
24      Q.  Specifically, I want to call your attention,

Lance Rogers

Page 10

1   first of all, to the third and fourth pages of that
2   document. Do you know from what this document was taken?
3       A.  This would be a summary document from Kay
4   Wasno related to circumstances surrounding Roberta
5   McWilliams.
6       Q.  Okay. So it was authored by Ms. Wasno?
7       A.  Correct.
8       Q.  All right. When did you first get involved
9   with the ultimate termination of Roberta McWilliams?
10      A.  I don't recall the exact date.
11      Q.  Well, looking at this, the first of July 9,
12  does that refresh your recollection at all as to when you
13  first got involved?
14      A.  No. I was involved with Roberta McWilliams
15  for a substantial amount of time prior to this -- leading
16  up to this.
17      Q.  Okay. How long was Ms. McWilliams out on
18  medical leave at the time of her termination?
19      A.  At the time of her termination, she was not on
20  medical leave.
21      Q.  She had returned from medical leave?
22      A.  Yes.
23      Q.  How long had she been out?
24      A.  When she had gone out on medical leave?

Page 11

1       Q.  Yeah.
2       A.  I don't recall.
3       Q.  Okay. Let's look at Ms. Wasno's note of
4   July 9th. Did you discuss the substance of this note
5   with Ms. Wasno?
6       A.  Yes.
7       Q.  Okay. Do you recall what you had discussed?
8       A.  Yes.
9       Q.  Tell me what you recall discussing with
10  Ms. Wasno about this note.
11      A.  I discussed with Kay and with Christine
12  Cornwell conversations that Kay had had with Kim Rudeen
13  at CIGNA. CIGNA had advised Kay that Roberta's appeal of
14  her time out was denied.
15      Q.  Which time out? FMLA or STD?
16      A.  I'm not sure. We would have relied on CIGNA
17  for both of those.
18      Q.  Looking at about the fourth line down, it
19  says, "She conferenced FMLA in on the call, and they
20  advised that a letter was being sent to Roberta today
21  that she has 15 days to respond with medical
22  documentation of approval for FMLA."
23          Do you see that?
24      A.  I do.

Page 12

1       Q.  All right. Did you discuss that with
2   Ms. Wasno?
3       A.  I recall discussing with Kay that Kay
4   discussed with CIGNA the denial of Roberta's FMLA and
5   that CIGNA would be sending a letter to Roberta with her
6   rights to appeal the decision of denial.
7       Q.  Okay. This would have been on July 9th that
8   the letter was being sent to her telling her she had 15
9   days to respond with medical documentation?
10      A.  Yes.
11      Q.  Okay. Did you have an understanding of this
12  later when you made the decision to terminate
13  Ms. McWilliams?
14      A.  I believe the decision to terminate
15  Ms. McWilliams was made that day.
16      Q.  What day?
17      A.  The 9th, pending decision of the appeal.
18      Q.  Okay. Turning to the next page of this
19  document, it seems to indicate that she discussed this
20  with you today, meaning July 9th, and you agreed that you
21  should go ahead and terminate her. Is that correct?
22      A.  That is correct.
23      Q.  And that Kay then left her a message telling
24  her to return the call. Was that to inform her that she

Page 13

1   was being terminated?
2       A.  I don't recall what that particular phone call
3   was for.
4       Q.  Okay.
5       A.  I don't believe it would have been to
6   terminate her. I believe we made a decision to terminate
7   pending notice of the appeal.
8       Q.  Okay. Is there anything here that says it was
9   a termination pending the appeal of her denial of FMLA or
10  a request for leave?
11      A.  Yes. We agreed that option two was our
12  option; however, we were aware that Roberta was being
13  mailed the notice of appeal.
14      Q.  Okay. Let's turn to the next document which
15  appears to be an e-mail from you to Ms. Wasno with a copy
16  to Mr. Dominica. Do you see that? Do you see that
17  e-mail?
18      A.  I see it, yes.
19      Q.  Okay. Now, it says that Kay called Roberta
20  into the office a little after 4:00 on July 19th, '04.
21  Correct?
22      A.  Correct.
23      Q.  This was ten days after the decision was made
24  to terminate. Is that correct?

Lance Rogers

5 (Pages 14 to 17)

---

Page 14

1    A. Yes.
2    Q. Okay. Then it goes on to say that the
3  decision had been made to terminate her. Is that
4  correct?
5    A. Why don't you give me a moment to read --
6    Q. Sure.
7    A. -- the whole note?
8    Q. Sure.
9    A. Okay. Can we go back to the question?
10        MR. CRONIN: Can you read it back?
11        (The reporter read the requested
12  portion.)
13        THE WITNESS: That is correct.
14  BY MR. CRONIN:
15    Q. Specifically it says that during the
16  conversation Roberta asked if we were firing her because
17  her short-term disability had been denied. Kay clarified
18  that, because it had been denied, the absences are
19  considered unexcused absence and that Roberta was being
20  separated because of the excessive unexcused absence. Is
21  that correct?
22    A. That is correct.
23    Q. All right. At that point Roberta asked about
24  FMLA?

---

Page 15

1    A. Yes.
2    Q. Okay. Then Kay indicated that FMLA was
3  provided and that Roberta had been paid through June 12th
4  and that her unexcused absence was the reason for
5  termination. What does that mean?
6    A. Roberta's case was extremely complicated.
7  FMLA is a collection of time over a rolling one-year
8  period. So Roberta had used or exhausted her FMLA at the
9  time in question and was again out and claimed to have
10  been out for medical reasons. And then when she went to
11  apply for that leave, it was denied.
12    Q. Okay. The time for filing an appeal for the
13  FMLA was still pending, however. Correct?
14    A. I believe the appeal was to an appeal. She
15  had been denied.
16    Q. But you decided to terminate her before the
17  appeal was resolved?
18    A. It would appear so from these notes.
19    Q. Okay.
20    A. But the decision to terminate was based on the
21  denial of the short-term disability. We were waiting for
22  the appeal of the denial of the FMLA.
23    Q. Okay. In fact, as you explained in connection
24  with the July 9 note here, this option two that was

---

Page 16

1  selected was actually not terminate but terminate
2  depending on the resolution of the FMLA appeal. Correct?
3    A. That is correct.
4    Q. Okay. But according to the July 19 e-mail,
5  you went ahead and terminated her anyway without getting
6  a resolution of the appeal. Correct?
7    A. And I'm not recollecting what came back from
8  CIGNA that led us to go ahead and separate on the 19th.
9    Q. Okay. Looking at the next page of the
10  document, this is an e-mail from August 5th, 2004.
11  Correct?
12    A. Are we looking at the same document?
13    Q. I think so.
14        Right at the top does it say --
15    A. Okay.
16    A. I did staple it.
17    A. That's all right. Okay.
18    Q. Based on some of the other documents you've
19  seen in connection with the other depositions today, this
20  seems to be e-mails back and forth between the company
21  that handles your unemployment defense of your
22  unemployment claims.
23    A. Yes.
24    Q. Okay. I guess Kay Wasno provided the

---

Page 17

1  information as of August 5th that Roberta was out of the
2  office from May 11th through July 12th and it was
3  considered unexcused absences -- that she had failed to
4  provide the appropriate documentation to our short-term
5  disability vendor. Correct?
6    A. Correct.
7    Q. It doesn't say anything about her exhausting
8  her FMLA leave, does it?
9    A. No.
10    Q. Do you know if by August 5th there had been a
11  resolution with respect to Ms. McWilliams' appeal of her
12  FMLA denial?
13    A. I don't recall.
14    Q. Okay. All right. When did you first get
15  involved, similar to Ms. McWilliams, in the situation
16  surrounding Hestal Lipscomb in 2004?
17    A. I believe I was made aware in the May/June
18  time frame of 2004.
19    Q. How were you made aware?
20    A. Barbara Jackson notified me that Hestal's
21  request for short-term disability had been denied.
22    Q. Okay. Did she advise you verbally or in
23  writing? By "writing," that would include e-mails.
24    A. Yeah. I don't recall. It could have been

---

Lance Rogers

Page 18

1  both.
2      Q.  So what did you do?  What did you do?
3      A.  Recommended that we call Christine Cornwell
4  and discuss our options.
5      Q.  So did you call Christine Cornwell?
6      A.  I did not.
7      Q.  Okay.  Did somebody?
8      A.  I believe Barbara Jackson called Christine.
9      Q.  Did she report back to you?
10     A.  Yes.  And I'm trying to recall whether or not
11 Barbara Jackson and I talked to Christine Cornwell or --
12 there were a number of conversations that I had with ER,
13 Christine Cornwell, related to unexcused absences during
14 this time frame.
15     Q.  With Ms. Lipscomb or with other employees as
16 well?
17     A.  Ms. Lipscomb and also related to Roberta
18 McWilliams.
19     Q.  Okay.  Let's try to do it chronologically, if
20 we can.  After this first communication from Barbara, you
21 had suggested she get in touch with Christine Cornwell.
22 What was your next contact that you recall from anybody
23 regarding Hestal Lipscomb?
24     A.  I don't recall the next one.  It would have

Page 19

1  been either a discussion with Barbara Jackson and
2  Christine Cornwell or discussion with Barbara Jackson
3  related to her conversation with Christine.
4      Q.  Okay.  So do you recall two different
5  conversations?
6      A.  I can't recall.
7      Q.  Can you recall anything about conversations in
8  between when you were first notified?
9      A.  Well, certainly.  But I can't recall which
10 conversation what was said.
11     Q.  All right.  How many conversations were there?
12     A.  I don't recall.
13     Q.  More than six?
14     A.  Conversations between myself and Christine
15 Cornwell?  Potentially.
16     Q.  Okay.  How about Barbara Jackson?  How many
17 with Barbara Jackson?
18     A.  I probably met with Barbara Jackson four or
19 five times, perhaps.
20     Q.  Okay.  So maybe six times with Christine
21 Cornwell and maybe four to five with Barbara Jackson.  Is
22 that right?
23     A.  That's correct.
24     Q.  All right.  How many of those would have

Page 20

1  overlapped in terms of being with both Barbara Jackson
2  and Christine Cornwell?
3      A.  I don't recall.
4      Q.  All right.  Anybody else that you had any
5  communications with regarding Hestal Lipscomb other than
6  Barbara Jackson and Christine Cornwell?
7      A.  I don't recall having other conversations with
8  them regarding Hestal.
9      Q.  Okay.  Did you ever look at any documents in
10 connection with these conversations that you had with
11 Christine Cornwell and Barbara Jackson?
12     A.  At the time?  No.
13     Q.  Okay.  So it would have been situations where
14 they would call you or, in the case of Barbara Jackson,
15 she would meet with you and you would discuss Hestal
16 Lipscomb?
17     A.  Let me go back to your question.  I said no.
18 I recall a denial letter from CIGNA.
19     Q.  Okay.  Now, was this a denial of STD or FMLA?
20     A.  As I recall, it was a denial of STD.
21     Q.  Do you recall about when that was?  Is it
22 likely that it would occur right at the beginning when
23 Ms. Jackson contacted you to let you know she had
24 received a denial?

