**Affidavit of Laurence V. Cronin**                    **Exhibit D**

# evolving together. benefiting more.

## ❖ Your Benefits.



# 2004 Benefits Handbook

*infoCentre Keyword:* Benefits US

http://infocentre.eds.com/us/people/pe_benefits.html



DEPOSITION
EXHIBIT
EDS-5
RWWR 4-12-06
PENGAD 800-631-6989


EDS

EDS I 00141

**California** – You will be reminded in the claim acknowledgement sent to you by CIGNA AbilityReturns to file a state disability claim. Obtain a claim form by calling any Employment Development Dept. (EDD) office listed in the government pages of your telephone directory. If you are out of state, call 1 800 480 3287 or download the request for a form via their Web site at www.edd.ca.gov

**Hawaii** – State disability benefits will be automatically integrated through CIGNA AbilityReturns. Your leader will initiate a Disability claim by calling CIGNA AbilityReturns. Your claim will be evaluated for eligibility for state disability benefits and coordinated with the EDS STD program. Contact Disability Services at 1 972 605 7335 for any additional questions.

**New Jersey** – You will be reminded in the claim acknowledgement sent to you by CIGNA AbilityReturns to file a state disability claim. Obtain a claim form or information by going to a local New Jersey Division of Temporary Disability Insurance or call 1 609 292 7060. You may also write to Division of Temporary Disability Insurance, CN 387, Trenton, NJ 08625-0387.

**New York** – State disability benefits will be automatically integrated through CIGNA AbilityReturns. Your leader will initiate a Disability claim by calling CIGNA AbilityReturns. Your claim will be evaluated for eligibility for state disability benefits and coordinated with the EDS STD program. Contact Disability Services at 1 972 605 7335 for any additional questions.

**Puerto Rico** – Puerto Rico employees are covered under the Puerto Rico Public Plan, sponsored by the Commonwealth of Puerto Rico. For more information, call the Puerto Rico Public Plan at 1 787 754 5788 or write them at Commonwealth of Puerto Rico, Department of Labor and Human Resources, Disability Insurance Program, Office of the Director, Prudencio Rivera Martinez Building, 505 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

**Rhode Island** – You will be reminded in the claim acknowledgement sent to you by CIGNA AbilityReturns to file a state disability claim. Obtain a claim form or information by visiting a local Rhode Island Department of Employment & Training office for state disability or call 1 401 462 8420.

If you still have questions regarding these benefits after talking to the contacts listed above, call EDS Disability Services at 1 972 605 7335. If EDS is required to provide information on your state disability claim form, send your form to:

EDS Disability and Life Services
5400 Legacy Drive
H3-1C-53
Plano, TX 75024

*Please contact your HR representative for additional information. A.T. Kearney employees should contact the Employee Benefits Department at 1 312 223 6560. UGS PLM Solutions employees should contact the Employee Benefits Department at 1 314 264 8393.*

# How to Report a Disability

## CIGNA AbilityReturns replaces Synchrony disability leave program.

Effective January 1, 2004, Synchrony will no longer be administering the disability, FMLA and Workers' Compensation Claims reporting.

Through our integrated disability service, EDS can combine and coordinate the management and administration of Short-Term Disability (STD), Long-Term Disability (LTD), FMLA, Workers' Compensation, state disability and a variety of other coverage. The integration of these services helps enhance productivity, promote health and safety, simplify disability claims administration, and reduce cost.

The administration of these benefits is managed for EDS by CIGNA. Disability insurance products and services are provided by Life Insurance Company of North America and/or CIGNA Life Insurance Company of New York, and not by CIGNA Corporation itself. "CIGNA" is used to refer to these subsidiaries and is a registered service mark. Workers' Compensation services are provided by ESIS, Inc. an ACE USA company. CIGNA works with the EDS Disability Services unit, which manages disability-related employee absences and serves as the liaison between EDS managers and CIGNA.

If you have a claim for STD, LTD, FMLA or Workers' Compensation, you must report it immediately to your manager. The following provides information for both employees and managers about the disability reporting process for these types of claims. A.T. Kearney employees should also contact the A.T. Kearney Employee Benefits Department at 1 312 223 6560. UGS PLM Solutions employees should contact the Employee Benefits Department at 1 314 264 8393.

**Employee Guidelines** – Describes an employee's responsibilities for reporting a disability leave of absence or on the job injury.
**Employee Questions and Answers** – Provides frequently asked questions regarding disability leaves of absence.
**Manager's Guidelines** – Describes a manager's responsibilities and processes for reporting a disability leave of absence or on the job injury.
**Manager's Questions and Answers** – Provides frequently asked questions regarding disability leaves of absence.
**Manager's Initial Reporting Process** – Read manager's guidelines and Q&A first before using this tool to report an employee's disability event.

*Please contact your HR representative for additional information. A.T. Kearney employees should contact the Employee Benefits Department at 1 312 223 6560. UGS PLM Solutions employees should contact the Employee Benefits Department at 1 314 264 8393.*

## Employee Guidelines

Whether you are sick, injured or absent from work, it is important that you seek appropriate care and guidance and notify your leader. A.T. Kearney employees should also contact the A.T. Kearney Employee Benefits Department at 1 312 223 6560. It is your responsibility to obtain and submit all medical documentation that substantiates your inability to work. These guidelines are provided to assist you during the claim process, if you are out of work due to a short-term disability leave, long-term disability leave, Workers' Compensation leave or requested leave under FMLA.

EDS I 00230

When an injury, illness or absence occurs, it is your responsibility to:
- Contact your leader within 24 hours of event, or as soon as reasonably possible. A.T. Kearney employees should also contact the A.T. Kearney Employee Benefits Department at 1 312 223 6560.
- Provide your leader with information regarding the injury, illness or absence. You do not have to give specifics, such as a medical diagnosis.
- Inform your leader if medical treatment is necessary (see below for additional details).

## Is medical treatment necessary?

**If no:**
- Update your leader on your expected return to work date.

**If yes:**
- Schedule any appointments and follow-up visits with your healthcare provider and attend all scheduled visits.
- Give your healthcare provider a copy of the Medical Ability Report form and the Certification of Healthcare Provider form that will be mailed to you by the insurance carrier for the healthcare provider to complete. Ensure your healthcare provider returns the Certification of Healthcare Provider form to CIGNA.
- Discuss medical restrictions, any required accommodations and return-to-work options with your leader.
- If you are out for three consecutive days or more for your own illness, your healthcare provider must provide a release for you to return to work for your leader.

*Note: You and your family are best able to obtain the required medical documentation to determine your disability status and eligibility for benefits. While the resources below are available to assist you, you are ultimately responsible for providing appropriate medical documentation within the specified time frames. You will have 15 days to submit this documentation letter. If your claim has been denied or closed, you will have 15 days from the date of the denial/closure letter to submit an appeal.*

During your absence from work, you may receive communication from any or all of the following:

**Your Leader to:**
- Check on your status
- Assist with return to work activities
- Explain the return to work process

**An EDS Disability Services Analyst to:**
- Answer any questions
- Assist with return to work activities
- Explain the return to work process

**CIGNA to:**
- Check on your status
- Answer any questions
- Assist with return-to-work activities, aided by a completed Medical Ability Report form.
- Request you complete and return an Authorization for Release and Use of Information form to assure proper care and treatment.
- Request you return a completed Certification of Healthcare Provider form to assure proper benefit administration.

**In addition, CIGNA may:**
- Request updates as needed on your health status.
- Request you receive additional medical opinions to gather or confirm information on your disability or absence.
- Request that your family member's healthcare provider complete the Certification of Healthcare Provider form, if you are absent as the result of a family member's serious medical condition.

*Please contact your HR representative for additional information. A.T. Kearney employees should contact the Employee Benefits Department at 1 312 223 6560. UGS PLM Solutions employees should contact the Employee Benefits Department at 1 314 264 8393.*

## General Questions

### Who is CIGNA?
Disability Insurance products and services are provided by Life Insurance Company of North America and/or CIGNA Life Insurance Company of New York, and not by CIGNA Corporation itself. "CIGNA" is used to refer to these subsidiaries and is a registered service mark. Workers' Compensation services are provided by ESIS, Inc. an ACE USA company.

### What is Integrated Disability?
Integrated Disability is a service that combines or coordinates the management and administration of short-term disability, long-term disability, Workers' Compensation, Family Medical Leave Act (FMLA), state disability and a variety of other coverage. This service helps reduce cost, enhance productivity, promote health and safety, and simplify the administration of disability claims.

### Who is EDS Disability Services?
This EDS unit manages disability-related employee absences that are due to occupational or non-occupational events and serves as the liaison between EDS leaders and CIGNA.

## Reporting a Claim

### When do I report a claim and to whom should it be reported?
If you are sick, injured or absent from work, you must notify your leader within 24 hours, or as soon as reasonably possible. If you need medical care, seek the proper medical attention as soon as possible.

### What do I report to my leader?
You must inform your leader of all absences or your inability to work. A.T. Kearney employees should also contact the A.T. Kearney Employee Benefits Department at 1 312 223 6560. You do not have to give medical specifics, including a diagnosis, to your leader. If you have a job-related accident or illness, you must report it immediately to your leader, regardless of whether you have sought treatment or missed any time from work.

### What happens if I don't report a medical absence immediately?
If you fail to notify your leader in a timely manner of a medical need to be out of the office, your leave of absence may be unexcused. A.T. Kearney employees should also contact the A.T. Kearney Employee Benefits Department at 1 312 223 6560. In Workers' Compensation situations, individual states have filing/reporting deadlines that must be met. Late reporting may also result in benefit and/or salary interruptions.