Page 21

1      A.  I -- it's likely.
2      Q.  Okay.  Do you recall the substance of any of
3  these conversations that you would have had with
4  Ms. Cornwell or Ms. Barbara Jackson?
5      A.  Yes.
6      Q.  Tell me what you recall.
7      A.  I recall having conversations with
8  Ms. Cornwell and with Ms. Jackson regarding our options
9  related to Hestal.  I recall discussing that Hestal had
10 been out for two weeks, that we did not -- or that the
11 proof of why she had been out had not been provided to
12 CIGNA.  I recall discussing what our options were related
13 to the treatment of Hestal based on not receiving that
14 information.  I recall our options were to consider
15 repayment of the time that she was out without
16 documentation.  I recall discussion of whether
17 termination would be appropriate.  And I don't recall if
18 we discussed any other disciplinary options at that
19 point.
20     Q.  What point are you talking about when you say
21 "that point"?
22     A.  During the times that I was talking with
23 Christine and Barbara Jackson related to Hestal Lipscomb.
24     Q.  Okay.  The time period we're talking about is

Lance Rogers

7 (Pages 22 to 25)

Page 22

1  from when Barbara Jackson first came to you and when
2  Ms. Lipscomb was terminated?
3       A.  Correct.
4       Q.  Okay.  That would have been, is it fair to
5  say, probably about a month?
6       A.  It could have been several months.
7       Q.  You think it could have been several months?
8       A.  Sure.  My conversations with Christine
9  Cornwell -- as it relates to Hestal Lipscomb, no.  My
10  conversations related to how to handle unexcused
11  absences, yes.
12       Q.  Okay.  Was it principally in connection with
13  these two employees, Roberta McWilliams and Hestal
14  Lipscomb?
15       A.  Predominantly, yes.
16       Q.  Okay.  Were there other employees?
17       A.  Not that I recall.
18       Q.  Okay.  So you had been having ongoing
19  discussions with Ms. Cornwell about Roberta McWilliams,
20  and then Ms. Lipscomb's situation arose and became
21  integrated with these conversations with her.  Is that
22  fair to say?
23       A.  We never discussed the two cases together;
24  however, I had discussions with Christine Cornwell

Page 23

1  regarding how to handle unexcused absences related to
2  these two people.
3       Q.  Okay.  So you recall talking with Christine
4  Cornwell about having Hestal repay for the time or
5  termination.  You don't recall any other options.
6  Correct?
7       A.  I don't recall any other options.
8       Q.  Okay.  What do you recall discussing about the
9  repayment option?
10       A.  I recall discussing one option available to us
11  would be to have Hestal pay for the time that she was out
12  of the office that was not approved.
13       Q.  Okay.  Was that discussed on more than one
14  occasion?
15       A.  I don't recall if it was discussed on more
16  than one occasion.  I recall that we talked about
17  difficulty in administering that approach given that her
18  sole means of earning income was to be at work and that
19  in fact was the problem.  So the likelihood of getting
20  her to repay something when she can't explain why she
21  didn't show up was slim to none.
22       Q.  Well, you did understand that she had been
23  trying through her doctor's office to explain to CIGNA
24  and give the medical basis for her reasons not being in

Page 24

1  the office?
2       A.  No.  You know, she indicated that she was
3  doing that, I believe, once, but evidence indicated to me
4  that she wasn't trying very hard at all.
5       Q.  Okay.  Is it still your belief that CIGNA
6  never received any documentation from her physicians?
7       A.  Yes.
8       Q.  Now, did you ever discuss with Christine
9  Cornwell or anyone that the requirement that people who are
10  given STD at EDS sign an agreement with EDS to reimburse
11  EDS for any short-term leave that's taken that results in
12  an overpayment?
13       A.  I don't recall having that conversation with
14  Christine until the point that we discussed options.
15       Q.  Okay.  Why don't you take a look at -- and
16  this is in EDS No. 3.  Turn to page EDS 1 -- no.  I'm
17  sorry.  It's not in that booklet.  It's in a separate
18  booklet.  EDS No. 5.  If you could turn to EDS I 00223,
19  please.
20       A.  Okay.
21       Q.  Now, I'd like you to look down to this first
22  section, the third paragraph from the bottom, which
23  discusses what you're going to be required to do if you
24  apply for STD.  There's a sentence there that begins,

Page 25

1  "Further, you will be required to sign and return an EDS
2  reimbursement agreement relating to overpayment made to
3  you for short-term disability, long-term disability and
4  worker's compensation."
5       A.  Okay.
6       Q.  You see that?
7       A.  I see it.
8       Q.  Obviously, Hestal was required to sign that.
9       A.  I don't know.
10       Q.  But she should have been.  Right?
11       A.  I don't know.
12       Q.  But isn't this the EDS benefits handbook that
13  was in place in 2004?
14       A.  It is.
15       Q.  Okay.  Does and did EDS follow this handbook
16  in 2004?
17       A.  We work with CIGNA to administer short-term
18  disability.
19       Q.  Okay.  But this doesn't refer to a CIGNA
20  reimbursement agreement.  It says an EDS reimbursement
21  agreement.
22       A.  I'm sure that EDS subcontracts with CIGNA, and
23  by extension they're referring to their -- I see right
24  above that any medical documentation should be submitted

Lance Rogers

11 (Pages 38 to 41)

Page 38

1 where we can discuss it. Why did you do that?
2    A. Anytime we separate an employee we take
3 caution to do it privately and not to have open
4 conversations on the floor related to someone's
5 employment.
6    Q. Okay.
7    A. So Hestal wanted to continue the conversation.
8 I called her back into the office to continue the
9 conversation.
10    Q. Okay. It goes on to say that Hestal proceeded
11 to explain that she had called CIGNA and called the
12 doctor's office seeking the required documentation. Do
13 you see that?
14    A. I do.
15    Q. Okay. That's what you recall her telling you
16 and telling Barbara?
17    A. Yes.
18    Q. All right. Then she asked why you had
19 immediately jumped to termination. Then you said, "I
20 discussed that we had discussed different options, such
21 as repayment, vacation time or termination. We felt that
22 we were left with no choice but to terminate her because
23 we had no documentation for her absences." It mentions
24 here vacation time. Does that refresh your recollection

Page 39

1 as to whether that was something that was considered?
2    A. It does. In one of my conversations with
3 Barbara Jackson we had discussed that she did not have
4 vacation time remaining.
5    Q. Vacation time remaining or enough vacation
6 time to pay for all of the days?
7    A. Correct.
8    Q. Okay. The latter. Correct?
9    A. That was not my conversation. My conversation
10 was: Did she have enough vacation time to cover it?
11    Q. Right.
12    A. And the answer was no.
13    Q. Okay. As we discussed earlier, you didn't ask
14 how close she would have been in terms of how many days.
15 Correct?
16    A. That is correct.
17    Q. All right. Then you say, "We felt that we
18 were left with no choice." Why did you say you were left
19 with no choice?
20    A. Because as I mentioned before, her ability to
21 repay was based on her ability to come to work.
22    Q. Okay.
23    A. And she had demonstrated an inability to come
24 to work.

Page 40

1    Q. Okay. How many sick days was Hestal Lipscomb
2 entitled to in 2004?
3    A. Sick days are not tracked.
4    Q. I see.
5       Okay. Vacation days are. Correct?
6    A. Yes.
7    Q. Okay. So sick days are left at the discretion
8 of the organization?
9    A. Pretty much. We monitor -- employees are paid
10 for their time, especially when they're salaried, as
11 Ms. Lipscomb was. They're paid for their time whether
12 they're there or not. So when an employee is out sick,
13 we monitor how many days they're out sick. If they're
14 out sick for more than three days, we ask for a doctor's
15 notice of return to work.
16    Q. Mm-hmm.
17    A. We are aware that short-term disability and
18 FMLA requests -- well, let me not include FMLA. We're
19 aware that short-term disability will not be evaluated
20 for less than five days. So if somebody is out for more
21 than five days, we will notify CIGNA to evaluate
22 short-term disability. So three days we -- you know,
23 obviously, when someone doesn't show up to work, we try
24 to find out what happened.