EDS I 00231

**Affidavit of Laurence V. Cronin**                    **Exhibit E**

Barbara Jackson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )     Civil Action No.
                                    )        05-477 SLR
ELECTRONIC DATA SYSTEMS             )
CORPORATION, a Delaware             )
Corporation,                        )
                                    )
            Defendant.              )

         Deposition of BARBARA JACKSON taken pursuant to
notice at the offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 9:20 a.m. on Wednesday, April 12, 2006,
before Robert Wayne Wilcox, Jr., Court Reporter and
Notary Public.

APPEARANCES:

         LAURENCE V. CRONIN, ESQ.
         SMITH, KATZENSTEIN & FURLOW LLP
            800 Delaware Avenue - 7th Floor
            Wilmington, Delaware  19801
            for the Plaintiff,

         THOMAS J. PIATAK, ESQ.
         BAKER HOSTETLER
            3200 National City Center
            1900 East 9th Street
            Cleveland, Ohio  44114
            for the Defendant.

                    CORBETT & WILCOX
              Registered Professional Reporters
         1400 French Street     Wilmington, DE 19801
                    (302) 571-0510
                 www.corbettreporting.com

Barbara Jackson

5 (Pages 14 to 17)

Page 14

1 BY MR. CRONIN:
2    Q. Okay. Anything else?
3    A. No.
4    Q. Now, what's your educational background?
5    A. I graduated from high school.
6    Q. When was that?
7    A. 1970.
8    Q. Okay. Any education after high school?
9    A. Courses.
10   Q. What kind?
11   A. At the University of Delaware to get a
12 Delaware insurance agent's license.
13   Q. Anything else?
14   A. Miscellaneous corporate courses.
15   Q. How long have you been employed by EDS?
16   A. Six years.
17   Q. What did you do before then?
18   A. I worked in the commercial insurance field.
19   Q. Where did you work?
20   A. For an agency in Hockessin.
21   Q. Which one?
22   A. Insurance & Financial Services.
23   Q. How long did you work there?
24   A. Seven or eight years.

Page 15

1    Q. What did you do for them?
2    A. I was their marketing manager.
3    Q. What positions have you had with EDS?
4    A. Supervisor, claims supervisor, claims manager
5 and deputy account manager.
6    Q. Okay. You started as a claims supervisor?
7    A. Yes.
8    Q. That would have been what? Around 2000?
9    A. Yes.
10   Q. What did that job entail? What did you do?
11   A. I managed a group of people that were
12 responsible for claim adjudication, as well as the mail.
13   Q. How many people did you manage in that
14 position?
15   A. Approximately 12.
16   Q. Okay. Then you got a promotion to claims
17 manager?
18   A. Yes.
19   Q. When did that occur?
20   A. In June of 2003.
21   Q. Okay. How did your position change?
22   A. My responsibilities broadened, and I had other
23 teams that reported to me as well.
24   Q. So how many people did you supervise as claims

Page 16

1 manager?
2    A. Approximately 30.
3    Q. Okay. Then you got a promotion to deputy
4 account manager?
5    A. Yes.
6    Q. When was that?
7    A. I'm going to say June or July of '05.
8    Q. Okay. So it would have been after
9 Ms. Lipscomb was terminated?
10   A. Yes.
11   Q. Okay. So you were claims manager at the time
12 she was terminated. Is that correct?
13   A. Yes.
14   Q. All right. You said you supervised about 30
15 people?
16   A. Yes.
17   Q. All right. Who were your direct reports?
18   A. I had two supervisors.
19   Q. Who were they?
20   A. Tracey Eaddy, Kristen Goulet.
21   Q. Okay. They were your only direct reports?
22   A. Well, then there were another line of team
23 leaders.
24   Q. How many were there?

Page 17

1    A. Four.
2    Q. Who were they?
3    A. Linda Jackson, Judy Ackerman, Liz Counselor,
4 and Denise Ouly.
5    Q. Okay. So Linda Jackson was also one of your
6 direct reports?
7    A. Yes.
8    Q. Now, did you have any contact with Hestal
9 Lipscomb while she was employed there?
10   A. Yes.
11   Q. Okay. Was it daily? Once a week? Once a
12 month?
13   A. I don't think it was on any regular basis.
14   Q. Okay. What would be the context in which you
15 would have contact with Ms. Lipscomb?
16   A. Seeing her deliver the mail on occasion,
17 having an occasion to go into the mailroom myself to
18 either take a look at some reports, deliver something to
19 be going out.
20   Q. Okay. Now, during the period she was employed
21 there, was she considered a salary or hourly employee?
22   A. Salary.
23   Q. Okay. It was that way the entire time she was
24 there. Correct?

Barbara Jackson

Page 50

1    Q.   Okay.  Is Ms. Cornwell an attorney?
2    A.   No.
3    Q.   No.
4         What did she say when you mentioned to
5    her the options that you were considering?
6    A.   She asked which of the options was -- were we
7    leaning towards.
8    Q.   All right.  What did you say?
9    A.   Termination.
10   Q.   What did she say?
11   A.   She said that she would have to confer with
12   someone from HR and then she would get back to us.
13   Q.   That was it?  She didn't ask you why?
14   A.   We had had that conversation prior to her
15   asking me that.
16   Q.   You had had the conversation with Ms. Cornwell
17   prior to her asking which one you were leaning towards?
18   A.   Yes.
19   Q.   Okay.  When was that conversation?
20   A.   It was just the question I thought you had
21   asked me just before.  When I called her, we discussed
22   the fact that the short-term disability and the FMLA had
23   been denied, that the 15-day appeal time had also
24   expired, that I had met with Hestal on three occasions

Page 51

1    myself to prompt her to get the documentation to the
2    carrier.  That all occurred in that conversation.
3    Q.   Okay.  So she said she had to talk to someone
4    in HR and get back to you.  Did she call you back?
5    A.   Yes, she did.
6    Q.   When did she call you back?
7    A.   I don't know the exact date.
8    Q.   Was it within a day or two?
9    A.   Probably within two or three days.
10   Q.   Okay.  What did she say?
11   A.   And she said that she had spoken to human
12   resources and that we could go ahead and terminate.
13   Q.   All right.  She is in human resources.  Right?
14   A.   She's in -- I'm sorry.  She's in human
15   resources.  She spoke to employee relations.
16   Q.   Okay.  Did she say why she needed to talk to
17   someone in employee relations?
18   A.   She did not.
19   Q.   Okay.  Did she say anything else other than
20   the fact that you could go ahead and terminate
21   Ms. Lipscomb?
22   A.   No.
23   Q.   All right.  Did you have any other
24   conversations with Ms. Cornwell in connection with

Page 52

1    Ms. Lipscomb's termination?
2    A.   No.
3    Q.   All right.  You mentioned a fourth person was
4    involved that you had communications with leading up to
5    Ms. Lipscomb's termination -- Ms. Yeardsley in ER.  When
6    did you first have contact with her?
7    A.   Around the same time frame that I would have
8    spoken to Christine.
9    Q.   Okay.  What did you do?  Did she call you?
10   Did you call her?  How did you make contact?
11   A.   I called her.
12   Q.   Okay.  Why did you call her?
13   A.   To let her know that we had received
14   notification from the vendor that the documentation had
15   not been provided.
16   Q.   Okay.  Would this have been after the appeal
17   had expired?
18   A.   Yes.
19   Q.   Okay.  So it would have been after the three
20   meetings with Ms. Lipscomb?
21   A.   Yes.
22   Q.   Why did you contact her?
23   A.   I wanted to validate that we were -- that
24   there was -- that the vendor absolutely did not get it,

Page 53

1    was -- could it have gone somewhere else, what were --
2    you know, did she know of -- could she validate with the
3    vendor that they did not get it?  I was looking for that
4    final reinforcement that, no, the vendor did not get it.
5    Q.   What is the function of ER with respect to
6    Ms. Lipscomb's situation?
7    A.   They actually are responsible for the
8    relationship between the account and the vendors that are
9    used by EDS.
10   Q.   Okay.  When you say the "account," what are
11   you referring to?
12   A.   The Delaware account.  The Delaware location.
13   Q.   All right.  Did she tell you what she had done
14   to determine or verify that nothing had been received?
15   A.   Yes.  She indicated that she herself had
16   called the CIGNA representative and they had validated
17   that nothing was received.
18   Q.   Okay.  Do you know what that entailed?  I
19   mean, did she just call?  Do you know who she spoke with?
20   A.   I don't know.
21   Q.   Was any attempt made by anyone at EDS to
22   contact any of Ms. Lipscomb's medical providers?
23   A.   No.
24   Q.   So, to your knowledge, the only contact that

Barbara Jackson

Page 58

1  have an understanding of the process for applying for STD
2  or FMLA?
3      A.  The employee handbook that I have here in
4  front of me also takes them -- guides them to a website
5  at which they can go ahead and pull down the
6  documentation.
7          MR. CRONIN:  Okay.  Mark this, please.
8          (EDS Deposition Exhibit No. 5 was marked
9  for identification.)
10  BY MR. CRONIN:
11     Q.  Ms. Jackson, you've had handed to you what's
12  been marked as EDS No. 5.  Do you recognize this
13  document?
14     A.  Yes.
15     Q.  Okay.  What is it?
16     A.  It is the 2004 benefits handbook.
17     Q.  Okay.  Where can an employee at the Newark
18  facility find a copy of this document to review?
19     A.  Well, they can find it one or two places.
20  They can either go out on-line to get it or at the time
21  they become an EDS employee -- I believe I received mine
22  in the mail.
23     Q.  Okay.  But you don't know whether employees
24  get theirs in the mail or not -- other employees?  Is