Page 41

1    Q. Mm-hmm.
2    A. If there was no phone call, nothing, we may
3 call their home, their whoever to figure out what
4 happened today. Certainly, after three days we would
5 have a conversation with the employee to say, "Why were
6 you out?" And if they're sick or they say they were sick
7 for three days, we would ask them for a doctor's notice
8 to return to work.
9    Q. Okay. I mean, that's what happened with
10 Ms. Lipscomb. Correct? I mean, she was asked for a
11 return to work note and she provided it.
12    A. It's a little bit different. Ms. Lipscomb was
13 not out sick, according to what she notified us of. She
14 notified us that she needed time away from work, and she
15 notified us that she was going out for a surgery --
16    Q. Right.
17    A. -- was her information to us.
18    Q. Right.
19    A. And in that situation CIGNA would be called to
20 manage the short-term disability.
21    Q. Right.
22    A. I view that differently than necessarily sick
23 days. However, anytime that you're out, whether it's
24 sick for more than three days or in a potentially

**Affidavit of Laurence V. Cronin**                              **Exhibit C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    Civil Action No.
                                    )      05-477-SLR
ELECTRONIC DATA SYSTEMS             )
CORPORATION,                        )
                                    )
            Defendant.              )


           Deposition of HESTAL LIPSCOMB taken pursuant to
notice at the offices of Richards, Layton & Finger, One
Rodney Square, Wilmington, Delaware, beginning at 10:00
a.m. on Tuesday, February 21, 2006, before Anne L. Adams,
Registered Professional Reporter and Notary Public.

APPEARANCES:

            LAURENCE V. CRONIN, ESQ.
            SMITH, KATZENSTEIN & FURLOW
              800 Delaware Avenue
              Wilmington, Delaware  19899
              for the Plaintiff,

            THOMAS J. PIATAK, ESQ.
            BAKER HOSTETLER
              3200 National City Center
              1900 East 9th Street
              Cleveland, Ohio  44114-3485
              for the Defendant.
      ALSO PRESENT:  Lance Rogers, EDS


      -------------------------------------------------
                    WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 10

1   A.  Yes.
2   Q.  And what are your hours of work?
3   A.  I work 3 to 11 p.m.
4   Q.  And what's your compensation there?
5   A.  I don't understand the question.
6   Q.  What amount are you paid?
7   A.  Before taxes I think it's 751 every two weeks.
8   Q.  Are you paid on a salary basis or hourly basis?
9   A.  Hourly.
10  Q.  What is your hourly rate?
11  A.  10.02.
12  Q.  And how many hours do you work per week
13  approximately?
14  A.  75.
15  Q.  75 hours per week?
16  A.  Excuse me.  I'm sorry.  I misunderstood the
17  question.  37.5 hours per week.
18  Q.  Do you ever work overtime?
19  A.  Occasionally.
20  Q.  Are you entitled to benefits at the Delaware
21  Psychiatric Center?
22  A.  Yes.
23  Q.  What are your benefits?  What benefits do you
24  receive?

Page 11

1   A.  I have Coventry Health.
2   Q.  I heard --
3   A.  Coventry.
4   Q.  Okay.  I didn't hear the first word.  Besides
5   health insurance, any other benefits you get at the
6   Delaware Psychiatric Center?
7   A.  I have dental.
8   Q.  Anything else?
9   A.  No.
10  Q.  How does the benefit package compare with your
11  benefit package at EDS?
12  A.  I'm not exactly -- I haven't really used my
13  medical package part yet.  I did use my dental.  My
14  medical didn't kick in until after I was there three
15  months.  So I haven't honestly used it.
16  Q.  And who is your supervisor there?
17  A.  That would be Bruce Ashbaum.  He's also the
18  hospital administrative director.
19  Q.  Do you enjoy your work there?
20  A.  Yes.
21  Q.  Have you received any accommodations or awards
22  for your performance?
23  A.  Not as yet.
24  Q.  Have you received any discipline?

Page 12

1   A.  No.
2   Q.  Do you know what their policy on absenteeism is
3   at the Delaware Psychiatric Institute?
4   A.  Yes.
5   Q.  And what is it?
6   A.  You have a certain amount of days that you can be
7   out.  I believe it's three days if you are sick.  And
8   then after three days, you would have to have a note from
9   your doctor or you can put in for your sick time or use
10  vacation time depending on the situation.
11  Q.  Now, do you know what the policy is if there is
12  an unexcused period of unexcused absence?
13  A.  No, I don't.
14  Q.  Do you know what their policy is on the Family
15  Medical Leave Act or FMLA?
16  A.  I might have the policy.  I did read through it.
17  I'm not exactly familiar because I have never had to
18  actually use it.
19  Q.  Do you know what the policy would be if you are
20  out for three days or more and do not have a note from
21  your doctor?
22  A.  Well, I know you get a verbal warning.  Then you
23  would get a written warning and they would reprimand you.
24  Q.  So being without a medical excuse can lead to

Page 13

1   discipline?
2   A.  Yes.
3   Q.  Has that been true for other places that you've
4   worked as well?
5   A.  No, with the exception of EDS.
6   Q.  Are you currently attending any form of school?
7   A.  No, sir.
8   Q.  Other than your work at the Delaware Psychiatric
9   Center, have you had any other employment of any kind
10  since you left EDS?
11  A.  Yes, I have.
12  Q.  Where else have you worked?
13  A.  I have had temp assignments, two temp
14  assignments.  One was for one week and that was at
15  Nationwide Insurance.  Then I had another assignment.
16  And that lasted a month.  And it was at Citigroup.
17  Q.  What was the temporary agency?
18  A.  One was, the first one was Careers.  The second
19  one was Randstad.
20  Q.  Rand --
21  A.  R-A-D-S-T-A -- think it is Randstad.
22      MR. CRONIN:  I think it's in our
23  interrogatory responses.
24  BY MR. PIATAK:

4 (Pages 10 to 13)

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 26

1  working at EDS?  Who did you meet with from the company?
2  A.  Barb Jackson interviewed me.  And I spoke with
3  Nicky, who is the, I believe the administrative
4  secretary, she gave me instructions where to get my drug
5  test done and fingerprints and things of nature.
6  Q.  Do you remember speaking to anyone besides Barb
7  and Nicky before coming to work at EDS?
8  A.  No.
9  Q.  Do you remember what you and Barb talked about?
10 A.  During the interview?
11 Q.  Yeah, during the interview.
12 A.  No, I don't remember exact conversation.
13 Q.  Was Barb the only person that you interviewed
14 with prior to being hired at EDS?
15 A.  I can't recollect.  I'm not sure.  Tracy Eddy
16 might have came in while she was doing the interview.
17 Q.  Anyone that you remember interviewing with before
18 starting at EDS other than Barb and possibly Tracy?
19 A.  No.
20 Q.  Did you turn down any job offer to come to EDS?
21 A.  No.
22 Q.  Hestal, during the time that you worked at EDS, I
23 want you to tell me about any complaints that you made
24 during that period of time about EDS or any of its

Page 27

1  employees.
2  A.  I didn't have any complaints.
3  Q.  What was your initial job when you were hired in
4  at EDS?
5  A.  Specialized support clerk.
6  Q.  And is that the position that you retained during
7  your whole time at EDS or did that change in any way?
8  A.  No, that was it except for I was back-up for
9  Linda Jackson, who was the team leader, when she wasn't
10 there.  I was like team leader for them when she wasn't
11 there.
12 Q.  So the whole time you were at EDS your position
13 was specialized support clerk?
14 A.  Yes.
15 Q.  But after a certain point, you became a back-up
16 for Linda Jackson when she was out?
17 A.  Yes.  She would leave directives for me to pass
18 on for her or something like that.
19 Q.  Do you remember when it was you started acting as
20 a back-up for Linda Jackson?
21 A.  No.
22 Q.  As a specialized support clerk, what were your
23 duties and responsibilities?
24 A.  We processed the Medicaid claims, sorted and

Page 28

1  scanned, the monthly bulk mailing and daily stuffing and
2  mailing of benefit information.
3  Q.  Any other duties or responsibilities that you
4  remember having?
5  A.  Inventory, basically keeping the shelves stocked.
6  Q.  Anything else?
7  A.  Just sign for UPS packages, sort mail.  I left
8  that out.  And I would put postage on the mail when I
9  mailed them out after stuffing them.  I would do the
10 monthly report for the meter machine, the stamping
11 machine and turn it in.  That's about it.  Answer the
12 phone.
13 Q.  And were you working in the mailroom area
14 primarily?
15 A.  Yes.
16 Q.  And the EDS facility in Delaware, was it your
17 understanding that most of what it did was process
18 Medicaid claims?
19 A.  Yes.
20 Q.  And who was your supervisor?
21 A.  Tracy Eddy.
22 Q.  Was that true the whole time you were there?
23 A.  Yes.
24 Q.  What was your salary or compensation?

Page 29

1  A.  Came in at 9.60, left at 10.10.
2  Q.  So the money you made when you left, that's
3  approximately equal to what you are making now at
4  Delaware Psychiatric Center?
5  A.  Yes.
6  Q.  And what benefits were you eligible for?
7  A.  Where at, sir?
8  Q.  At EDS.  Sorry.
9  A.  Medical, dental.
10 Q.  You mentioned Linda Jackson already.  Who was
11 Linda Jackson?
12 A.  She was my team leader.
13 Q.  And what is a team leader?
14 A.  She oversees the personnel that worked in the
15 mailroom.
16 Q.  In your dealings with Linda Jackson, was she
17 honest?
18 A.  Yes.
19 Q.  Was she fair?
20 A.  Yes, she was.
21 Q.  Did you consider her to be a friend?
22 A.  Yes, I did.
23 Q.  You mentioned Tracy Eddy.  In your dealings with
24 Tracy Eddy, was she honest?