Page 59

1  that correct?
2      A.  I don't know that.
3      Q.  Okay.  You got yours in the mail back when you
4  started in 2000?
5      A.  Yes.
6      Q.  All right.  Did you get subsequent ones?
7      A.  Yes.
8      Q.  All right.  Is there a new one every year?
9      A.  As changes occur to the benefits, then there
10  are amendments, I believe, to the handbook that come
11  along.
12     Q.  Okay.  What about when the company changes
13  vendors?  What do they do then?
14     A.  I don't know.
15     Q.  Okay.  Is there any sort of seminar or other
16  training or any type of instruction given to employees
17  when EDS would change vendors for purposes of STD and
18  FMLA?
19     A.  No.
20     Q.  All right.  Now, you've already testified that
21  you don't know when CIGNA took over the role as the
22  vendor in charge of STD and FMLA.  Correct?
23     A.  Correct.
24     Q.  All right.  And you don't know, therefore, how

Page 60

1  this changeover was conveyed to employees.  Correct?
2      A.  Correct.
3      Q.  Now, from the beginning of 2004 until the end
4  of July 2004, how would EDS handle a salaried employee's
5  request for medical leave if they were not entitled to
6  either short-term disability or FMLA?
7      A.  The request for time off would still be
8  reported to the vendor for the vendor to validate the
9  short-term disability was in fact valid, and at that time
10  they would issue a notice saying that, although the
11  short-term disability was a valid occurrence, they were
12  not eligible for time off with pay.
13     Q.  Okay.  So if an employee was out, say, three
14  days but they had not been there long enough to be
15  eligible for FMLA leave, the process was still to submit
16  it as if it was an STD application to the vendor for them
17  to reject it?
18     A.  No.
19     Q.  What's the purpose of submitting it to the
20  vendor?
21     A.  For one thing, they would need to be out for
22  five or more consecutive days for it to be reported to
23  the vendor.
24     Q.  Okay.  So nothing gets reported to the vendor

Page 61

1  unless somebody has been out five days?
2      A.  Yes.
3      Q.  Okay.  What happens if somebody is out three
4  days?
5      A.  It's considered sick days.
6      Q.  Okay.  It's not considered potentially FMLA
7  leave?
8      A.  No.
9      Q.  What if they're out four days?
10     A.  Sick days.
11     Q.  Okay.  So if somebody were to advise you or
12  advise one of your subordinates who's also a supervisor
13  that they needed to be out for four days, you wouldn't
14  consider that as potential FMLA leave?
15     A.  No.
16     Q.  Now, is this procedure written down somewhere
17  with respect to what you just described?
18     A.  I don't know if it's written in the benefits
19  handbook or not.  I would have to go through it.
20     Q.  But it's not in the employee handbook that you
21  described that's been marked as EDS No. 4.
22     A.  Just a minute.
23     Q.  Okay.
24     A.  Under Absences under -- on page 17 --

Barbara Jackson

17 (Pages 62 to 65)

Page 62

1    Q. Mm-hmm.
2    A. -- it indicates that if an employee is absent
3 for three or more days consecutively due to a medical
4 reason they may be required to provide a health care
5 provider certification to their manager upon return to
6 the workplace.
7        And then it says: Further, a health
8 care provider certification may be required to validate
9 any other illness or time away from the work due to
10 medical reason if deemed appropriate by EDS leadership.
11    Q. Okay. But you're talking about things that
12 would be submitted to the workplace. Correct?
13    A. Correct.
14    Q. All right. Nothing gets submitted to the
15 vendor for purposes of determining whether it's FMLA
16 leave until somebody has been out at least five days?
17    A. Yes.
18    Q. Okay. How long has this document been in
19 effect, EDS No. 4, this account handbook?
20    A. I don't know.
21    Q. Okay. Do you ever recall discussing with
22 anyone at either EDS or CIGNA the significance of this
23 document in connection with the decision to terminate her
24 employment?

Page 63

1    A. No.
2    Q. Okay. Now, we've talked a little bit about
3 this policy that's contained in pages 16 and 17. Was
4 this the policy that was relied upon to terminate
5 Ms. Lipscomb's employment?
6    A. Yes.
7    Q. Okay. What provision in this policy did EDS
8 rely on to terminate her employment?
9    A. Under Absences, again, the paragraph that
10 begins: If any employee is absent for three or more days
11 due to a medical reason, they may be required to provide
12 a health care provider certification to their manager
13 upon return to the workplace. Further, a health care
14 provider certification may be required to validate any
15 other illness or time away from work due to a medical
16 reason if deemed appropriate by EDS/USGS leadership.
17 Excessive absenteeism may result in disciplinary action
18 up to and including separation from EDS.
19    Q. Okay. So in your view she violated the whole
20 provision?
21    A. Yes.
22    Q. Okay. Let's break it down and deal with it
23 sentence by sentence. Is it your view that she did not
24 provide health care provider certification to her manager

Page 64

1 upon her return to the workplace?
2    A. What's your definition of health care
3 certification?
4    Q. Well, you know, it's your document.
5        It says "provide a health care provider
6 certification to their manager upon return to the
7 workplace." Is it your view that Ms. Lipscomb did not
8 comply with that?
9    A. Yes.
10    Q. Okay. Take a look at EDS II 00033.
11    A. I'm sorry. What was the number?
12    Q. 33.
13        Have you ever seen this before?
14    A. Yes.
15    Q. Okay. What is it?
16    A. It's a slip of paper from Christiana Care
17 Health Services.
18    Q. Okay. It's a slip of paper.
19        Isn't it a return-to-work note?
20    A. Yes.
21    Q. Okay. It was submitted at the time that
22 Ms. Lipscomb returned to employment. Correct?
23    A. Yes.
24    Q. On May 17th, 2004. Correct?

Page 65

1    A. Yes.
2    Q. It was submitted to her manager upon her
3 return to the workplace?
4    A. Yes.
5    Q. Okay. So she complied with the first sentence
6 of this policy Absences. Correct?
7    A. No.
8    Q. Okay. What other certification was she
9 requested to provide to her manager upon return to the
10 workplace?
11    A. To her manager -- that is correct. This is
12 what she would have provided on the day she returned.
13    Q. Okay. So she complied with the first
14 sentence. Correct?
15    A. Yes.
16    Q. All right. Now, let's look at the second
17 sentence. It reads, "Further, a health care provider
18 certification may be required to validate any other
19 illness or time away from work due to medical reason if
20 deemed appropriate by EDS/USGS leadership." Do you see
21 that?
22    A. I do.
23    Q. What's USGS?
24    A. That is our division -- United States

Barbara Jackson

18 (Pages 66 to 69)

Page 66

1 Government Services.
2     Q.  Okay.  So who's the EDS/USGS leadership?
3     A.  There would be multiple levels of EDS/USGS
4 leadership beginning with the Delaware account, and that
5 would be the leadership of the Delaware account and then,
6 certainly, corporate above us.
7     Q.  Okay.  Now, is short-term disability
8 considered protected leave?
9     A.  Yes.
10     Q.  Okay.  Now, looking at the page previous,
11 EDS II 16 --
12     A.  Mm-hmm.
13     Q.  -- do you see where it reads "The requirements
14 of these guidelines exclude any qualifying FMLA absences
15 or other protected leave"?
16         Do you see that?
17     A.  I don't.
18     Q.  It says Note about two-thirds of the way down.
19     A.  Okay.  Yes.
20     Q.  Do you see that?
21     A.  I do.
22     Q.  Okay.  So the requirements of these attendance
23 requirements don't apply to STD or FMLA leave.  Correct?
24     A.  Correct.

Page 67

1     Q.  All right.  So could you show me where in this
2 thick file that was Ms. Lipscomb's personnel file where
3 she was required to present a health care provider
4 certification separate and apart from her application for
5 short-term disability and FMLA leave?
6     A.  I wouldn't have a copy of that in the file.
7     Q.  Where would it be?
8     A.  That would have been notification that she
9 would have received directly from CIGNA.  And that's why
10 I'm saying that this return to work does not really apply
11 to the section that you're reading that says Absences,
12 because this is a result of the FMLA -- request for FMLA
13 and short-term disability.  That certification was not
14 provided.
15     Q.  Ma'am, I'm looking at your policy, the EDS
16 policy.
17     A.  Yes.
18     Q.  You've agreed with me it doesn't apply to STD
19 and FMLA leave.  Correct?
20     A.  Correct.
21     Q.  CIGNA was your vendor for STD and FMLA.
22 Correct?
23     A.  Correct.
24     Q.  You didn't turn over to them, you know, all

Page 68

1 your management functions with respect to when employees
2 could be off work, did you?
3     A.  No.
4     Q.  Okay.  So what I'm asking for is what document
5 you have which reflects the fact that Ms. Lipscomb was
6 told that it was deemed appropriate by her leadership,
7 not CIGNA, EDS's leadership that she provide a
8 certification for the time that she was away from work
9 that is not related to either a short-term disability or
10 FMLA?
11     A.  CIGNA is working on behalf of EDS.
12     Q.  So what you're saying is that CIGNA made a
13 request of Ms. Lipscomb for medical certification
14 separate and apart from her application for FMLA and
15 short-term disability?
16     A.  In coordination --
17         MR. PIATAK:  Objection to the form of
18 the question.  You may answer.
19         THE WITNESS:  Sorry.  Would you ask the
20 question again?
21         MR. CRONIN:  Could you read it back,
22 please?
23         (The reporter read the requested
24 portion.)