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 34

1  were considered excused absences?
2  **A. Yes.**
3  Q. And that unexcused absences could lead to
4  discipline?
5  **A. Yes.**
6  Q. Including termination?
7  **A. Could you repeat that, please? I'm sorry.**
8  Q. Sure. As I said, if I ask you questions you
9  don't understand or I mumble something, let me know.
10     And you knew that unexcused absences could
11  lead to discipline, including termination?
12  **A. Yes.**
13  Q. And you took some time off of work in August of
14  2003. Do you remember that?
15  **A. Vacation?**
16  Q. No, not vacation. I think it was health related.
17  Do you remember being off work for a time in August,
18  2003?
19  **A. No.**
20     MR. PIATAK: That's fine.
21     (Lipscomb Deposition Exhibit No. D, Letter
22  from Metlife Synchrony dated August 7, 2003, was marked
23  for identification.)
24  BY MR. PIATAK:

Page 35

1  Q. Hestal, I have handed you what's been marked as
2  Exhibit D. This is a letter to you dated August 7th,
3  2003, to the West 2nd address that we've already
4  mentioned?
5  **A. Yes.**
6  Q. And this is from MetLife Synchrony. Do you see
7  that?
8  **A. Yes.**
9  Q. And EDS does not directly evaluate requests for
10  short-term disability or FMLA leave, correct?
11  **A. I didn't understand that.**
12  Q. EDS does not, when an employee applies for FMLA,
13  Family Medical Leave Act, or short-term disability, EDS
14  is not directly evaluating that request. Were you aware
15  of that?
16  **A. I'm still not exactly sure what you mean on the**
17  **question.**
18  Q. I'll try to come back to it. In the letter it
19  says, the first paragraph, "We have evaluated your
20  request for short-term disability and find that you are
21  eligible for leave under the term of your policy. Based
22  on the medical information submitted to this office, your
23  absence qualifies for disability leave from August 1,
24  2003, through August 18, 2003." Do you see that?

Page 36

1  **A. Yes.**
2  Q. Does that refresh your recollection, your memory
3  that you were off from work for some time in August of
4  2003?
5  **A. I don't recall being off in August. I think it**
6  **was in April that I was out, not in August.**
7  Q. And it also, next paragraph, "You are also
8  eligible for leave under the Family Medical Leave Act of
9  1993 from August 1, 2003, through August 18, 2003, and
10  your absence will be counted as part of your
11  entitlement." Do you see that?
12  **A. Yes.**
13  Q. And do you have any memory at all of being out in
14  August of 2003?
15  **A. No, I don't.**
16  Q. Do you have any memory of being out for medical
17  reasons at any time during 2003?
18  **A. To my recollection, I thought it was in April**
19  **that I was out. If it was August, then that means I got**
20  **my months mixed. But I thought it was April I was out,**
21  **April of 2003. I thought it was April of 2003. But if**
22  **it was August, that's my error.**
23  Q. Did you let anyone at EDS know that you were
24  going out for medical reasons in 2003?

Page 37

1  **A. Yes, I did.**
2  Q. Who did you let know?
3  **A. Tracy Eddy.**
4  Q. And what did you tell Tracy in 2003?
5  **A. That I had to go out for a surgical procedure.**
6  Q. Did you tell her anything else?
7  **A. No. I told her the day that the surgery would be**
8  **on.**
9  Q. So you told her you had to go out for a surgical
10  procedure and the date of the surgery?
11  **A. Yes.**
12  Q. And you didn't tell her anything else about that?
13  **A. No.**
14  Q. And then what happened once you told Tracy that
15  you were going to be out for a surgical procedure and you
16  gave her the date?
17  **A. She said she would take care of the FMLA papers**
18  **and she picked up the phone and made a phone call.**
19  Q. And what did you understand her to mean when she
20  told you she would take care of the FMLA papers?
21  **A. That she would take care of it.**
22  Q. And you knew that your leave potentially was
23  covered by the family medical Leave Act, the FMLA?
24  **A. Yes.**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 38

1   Q.   And you knew if your leave was covered by the
2   FMLA, it was counted as an excused absence under EDS's
3   policy?
4   A.   Yes.
5   Q.   And if it was not covered, it might be counted as
6   an unexcused absence?
7   A.   Yes.
8   Q.   And so do you remember talking to Tracy and her
9   saying she would take care of the FMLA paperwork?  Did
10  you have your doctors submit any medical information in
11  connection with the time you were off in 2003?
12  A.   To whom?
13  Q.   To anybody, to EDS or to MetLife Synchrony?
14  A.   I went out.  I had the surgery.  I was out two
15  weeks.  And I went back for my checkup and they released
16  me back to work.  I didn't have any paperwork or anything
17  that I had to submit to anyone or anything like that.
18  Q.   And do you remember receiving a letter, this
19  letter from MetLife Synchrony?
20  A.   No, I don't.
21  Q.   There is a paragraph on there that's in bold
22  language, bold print.  Do you see that?
23  A.   Yes.
24  Q.   "If your absence extends beyond August 18, 2003,

Page 39

1   you must provide clinical documentation of the medical
2   reasons for your continued absence and how they will
3   impact ability to return to work.  Although we will
4   attempt to contact you and your physician, it is your
5   responsibility to ensure Synchrony is provided the
6   additional information which may include office notes,
7   laboratory data and other pertinent tests needed to
8   evaluate your condition and your functionality."
9           This letter is indicating that you might
10  have to provide medical information directly to
11  Synchrony; is that correct?
12  A.   That's what you are reading.
13  Q.   Had you received such a letter, how would you
14  respond?
15  A.   I would have submitted it to my doctor so it
16  could be filled out and sent to the proper destination.
17  Q.   And why would you do that?
18  A.   Because it was sent to me.
19  Q.   And because they were asking you to get them the
20  medical documentation?
21  A.   If that's what it stated.
22  Q.   And if someone acting on your employer's behalf
23  is asking you to provide medical documentation, you
24  understand that it's your job to get that medical

Page 40

1   documentation to them?
2   A.   Yes.
3   Q.   And as a responsible employee, you would take
4   care to do that, right?
5   A.   If they requested it.
6   Q.   You were also away from work at EDS for a time in
7   late April, early May of 2004, correct?
8   A.   Say that again, please.
9   Q.   Sure.  You were also away from work for a time in
10  late April and early May of 2004, correct?
11  A.   Yes, I was.
12  Q.   And why did you take time off work then?
13  A.   I had a medical procedure that needed to be taken
14  care of.
15  Q.   And before you went out, did you tell anyone that
16  you would be missing from work?
17  A.   Yes, I did.
18  Q.   And who did you tell?
19  A.   I spoke with Tracy Eddy.
20  Q.   And what did you tell Tracy?
21  A.   That I would have to go out to have a surgical
22  procedure done.  She then, in turn, requested that I get
23  some type of document from the doctor stating which day I
24  was going out to have the procedure done.  She also

Page 41

1   wanted it to state how long I was going to be out, but
2   that couldn't be done until after the procedure was done.
3   Q.   So you told Tracy that you were going to be going
4   out on a surgical procedure?
5   A.   Yes.
6   Q.   Anything else you told her about that?
7   A.   No.
8   Q.   And she asked you for some documentation about
9   how long you were going to be out?
10  A.   Yes.
11  Q.   What else happened?
12  A.   Nothing.  I called the doctor and asked him could
13  they fax me a letter stating which day I was going to
14  have surgery and how long I was going to be out.  They
15  said they were unable to put that part on there because
16  they would not know until after I had the procedure done.
17  They could only state what day the procedure was to be
18  done.
19  Q.   And which doctor did you ask to fax this?
20  A.   The doctor at Wilmington Hospital Surgical
21  Clinic.
22  Q.   Do you remember the doctor's name?
23  A.   I think it's Dr. Kratz.
24  Q.   Dr. Kraut?

11 (Pages 38 to 41)

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 42

1    A.  Kraut maybe.  I'm not sure exactly how to
2  pronounce it, but it does start with a K.  He's the head
3  doctor of the surgical unit or something like.
4    Q.  So you had asked Dr. Kraut to fax it to you?
5    A.  Not him personally, I asked his secretary.  I
6  called the nurses and they returned my phone call.  I
7  told them what I needed.  And they said, okay, they would
8  have it faxed right over.  I asked that twice because the
9  first time it wasn't sent.  So I requested it again and
10  they said they would fax it out immediately.
11    Q.  And who did you have them fax it to?
12    A.  They actually faxed it to me at EDS and I
13  presented it to Tracy Eddy right after the fax came in.
14    Q.  And this was before you went out on leave?
15    A.  Yes.
16    Q.  And you told Tracy that you were going out for a
17  surgery and she asked for this documentation.  Did you
18  tell anyone else at EDS that you were going to be going
19  out in late April and early May of 2004?
20    A.  My coworkers that I worked with closely in the
21  mailroom.  I told Linda Jackson.  I let them know that I
22  would be going.  I didn't know how long I was going to be
23  gone, but I was going out for the procedure.
24    Q.  So you told several people that you were going to

Page 43

1  be out for surgery?
2    A.  Yes.
3    Q.  But the official notice is what you gave to Tracy
4  Eddy?
5    A.  Yes.
6    Q.  And what you told Tracy is that you were going to
7  be out on surgery and when that surgery was scheduled?
8    A.  Yes.
9    Q.  And that was all the information you gave her
10  about your surgery?
11    A.  Yes.
12    Q.  What was the surgery for?
13    A.  Ganglioma cell tumor.
14    Q.  And what -- I'm not a doctor nor do I play one on
15  TV.  What is that?
16    A.  It's a, best of my knowledge -- I'm not exactly
17  sure what they are.  They can become cancerous at some
18  point or not.  The doctor suggested removal.  And like
19  you said, you are not a doctor.  So I took their advice
20  and had the surgery done.
21    Q.  Do they cause any, apart from the time when you
22  are recovering from surgery, do they cause any work
23  related problems?
24    A.  No, but they can be painful at times depending.