Page 69

1         MR. PIATAK:  Same objection.  You may
2 answer.
3         THE WITNESS:  I'm saying that they made
4 it on behalf of EDS as their vendor -- as their approved
5 vendor.
6 BY MR. CRONIN:
7     Q.  Where?
8         Show me a document.
9         MR. PIATAK:  I'm sorry.  Can you show
10 the witness a correspondence from CIGNA, Larry?
11         MR. CRONIN:  I don't think it's in
12 there, Tom.
13         MR. PIATAK:  Well, it's been produced.
14         MR. CRONIN:  No.  I mean, I've asked
15 whatever documents she has which reflect the fact that
16 CIGNA made the request that Ms. Lipscomb provide medical
17 certification for leave separate and apart from
18 short-term disability and FMLA.  I don't know of any
19 document that relates to that.
20         MR. PIATAK:  Well, all I'm saying is the
21 CIGNA correspondence is the germane documentation, and
22 that's been produced to you.
23         MR. CRONIN:  I think it's all in the
24 file there.  I've not separated it out.

Barbara Jackson

19 (Pages 70 to 73)

Page 70

1    A. Sir, can you ask the question again, please?
2    Q. What I asked for was the documentation that
3  reflected the fact that CIGNA, as EDS's vendor, was
4  asking for medical certification from Ms. Lipscomb
5  separate and apart from any application for either
6  short-term disability or FMLA.
7        I mean, if it will help you, why don't
8  you take a look at EDS II 145?
9    A. This is CIGNA's letter asking them for -- to
10  review the packet that they had sent her and asking for
11  documentation.
12    Q. The letter is what it is.
13        I'm just trying to turn you to a letter
14  that came from CIGNA in response to counsel's request in
15  order to save a little bit of time. I'm trying to find
16  some letter as you've described from CIGNA which
17  indicates that they told Ms. Lipscomb to provide medical
18  certification separate and apart from her applications
19  for FMLA leave or short-term disability.
20    A. I don't know of one.
21    Q. Okay.
22    A. I'm not familiar with that.
23    Q. All right. Do you know how employees at the
24  company were advised that CIGNA was also administering

Page 71

1  non-FMLA and non-short-term disability leave for the
2  employees?
3    A. I know that when they -- when she would have
4  met with her supervisor -- when someone meets with their
5  supervisor to discuss short-term disability or FMLA
6  leave -- at that time when the call is made, they are
7  told who the vendor is.
8    Q. Right.
9        But I'm asking more specifically when
10  EDS advises its employees that the vendor is not only
11  handling applications for short-term disability and FMLA
12  leave. They're also handling other requests for medical
13  leave which are not covered by either STD or FMLA.
14    A. I don't know.
15    Q. Okay. Let's turn to EDS II 254 and 254-A.
16    A. (The witness complied with counsel's request.)
17    Q. Do you recognize this two-page document?
18    A. I do.
19    Q. What is it?
20    A. These were my notes of the time period leading
21  up to the termination of Ms. Lipscomb.
22    Q. When did you create this document?
23    A. The day of her termination.
24    Q. For what purpose did you create it?

Page 72

1    A. There is always a summary of notes that are
2  produced after an event.
3    Q. Okay. What did you create it from? From your
4  memory? Other documents?
5    A. Other documents.
6    Q. Are those other documents all still in
7  existence, or did you destroy them?
8    A. They were just handwritten documents.
9    Q. Okay.
10    A. I destroyed them.
11    Q. Okay. You destroyed them at the time you
12  created this document?
13    A. Yes.
14    Q. Okay. You referred to a team leader and a
15  supervisor. The team leader is Linda Jackson, and the
16  supervisor is Tracey Eaddy?
17    A. Correct.
18    Q. All right. Let's turn to the entry on
19  June 17th, 2004.
20    A. (The witness complied with counsel's request.)
21    Q. It says EDS received a copy of the letter sent
22  by CIGNA to Hestal notifying her that the request for a
23  leave under the Family Medical Leave Act, FMLA, was
24  denied as they did not receive a completed medical

Page 73

1  certification within the required time frame.
2        How did you find that out?
3    A. Tracey Eaddy advised me.
4    Q. Okay. So this was the first time that you
5  learned of the situation. Is it shortly thereafter that
6  you spoke to Mr. Rogers?
7    A. No.
8    Q. Okay. When did you speak with Mr. Rogers in
9  relation to June 17th, 2004?
10    A. Not until I was notified that the 15 days had
11  expired.
12    Q. Now, before you testified that you talked to
13  him on three occasions. The first time you talked to
14  him before the appeal was denied.
15    A. That's not correct.
16    Q. Okay. So you talked to him twice after the
17  appeal was denied and then a third time at the time of
18  his termination?
19    A. Yes.
20    Q. The time of her termination.
21        Okay. So what did you do with the
22  information that Ms. Eaddy gave you on June 17th, 2004?
23    A. Nothing.
24    Q. Nothing at all?

Barbara Jackson

20 (Pages 74 to 77)

Page 74

1     A.  No.
2     Q.  Okay.  Why don't you take a look at EDS II
3  0042?
4     A.  Mm-hmm.
5     Q.  Okay.  Do you recognize this document?
6     A.  Yes.
7     Q.  Okay.  What's the date of it?
8     A.  It looks like 7/31.
9     Q.  EDS II 00042?
10    A.  Oh, 42.  I'm sorry.
11    Q.  Okay.  That's all right.
12    A.  42, yes.
13    Q.  Okay.  Do you recognize this document?
14    A.  Yes.
15    Q.  So, actually, in response to any
16  information from Ms. Eaddy, you didn't do nothing.
17  Instead you contacted Ms. Cornwell?
18    A.  Yes.  I thought you were asking me what did I
19  do in connection with Ms. Lipscomb.  Nothing.
20    Q.  Well, this is about Ms. Lipscomb, isn't it?
21    A.  I did not -- I thought you were asking me did
22  I have a conversation with Ms. --
23    Q.  No.
24        Okay.  So you contacted Ms. Cornwell?

Page 75

1     A.  Yes.
2     Q.  Okay.  What happened in response to your
3  contact with Ms. Cornwell?
4     A.  She indicated to me that we would -- that
5  Hestal still had 15 days in which to provide the
6  documentation and that the vendor was working with her --
7  that she also received a copy of the letter.
8     Q.  Okay.  So you had that conversation with
9  Ms. Cornwell, and then you didn't do anything else.  Is
10  that correct?
11    A.  To the best of my knowledge, yes, that is
12  correct.
13    Q.  All right.  Let's turn to EDS II 265.
14    A.  (The witness complied with counsel's request.)
15    Q.  Okay.  Is this the communication through which
16  you found out about Ms. Lipscomb being denied the FMLA
17  leave?
18    A.  This was one of them, yes.
19    Q.  Okay.  This was what prompted you to contact
20  Ms. Cornwell.  Correct?
21    A.  Yes.
22    Q.  All right.  Now, according to EDS II, 254,
23  254-A, in your prior testimony, it appears you did
24  nothing else with respect to Ms. Lipscomb until the end

Page 76

1  of the appeal period -- the end of June.  Correct?
2     A.  Yes.
3     Q.  All right.  You had those three conversations
4  with her at the very end of that period.  Correct?
5     A.  Correct.
6     Q.  Is it fair to say that during those three
7  meetings with her you never told her that she was going
8  to be terminated if she did not provide a medical
9  certification?  Correct?
10    A.  Correct.
11    Q.  Okay.  What do you recall of those three
12  conversations?
13    A.  I remember the first one.  Tracey and I met
14  with Ms. Lipscomb to tell her that -- to ask her did she
15  get the paperwork from CIGNA, that CIGNA had not received
16  the paperwork from the doctor and that these would be
17  considered unexcused absenteeism days and that she needed
18  to have her provider get the documentation to CIGNA.
19        I also asked that she contact the doctor
20  herself to be sure that that happened and also to contact
21  CIGNA so that CIGNA would know that she was working on
22  it.  She said that she would.
23        I -- the very next morning when I came
24  in, I went looking for Hestal, and I asked her if she had

Page 77

1  made contact with the doctor.  And she said she was
2  unable to reach him.  I think she said she got as far as
3  the nurse.  I suggested to her that she use one of the
4  conference rooms and to pursue that as best she could
5  because the documentation was important to document her
6  14 days of unexcused absence.
7        On 7/2 I followed up with Hestal a third
8  time.  She said that the doctor had communicated to her
9  that it had been faxed.  I suggested that she contact
10  CIGNA and also that she have the documentation faxed to
11  her so that she herself could intercept it and then fax
12  it off to CIGNA and be assured that in fact her
13  caseworker at CIGNA did have the documentation.
14    Q.  Okay.  What did she say?
15    A.  She said she would do that.
16    Q.  Okay.  Do you remember anything else of those
17  three conversations?
18    A.  I do not.
19    Q.  Okay.  Ms. Eaddy was present in only the first
20  one?
21    A.  I believe she was.
22    Q.  Okay.  Now, you've mentioned that during the
23  first two meetings you referred to it as unexcused
24  absentee days.  Did you explain to Ms. Lipscomb what that

CORBETT & WILCOX

Barbara Jackson

26 (Pages 98 to 101)

Page 98

1    Q.  Okay.  Take a look at EDS II 00098.
2    A.  (The witness complied with counsel's request.)
3    Q.  Have you ever seen this document before?
4    A.  Yes.
5    Q.  What is it?
6    A.  It is the notification by CIGNA that the FMLA
7  was denied.
8    Q.  Okay.  It gives her 15 days to submit a
9  medical certification.  Correct?
10    A.  That is correct.
11    Q.  I think you've already answered this, but just
12  so I'm clear:  If you found out that Ms. Lipscomb had in
13  fact submitted a medical certification within those 15
14  days, you would not have terminated her.  Correct?
15        MR. PIATAK:  Objection.  You may answer.
16    A.  If Ms. Lipscomb had indicated to me that she
17  had herself even faxed something to CIGNA, we would have
18  intervened with CIGNA to say the employee has a copy of
19  the documentation that she herself faxed to CIGNA.  I
20  asked her repeatedly on three occasions.  I asked her to
21  get the documentation in her own hands to assure her
22  herself and to assure us that in fact she had submitted
23  the documentation.  She did not do that on either one of
24  those occasions.