Page 44

1    Q.  Have you ever been prevented from doing your work
2  because of the tumors themselves?
3    A.  No.
4    Q.  Is there any other medical condition you have
5  that's ever prevented you from doing your work?
6    A.  No.
7    Q.  So you were going to go out for surgery and there
8  was a recuperation period after surgery?
9    A.  Yes.
10    Q.  You said for the period of time you were out in
11  2003 that Tracy made a comment that she would take care
12  of the FMLA papers.  Did you have any discussions with
13  anyone at EDS about FMLA leave or short-term disability
14  before you went out?
15    A.  No, not at all.  The only thing that went on
16  between me and Tracy is she asked me for the paper saying
17  which date I was going out.  She asked me where was the
18  procedure going to be done.  All that was on the letter
19  when it was faxed over.
20    MR. CRONIN:  Now is a good time to take a
21  break.
22    (Thereupon, a short recess was had.)
23    (Lipscomb Deposition Exhibit No. E, Letter
24  from Dr. Kraut dated April 19, 2004, was marked for

Page 45

1  identification.)
2    Q.  Hestal, while you were out, we marked Exhibit E.
3  If you could take a look at that and let me know what
4  that is.
5    A.  This is the letter that was sent to me to give to
6  Tracy Eddy saying what day I would be going out for my
7  surgery, and if they needed any further information, they
8  could call them.
9    Q.  So this is the document that you were referring
10  to earlier?
11    A.  Yes.
12    Q.  And it was faxed directly to you?
13    A.  It was faxed to one of the fax machines in EDS.
14    Q.  How did you know this fax was coming?
15    A.  I spoke with the nurse.  She says I'm going to
16  keep you on the phone and I'll fax while you are here.
17  And she faxed it and I walked over to the fax machine and
18  picked it up.
19    Q.  I see on the third page of this message
20  confirmation, it says Marybeth's office.  Do you know
21  what Marybeth's office is?
22    A.  No, sir.  Somewhere in Wilmington Hospital,
23  medical records or something.
24    Q.  And this note, the note states, "Miss Hestal has

12 (Pages 42 to 45)

Lipscomb
Hestal Lipscomb

v.
C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

**Page 46**

1 been scheduled for outpatient surgery on 4/29/04 at
2 Wilmington Hospital.  Please contact Surgical Services at
3 428-4413 if any questions."
4    A.  Yes.
5    Q.  And it's signed by Jonathan Kraut, M.D.?
6    A.  Yes.
7    Q.  Did you provide any other documentation to anyone
8 at EDS prior to going out on medical leave other than
9 what's contained in this Exhibit E?
10    A.  No.
11    Q.  Now, at the time you went out, Cigna had replaced
12 MetLife's Synchrony as the outside company overseeing
13 FMLA and short-term disability for EDS; isn't that
14 correct?
15    A.  I'm not aware of that.
16    Q.  Was there anybody at EDS in Delaware who was
17 trained to evaluate medical information supporting a
18 leave of absence that you are aware of?
19    A.  I'm not sure of the question.  Could you repeat
20 that again, please?
21    Q.  Sure.  Was there anyone employed at EDS in
22 Delaware who was trained to evaluate medical information
23 that was submitted to support an FMLA leave or short-term
24 disability leave?

**Page 47**

1    A.  Not to my knowledge, unless it was the supervisor
2 or the managers.
3    Q.  Were you aware of anyone who had that training at
4 EDS in Delaware?
5    A.  No.
6    Q.  Were you aware whose job it was to process the
7 medical information supporting employees' FMLA or
8 short-term disability leave?
9    A.  No, I wasn't aware who would take care of that.
10    Q.  When you were at EDS, you had access to the EDS
11 Employee Handbooks, the corporate employee handbook?
12    A.  Access to it?
13    Q.  Yes, you were able to get access to it if you
14 wanted to look something up?
15        MR. CRONIN:  Object to the form of the
16 question.  You can answer it.
17        THE WITNESS:  I never had any reason to
18 actually ask for it.  So I don't know if I was able or
19 not to obtain it if I needed it.  I never had need to ask
20 for it.
21 BY MR. PIATAK:
22    Q.  Do you know if it was available on-line through
23 an intranet or something like that?
24    A.  No, I'm not aware.

**Page 48**

1    Q.  Do you know whether there were physical copies
2 located at the facility?
3    A.  No, I'm not aware of any.
4        (Lipscomb Deposition Exhibit No. F,
5 Disability Benefits Overview and FMLA from Employee
6 Handbook, was marked for identification.)
7 BY MR. PIATAK:
8    Q.  You have been handed what's been marked as
9 Exhibit F.  This is from the EDS Employee Handbook.  If
10 you can turn to the second page there, the fifth
11 paragraph down.
12        MR. CRONIN:  I want to object to the form of
13 the question when I get a chance.
14    Q.  Of course.  It states, "Any medical documentation
15 should be submitted directly to Cigna Ability Returns for
16 its review."  Do you see that language?
17    A.  No.  Five paragraphs down?
18    Q.  Yeah.  Maybe I miscounted.  There is a paragraph
19 beginning, "It is your responsibility to furnish the
20 necessary information."  Do you see that?
21    A.  Yes.
22    Q.  In that paragraph it reads as well, "Any medical
23 documentation should be submitted directly to Cigna
24 Ability Returns for its review."  Do you see that?

**Page 49**

1    A.  Yes.
2        (Lipscomb Deposition Exhibit No. G, Letter
3 from Cigna Group Insurance dated April 21, 2004, was
4 marked for identification.)
5 BY MR. PIATAK:
6    Q.  Hestal, I've handed you what's been marked as
7 Exhibit G.  This is a letter to you dated April 21st,
8 2004, from Cigna.  And it's addressed to you at the 2nd
9 Street address that you had at that time, right?
10    A.  Yes.
11    Q.  And this letter acknowledges your request for
12 FMLA leave.  Do you see that in the first paragraph?
13    A.  Yes.
14    Q.  And did Tracy Eddy set up this leave request for
15 you?
16    A.  Yes.
17    Q.  And that's the same that it had been in 2003 that
18 we've already discussed?
19    A.  Yes.
20    Q.  And the person, the entity evaluating the leave
21 request was Cigna?
22    A.  I don't understand.
23    Q.  This letter is from Cigna Group Insurance.
24    A.  Okay.

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 50

1    Q.  Do you see that?
2    A.  Yes.
3    Q.  And they are the ones who were evaluating your
4    leave request?
5    A.  Yes.
6    Q.  And it states in there that, in that second
7    paragraph, "You will not be required to submit separate
8    FMLA medical certification provided your claim for
9    short-term disability benefits and/or Workers'
10   Compensation claim under your company's plan is
11   approved."  Do you see that language?
12   A.  Yes, I do.
13   Q.  So if your short-term disability claim was
14   approved, there would be no need to submit any medical
15   certification for FMLA.
16   A.  Are you asking me a question, sir?
17   Q.  Yes.  And then this document states that if you
18   were awarded short-term disability leave, you would not
19   be required to submit separate FMLA medical
20   certification.
21   A.  That's what it says here.
22   Q.  And this letter was sent to you?
23   A.  I didn't receive this letter though.
24   Q.  But it's addressed to your correct address at the

Page 51

1    time?
2    A.  Yes, it is.
3    Q.  And this letter also states, "If, for any reason,
4    your short-term disability or Workers' Compensation claim
5    is not approved, we will provide you with the
6    Certification of Healthcare Provider Statement to be
7    completed by you and the attending healthcare provider to
8    certify your leave under FMLA."  Do you see that
9    language?
10   A.  Yes, I do.
11   Q.  "And a final determination will be based on the
12   medical information outlined by the attending healthcare
13   provider."  Do you see that?
14   A.  Yes.
15   Q.  And as we discussed earlier, if received a
16   request for medical information, as a responsible
17   employee, you would take care to see to it that it was
18   fulfilled?
19   A.  Yes.
20       (Lipscomb Deposition Exhibit No. H, Letter
21   from Cigna Group Insurance dated May 4, 2004, was marked
22   for identification.)
23   BY MR. PIATAK:
24   Q.  Hestal, I've handed you what has been marked as

Page 52

1    Exhibit H.  This is also a letter to you from Cigna.  And
2    this is addressed to your current address at the time?
3    A.  Yes.
4    Q.  And what action did you take as a result of this
5    letter?
6    A.  I don't recall getting this letter.  I think if I
7    recall right, this is, I think, came after.  This was
8    around the time that I had called them to -- no, that's
9    not, no, that's not right.  I'm sorry. I don't remember
10   this letter.
11   Q.  Do you know for a fact that you didn't receive it
12   or you just don't remember receiving it?
13   A.  I don't remember if I received it or if I didn't.
14   So I don't want to say I did and I didn't and I didn't
15   and I did.
16   Q.  With respect to the prior Exhibit G, also you
17   don't remember receiving that?
18   A.  This I know I didn't receive.  This sounds
19   familiar, but I'm not sure where, reworded or the like.
20   Q.  And Exhibit H, first paragraph acknowledges that
21   you have applied for short-term disability.  Do you see
22   that?
23   A.  Yes.
24   Q.  And you knew that if you were granted short-term

Page 53

1    disability, you wouldn't have to provide FMLA medical
2    certification, right?
3    A.  I would believe so.  But I didn't, actually, know
4    which one was being filed for.  I made Tracy Eddy aware.
5    She said she would take care of it.  I don't know which
6    one was filed first, second or whether they both were
7    filed.  So I couldn't really say that, yes, I applied for
8    it because I don't know which was done first or to that
9    nature.
10   Q.  When did Tracy tell you she would take care of
11   it?
12   A.  She told me that when I let her know that I was
13   having the surgery.
14   Q.  Did she tell you anything else besides that she
15   would take care of it?
16   A.  No, she didn't.
17   Q.  And the second paragraph, "In order to make a
18   determination about short-term disability benefits, we
19   must obtain medical information to verify your diagnosis
20   and current functional abilities and your current
21   treatment plan.  We are asking information from
22   Dr. Jonathan Kraut.  In the event we are unable to obtain
23   this medical information, it is your responsibility to
24   provide us with the required information."  Do you see

14 (Pages 50 to 53)

Lipscomb
Hestal Lipscomb

v.

C.A. # 05-477-SLR

Electronic Data Systems Corporation
February 21, 2006

Page 58

1    Q.  Do you know whether you received it and don't
2  remember or you are certain that you didn't receive it?
3    **A.  I don't remember receiving it at all.**
4    Q.  Is it possible that you did and you just don't
5  remember?
6        MR. CRONIN:  Object to the form.
7    **A.  I don't remember receiving the document.**
8    Q.  This letter indicated that your claim for
9  short-term disability had been denied, correct?
10    **A.  That's what it states.**
11    Q.  And that your doctor was supposed to complete the
12  attached Certification of Healthcare Providers Statement?
13    **A.  That's what it says.**
14    Q.  And that failure to provide the medical
15  certification within 15 days of the date of this letter
16  may result in denial of FMLA protection, correct?
17    **A.  Yes, that's what it says.**
18    Q.  And if your absences were not covered or
19  protected by the FMLA, they could be unexcused under EDS
20  policy, correct?
21    **A.  Excuse me?**
22    Q.  If your absences were not covered by the FMLA,
23  they could be considered unexcused under the EDS policy,
24  correct?