Page 99

1    Q.  Okay.  Ms. Jackson, I'm sorry, but I don't
2  think you answered my question.
3        MR. CRONIN:  Could you read the question
4  back, please?
5        (The reporter read the requested
6  portion.)
7        THE WITNESS:  That is correct.
8        (The reporter requested a brief recess.)
9        - - - - -
10        BARBARA JACKSON, resumes
11  BY MR. CRONIN:
12    Q.  Okay.  Ms. Jackson, I'd like you to turn to
13  EDS II 00099 through 00101.
14    A.  (The witness complied with counsel's request.)
15    Q.  Have you seen this document before?
16    A.  I don't remember --
17    Q.  Okay.
18    A.  -- seeing this document.
19    Q.  All right.  I'd like you to turn to the third
20  page, EDS II 00101.
21    A.  (The witness complied with counsel's request.)
22    Q.  Under the Note section -- it's the last
23  writing -- it says:  If you exceed your 12-month FMLA
24  entitlement or if your LOA ceases to qualify under FMLA,

Page 100

1  other EDS LOAs may apply.
2        First of all, what is an LOA?
3    A.  Leave of absence.
4    Q.  Okay.  Do you know what other LOAs could have
5  possibly been available to Ms. Lipscomb at the time of
6  her termination?
7    A.  I do not.
8    Q.  I mean, so, therefore, you didn't consider any
9  other possible types of leave of absence that she may
10  have been eligible for as an alternative to termination.
11  Correct?
12    A.  I was not aware of any other LOAs available to
13  her.
14    Q.  Okay.  Could you turn to EDS II 00108, please?
15    A.  (The witness complied with counsel's request.)
16    Q.  Do you recognize this document?
17    A.  I don't know if I -- we received a copy of
18  this or not.
19    Q.  Okay.  If you could just turn to the beginning
20  of the second paragraph.  It says, "The claimant was
21  discharged due to excessive absenteeism and tardiness."
22  Was she terminated for tardiness?
23    A.  No.
24    Q.  Okay.  So is that letter just mistaken?

Page 101

1    A.  I would have to assume that this is.
2    Q.  Okay.  All right.  Could you turn to 152,
3  please, in the same collection?
4    A.  (The witness complied with counsel's request.)
5    Q.  Have you ever seen this document before?
6    A.  Yes.
7    Q.  Okay.  It appears to be an e-mail to Tracey
8  Eaddy of June 3rd, 2004, and then it was forwarded to you
9  on September 2nd, 2004.  Is that correct?
10    A.  Yes.
11    Q.  Okay.  Did you have a discussion with
12  Ms. Eaddy about this?
13    A.  I don't remember.
14    Q.  Do you remember receiving it?
15    A.  I can't say that I do.
16    Q.  Okay.  The "ES" that is referred to by
17  Mr. Jaconette, that would be employee services?
18    A.  Yes.
19    Q.  The same people who work the relationship
20  between the Delaware location and CIGNA, the vendor?
21    A.  I don't know that.
22    Q.  What is the function of ES?
23    A.  I don't know what their responsibility is to
24  the vendor.  Employee services is just so that they're

**Affidavit of Laurence V. Cronin**                    **Exhibit F**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

2

3   HESTAL LIPSCOMB,                )
                                    )
4                                   )
              PLAINTIFF,            )
5                                   )
    VS.                             )    CIVIL ACTION
6                                   )
                                    )    NO.: 05-477 SLR
7   ELECTRONIC DATA SYSTEMS         )
    CORPORATION, a Delaware         )
8   Corporation,                    )
                                    )
9                                   )
              DEFENDANT.            )

**RECEIVED**

MAY 1 8 2006

**LVC**

10

11       ------------------------------------

12              ORAL DEPOSITION OF

13              KIMBERLEE RUDEEN

14               May 4, 2006

15               Volume 1

16       ------------------------------------

17     ORAL DEPOSITION OF KIMBERLEE RUDEEN, produced as a witness

18   at the instance of the PLAINTIFF, and duly sworn, was taken in

19   the above-styled and numbered cause on the 4th day of May,

20   2006, from 10:57 a.m. to 12:16 p.m., before Caroline Tadlock,

21   RPR, CSR in and for the State of Texas, reported by machine

22   shorthand, at the law offices of Crouch & Ramey, 1445 Ross

23   Avenue, Suite 3600, Dallas, Texas, pursuant to the Federal

24   Rules of Civil Procedure and the provisions stated on the

25   record or attached hereto.

Page 2

```
 1        A P P E A R A N C E S
 2
 3 FOR THE PLAINTIFF:
 4   Mr. Laurence V. Cronin
     SMITH KATZENSTEIN FURLOW, LLP
 5   The Corporate Plaza
     800 Delaware Avenue
 6   Wilmington, Delaware 19899
     302-652-8400
 7
   FOR THE DEFENDANT:
 8
     Mr. Thomas J. Piatak
 9   BAKER HOSTETLER
     3200 National City Center
10   1900 East 9th Street
     Cleveland, Ohio 44114-3485
11   216-861-7148
12 FOR THE WITNESS:
13   Mr. Craig A. McDougal
     CROUCH & RAMEY
14   1445 Ross Avenue
     Suite 3600
15   Dallas, Texas 75202
     214-922-7100
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           INDEX
 2                      PAGE
 3 Appearances............................................ 2
 4 Stipulations........................................... 52
 5 KIMBERLEE RUDEEN
     Examination by Mr. Cronin...................... 4
 6   Examination by Mr. Piatak...................... 36
     Further Examination by Mr. Cronin............ 45
 7
 8 Signature and Changes................................ 53
 9 Reporter's Certificate................................ 54
10
11           EXHIBITS
       (No exhibits were marked.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            KIMBERLEE RUDEEN,
 2 having been first duly sworn, testified as follows:
 3              EXAMINATION
 4 BY MR. CRONIN:
 5   Q.  Good morning, Ms. Rudeen.  My name is Larry Cronin.
 6 I represent Hestal Lipscomb in a lawsuit that's pending in the
 7 District Court for the U.S. District of Delaware against EDS.
 8        Have you ever been deposed before?
 9   A.  Yes.
10   Q.  How many times?
11   A.  About ten or twelve.
12   Q.  Okay.  All in connection with your employment?
13   A.  Yes.
14   Q.  What kinds of cases?
15   A.  Disability cases.
16   Q.  When was the last time you were deposed?
17   A.  Probably, roughly, three years ago.
18   Q.  Have you ever testified in court?
19   A.  No.
20   Q.  For purposes of today, I'd like you to just keep in
21 mind three basic rules that are important.  Number one, make
22 sure that you understand my question.  If there's anything
23 that's confusing or poorly phrased, let me know, and I'll try
24 to rephrase it so that it makes sense to you.  The second one,
25 make sure I'm done before you start answering so we can get a
```

Page 5

```
 1 clean transcript.  And, finally, I'll need you to answer
 2 verbally so we'll have a written record of your answers.  Okay?
 3   A.  Okay.
 4   Q.  All right.  What's your highest level of formal
 5 education?
 6   A.  Bachelor's degree.
 7   Q.  Where did you get your bachelor's degree?
 8   A.  UT Arlington.
 9   Q.  And when did you do that?
10   A.  1994.
11   Q.  Where are you employed?
12   A.  Life Insurance Company of North America.
13   Q.  Okay.  And for ease of reference, I'll refer to that
14 as LINA today; is that okay?
15   A.  That's fine.
16   Q.  And what, as you understand it, is LINA's
17 relationship to CIGNA?
18   A.  It's a division.
19   Q.  Division or a subsidiary?
20   A.  I don't know.
21   Q.  Okay.
22   A.  Division is my understanding.
23   Q.  All right.  How long have you been employed by LINA?
24   A.  It will be nine years this June.
25   Q.  And what positions have you held with LINA, starting
```

2 (Pages 2 to 5)

Page 6

1 with the one you're currently holding?

2    A.  Senior claim manager, appeal review claim manager.

3    Q.  **Okay. What years have you been senior claim manager?**

4    A.  Oh. From January 2004 to present.

5    Q.  **All right. And before that?**

6    A.  An appeal review claim manager.

7    Q.  **When -- when did you hold that position?**

8    A.  May 2002 through December of 2003.

9    Q.  **Okay. And before that?**

10   A.  A claim manager.

11   Q.  **And was that the position you held since you started**

12 **with the company?**

13   A.  Yes.

14   Q.  **Okay. Can you tell me what, basically, your job**

15 **duties are as a senior claim manager?**

16   A.  I kind of am the technical advisor to the team. I

17 help them with contract issues, process and procedure

18 questions, do some of the -- the customer service between us

19 and EDS.

20   Q.  **Okay. Now you're talking -- you mentioned a team.**

21 **What are you talking about?**

22   A.  There's a team of claim managers that handles the EDS

23 account.