Page 59

1        MR. CRONIN:  Object to the form.
2    **A.  That's on here?**
3    Q.  Yeah, that's my question.
4    **A.  I'm sorry.  I didn't see that written.**
5    Q.  My question is:  If your absences were not
6  covered by the FMLA, they could be considered unexcused
7  under the EDS policy, correct?
8        MR. CRONIN:  Object to form.
9    **A.  I didn't consider them unexcused because I did go**
10  **and I did have the surgery and the process was supposed**
11  **to be taken care of.  And I never received anything that**
12  **I had to leave home and go to take to the hospital to**
13  **have filled out.  Because if I did, I would have taken**
14  **them and had them filled out.  No one made me aware that**
15  **any papers were going to come to me and I was going to**
16  **have to have them filled out.**
17    Q.  We have already discussed that you were aware
18  under the FMLA policy of the EDS attendance policy that
19  FMLA absences would be considered excused.
20        MR. CRONIN:  Object to the form.
21    **A.  If FMLA, that they would be excused?**
22    Q.  Right.
23        MR. CRONIN:  I think now is probably a good
24  time to state an objection I have to this line of

Page 60

1  questioning that I have to this so-called EDS policy.
2  And specifically -- if you prefer this outside the
3  presence of the witness, that's fine.
4        MR. PIATAK:  Sure.
5        THE WITNESS:  Sure.  I will get some more
6  water.
7        (The witness left the room.)
8        MR. CRONIN:  We have been presented with
9  certain exhibits today, specifically Exhibit B, Exhibit
10  C, Exhibit D, all of which were not identified in the
11  defendant's initial disclosures of which were served last
12  fall.  They were served in October.  And, specifically,
13  several documents were identified in response to those
14  initial disclosures identifying with great specificity
15  certain documents which would be relied upon by the
16  defendant.
17        And I do note, in particular, that these
18  three documents all bear a fax line from July of 2005.
19  And with the questioning today, it seems readily apparent
20  to me that the defendant is relying on the existence of
21  this attendance guidelines which has been marked as
22  Lipscomb C.  And it's argued that this document, to the
23  extent that it's being relied upon by the defendant,
24  should have been identified in response to the initial

Page 61

1  disclosures which were served about three months later
2  and which were requested as part of a request for
3  production.
4        I would also note that what was further
5  identified in the initial disclosures was Miss Lipscomb's
6  personnel file, which seems logically to me as part of
7  that would include a Handbook Acknowledgment Form.  And I
8  note also that that's dated December 12, 2003, and
9  apparently was also subject to a fax of August 15, 2005.
10  But that was also not produced pursuant to our request
11  for production.
12        So to the extent that we are going to have
13  continuing questions with respect to Miss Lipscomb's
14  knowledge about these policies, we object to that because
15  they should have been produced already in response to our
16  request for production.
17        MR. PIATAK:  Okay.  Do you want to break for
18  lunch now?
19        (Thereupon, a lunch recess was had.)
20        MR. PIATAK:  Mr. Cronin has asked to adjourn
21  the deposition today and I agreed to.
22        MR. CRONIN:  And just to explain my
23  reasoning, I've taken a little time to think more about
24  the documents that were produced today for the first

16 (Pages 58 to 61)

Page 66

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                    )
                                   )
            Plaintiff,             )
                                   )   Civil Action
v.                                 )   No. 05-477-SLR
                                   )
ELECTRONIC DATA SYSTEMS            )
CORPORATION,                       )
                                   )
            Defendant.             )


         Continued deposition of HESTAL LIPSCOMB taken
pursuant to notice at the law offices of Richards, Layton
& Finger, One Rodney Square, Wilmington, Delaware,
beginning at 1:32 p.m. on Tuesday, April 11, 2006, before
Eleanor J. Schwandt, Registered Merit Reporter and Notary
Public.

APPEARANCES:

            LAURENCE V. CRONIN, ESQ.
            SMITH, KATZENSTEIN & FURLOW
               800 Delaware Avenue
               Wilmington, Delaware  19801
               for the Plaintiff

            THOMAS J. PIATAK, ESQ.
            BAKER HOSTETLER
               3200 National City Center
               1900 East 9th Street
               Cleveland, Ohio  44114-3485
               for the Defendant

     ALSO PRESENT: LANCE ROGERS, EDS



                    WILCOX & FETZER
         1330 King Street -  Wilmington, Delaware 19801
                     (302) 655-0477

Page 67

1        MR. PIATAK:  Before the deposition I gave to
2    Mr. Cronin the documents 2 and 3 identified in our
3    privilege log, and some additional documents responsive
4    to interrogatory number 17, and I also gave him, at his
5    request, an opportunity to confer with his client about
6    those documents, and these are being produced subject to
7    the agreement that there would be no argument that EDS
8    had waived any privilege by producing them. Is that
9    correct, Mr. Cronin?
10        MR. CRONIN:  That's correct.
11        (Hestal Lipscomb, having been previously
12    duly sworn, was examined and testified further as
13    follows:)
14                CONTINUED EXAMINATION
15    BY MR. PIATAK:
16    Q.  Good afternoon, Hestal.
17    A.  Good afternoon.
18    Q.  You understand you are still under oath from the
19    last time we met?
20    A.  Yes, sir.
21    Q.  Same ground rules apply. I'll just remind you
22    quickly, you need to answer orally. Nods of the head,
23    mm-hmm, natural, it happens. We all talk that way. But
24    it makes it hard for the court reporter, so try to avoid

Page 68

1    that.
2        Also, wait until or try to wait until I'm
3    done with my question before you give your answer, and I
4    will try to wait until you are done with your answer
5    before I go on to my next question. Again, that makes it
6    easier for the court reporter.
7        And finally, I will assume if you answer any
8    question that you have understood my question. Do you
9    remember all that from last time?
10    A.  Yes.
11    Q.  And again, if you need a break at any time, just
12    let me know. Is that understood?
13    A.  Yes.
14    Q.  Hestal, has there been any change in your
15    employment since the last time we met?
16    A.  No.
17    Q.  So you are still working at the Delaware
18    psychiatric hospital?
19    A.  Yes.
20    Q.  Are you doing any work in the document production
21    facility that we talked about last time?
22    A.  No.
23        (Defendant's Deposition Exhibit K was marked
24    for identification.)

Page 69

1    Q.  Hestal, I've handed you what has been marked as
2    Exhibit K. Do you remember receiving this document?
3    A.  No, I don't.
4    Q.  Do you know whether you received it and you don't
5    remember receiving it, or do you know for a fact that you
6    did not receive that?
7    A.  I don't recall.
8    Q.  Okay. But this is addressed to your correct
9    address at the time?
10    A.  Yes.
11    Q.  And the letter indicates that Cigna at that date
12    had not received, these are the items that are checked,
13    confirmation of the surgical procedure you underwent,
14    medical information from Dr. Kraut to support your time
15    off work, and your signed authorization to release
16    medical information, inclusive of proof of loss form,
17    correct?
18    A.  Yes.
19    Q.  And the letter also indicates that Cigna had
20    attempted to contact you by phone on May 27th and June
21    the 1st. Correct?
22    A.  Yes, it does.
23    Q.  What action did you take as a result of this
24    letter?

Page 70

1        MR. CRONIN:  Object to the form. You can
2    answer.
3    Q.  What action, if any, did you take as a result of
4    this letter?
5        MR. CRONIN:  Object to the form.
6    A.  There wasn't any action taken, to my knowledge.
7    I don't recall receiving this letter.
8    Q.  Okay. That's fine. Did you ever speak to anyone
9    at Cigna about your request for short-term disability or
10    FMLA leave in 2004?
11    A.  No.
12    Q.  And do you have facts or evidence showing that at
13    the time this letter was sent on June 2nd, Cigna had
14    received information regarding confirmation of the
15    surgical procedure you underwent, medical information
16    from Dr. Kraut to support your time off work, or your
17    signed authorization to release medical information and
18    proof of loss form?
19        MR. CRONIN:  Object to the form.
20    A.  Could you repeat the beginning of that one?
21    Q.  Oh, sure.
22    A.  You are saying -- I lost part of it.
23    Q.  Of course, that's fine. Do you have any facts or
24    evidence showing that as of June 2nd, the date of

2 (Pages 67 to 70)

Lipscomb                          v.            Electronic Data Systems Corporation
Hestal Lipscomb              C.A. # 05-477-SLR                     April 11, 2006

Page 71

1  Exhibit K, Cigna had, in fact, received confirmation of
2  the surgical procedure you underwent?
3      A.  I didn't receive anything personal, personally,
4  faxed to me stating that they received it.
5      Q.  Do you have any facts or evidence showing that as
6  of June the 2nd Cigna had received medical information
7  from Dr. Kraut supporting your time off of work?
8      A.  No, not personally.
9      Q.  Okay.  And do you have any facts or evidence
10  showing that as of June the 2nd Cigna had received signed
11  authorization to release medical information and proof of
12  loss form?
13      A.  No.  The only thing that I had with anything in
14  regards to this is when Barbara Jackson spoke to me and
15  said something about them not receiving it and I
16  contacted the hospital.  They in turn faxed -- said that
17  they faxed the information over to Cigna.
18      Q.  Okay.
19      A.  And that was the only thing that I know in
20  regards to anything being faxed to them.
21      Q.  Okay.  And do you remember who you spoke with at
22  the hospital?
23      A.  Oh, it was a nurse in the surgical department.  I
24  don't recall her name.