24   Q.  **How many team managers are there?**

25   A.  Team managers or claim managers?

Page 7

1    Q.  **Team -- oh, I'm -- claim managers.**

2    A.  There are six claim managers.

3    Q.  **Okay. Does anybody else service the EDS account?**

4    A.  There are several nurses.

5    Q.  **How many nurses?**

6    A.  At this time, there are four.

7    Q.  **Now, do these six claim managers and you only work on**

8 **the EDS account?**

9    A.  Yes.

10   Q.  **Since your promotion to senior claim manager, have**

11 **you only worked on the EDS account?**

12   A.  No.

13   Q.  **Okay. What other accounts have you worked on?**

14   A.  I've also got Black & Decker in my team and the CIGNA

15 account for Pittsburgh claims.

16   Q.  **Okay. So does your whole team work on these three**

17 **different accounts?**

18   A.  No.

19   Q.  **So do you supervise different people for these other**

20 **accounts?**

21   A.  I don't really supervise them. I'm more of an

22 advisor kind of capacity. There's a team leader who's actually

23 the manager.

24   Q.  **I see. Okay.**

25        So you just provide technical assistance to the

Page 8

1 Black & Decker account and the CIGNA account -- for Pittsburgh

2 you say?

3    A.  Right.

4    Q.  **And Pittsburgh what? Pittsburgh Paints or --**

5    A.  Pittsburgh claim office.

6    Q.  **Oh, Pittsburgh claim office. Okay.**

7        And that's the CIGNA account; is that right?

8    A.  Right.

9    Q.  **Okay. If you're an employee of LINA, why are you**

10 **providing assistance to CIGNA?**

11   A.  I guess that's --

12        MR. McDOUGAL: Objection; form.

13   Q.  **(BY MR. CRONIN) I'm just trying to understand.**

14   A.  Okay. Yeah -- well, I mean, it's the same kind of

15 claim office we are. It's just -- we call ourselves CIGNA.

16   Q.  **Okay. Now, what types of claims does this team that**

17 **you've described handle on behalf of EDS?**

18   A.  Short-term disability.

19   Q.  **And just short-term disability, no other types of**

20 **claims?**

21   A.  Not in our office.

22   Q.  **Okay. And I guess you took over senior claim manager**

23 **when CIGNA first got this account?**

24   A.  Yes.

25   Q.  **How many different claim managers have worked with**

Page 9

1 you since January 2004?

2    A.  I don't know an exact number.

3    Q.  **Well, can you name the six that are there now?**

4    A.  The six that are there now?

5    Q.  **Uh-huh.**

6    A.  That would be De'Shima Smith, Susan Heliker, Anthony

7 Campbell, Emeka Ohagi and Natosha Adger -- and, let's see,

8 there's one more -- Linda Payne.

9    Q.  **How are FMLA claims handled on behalf of EDS?**

10   A.  There is a separate vendor that handles them in a

11 completely different company.

12   Q.  **And what's the name of that separate vendor?**

13   A.  SHPS, S-H-P-S.

14   Q.  **S --**

15   A.  H-P-S.

16   Q.  **No vowels?**

17   A.  No.

18   Q.  **SHPS is an acronym for?**

19   A.  I have no idea.

20   Q.  **Is that company affiliated with CIGNA?**

21   A.  No.

22   Q.  **Has that always been the case since January 1st,**

23 **2004?**

24   A.  Yes.

25   Q.  **Does your team have any interaction with SHPS in**

3 (Pages 6 to 9)

1 connection with individuals who have applied for short-term

2 disability and FMLA who are employed at EDS?

3   A.   Not typically.

4   Q.   Well, ever.

5   A.   Sometimes.

6   Q.   Okay. What circumstances is there contact between

7 LINA and SHPS?

8   A.   If there's a question about the date a leave ended.

9 That's really about it. Maybe a delivery date of a baby.

10   Q.   Where are they located?

11   A.   Louisville, Kentucky.

12   Q.   Is there a contact person there that you would

13 contact if you wanted to get ahold of somebody?

14   A.   Gina Davis.

15   Q.   Do you know how many people SHPS has working this

16 account?

17   A.   I don't.

18       MR. CRONIN: Excuse me one second.

19   Q. (BY MR. CRONIN) Do you know who Hestal Lipscomb is?

20   A.   Yes.

21   Q.   How do you know who she is?

22   A.   She had a claim for short-term disability benefits.

23   Q.   Did you have any involvement in that?

24   A.   Yes.

25   Q.   What was your involvement?

1   A.   I made the claim decision.

2   Q.   Did anybody else work with you from LINA with respect

3 to that short-term disability claim?

4   A.   You know, I don't remember.

5   Q.   Okay. I'm going to hand you a document that's been

6 previously marked in the case in another deposition. It's

7 EDS 3.

8       MR. CRONIN: Off the record.

9       (An off-the-record discussion was held from

10       11:07 a.m. to 11:10 a.m.)

11   Q. (BY MR. CRONIN) Ms. Rudeen, was it your

12 understanding while you were dealing with Hestal Lipscomb's

13 claim that she also had a pending claim for FMLA leave?

14   A.   Yes.

15   Q.   Okay. And how are you aware of that?

16   A.   It's a concurrent process.

17   Q.   Okay. What do you mean it's a concurrent process?

18   A.   Once a short-term disability claim is received,

19 it's -- the record is electronically sent to SHPS, and they

20 handle an FMLA claim.

21   Q.   Okay. Who does that electronic transfer?

22   A.   I don't know.

23   Q.   Okay. So it comes in through some administrative

24 process, and it get sent to SHPS in Louisville, Kentucky?

25   A.   Right.

1   Q.   All right. I'm going to hand you a document that

2 we've marked previously in a series of other depositions

3 involving EDS employees, and it's been marked EDS No. 3. And

4 I'll represent to you that it's the personnel file relating to

5 Hestal Lipscomb that was produced the EDS site in -- in

6 Delaware. And I'd like you to turn specifically to the page

7 that's been numbered EDS 98.

8   A.   (Witness complies.)

9   Q.   Do you recognize this document?

10   A.   Yes.

11   Q.   Okay. What is it?

12   A.   This is a letter that SHPS send out if a FMLA claim

13 is closed or denied.

14   Q.   Okay. If SHPS denies it, why is it going out under

15 CIGNA Group Insurance letterhead?

16   A.   I don't know what their process is. They operate

17 under the name CIGNA Leave Solutions, as far as the

18 relationship with EDS is concerned.

19   Q.   Who operates under the name CIGNA Leave Solutions?

20   A.   SHPS.

21   Q.   Okay. But SHPS is not a CIGNA company?

22   A.   No.

23   Q.   Okay. Do you recall any discussions that you had

24 with anyone at SHPS in connection with Ms. Hestal's claim for

25 either short-term disability or FMLA?

1   A.   No.

2   Q.   Do you ever have occasion, while administering EDS

3 claims, to receive a form that relates to FMLA leave as opposed

4 to short-term disability?

5   A.   I'm not sure what you mean.

6   Q.   Okay. There are different forms that are used for

7 the two types of leave, correct?

8   A.   Right.

9   Q.   Okay. Why don't you explain to me how medical

10 certifications are used in connection with short-term

11 disability claims for EDS?

12   A.   Well, I'm still not sure what -- what you're asking.

13   Q.   Okay. Then I'll ask another question.

14       Can I see – oh.

15       I'm going to hand you what's been marked today

16 as CIGNA No. 1 and turning to page numbered LINA 026. Have you

17 ever seen that form before?

18   A.   Yes.

19   Q.   Okay. What is it?

20   A.   This is a fax that we will send to a doctor's office

21 to get some medical information for disability claims.

22   Q.   Okay. And when do you send it to doctors' offices?

23   A.   When a claim is received.

24   Q.   Do you send it in all cases?

25   A.   No.

4 (Pages 10 to 13)

Page 26

1  Q.  Okay.  And, again, it says that the -- she is going
2 to follow up within 48 working hours?
3  A.  Yes.
4  Q.  Do you know how she got the name Johnathan Kraut?
5  A.  Yes.
6  Q.  Okay.  How did she?
7  A.  The intake that's found at LINA 021.
8  Q.  Uh-huh.
9  A.  The person who reported the claim provided that
10 doctor's name and telephone number.
11  Q.  Let's go to the -- the intake.  That would be LINA 19
12 to 25 in CIGNA 1 and 27 to 33 in LINA 3; is that right?
13  A.  Yes.
14  Q.  Okay.  How does an intake occur?  Is there a
15 telephone call?
16  A.  Yes.
17  Q.  All right.  In this instance, who made the telephone
18 call?
19  A.  Tracey Eaddy.
20  Q.  Okay.  And when was it made?
21  A.  April 30th, 2004.
22  Q.  Now, who was the person taking the information?  Was
23 it Charlene Crowder?
24  A.  No.  It was Timothy Wilson.
25  Q.  Who's Timothy Wilson?

Page 27

1  A.  Apparently, he was an intake representative at the
2 time.
3  Q.  Okay.  And how does this typically occur?  Does the
4 intake person ask questions of Ms. Eaddy for purposes of
5 filling out this form?
6  A.  Yes.
7  Q.  I'd like you to turn to page 31 of 33 in CIGNA No. 3,
8 please.
9  A.  Okay.
10  Q.  Towards the bottom of the page, it says, In the past
11 12 months, has the employee received any of the following?  Do
12 you see that?
13  A.  Yes.
14  Q.  Why is that asked?
15  A.  It sometime is an issue with regard to return to work
16 planning.
17  Q.  How so?
18  A.  If employees have problems with attendance or
19 performance, sometimes there might be some lack of wanting to
20 return to work on their part.
21  Q.  Okay.  Is this a CIGNA designed form or -- or does
22 EDS have involvement --
23      MR. McDOUGAL:  Objection --
24  Q.  (BY MR. CRONIN)  -- in designing this form?
25      MR. McDOUGAL:  Objection; form.