Page 72

1      Q.  Okay.  There may be some documents later on that
2  have some names.  And this conversation occurred after
3  Barbara Jackson told you that Cigna had not received the
4  information, correct?
5      A.  Yes.
6      Q.  And what the nurse told you was that they had
7  already previously faxed to Cigna information?
8      A.  Yes, they did, and that she would re-fax the
9  information because I requested it.
10      Q.  And that conversation is the only information you
11  had about anything being sent to Cigna, that's correct?
12      A.  Yes.
13      (Defendant's Exhibit L was marked for
14  identification.)
15      Q.  Hestal, you have been handed what has been marked
16  as Exhibit L.  This is a letter from Cigna dated June
17  17th, 2004.  This is addressed to your correct address at
18  the time, right?
19      A.  Yes, it is.
20      Q.  And this letter stated your request for FMLA
21  leave was denied as Cigna had not received a completed
22  medical certification.  Is that --
23      A.  I'm sorry.  Yes, it does.
24      Q.  Okay.  And the letter stated, "If you still want

Page 73

1  your leave considered for FMLA protection, please submit
2  a Medical Certification within 15 days."  Do you see that
3  language?
4      A.  Yes.
5      Q.  What action did you take as a result of this
6  letter?
7      A.  I didn't take any action as a result of this
8  letter.  I seen this letter after I was terminated.
9  There was no action to be taken then.
10      Q.  Okay.  Do you recall whether you received this
11  letter at the time?
12      A.  Barbara Jackson showed it to me in the office on
13  the day of the termination.  She showed me this letter.
14      Q.  Okay.  Do you recall whether you also received a
15  copy in the mail?
16      A.  I did receive a copy, but it was after I was
17  terminated.
18      Q.  You received a copy from whom after you were
19  terminated?
20      A.  I would believe Cigna.
21      Q.  Do you recall whether you also received a copy of
22  this letter in the mail in the June 2004 time frame?
23      A.  No, sir.
24      Q.  Is it possible that you received one and you just

Page 74

1  don't recall?
2      A.  I don't recall receiving one in June.  I did
3  receive the letter in July, but it was after I was
4  terminated.
5      Q.  Did you return to work after your April 2004
6  surgery?
7      A.  Yes, I did.
8      Q.  When did you return to work?
9      A.  I don't recall.  I believe it was the 14th, 14th,
10  15th, something around there.
11      Q.  Could it have been --
12      A.  Of April.
13      Q.  Of April or May?
14      A.  I mean, I'm sorry, that was April -- wrong year.
15  It was May 17th when I returned.
16      Q.  Of 2004?
17      A.  And '4.
18      Q.  Okay.  Did you speak to anyone at EDS about your
19  absence from work when you returned?
20      A.  No, I didn't.  I spoke -- only thing I had did
21  was give my return to work slip to Tracey Eaddy.
22      Q.  And other than giving that return to work slip to
23  Tracey, you didn't have any conversation with anyone at
24  EDS about your absence?

3 (Pages 71 to 74)

Lipscomb                                   v.              Electronic Data Systems Corporation
Hestal Lipscomb                    C.A. # 05-477-SLR                          April 11, 2006

Page 87

1  that I actually went to the hospital, after I was
2  terminated, and went in my record to find out whether or
3  not -- and this is the form that was faxed, with a fax
4  cover sheet, stating it was faxed to Cigna.
5      Q.  And that form is Exhibit M?
6      A.  Yes, Exhibit M.
7      Q.  You will see that Exhibit M says in bold print,
8  "Please send copies of all current test results and
9  office notes from April 2004 through the present."  Do
10  you see that language?
11      A.  Yes.
12      Q.  Do you have any facts or evidence showing that
13  you or anyone acting on your behalf had sent to Cigna
14  copies of all current test results and office notes from
15  April 2004 through the present?
16      A.  I only know what I was told by the hospital that
17  was sent.
18      Q.  Okay.  And what you were told by the hospital was
19  sent was what has been marked as Exhibit N?
20      A.  Yes.
21      Q.  And that's a one-page document?
22      A.  Yes.
23          (Defendant's Exhibit O was marked for
24  identification.)

Page 88

1      Q.  Hestal, I've handed you what has been marked as
2  Exhibit O.  This was produced to us by your attorney.
3  When did you first see this document?
4      A.  When I went to the hospital and asked -- signed
5  out my chart, my records out of the chart so that I could
6  find information to take with me to unemployment.
7      Q.  That was after you were terminated by EDS?
8      A.  Yes.
9      Q.  That was in preparation for your unemployment
10  hearing?
11      A.  Yes, sir.
12      Q.  This document indicates that it was faxed to you
13  on May 20th, 2004.  Do you see that?
14      A.  Yes.
15      Q.  And the number given is 454-1074?
16      A.  Yes.
17      Q.  Do you know what that number is?
18      A.  It is a number at EDS.
19      Q.  And it indicates that what was being faxed was
20  one page, plus a cover?
21      A.  Yes.
22      Q.  And the message says "Cigna form"?
23      A.  Yes.
24      Q.  Did the hospital fax a Cigna form to you at EDS

Page 89

1  on May 20 of 2004?
2      A.  Not to my knowledge.  I never received anything.
3  When it came out on the fax no one where it came out of
4  the fax machines called me or brought it to me or
5  anything like that.  I never personally received it.
6      Q.  So this is a hospital fax transmission form
7  indicating that one page, plus the cover, had been faxed
8  to you at EDS on 5/20/2004, but you never received it at
9  the time?
10      A.  No.
11      Q.  Do you remember asking the hospital to fax to you
12  a Cigna form at that time, in May of 2004?
13      A.  No, I don't.
14      Q.  Do you remember having discussions with anyone at
15  the hospital in May of 2004 concerning your request for
16  short-term disability or FMLA leave?
17      A.  With someone in the hospital?
18      Q.  With someone at the hospital, correct.
19      A.  No.
20      Q.  Does this document, this document meaning
21  Exhibit O, refresh your recollection that you were aware
22  in May of 2004 that Cigna had denied your request for
23  short-term disability?
24      A.  This form doesn't state that, and I never

Page 90

1  received, received it, so I don't -- I'm not aware of
2  anything as far as this particular paper is concerned,
3  because I never seen it until I got it out of my chart.
4      Q.  Okay.
5          (Defendant's Exhibit P was marked for
6  identification.)
7      Q.  Hestal, you have been handed what has been marked
8  as Exhibit P.  It is two pages, the first Bates labeled
9  HL-087 and the second Bates labeled HL-085.  HL-087 is a
10  fax cover sheet from Christiana Care Health Services; is
11  that correct?
12      A.  Yes.
13      Q.  And that's similar to the fax cover sheet that we
14  had already looked at as Exhibit O; is that correct?
15      A.  Yes.
16      Q.  And this indicates that there is one page, plus
17  cover, transmitted to Cigna on June 21st, 2004, correct?
18      A.  Yes.
19      Q.  And it says from Shazi Zodeh.  Do you see where
20  that is checked?
21      A.  Yes, I do.
22      Q.  And was that the nurse that you spoke with?
23      A.  Yes, it is.
24      Q.  At Christiana Care Health Services?

7 (Pages 87 to 90)

Lipscomb                                                    Electronic Data Systems Corporation
Hestal Lipscomb                    v.                              April 11, 2006
                        C.A. # 05-477-SLR

Page 91

1    A.  Yes.
2    Q.  Then the other page is a fax transmission sheet
3  stating at the top "Message Confirmation"?
4    A.  Yes.
5    Q.  Do you know what the document was, the one-page
6  document that accompanied this fax cover sheet marked as
7  Exhibit P?
8    A.  It would be -- it would have been the, what is
9  your Exhibit N.
10   Q.  Okay.  And Exhibit N was not the Certification of
11 Healthcare Provider statement, correct?
12   A.  Excuse me?
13        MR. CRONIN:  Object.
14   Q.  Exhibit N is not the same document as the
15 Certification of Healthcare Provider statement, correct?
16        MR. CRONIN:  Object to the form.
17   A.  Is that what you showed me in the other book?
18   Q.  Yes.
19   A.  No, it is not the same as that.
20   Q.  And the message confirmation sheet refers, says
21 "Mary Beth's office" on it.  Do you know what that refers
22 to?
23   A.  No, I don't.
24   Q.  At any point did you directly, yourself, send any

Page 92

1  medical information to Cigna?
2    A.  No.
3    Q.  Do you know why two different 800 numbers appear
4  on the message confirmation sheet?
5    A.  No, I don't.  It came from Christiana Hospital.
6  I have no dealings with their things.
7    Q.  I just asked you if you knew why.
8    A.  No, I don't.
9    Q.  Do you have a copy of any document that was sent
10 along with the fax cover sheet that has on it fax
11 transmission information showing that it was actually
12 sent to Cigna?
13   A.  Just the --
14        MR. CRONIN:  Object to the form.  You can
15 answer.
16   A.  Just the same thing that you have here.
17   Q.  The same thing meaning Exhibit P?
18   A.  Exhibit P, yes.  I'm sorry.
19   Q.  Other than Exhibit P, you are not aware of any
20 document that was faxed to Cigna that has fax
21 transmission data on it showing it was faxed to Cigna?
22   A.  No.
23   Q.  Do you know of anyone else who has a copy of any
24 document that was sent along with this fax cover sheet

Page 93

1  showing fax transmission information confirming it was
2  sent to Cigna?
3        MR. CRONIN:  Object to the form.
4    A.  Other than the forms that I picked up myself out
5  of my, my hospital records, the lawyer, you.  I don't
6  know who else might have it.
7    Q.  When you went to your medical forms to prepare
8  for your unemployment compensation hearing, the fax
9  transmission sheet that you found was what is marked as
10 Exhibit P, correct?
11   A.  Yes, it is.
12   Q.  You are not aware of any document being faxed to
13 Cigna after June 21st, 2004, correct?
14   A.  Not to my knowledge.
15   Q.  Neither of the 800 numbers contained in Exhibit P
16 are the same as the 800 number found on the cover of
17 Exhibit H; is that correct?
18   A.  No, it is not the same number.
19   Q.  If you would look at the second page of Exhibit P
20 where there are two 800 numbers there.
21   A.  No, they are not the same.
22   Q.  Okay.  So the fax numbers found on Exhibit P are
23 not the same as the fax number found on Exhibit H?
24   A.  Correct.