Page 28

1  Q.  (BY MR. CRONIN)  Or is this -- is this a LINA
2 designed form, or is it a form that -- in which EDS has some
3 type of input?
4  A.  It is a LINA form.
5  Q.  Okay.
6  A.  Used for all accounts.
7  Q.  Now, with respect to attendance warnings, performance
8 warnings and conduct warnings, were any of those boxes checked?
9  A.  No.
10  Q.  And this form was completed on April 30th, 2004?
11  A.  Yes.
12  Q.  All right.  Let's turn to LINA 17 in CIGNA No. 1 and
13 fax pages 21 of 33 in -- in CIGNA 3.
14  A.  Okay.
15      MR. CRONIN:  Off the record.
16      (An off-the-record discussion was held at
17      11:34 a.m. for less than one minute.)
18  Q.  (BY MR. CRONIN)  All right.  What is this document?
19  A.  This is the phone documentation from the claimant
20 contact.
21  Q.  Okay.  Is this a summary of all contacts?
22  A.  It appears to be a summary of three telephone calls.
23  Q.  Okay.  When were those calls made?
24  A.  5/27/04, 6/1/04 and 6/2/04.
25  Q.  And who were the phone calls to?

Page 29

1  A.  Hestal Lipscomb.
2  Q.  You read this to say that there was a phone call on
3 June 2nd, 2004?
4  A.  That's not clear.
5  Q.  Okay.  Because contact information says first phone
6 call May 27th, 2004, correct?
7  A.  Yes.
8  Q.  And then second phone call June 1st, 2004?
9  A.  Yes.
10  Q.  And then it says on 6/2/2004, no response from
11 employee; is that -- am I reading that right?
12  A.  Yes.
13  Q.  Will have CM -- claims manager?
14  A.  Yes.
15  Q.  -- send contact letter to obtain medical.  Do you see
16 that?
17  A.  Uh-huh.
18  Q.  Is that correct?
19  A.  Yes.  Sorry.
20  Q.  All right.  And that's by Sharon Reeves?
21  A.  Yes.
22  Q.  Dated June 2nd, 2004?
23  A.  Yes.
24  Q.  Okay.  So did the claim manager send a contact letter
25 to obtain medical on June 2nd, 2004?

8 (Pages 26 to 29)

Page 38

1    Q. If you had, it would have been in the claim file?

2    A. It would have, yes.

3    Q. And if it had been related to an FMLA claim, you

4 would have transmitted it, as well, to SHPS?

5    A. No.

6        MR. CRONIN: Objection.

7        THE WITNESS: Sorry.

8        MR. CRONIN: No, that's okay. I just -- object

9 to the form.

10   Q. (BY MR. PIATAK) This document also requested copies

11 of all current test results and office notes from April 2004 to

12 the present?

13   A. Yes.

14   Q. Did CIGNA or LINA ever receive all current test

15 results and office notes from April 2004 through the present

16 from Ms. Lipscomb or her health care providers?

17   A. No.

18   Q. Would the information provided on this sheet have

19 been sufficient to allow you to approve a claim for short-term

20 disability for Hestal Lipscomb?

21   A. No, it would not.

22   Q. Any documents relating to Ms. Lipscomb that were sent

23 to LINA or CIGNA fax numbers would have been placed in the

24 claims file; is that correct?

25   A. That is --

Page 39

1        MR. CRONIN: Object to the form.

2        You can answer.

3    A. That is correct.

4    Q. (BY MR. PIATAK) Taking a look at CIGNA Exhibit 1,

5 going to LINA 012.

6    A. (Witness complies.) Okay.

7    Q. And this is a letter that was sent out to acknowledge

8 receipt of Ms. Lipscomb's claim for short-term disability

9 benefits?

10   A. Correct.

11   Q. Is this sort of letter typically sent out by you when

12 an EDS employee makes a claim for short-term disability

13 benefits?

14   A. I don't send this out.

15   Q. I mean by LINA or CIGNA.

16   A. LINA sends this letter out on every received claim.

17   Q. Is there any indication that EDS employees do not

18 receive this letter when it is sent to them via the United

19 States mail?

20       MR. CRONIN: Object to the form.

21   A. No.

22   Q. (BY MR. PIATAK) And is there a fax number indicating

23 where information could be sent on this form?

24   A. Yes, there is.

25   Q. And what's that fax number?

Page 40

1    A. 860-731-3511.

2    Q. And if you'd go two pages before that, to LINA 012.

3    A. I'm sorry. Which page?

4    Q. LINA 0- -- pardon me -- 010.

5    A. Okay.

6    Q. And is this a copy of the letter that you sent?

7    A. It is.

8    Q. And you sent this to Ms. Lipscomb?

9    A. I did.

10   Q. And is this the form of letter that's sent out when

11 medical information is needed to support a short-term

12 disability benefits claim by an EDS employee?

13   A. This is a closure letter.

14   Q. Is there any indication that EDS employees who

15 receive closure letters do not actually receive them if it's

16 sent to them by the United States mail?

17       MR. CRONIN: Object to the form.

18   A. No.

19   Q. (BY MR. PIATAK) And this letter indicated that as of

20 June 2nd, 2004, you -- CIGNA or LINA had not received from

21 Ms. Lipscomb or her health care providers confirmation of the

22 surgical procedures she underwent, medical information from

23 Dr. Kraut to support her time off of work, or her signed

24 authorization to release medical information and proof of loss

25 form; is that correct?

Page 41

1    A. That's correct.

2    Q. And those were all accurate statements?

3    A. Yes.

4    Q. And it also indicated that CIGNA or LINA made an

5 attempt to contact Ms. Lipscomb by phone on May 27th and

6 June 1st, 2004. Are those -- do you see that language?

7    A. I do.

8    Q. And those are also -- that's also an accurate

9 statement?

10   A. Yes.

11   Q. And that on May 27th, 2004, CIGNA or LINA requested

12 that Dr. Kraut provide us with medical information regarding

13 Ms. Lip- -- regarding the treatment for Ms. Lipscomb and the

14 reasons for her being off work?

15   A. Yes.

16   Q. And so -- do you see that language in the letter?

17   A. I do.

18   Q. And that was also an accurate statement?

19   A. Yes.

20   Q. And did you receive any response from Ms. Lipscomb or

21 her physicians in response to this letter?

22   A. None.

23   Q. If you'd go to CIGNA Exhibit 3, page 18 of 32.

24   A. Provider contact?

25   Q. Right.

11 (Pages 38 to 41)

Page 42

1    What -- could you just decipher -- it says,
2 Contact Comments, do you see that, on 5- -- 5/27/2004?
3    A.  Yes.
4    Q.  Would you just read what that -- what that means, I
5 mean -- filling in the abbreviations.
6    A.  Just read the contact?
7    Q.  Right -- well -- let me rephrase that.
8        What does this mean in English?  I mean -- I
9 mean, there's a number of abbreviations.
10    A.  Oh, sure.
11        What it means in English is that Sharon Reeves
12 made a call to Dr. Johnathan Kraut --
13    Q.  Uh-huh.
14    A.  -- at 1511 on 5/27/04 requesting -- she left a
15 message for a callback with the diagnosis, type of surgery and
16 treatment plan referencing what was causing Hestal Lipscomb
17 from being off of work and her return to work status.
18    Q.  Okay.
19    A.  And that she would follow up in 48 hours if she
20 didn't get a response.
21    Q.  Okay.  Did Dr. Kraut ever call in with that
22 information?
23    A.  No, he did not.
24    Q.  Going back to CIGNA Exhibit 2, HL 086, there's a
25 phone number listed for Charlene Crowder.  Do you see that

Page 43

1 phone number?
2    A.  Yes.
3    Q.  And what is it?
4    A.  (800) 352-0611, Extension 5686.
5    Q.  And the fax number is listed there as (800) 325-7016?
6    A.  Yes.
7    Q.  Do you know whether there was a transposition error
8 in writing down the fax number?  Should that really be 352?
9    A.  Possibly.  I don't know for sure.
10    Q.  When a document is faxed to CIGNA, is there typically
11 found at the top of the document fax transmission information
12 indicating that it's been received by CIGNA?
13    A.  Sometimes, but not always.
14    Q.  Okay.  The prior page of HL 085, there's a fax number
15 of 1-800-377-4286.  To your knowledge, is that a CIGNA or LINA
16 fax number?
17    A.  No.
18    Q.  Is that a fax number that you -- that CIGNA or LINA
19 requested Ms. Lipscomb to send information to?
20    A.  No.
21    Q.  Is that the fax number used for EDS employee benefit
22 claims?
23    A.  No.
24    Q.  And you were involved in making the decision in terms
25 of denying Ms. Lipscomb's short-term disability claim?