Page 94

1        (Defendant's Exhibit Q was marked for
2  identification.)
3    Q.  Hestal, I've handed you Exhibit Q.  These are
4  documents that we received from your attorney in
5  connection with the case.  I believe both documents have
6  also been previously marked.  If you would look at the
7  second page of Exhibit Q.  That's the document that you
8  believe was sent to Cigna on June the 21st, correct?
9    A.  Yes.
10   Q.  And that's a copy of the actual document you
11 retrieved from your medical file in connection with your
12 unemployment compensation hearing?
13   A.  Yes.
14   Q.  Is there any fax transmission information on the
15 second page of Exhibit Q indicating that it was sent to
16 Cigna on June 21st?
17   A.  Excuse me?
18   Q.  Sure.  Is there any fax transmission information
19 on the second page of Exhibit P indicating that it was
20 sent to Cigna on June 21st, 2004?
21   A.  Exhibit P or Exhibit --
22   Q.  Q, I'm sorry.  Exhibit Q, the second page of
23 Exhibit Q?
24   A.  The second page of Exhibit Q has a fax number on

8 (Pages 91 to 94)

Lipscomb                                                    Electronic Data Systems Corporation
v.
Hestal Lipscomb                      C.A. # 05-477-SLR                        April 11, 2006

Page 95

1  it that's an 800 number for Charlene Crowder. I guess
2  that's where it is supposed to be sent back to, right
3  here.
4     Q.  Right. Is there any fax transmission information
5  it was sent back to Charlene Crowder at that number?
6     A.  Not on this particular page.
7     Q.  And this page is the copy of the document you
8  retrieved from your medical files?
9     A.  Yes, sir.
10    Q.  Other than the second page of Exhibit Q, are you
11 aware of any test results or office notes from 2004 to
12 the present that was sent to Cigna on your behalf?
13    A.  No, no, I'm not.
14    Q.  Other than the second page of Exhibit Q, are you
15 aware of any Certification of Healthcare Provider, such
16 as found in Exhibit J, that was sent to Cigna on your
17 behalf?
18    A.  Only thing I am aware of is what they said they
19 received at the hospital, and that was this, and this is
20 what they said they filled out and they sent back.
21    Q.  Hestal, you took time off of work at EDS for
22 surgery in 2003. Do you remember that?
23    A.  Yes, I do.
24    Q.  Did you take time off once or twice for that?

Page 96

1     A.  Once.
2     Q.  And you also took time off work for surgery in
3  2004 at EDS?
4     A.  Yes.
5     Q.  Was there anyone there who made any disparaging
6  comments about your taking time off for surgery on either
7  occasion?
8     A.  No.
9     Q.  Is there anyone at EDS who ever made any
10 disparaging comments about your health?
11    A.  No.
12    Q.  Are you aware that other EDS employees also took
13 time off for medical reasons while you worked there?
14    A.  I have -- I believe there were people that took
15 off for whatever, various reasons. I wasn't really into
16 everyone's business, so I don't know who was out, for
17 what reason they were out.
18    Q.  Are you aware of any employee at EDS being
19 terminated as a result of taking time off for medical
20 reasons?
21    A.  No, I'm not aware of anyone.
22    Q.  And you indicated Barb Jackson came to you twice
23 and urged you to get medical documentation into Cigna,
24 correct?

Page 97

1     A.  Yes.
2     Q.  Did Barb Jackson ever come to you two times and
3  tell you to do anything else where you did not do what
4  she asked you to do?
5        MR. CRONIN:  Object to the form. You can
6  answer.
7     A.  No, I didn't. No, she didn't, I meant.
8     Q.  Are you aware of Barb Jackson going to any other
9  employee two times and telling them to do something and
10 it was not done?
11       MR. CRONIN:  Object to the form.
12    A.  No, I'm not aware of any conversation with her
13 and any other employee.
14    Q.  At EDS when Barb Jackson asked something to get
15 done, employees got it done; is that correct?
16    A.  I would believe so. Everyone is their own
17 individual. I know what I did when she asked me to do
18 it.
19    Q.  Right. When she asked you to do something, you
20 got it done?
21    A.  That's what I did. I made the phone call which
22 was necessary to try to get the documents to Cigna as she
23 requested.
24    Q.  And generally speaking, leaving aside that

Page 98

1  instance when Barb Jackson asked you to do something, you
2  would take care to get it done?
3     A.  Yes, if it was something pertaining to their job
4  or whatever, yes, I would.
5     Q.  Did you receive your last EDS paycheck through
6  the mail?
7     A.  I don't believe it came through the mail. I
8  believe it actually went direct deposit, like they had
9  been doing for the entire time I was working there.
10    Q.  Okay. Are you aware of any items sent to you
11 through the mail in the period of April through June of
12 2004 that you did not receive?
13    A.  When, sir?
14    Q.  Sure. Are you aware of any item sent to you
15 through the mail in the period of April through June 2004
16 that you did not receive?
17    A.  Only the document that you presented to me
18 before, which I don't know the letters, and the thing,
19 letter that Barb Jackson showed me, I got that after the
20 fact.
21    Q.  Did you contact the post office concerning
22 problems receiving mail at your 3111 West 2nd Street
23 address?
24    A.  Did I contact the post office?

9 (Pages 95 to 98)

Lipscomb                          v.        Electronic Data Systems Corporation
Hestal Lipscomb           C.A. # 05-477-SLR                      April 11, 2006

Page 115

1 A. Okay. It says, "To expedite processing of your
2 claim, please sign and fax the enclosed disclosure,
3 authorization and EDS reimbursement agreement to us as
4 soon as possible at the 860-371-3511."
5 Q. Okay. Did you read that second seven digits
6 correctly?
7 A. 3511.
8 Q. The second set.
9 A. Oh.
10 Q. Why don't you re-read the whole number again.
11 A. I'm sorry. 860-731-3511.
12 Q. Okay. Now, let's take a look at Exhibit P. This
13 is another document that the counsel showed you, correct?
14 A. Yes, sir.
15 Q. Now, he also pointed out the second page of this
16 document as being a confirmation of a fax sheet, correct?
17 A. Yes.
18 Q. All right. And his question of you, he asked
19 whether the number, the phone number, the fax number on
20 Lipscomb H appears anywhere on this fax confirmation
21 sheet. Do you remember that question?
22 A. Yes, sir.
23 Q. And is that number contained here as any of the
24 numbers indicated on the confirmation?

Page 116

1 A. No, it isn't.
2 Q. Are there other fax numbers?
3 A. Yes, there is.
4 Q. Okay. And what are those fax numbers?
5 A. One is 1-800-377-4286.
6 Q. Okay.
7 A. And the other seems -- is 1-800-325-7016.
8 Q. Okay. Now, let's take a look at Exhibit N and
9 the first page of Exhibit P. Now, what is Exhibit N?
10 A. Exhibit N is the form that the hospital received
11 from Cigna to be filled out.
12 Q. Okay. Was this the document you discussed with
13 Nurse Zodeh?
14 A. Yes, it is.
15 Q. Okay. Now, looking on Exhibit N, the first page,
16 does that indicate a particular fax number?
17 A. Yes, it does.
18 Q. What is the number?
19 A. 1-800-325-7016.
20 Q. And that's the same number or one of the two
21 numbers that shows up on the second page of that, being
22 the fax confirmation sheet, correct?
23 A. Yes, it is.
24 Q. Now, do you see the number 800-325-7016 anywhere

Page 117

1 on Exhibit N?
2 A. Yes, it is. It is up underneath Charlene Crowder
3 department's fax number.
4 Q. Any place else on the form? How about the bottom
5 right-hand corner?
6 A. Yes, it is also on the bottom of the page,
7 right-hand.
8 Q. All right. And who is this fax, which is
9 directed to a Dr. Emily Jane Penman, purported to be
10 from?
11 A. It is from Charlene Crowder.
12 Q. Okay. Charlene Crowder at Cigna?
13 A. At Cigna.
14 Q. Apparently the same Charlene Crowder that's
15 referenced in Lipscomb Exhibit H?
16 A. Yes, sir.
17 Q. So she has two different fax numbers?
18 A. It appears so.
19 Q. Now, looking at the second page of Exhibit P,
20 there is this other fax number. Do you see that other
21 one on there that you have already -- not 7016 but the
22 other one, 377 --
23 A. 377.
24 Q. -- 4286?

Page 118

1 A. Yes.
2 Q. Do you know where that one is?
3 A. No, I don't, sir.
4 MR. CRONIN: Okay. I have no further
5 questions.
6 MR. PIATAK: I have nothing further at this
7 time. Do you want to advise her on waiver?
8 MR. CRONIN: We are going to read and sign.
9 (Proceedings conclude at 3:22 p.m.)
10 I N D E X
11 DEPONENT: HESTAL LIPSCOMB          PAGE
12 Examination by Mr. Piatak          67
   Examination by Mr. Cronin          114
13
14 E X H I B I T S
15 DEFENDANT'S DEPOSITION EXHIBITS          MARKED
16 K - 6/2/04 Cigna to Lipscomb letter     68
17 L - 6/17/04 Cigna to Lipscomb letter    72
18 M - 5/10/04 Dr. Kraut note              75
19 N - 5/7/04 Crowder to Penman fax        86
20 O - 5/20/04 To: Lipscomb fax, "Cigna form"  87
21 P - 6/21/04 Zodeh to Cigna fax          90
22 Q - 6/21/04 Zodeh to Cigna fax          94
23 ERRATA SHEET/DEPONENT'S SIGNATURE  PAGE 119
24 CERTIFICATE OF REPORTER            PAGE 120

14 (Pages 115 to 118)