Page 44

1    A.  Yes.
2    Q.  And to your knowledge, neither LINA nor CIGNA
3 received the document Bates labeled HL 086?
4    A.  No, we did not.
5    Q.  How long have you been working with EDS in terms of
6 processing these claims?
7    A.  I don't actually usually process the claims.  I've
8 been doing that since January 1 of 2004.
9    Q.  In your dealings with EDS employees since January 1,
10 2004, have they been professional in your dealings with them --
11    A.  Yes.
12    Q.  -- in their dealings with you, rather?
13    A.  Yes.
14    Q.  In their dealings with you, have they endeavored to
15 comply with the terms of EDS' leave policies?
16    A.  Yes.
17    Q.  In their dealings with you, have they endeavored to
18 comply with the terms of the Family Medical Leave Act?
19    A.  I don't know the terms of the Family Medical Leave
20 Act.
21        MR. PIATAK:  Okay.  I have nothing further.
22        MR. CRONIN:  I actually have a few questions.
23        THE WITNESS:  Okay.
24
25

Page 45

1        FURTHER EXAMINATION
2 BY MR. CRONIN:
3    Q.  All right.  First, I'd like you to look back at CIGNA
4 No. 3.  And you were just answering some questions for counsel
5 regarding pages -- and we used the page numbers in the upper
6 right-hand corner -- page 18 and page 20.  First, I'd like you
7 to look at 18.
8        If I understand your answers correctly, you were
9 explaining to counsel the meaning of this note dated May 27th,
10 2004, correct?
11    A.  Yes.
12    Q.  Okay.  And I think you described that last sentence
13 as saying there would be a follow-up within 48 working hours.
14    A.  Yes.
15    Q.  48 -- okay.  What does NCM stand for?
16    A.  Nurse case manager.
17    Q.  Which was Sharon Reeves?
18    A.  Yes.
19    Q.  So the plan as of May 27th, 2004, was for her to
20 follow up within 48 working hours?
21    A.  Yes.
22    Q.  Does that mean two days -- two working days?
23    A.  Yes.
24    Q.  Okay.  Now, let's turn to page 20 of 32 in the same
25 exhibit.

12 (Pages 42 to 45)

Page 46

1    These list all the various claimant contacts,
2 correct?
3    A.  Yes.
4    Q.  Do you see whether Nurse Reeves followed up within
5 the 48 working hours as she said she was going to?
6    A.  I don't know what the days of the week are here.  So
7 I don't know if this is two business days or if a weekend spans
8 in between.
9    Q.  All right.  Well, can you find anywhere in the
10 document an indication that she, in fact, did follow up within
11 48 working hours?
12    A.  Without a calendar, I can't tell.
13    Q.  Well, is there anything in here that indicates she
14 ever followed up ever?
15    A.  Yes, she did.
16    Q.  After May 27th?
17    A.  Yes.
18    Q.  With Dr. Kraut?
19    A.  No.  But she didn't specifically say she was
20 following up with him.  I -- I don't know what her follow-up
21 plan was specifically.
22    Q.  Okay.  So you read that last sentence of the May 27th
23 note to mean that the nurse case manager would follow up with
24 somebody in 48 hours if there was no response?
25    A.  Right.  And I don't know who that might have been.

Page 47

1    Q.  All right.  And then turning, again, to page 20 of
2 32, it says, on June 2nd, No -- no response from employee.
3 Will have case manager send contact letter to obtain medical.
4 Correct?
5    A.  Yes.
6    Q.  And that was never done, was it?
7    A.  No.
8    Q.  That's correct?
9    A.  That's correct.
10    Q.  Okay.  All right.  Now I'd like to turn to another
11 document that counsel discussed with you, specifically the --
12 the documents that were included in my letter to Ms. Gunther.
13    Do you have those in front of you?  I think
14 they're numbered HL 85 through 87.  It would be part of CIGNA
15 No. 2.
16    A.  I do.
17    Q.  All right.  And if I understood your testimony
18 correctly, he asked you about this fax number, (800) 377-4286.
19 Do you remember that?
20    A.  I do.
21    Q.  And I think you said that that was not a LINA/CIGNA
22 number.
23    A.  Not to my knowledge, no.
24    Q.  Okay.  All right.  I want to play a tape for you.
25 But first I want you to take a look at two documents which have

Page 48

1 been marked already as CIGNA 6 and 7.  And you can read
2 along -- actually, let me show you CIGNA No. 5.
3    CIGNA No. 5, have you ever seen this document
4 before?
5    A.  No, I haven't.
6    Q.  Okay.  What is it?
7    A.  It's a fax.
8    Q.  It's a letter?
9    A.  Maybe.  It's very short.  But it's a -- it's a short
10 fax cover or letter of some type.
11    Q.  Okay.  And what is it directed to?
12    A.  To Whom It May Concern.
13    Q.  Okay.  But more specifically, to a particular address
14 or fax number?
15    A.  (800) 377-4286.
16    Q.  Okay.  Looking back at HL 085, is that the same
17 number?
18    A.  It is.
19    Q.  Okay.  All right.  Let me just play these for you,
20 and you can read along, No. 6 and then No. 7.
21    MR. PIATAK:  Object to the form of the question.
22    (Message played.)
23    Message, Monday, April 3rd, at 12:07 p.m.
24    Hi, Larry.  This is Elizabeth Williams calling
25 from CIGNA Group Disability.  And I received a fax that you

Page 49

1 sent, but I only got the cover sheet.  I was wanting to know
2 what the name of the claimant was or what it was you were
3 faxing over to us.  If you can give me a call again, I'd
4 appreciate it.  My number here is (972) 952-1087.  And, again,
5 this is in regards to a fax you sent us earlier today.  Thanks.
6    Q.  (BY MR. CRONIN)  Do you know someone named Elizabeth
7 Williams?
8    A.  I don't.
9    Q.  Okay.  Is there an entity that you're aware of called
10 CIGNA Group Disability that somehow differs from LINA?
11    A.  No.
12    Q.  Okay.  So do you have any reason to believe that
13 Elizabeth Williams doesn't work for LINA?
14    MR. PIATAK:  Objection.
15    MR. McDOUGAL:  Same objection.
16    Q.  (BY MR. CRONIN)  You can answer.
17    A.  No, I don't.
18    Q.  Okay.
19    A.  I mean --
20    Q.  All right.  Let's turn to the next message.
21    (Message played.)
22    Message, Tuesday, April 4th, at 2:17 p.m.
23    Hi, this is Janice Cook with CIGNA Insurance.
24 We received a single-page fax from you yesterday, approximately
25 one o'clock.  It says, To Whom It May Concern:  Please contact

13 (Pages 46 to 49)

Page 50

1 me upon receipt of this fax. The fax number you sent it to was
2 1-800-352-8553 -- oh, I'm sorry -- 1-800-642-8553. I don't
3 know if there's any additional pages. Please contact me. My
4 number is 1-800-352-0611, and my extension is 1284. Thank you.
5 Q. Do you -- do you know someone named Janice Cook?
6 A. I don't.
7 Q. Are you familiar with the fax number 1-800-642-8553?
8 A. No, I'm not.
9 Q. Okay. Is that the fax number that the letter that's
10 been marked as CIGNA No. 5 was sent to?
11 A. No, it's not.
12 Q. Okay. All right. I'd like you to take a look at
13 what's been marked as CIGNA No. 8. I'll represent to you that
14 this is a printout from a web-site. Are you familiar with this
15 web-site?
16 A. No, I'm not.
17 Q. Do you know what CIGNA Disability Management
18 Solutions is?
19 A. It's -- it's the name that our customers know us as.
20 Q. Okay. When you say "us," what are you talking about?
21 A. LINA.
22 Q. Okay. Do you know what the paper intake team is?
23 A. Not really. It's part of the intake where if a claim
24 form comes in that's not by a telephone call, it's on paper, it
25 would go to the same intake department. It's not a separate

Page 51

1 group.
2 Q. Are you located at 12225 Greenville Avenue?
3 A. Yes, we are.
4 Q. In Dallas?
5 A. Yes.
6 Q. Okay. Now, do you see a fax number listed there?
7 A. I do.
8 Q. All right. Now, is that the same fax number that
9 Ms. Cook references in her message?
10 A. Yes, it is.
11 Q. Okay. And what is the purpose, based on this
12 printout from the web-site, for giving this fax number?
13 A. I have no idea.
14 Q. Well, read Point No. 3 on how to file a disability
15 claim.
16 A. Okay. Mail or fax the completed and signed
17 disability claim form, physician statement and any requested
18 documentation to that fax number.
19 Q. Okay.
20 A. Or, you know, mail it.
21 Q. All right. Do you have any idea of -- of how it
22 could be that a fax that's sent to one number then ends up at
23 another number?
24     MR. McDOUGAL: Objection; form.
25     MR. PIATAK: Objection.

Page 52

1 A. I don't know. I'm not an expert on faxing.
2 Q. (BY MR. CRONIN) Have you ever had occasion while
3 you've been working for LINA where a document that's directed
4 to one fax number actually is received at another?
5 A. I wouldn't have any idea.
6     MR. CRONIN: No further questions.
7     MR. PIATAK: Nothing further.
8     MR. McDOUGAL: Thank you very much.
9     You're going to have an opportunity to review
10 the transcript. It will be sent to me, I guess, and I'll get
11 it to you, and you can review it and make sure it's accurate
12 and let me know.
13     THE WITNESS: Okay.
14     (End of proceedings at 12:16 p.m.)

Page 53

1     CHANGES AND SIGNATURE
2 PAGE/LINE    CHANGE    REASON FOR CHANGE__
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 I, KIMBERLEE RUDEEN, have read the foregoing deposition
and hereby affix my signature that same is true and correct
16 except as noted herein.
17
18 _____
    KIMBERLEE RUDEEN
    CA# 05-477 SLR
19
STATE OF TEXAS )
20 Subscribed and sworn to before me by the said witness,
    KIMBERLEE RUDEEN, on this the _____ day of _____.
21 2006.
22
23 _____
    NOTARY PUBLIC IN AND FOR
    THE STATE OF _____
24
25 My Commission Expires:

14 (Pages 50 to 53)