**Affidavit of Laurence V. Cronin**                    **Exhibit G**

DEPOSITION
EXHIBIT

EDS-11

Pbvir R 4-12-06

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Hestal Lipscomb,                          §
                                          §
              Plaintiff,                   §
                                          §
v.                                        §     C.A. No. 05-477-SLR
                                          §
Electronic Data Systems Corporation,      §
                                          §     JURY TRIAL DEMANDED
              Defendant.                   §
                                          §

## DEFENDANT ELECTRONIC DATA SYSTEMS
## CORPORATION'S INITIAL DISCLOSURES

Defendant Electronic Data Systems Corporation ("EDS") hereby makes the following

disclosures in accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure and D. Del.

L.R. 16.2.  EDS makes the following disclosures subject to, and without waiving, its right to

protect from disclosure: (a) all communications protected by the attorney-client privilege; and (b)

all documents protected by the attorney work product doctrine.  These disclosures are based on

information reasonably available to EDS as of the present date and are subject to

supplementation as additional information becomes available.

These disclosures are also made without waiving (1) the right to object on the grounds of

competency, relevance, hearsay, or any other proper ground, or the right to object to the use of

any information disclosed for any purpose, in whole or in part, in any subsequent proceeding in

this action or in any other action; and (2) the right to object on any and all proper grounds to any

other discovery request or proceeding involving or relating to the subject matter of these

disclosures consistent with the Federal Rules of Civil Procedure and the District of Delaware

Local Rules of Civil Practice and Procedure.  EDS also reserves the right to call any witness or

present any exhibit or item at trial not listed here but determined through discovery or

investigation to be relevant to the subject matter of this action. Subject to and without waiving the foregoing, EDS makes the following disclosures pursuant to Rule 26(a)(1).

1.      **Rule 26(a)(1)(A).  The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

With respect to each current employee of EDS and CIGNA, the current business address of the employee is stated. No contact should be made, however, with current or former employees of EDS without first obtaining permission from EDS' attorneys. Any effort to make such contact will be considered an improper attempt to communicate with a represented client.

a.      Hestal Lipscomb, plaintiff;

b.      Barbara Jackson, Deputy Account Manager for EDS' Title XIX Account, 248 Chapman Rd., Suite 100, Newark, Delaware, 19702, facts supporting defenses, knowledge regarding plaintiff's employment, performance, tardiness and absenteeism issues, and application for short term disability benefits and FMLA leave;

c.      Tracey Eaddy, Claims Supervisor for EDS' Title XIX Account, 248 Chapman Rd., Suite 100, Newark, Delaware, 19702, facts supporting defenses, knowledge regarding plaintiff's employment, performance, tardiness and absenteeism issues, and application for short term disability benefits and FMLA leave;

d.      Linda Jackson, Mailroom Team Lead for EDS' Title XIX Account, 248 Chapman Rd., Suite 100, Newark, Delaware, 19702, facts supporting defenses, knowledge regarding plaintiff's employment, and application for short term disability benefits and FMLA leave;

e.      Lance Rogers, Account Manager for EDS' Title XIX Account, 248 Chapman Rd., Suite 100, Newark, Delaware, 19702, facts supporting defenses, and knowledge regarding plaintiff's employment with EDS;

f.      Kimberly Rudeen, Case Manager for CIGNA Group Insurance, 12225 Greenville Ave., Suite 1000, Dallas, Texas 75243, facts supporting

defenses, and knowledge regarding plaintiff's application for short term disability benefits and FMLA leave; and

g.     Charlene Crowder, Case Manager for CIGNA Group Insurance, 12225 Greenville Ave., Suite 1000, Dallas, Texas 75243, facts supporting defenses, and knowledge regarding plaintiff's application for short term disability benefits and FMLA leave.

h.     Representative/Records Custodian for EDS, 5400 Legacy Dr., Plano, TX 75024, authentication and admission of EDS corporate records.

i.     Representative of EDS Disability Services, 5400 Legacy Dr., Plano, TX 75024, facts regarding EDS' administration of its STD and FMLA leave plans.

j.     Representative/Records Custodian for CIGNA Group Insurance, 12225 Greenville Ave., Suite 1000, Dallas, Texas 75243, authentication and admission of CIGNA corporate records related to this lawsuit.

k.     Representative/Records Custodian of all employers of Plaintiff following her separation from EDS, address known to Plaintiff, facts related to mitigation of damages.

EDS reserves the right to supplement this list following discovery.

2.     **Rule 26(a)(1)(B). A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

a.     Plaintiff's personnel file. These records are in the possession of EDS.

b      April 21, 2004 letter from CIGNA to Plaintiff. These records are in the possession of EDS and CIGNA.

c.     May 4, 2004 letter from CIGNA to Plaintiff. These records are in the possession of EDS and CIGNA.

d.     May 7, 2004 fax cover sheet from Charlene Crowder of CIGNA to Dr. Emily Jane Penman. These records are in the possession of EDS and CIGNA.

- 3 -

e.    May 20, 2004 letter from CIGNA to Plaintiff.  These records are in the possession of EDS and CIGNA.

f.    June 2, 2004 letter from CIGNA to Plaintiff.  These records are in the possession of EDS and CIGNA.

g.    June 2, 2004 letter from Kim Rudeen of CIGNA to Tracy Eaddy of EDS.  These records are in the possession of EDS and CIGNA.

h.    June 17, 2004 letter from CIGNA to Plaintiff.  These records are in the possession of EDS and CIGNA.

i.    EDS' U.S. Benefits Employee Handbook.  This record is in the possession of EDS.

j.    EDS' Short Term Disability Plan.  This record is in the possession of EDS.

k.    EDS' FMLA Policy.  This record is in the possession of EDS.

EDS expects to discover documents and things in the possession of Plaintiff, EDS, and/or third-parties, the specific identities of which are not yet known to EDS, that may be used to support EDS' claims or defenses.

**3.    Rule 26(a)(1)(C). A computation of the category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

EDS is not claiming damages.

**4.    Rule 26(a)(1)(D).   The insurance agreement which may provide coverage for the part or all of the judgment for this action.**

None.

**5.    Rule 26(a)(2)(A).  In addition to the disclosures required by paragraph (1), a**

- 4 -

party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

EDS will comply with this Court's September 29, 2005 Order and Fed. R. Civ. P. 26(a)(2)(C) regarding the disclosure of experts.

Of Counsel:
Stephen C. Sutton
Roger G. Trim
Baker & Hostetler LLP
3200 National City Center
1900 East Ninth Street
Cleveland, OH  44114-3485
Telephone: (216) 621-0200

Richard G. Elliott, Jr. (#687)
elliott@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King St., P.O. Box 551
Wilmington, DE 19899-0551
Telephone: (302) 651-7700

Attorneys for Defendant
Electronic Data Systems Corporation

Dated:  October 7, 2005

- 5 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2005, true and correct copies of the within document

were caused to be served on the attorney of record at the following addresses as indicated:

### VIA HAND DELIVERY

Laurence V. Cronin
Smith Katzenstein & Furlow
The Corporate Plaza
800 Delaware Avenue
7th Floor
P. O. Box 410
Wilmington, Delaware 19899

Alyssa M. Schwartz (#4351)
schwartz@rlf.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RECEIVED
OCT 0 7 2005
LVC

| | | |
|---|---|---|
| Hestal Lipscomb, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-477-SLR |
| | ) | |
| Electronic Data Systems Corporation, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that on October 7, 2005, true and correct copies of Defendant Electronic Data Systems Corporation's Initial Disclosures were served on counsel below as noted:

## VIA HAND DELIVERY

Laurence V. Cronin
Smith Katzenstein & Furlow
The Corporate Plaza
800 Delaware Avenue
7th Floor
P. O. Box 410
Wilmington, Delaware 19899

Of Counsel:
Stephen C. Sutton
Roger G. Trim
Baker & Hostetler LLP
3200 National City Center
1900 East Ninth Street
Cleveland, OH 44114-3485
Telephone: (216) 621-0200

Richard G. Elliott, Jr. (#687)
elliott@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King St., P.O. Box 551
Wilmington, DE 19899-0551
Telephone: (302) 651-7700

Attorneys for Defendant
Electronic Data Systems Corporation

Dated: October 7, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2005, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

**VIA HAND DELIVERY**

Laurence V. Cronin
Smith Katzenstein & Furlow
The Corporate Plaza
800 Delaware Avenue
7th Floor
P. O. Box 410
Wilmington, Delaware 19899

Alyssa M. Schwartz (#4351)
schwartz@rlf.com

**Affidavit of Laurence V. Cronin**                    **Exhibit H**

Tracey Eaddy

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HESTAL LIPSCOMB,                )
                                )
        Plaintiff,              )
                                )
v.                              )    Civil Action No.
                                )       05-477 SLR
ELECTRONIC DATA SYSTEMS         )
CORPORATION, a Delaware         )
Corporation,                    )
                                )
        Defendant.              )

        Deposition of TRACEY EADDY taken pursuant to
notice at the offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 12:25 p.m. on Wednesday, April 12, 2006,
before Robert Wayne Wilcox, Jr., Court Reporter and
Notary Public.

APPEARANCES:

        LAURENCE V. CRONIN, ESQ.
        SMITH, KATZENSTEIN & FURLOW LLP
           800 Delaware Avenue - 7th Floor
           Wilmington, Delaware  19801
           for the Plaintiff,

        THOMAS J. PIATAK, ESQ.
        BAKER HOSTETLER
           3200 National City Center
           1900 East 9th Street
           Cleveland, Ohio  44114
           for the Defendant.

                CORBETT & WILCOX
        Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
                (302) 571-0510
           www.corbettreporting.com

Tracey Eaddy

6 (Pages 18 to 21)

Page 18

1 in 2002?
2    A.   Around May.
3    Q.   Okay.  How many other people did you supervise
4 in addition to Hestal Lipscomb?
5    A.   About 15.
6    Q.   Okay.  What were their positions?
7    A.   There was four people in the mailroom, three
8 people in the resolutions department, two people in drug
9 rebate, two people in reference --
10    Q.   Reference?
11    A.   Reference.
12         -- two people in financial.
13         And then I have one person in TPL and
14 one person in buy-in.
15    Q.   Okay.  Ms. Lipscomb was in the mailroom?
16    A.   That's correct.
17    Q.   All right.  Was there a team leader there?
18    A.   Yes.
19    Q.   That was Linda Jackson?
20    A.   That's correct.
21    Q.   Okay.  So during the entire period of
22 Ms. Lipscomb's employment from July 2002 until her
23 termination in 2004, she had Linda Jackson as a team
24 leader and you as her supervisor, and you reported to

Page 19

1 Barbara Jackson.  Is that correct?
2    A.   That's correct.
3    Q.   All right.  Now, during that time period, did
4 you have any type of role with respect to Ms. Lipscomb's
5 requests for leave of any kind?
6    A.   I was notified when she was going to be out by
7 the team leader.  And if it was anything to do with being
8 out for an extended period of time, I would have been the
9 one to contact Synchrony or CIGNA.
10    Q.   Okay.  Now, what's an extended period of time
11 through that period of time you held that position?
12    A.   More than five days.
13    Q.   Okay.  So the process was that Ms. Lipscomb
14 would tell Ms. Jackson she was going to be out a certain
15 number of days.  If it was five or more, Ms. Jackson
16 would then come see you?
17    A.   Ms. Jackson would tell me of all the days she
18 was going to be out.  I was notified by e-mail of any
19 days that she was going to be out of the office.  But if
20 anything was going to be more than five days, I would
21 contact Synchrony or CIGNA.
22    Q.   Okay.  How was vacation handled?  How did
23 Ms. Lipscomb make requests for vacation?
24    A.   Through Ms. Jackson.

Page 20

1    Q.   Okay.  So it was through --
2    A.   The team leader.
3    Q.   So Ms. Jackson could approve it?
4    A.   Yes.
5    Q.   How much vacation was Ms. Lipscomb entitled
6 to?
7    A.   I believe it was two weeks.
8    Q.   Two weeks a year?
9    A.   Yes.
10    Q.   That's all available at the beginning of the
11 year?  Or does it accrue during the year?
12    A.   It's available to her.
13    Q.   Okay.  How was sick time handled if somebody
14 was going to be out for a day or two?  Was Ms. Lipscomb
15 allotted a certain amount of sick time over the course of
16 a year?
17    A.   There is not a designated number of sick days.
18 It's based on trends and being out consistently.
19    Q.   So tell me how it would work.
20         If somebody was out sick, was there a
21 certain threshold they would need to be out in terms of
22 number of days?  I'm not talking about in a single
23 duration.  If somebody is out one day, two days, is there
24 some point in time that employee is spoken to for being

Page 21

1 out too often?
2    A.   Usually around the third day.
3    Q.   During what time frame?  A year?
4    A.   A year.
5    Q.   Okay.  What happens?
6    A.   We usually just meet with the employee and say
7 just be careful, you know, you're using a lot of sick
8 time.  At that time as well, we're able to, you know,
9 gather information on why, you know, they're out.
10 Just -- we just tell them to be careful -- that it could
11 lead to a written warning if they continue to be out.
12    Q.   Okay.  Now, is that considered a verbal
13 warning?
14    A.   Yes.
15    Q.   So if you have three days of sickness during
16 the course of the year, you get a verbal warning.
17 Correct?
18    A.   Yes.
19    Q.   Okay.  That was the practice in place from
20 2000 through 2004.  Is that correct?
21    A.   I mean, that's -- I mean, we look at
22 attendance in a whole.  I mean, we look at latenesses.
23 We look at sick.  We look at unexpected leave early.
24 It's all part of attendance.  It's not just being sick.

Tracey Eaddy

7 (Pages 22 to 25)

Page 22

1    Q.  Okay.  But let's just deal with the sick issue
2  at this point.  If an employee is out sick three times,
3  let's say, by the middle of April, is it the practice
4  that you then speak to the employee and give them a
5  verbal warning that they need to watch the amount of time
6  they've been out?
7    A.  Yes.  That is true.
8    Q.  Okay.  Is that practice written down anyplace?
9    A.  Not the specific number of times.
10    Q.  Who told you about that as the practice?
11    A.  I don't recall.
12    Q.  Okay.  Now, I think you said, when we
13  discussed earlier the attendance sheets that you create,
14  you have a snapshot of how much somebody has been out
15  during the course of the year -- that being out sick
16  would not include those days covered by FMLA leave.
17  Correct?
18    A.  Yes.
19    Q.  All right.  Would the same hold true for leave
20  that's covered by short-term disability?
21    A.  Yes.
22    Q.  Okay.  So if somebody is out on either FMLA or
23  short-term disability, you don't consider that to be a
24  sick day.  That would add up to the three that would lead

Page 23

1  to you giving them a verbal warning.  Correct?
2    A.  Yes.
3    Q.  All right.  When was the first time that you
4  had occasion to do anything on Ms. Lipscomb's behalf with
5  respect to any time she was going to spend away from work
6  due to sickness?
7    A.  Could you repeat the question?
8    Q.  Sure.
9        During the period of time that she
10  worked for you, from July 2002 to July 2004, when was the
11  first time that you got involved on her behalf with
12  respect to sick days?
13    A.  I don't remember.
14    Q.  Okay.  Let's take a look at some documents and
15  see if we can refresh your recollection.  Again, turn to
16  that large document that's marked EDS No. 3.  Why don't
17  you take a look at EDS II 28?
18    A.  (The witness complied with counsel's request.)
19    Q.  Do you recognize that document?
20    A.  I remember seeing it.
21    Q.  Okay.  Does this refresh your recollection as
22  to the first time that you may have been involved on
23  behalf of Ms. Lipscomb with respect to any medical leave
24  that she needed?

Page 24

1    A.  The only thing that I would have done was
2  called Synchrony to report a leave of absence.
3    Q.  Okay.  Do you remember having done that?
4    A.  I remember doing at least one.  I mean, I
5  remember calling Synchrony.
6    Q.  Do you remember anything about it?
7    A.  I don't remember the date.  I don't.
8    Q.  Okay.  All right.  I want you to take a look
9  at some other documents to see if we can try to refresh
10  your recollection on this -- EDS II 00034.
11    A.  (The witness complied with counsel's request.)
12    Q.  Do you recognize this document?
13    A.  Yes.
14    Q.  Okay.  Does that refresh your recollection
15  about any assistance that you may have given Ms. Lipscomb
16  in April of 2003 in connection with her request for
17  leave?
18    A.  This was just a note that she used to return
19  to work.
20    Q.  Okay.  All right.  Let's turn to EDS II 00078.
21    A.  (The witness complied with counsel's request.)
22    Q.  Do you recognize this document?
23    A.  I recall seeing it.  These -- I mean, when I
24  would receive these, I would just forward them on to Barb

Page 25

1  Jackson.  I never did anything with them.  I mean, I
2  forward them on to her.
3    Q.  Okay.  Do you remember what you told
4  Ms. Lipscomb you would do in connection with her request
5  for medical leave?
6    A.  Anytime anyone tells -- whenever we call
7  Synchrony or CIGNA, I tell them that all I do is the
8  initial call.  Then I'm out of it.  I'm not medically
9  trained.  I don't know if someone needs to be out.  They
10  need to work with CIGNA to get it -- or Synchrony to get
11  it approved.
12    Q.  Okay.  Did the procedure change at all when
13  EDS changed vendors from Synchrony to CIGNA?
14    A.  Not with regard to my part.  My part is just
15  to call it in.  And then it's up to the employee after
16  that.
17    Q.  Okay.  Well, what part of the procedures did
18  change other than your role?
19    A.  I'm not aware of any change procedures.
20    Q.  Okay.  Were there procedures set forth in any
21  booklets or anything that were given to employees?
22    A.  I mean, we just tell employees that they will
23  receive information from our vendor and they are to work
24  with the vendor with any questions.  They need to

Tracey Eaddy

Page 26

1  complete the paperwork with their doctor. They work with
2  the vendor to get that approved.
3      Q. What did you tell employees with respect to
4  medical leave when they were not covered by either
5  short-term disability or FMLA?
6      A. I had never had a case before where it wasn't
7  approved through either, so I didn't tell them anything.
8  I just told them they needed to work with the vendor.
9      Q. Okay. But did EDS have a policy for dealing
10  with sick leave in a situation where somebody was not
11  entitled to either short-term disability or the FMLA?
12      A. I'm not sure that would have ever reached my
13  level. I don't know.
14      Q. Did you ever receive any training regarding
15  the FMLA?
16      A. I'm not sure what you mean by "training."
17      Q. As to what the FMLA is, what it provides and
18  the various obligations of the employees and the
19  employers.
20      A. I have been in training, yes, for what FMLA is
21  for.
22      Q. Okay. When did you get training?
23      A. I don't recall.
24      Q. Do you know what year?

Page 27

1      A. No.
2      Q. No?
3      A. I don't know. Sorry.
4      Q. Do you know how many times?
5      A. I think I've been through at least two
6  trainings.
7      Q. Let's take a look at EDS II 00041.
8      A. I'm sorry?
9      Q. 41.
10      A. (The witness complied with counsel's request.)
11      Q. Do you recognize this document?
12      A. I don't specifically remember seeing it.
13  Again, I -- when I get e-mails from Synchrony or CIGNA, I
14  usually just forward it to the manager.
15      Q. Okay. So you don't remember being involved at
16  all in connection with any requests that Ms. Lipscomb had
17  for medical leave in August 2004?
18      A. I'm sorry. For when?
19      Q. August 2003. I'm sorry if I said 2004.
20      A. Okay. I remember getting it through --
21  calling it in through Synchrony. And, then, really I had
22  no other parts of that. I mean, we get e-mails from
23  Synchrony. I forward them on to the manager. That's my
24  role.

Page 28

1      Q. Okay. Do you know whether Ms. Lipscomb was
2  actually out for more than a day in August of 2003?
3      A. I mean, I wouldn't have called Synchrony if
4  she was out just one day.
5      Q. What records would there be in
6  existence showing exactly what days Ms. Lipscomb was out
7  in August of 2003?
8      A. I mean, normally it would be the attendance
9  sheet.
10      Q. Was there any other way of verifying whether
11  she was there or not?
12      A. She would have submitted a time card.
13      Q. Okay. When are those time cards submitted?
14      A. They should be submitted every week.
15      Q. Okay. What happens to them after they're
16  submitted?
17      A. They go to our corporate office for payroll.
18      Q. Okay. Where do they go from there? Are they
19  thrown away?
20      A. I'm not sure.
21      Q. In 2004 were you involved in Ms. Lipscomb's
22  request for medical leave in April?
23      A. I had contacted CIGNA to report that she was
24  going to be out.

Page 29

1      Q. Okay. How did you find out that she needed to
2  be out?
3      A. From what I remember, the team leader told me
4  that she was going to be out. She reported to the team
5  leader. The team leader reported it to me.
6      Q. Okay. That would have been Linda Jackson?
7      A. Correct.
8      Q. Okay. So you would have then contacted CIGNA.
9         Do you remember who you spoke with?
10      A. No.
11      Q. Did you contact her on your own or did you
12  contact her with Ms. Lipscomb?
13      A. I know on one of the two cases she was with
14  me, and we contacted them together.
15      Q. Okay. So there were two occasions that you
16  contacted --
17      A. Well, Synchrony was one and CIGNA was the
18  second.
19      Q. So you just recall the two.
20         One was Synchrony and one was CIGNA?
21      A. That's correct.
22      Q. You just can't remember whether you
23  were on the phone with her with Synchrony or CIGNA.
24  Correct?

Tracey Eaddy

Page 42

1     A.  Not that I remember.
2     Q.  Okay.  So you went ahead and you created this
3   attendance improvement plan at Ms. Jackson's request on
4   or about July 9th dated for July 12th, 2004, and you
5   presented it to Ms. Jackson.  Correct?
6     A.  Yes.  I gave it to Ms. Jackson.
7     Q.  Right.
8         Then the next thing that you heard with
9   respect to Ms. Lipscomb was that she was being
10  terminated.  Is that correct?
11    A.  From what I remember, yes.
12    Q.  Did anybody tell you why?
13    A.  From what I recall, for being an unexcused
14  absence.
15    Q.  Okay.  But that was also the same reason that
16  you created the attendance improvement plan.  Correct?
17  Because they were unexcused absences.  Correct?
18    A.  Yes.
19    Q.  Okay.  When you were told she had been
20  terminated, did you ask why she was terminated as opposed
21  to being put on the attendance improvement plan that you
22  had written?
23    A.  No.  Not that I recall.
24    Q.  Okay.  Let's take a look at the employee

Page 43

1   handbook.
2     A.  (The witness complied with counsel's request.)
3     Q.  Okay.  I'd like to turn your attention to
4   the -- well, first of all, let me ask you:  Was there any
5   provision contained in this handbook that Ms. Lipscomb
6   violated to your understanding that was the reason for
7   her termination?
8     A.  On EDS II 00017, it says that a health care
9   provider certification must be required to validate any
10  other illness or time away from work due to medical
11  reason, if appropriate, and absenteeism could result into
12  disciplinary action up to and including separation.
13    Q.  Okay.  So is it your understanding that it was
14  this provision that was the basis for Ms. Lipscomb's
15  termination?
16    A.  I don't know the answer to that.
17    Q.  You don't know?
18    A.  I wasn't part of that decision.
19    Q.  All right.  What's your understanding of why
20  she was terminated?
21    A.  My understanding is because of unexcused
22  absence.
23    Q.  Okay.  That's specifically the time in April
24  and May of 2004?

Page 44

1     A.  For the unexcused absence?
2     Q.  Are we talking about the same unexcused
3   absences?
4     A.  The one that was denied from CIGNA.
5     Q.  Okay.  Now, did Ms. Lipscomb have to submit
6   anything from a doctor before going out at that time?
7     A.  She would have had to submit something through
8   CIGNA.
9     Q.  She didn't have to submit anything at work
10  saying that she was going to be out?  No type of note or
11  anything like that?
12    A.  I don't think it's mandatory they do that.  I
13  mean, if she submitted something, she could have, but
14  it's not --
15    Q.  So she just has to submit something to CIGNA?
16    A.  Correct.
17    Q.  Okay.  Then she would have to, I guess,
18  pursuant to this -- employee can be required to provide a
19  certification upon return to the workplace.
20    A.  If they're out more than three days, they have
21  to give a doctor's note to return to work.
22    Q.  Okay.  It says they may be required.
23        What you're telling me is that, despite
24  the "may be required," in fact it is a requirement if

Page 45

1   somebody is out for three or more days they must provide
2   one?
3     A.  On -- yes.
4     Q.  Okay.
5     A.  They have to supply --
6     Q.  Okay.
7     A.  -- a doctor's return to work.
8     Q.  All right.  So that should say they are
9   required to provide certification.  Correct?
10        MR. PIATAK:  Objection.  You can answer.
11    A.  I mean, I'm sure there's -- I mean, I'm sure
12  not everyone has to submit a doctor's note after three
13  days.  I mean, there could be other reasons.
14    Q.  Okay.
15    A.  I'm sure it's worded that way for a reason.
16    Q.  Okay.  Who do they submit this note to?
17    A.  I usually accepted the notes to return to
18  work.
19    Q.  Okay.  So it doesn't go to CIGNA?
20    A.  Not to return to work.
21    Q.  Okay.
22    A.  I mean, I'm sure they complete something with
23  CIGNA so they can return, but in order for them to
24  return, I need something from the doctor saying --

Tracey Eaddy

13 (Pages 46 to 49)

Page 46

1   Q.  Okay.
2   A.  -- that they can come back to work and what
3   restrictions there are.
4   Q.  All right.  Now, did you get that from
5   Ms. Lipscomb?
6   A.  I...
7   Q.  Why don't you take a look at EDS II 00033?
8   A.  (The witness complied with counsel's request.)
9   Q.  Is that the document you received?
10  A.  Yes.
11  Q.  All right.  So Ms. Lipscomb was in compliance
12  with this first sentence of this policy that you
13  reference as being EDS II 17.  Correct?
14  A.  Yes.  She supplied the note to return to work.
15  Q.  Okay.  All right.  Let's move to the second
16  sentence.  It says:  Further, health care provider
17  certification may be required to validate any other
18  illness or time away from work due to medical reason if
19  deemed appropriate by EDS/USGS leadership.
20       What do you understand that to mean?  Is
21  that also a mandatory provision despite the language that
22  says "if deemed appropriate by EDS/USGS leadership"?
23  A.  What was the question again?  I'm sorry.
24       MR. CRONIN:  There are actually two

Page 47

1   questions there, if you can read them both.
2        (The reporter read the requested
3   portion.)
4        THE WITNESS:  I mean, I think it depends
5   on why the person is away from work.  I mean, there's
6   different issues that arise.
7   BY MR. CRONIN:
8   Q.  Okay.  So in some instances is it fair to say
9   that if somebody is away from work due to an illness they
10  may not need to provide a health care provider
11  certification?
12  A.  It depends on the number of days that they're
13  out.
14  Q.  Okay.  What is the number of days where it
15  would be required?
16  A.  We report anything to CIGNA over five days.
17  Q.  Okay.  What about if somebody is out for three
18  days or says they need to be out sick for three days?
19  What do you do then?
20  A.  And what do you really mean by "out sick"?  I
21  mean, people don't know that they're going to be out sick
22  three days.
23  Q.  Well, sometimes they do.  I mean, somebody
24  might go out for minor surgery and say, Ms. Eaddy, I've

Page 48

1   got to be out for three days because I'm having a wisdom
2   tooth removed and the doctor tells me surgery is going to
3   be Wednesday and they want me off the rest of the week.
4   What do you do?
5   A.  If that were me, I would probably call it in
6   to CIGNA because it's possible that it could be longer
7   than the three days.
8   Q.  Okay.  But is the rule, as you understand it,
9   that there has to be a possibility that it could be five
10  more days before you could contact CIGNA?
11  A.  Say that again.
12  Q.  Is it your understanding that there has to be
13  a possibility that it would be five more days before you
14  call it in to CIGNA?
15  A.  No.  We could call it in for three.
16  Q.  Okay.  How many days does an individual need
17  to be out of work in order to be covered by the FMLA?
18  A.  I have people that are on it intermittent --
19  one day here and one day there for the same pattern, same
20  reason.
21  Q.  Okay.  Going back to the policy, with respect
22  to that second sentence, did EDS advise Hestal Lipscomb
23  that it needed to provide a health care provider
24  certification separate and apart from her applications

Page 49

1   for short-term disability and FMLA leave?
2   A.  I don't recall requesting -- the only thing I
3   would have needed from her was her note to come back to
4   work.
5   Q.  Right.
6        Okay.  So you're not aware of any
7   request by EDS to Ms. Lipscomb to provide a health care
8   provider's certification other than what was being
9   requested by CIGNA?
10  A.  I'm not aware of one.
11  Q.  Okay.  But it is your understanding that it
12  was pursuant to the last sentence of this section
13  regarding excess absenteeism that Ms. Lipscomb was
14  terminated, specifically the excessive absenteeism
15  related to that period from April 29th through May 15th
16  that she was out of the office.  Correct?
17  A.  I believe that she was separated from EDS for
18  unexcused absences.
19  Q.  What unexcused absences?
20  A.  The one that was denied from CIGNA.
21  Q.  Okay.  The one from late April to mid May
22  2004.  Correct?
23       MR. PIATAK:  We're taking all day over
24  something that's not in dispute, Larry.

**Affidavit of Laurence V. Cronin**                                    **Exhibit I**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

2

3   HESTAL LIPSCOMB,              )

                                  )

4                                 )

              PLAINTIFF,          )

5                                 )

  VS.                             )   CIVIL ACTION

6                                 )

                                  )   NO.: 05-477 SLR

7   ELECTRONIC DATA SYSTEMS       )

    CORPORATION, a Delaware       )

8   Corporation,                  )

                                  )

9                                 )

              DEFENDANT.          )

10

11          ------------------------------------

12                  ORAL DEPOSITION OF

13                  PATTY HARRINGTON

14                  May 4, 2006

15                  Volume 1

16          ------------------------------------

17      ORAL DEPOSITION OF PATTY HARRINGTON, produced as a witness

18 at the instance of the PLAINTIFF, and duly sworn, was taken in

19 the above-styled and numbered cause on the 4th day of May,

20 2006, from 1:01 p.m. to 1:49 p.m., before Caroline Tadlock,

21 RPR, CSR in and for the State of Texas, reported by machine

22 shorthand, at the law offices of Crouch & Ramey, 1445 Ross

23 Avenue, Suite 3600, Dallas, Texas, pursuant to the Federal

24 Rules of Civil Procedure and the provisions stated on the

25 record or attached hereto.

RECEIVED

MAY 1 8 2006

LVC

Page 6

1    A.  No, not -- the opposing counsel, no.

2    Q.  And you don't have any idea what states the cases

3 were involved in?

4    A.  No.

5    Q.  For purposes of today, just keep three things in

6 mind.  Make sure that you understand my question.  If you

7 don't, tell me.  I'll try to rephrase the question.  Second,

8 make sure I'm done before you start answering.  And, finally,

9 answer verbally.  Okay?

10    A.  Okay.

11    Q.  You're employed by EDS.  How long have you been

12 employed there?

13    A.  Thirteen years.

14    Q.  And what's your position?

15    A.  I am currently manager of EDS disability services.

16    Q.  And how long have you been manager of EDS disability

17 services?

18    A.  One year.

19    Q.  What did you do before that?

20    A.  I was a disability analyst in disability services.

21    Q.  And how long were you a disability analyst?

22    A.  Five years.

23    Q.  What did you do before that?

24    A.  I was with EDS for six years in employee relations.

25    Q.  Okay.  Does that cover your full employment?

Page 7

1    A.  At EDS.

2    Q.  Okay.  What -- how far have you gone in school?

3    A.  I have an undergraduate degree.

4    Q.  In what?

5    A.  In general business.

6    Q.  When did you graduate from college?

7    A.  In 1980.

8    Q.  Okay.  You're the manager of EDS disability services.

9 How many -- is that a department?

10    A.  Yes, sir.

11    Q.  Okay.  How big is the department?

12    A.  We currently have five employees.

13    Q.  And what are the positions of the other four?

14    A.  The other -- I have five.

15    Q.  Oh, you have five reporting to you?

16    A.  Right.

17    Q.  Okay.  I included you.

18    A.  I have three disability analysts and two disability

19 administrators.

20    Q.  And -- I'm sorry.  Analysts and what was the --

21 administrators?

22    A.  Administrators.

23    Q.  Okay.  And what are the functions of the analysts and

24 administrators?

25    A.  The disability analysts work with the managers and

Page 8

1 employees and CIGNA regarding concerns and problems with their

2 claims, and the administrators key in the leave of absences to

3 our database, which is connected to payroll and benefits, so

4 that their leave of absence is tracked and paid or unpaid.

5    Q.  Okay.  So the administrators, basically, have an

6 administerial task of inputting data so that there's accurate

7 data with respect to leave of absence?

8    A.  Correct.

9    Q.  Do they do anything more than that?

10    A.  No.

11    Q.  And the disability analysts, basically, serve as

12 people working with the managers, as well as CIGNA, in order to

13 deal with any issues that may arise with disability leave?

14    A.  Correct.

15    Q.  Do they do anything else?

16    A.  We do some monthly reporting, quarterly reporting, on

17 number of claims, length of time out, cost of claims, things

18 like that.

19    Q.  And who does that, the analysts?

20    A.  The analysts.

21    Q.  Okay.  What do you do?

22    A.  I manage them.

23    Q.  Okay.  So you, basically, help out the analysts with

24 issues as they arise?

25    A.  Yes.

Page 9

1    Q.  Okay.

2       MR. CRONIN:  If you could mark this as EDS 12,

3 please.

4       (Exhibit 12 marked.)

5    Q.  (BY MR. CRONIN)  Ms. Harrington, I'm handing you

6 what's been marked as EDS No. 12.  Have you ever seen this

7 document before?

8    A.  Yes.

9    Q.  Okay.  In what context did you see it?

10    A.  Yesterday, when I met with Tom.

11    Q.  Okay.  Now, it's my understanding that you've been

12 designated as the representative of EDS with respect to

13 paragraphs 1 and 2 of this notice of deposition.  Is that your

14 understanding?

15    A.  Yes.

16    Q.  Okay.  And do you consent to that designation?

17    A.  Yes.

18    Q.  Did you review any documents in preparation for your

19 deposition?

20    A.  No.

21    Q.  Have you talked to anyone other than Mr. Piatak about

22 this subpoena or the deposition?

23    A.  No.

24    Q.  How long has this department been in existence that

25 you manage?

3 (Pages 6 to 9)

Page 22

1  Q.  Okay.  Am I right, there are no number of sick days
2 that are given to employees of EDS?
3  A.  That's correct, for salaried employees.
4  Q.  Okay.  Now, if an employee is -- gives the three days
5 off, based on the hypothetical I just gave you, can he or she
6 be disciplined for that?
7  A.  It's possible.
8  Q.  Okay.  What if the individual has had to go off, say,
9 once every two months for three days, resulting in six times in
10 a year missing three days' time for this minor surgery, could
11 the employee be disciplined for that?
12  A.  If it was not covered under intermittent FMLA.
13  Q.  Not covered under intermittent FMLA.
14       How would that ever become determined if
15 managers are not reporting anything less than five days?
16  A.  They -- they do report intermittent FMLA, as well.
17 They also report workers' comp.
18  Q.  Okay.  How is it -- how are managers instructed in
19 being able to identify what intermittent FMLA is?
20  A.  They're -- back to 2004.  We have information in our
21 handbook about intermittent FMLA.  We offer classes to
22 managers, new managers, on FMLA, what the definition is, what
23 the requirements are.
24       And if managers at any time are not sure what to
25 do, they're told to call the 800 number for CIGNA and report

Page 23

1 the information that they have, and CIGNA will make the
2 determination if it's short-term disability, if it's FMLA, if
3 it's both, if it's workers' comp.
4  Q.  What -- what is your understanding of what triggers
5 an employer's obligation for purposes of providing intermittent
6 FMLA?
7  A.  It's based upon the knowledge that the employee gives
8 to the manager, their need to be out for a medical reason.
9  Q.  But -- but how many days?  What's the nature of the
10 condition?  I mean, can you give me a little bit more in terms
11 of what factors an employer would be expected to consider
12 before phoning it in to CIGNA?
13  A.  It's generally --
14  Q.  Well, let's go back to my hypothetical.  You have an
15 employee who's -- six times over the course of a year has had
16 to go out for three day surgeries.  Is that covered by the
17 FMLA?
18       MR. PIATAK:  Objection to the form of the
19 question.
20       You may answer.
21  A.  It could be.  There's not enough information there to
22 make a determination.
23  Q.  (BY MR. CRONIN)  What additional information would
24 you or a manager need?
25  A.  We -- CIGNA would need information regarding -- if

Page 24

1 it's a serious health condition, it's ongoing treatment by a
2 physician.  They could have had three cosmetic surgeries that
3 was outpatient that is not FMLA.
4  Q.  Okay.  What responsibilities did EDS have with
5 respect to FMLA once the contact had been made with CIGNA?
6  A.  I don't understand the question.
7  Q.  Well, I think you've described the process whereby a
8 manager -- if a manager realizes an employee is going to be out
9 five consecutive days, they know to call CIGNA, correct?
10  A.  Correct.
11  Q.  Okay.  And what I'm trying to find out is, what does
12 EDS view to be its continuing obligation with respect to an
13 individual's claim for FMLA leave after that initial call has
14 been made?
15  A.  At that point, it's the employee's responsibility to
16 provide the required requested documentation back to CIGNA.
17  Q.  So EDS doesn't have any further responsibility?
18  A.  Not according to our procedures back in 2004.
19  Q.  Okay.  What if there's a mistake made by CIGNA with
20 respect to the manner in which they've handled an individual's
21 application for FMLA or short-term disability?  Is -- does EDS
22 have any concern about that?
23  A.  What kind of mistake?
24  Q.  Well, let's just say a form was lost, a form that was
25 submitted to CIGNA was lost, and that CIGNA was at fault.  Does

Page 25

1 EDS have a concern about that, or is it EDS' view that once it
2 has turned over something to CIGNA, that it's their problem?
3  A.  I'm not aware of any situations where a form has been
4 lost.  I know employees have said they've faxed something once,
5 and we'll ask them to fax it again.  But it is ultimately the
6 EDS philosophy at that time to have the employee submit all the
7 information.  We would not reach out and retrieve it for them
8 or on their behalf.
9  Q.  Okay.  By outsourcing to CIGNA and SHPS -- or, I
10 guess, more specifically SHPS, the responsibility for
11 administering FMLA leave, is it EDS' understanding that it's no
12 longer responsible for compliance with any employer's
13 responsibilities under the FMLA?
14  A.  No, it's not our understanding.
15  Q.  Okay.  So if -- if EDS found out that the people that
16 they had entrusted had made a mistake, what would EDS do?
17       MR. PIATAK:  Objection to form.
18       You may answer.
19  A.  If -- if I became aware that they were denying an
20 FMLA claim due to eligibility, we've got the dates of hire, we
21 know that they've worked a year or something like that, we
22 would correct that information.  But lost paperwork would be
23 the employee's responsibility to make sure that it got to
24 CIGNA.
25  Q.  (BY MR. CRONIN)  Okay.  So in your view, if CIGNA

7 (Pages 22 to 25)

Page 30

1 information. We get summaries, this claim's approved, it's
2 denied.
3    Q.  Right.
4        But they don't show you the types of forms that
5 they use for purposes of requesting information from your
6 employees?
7    A.  No.
8    Q.  Okay. I'll represent to you that it appears to us
9 that this document was faxed to CIGNA on June 21st, 2005. I'll
10 also represent to you that it appears to have been lost by
11 CIGNA.  If, as EDS, you were to find out that CIGNA had lost
12 the medical certification and that it was on that basis that
13 their claim -- this individual's claim was denied, would you,
14 as EDS, want to do anything to remedy the situation?
15       MR. PIATAK:  Objection.
16       You may answer, if you can.
17    A.  This happened in 2004, and I was not the manager at
18 the time, and --
19    Q.  (BY MR. CRONIN)  Okay.  All right.  Well, we're
20 dealing with -- I'm trying to base a hypothetical on what's
21 really occurred.
22    A.  Okay.
23    Q.  All right.  And if you want, we can change the facts
24 and say this came in to you today, however you want to do it.
25 But what I'm trying to do is give you a hypothetical based on

Page 31

1 what we believe really occurred here to find out what EDS would
2 do if it found out that there was evidence to suggest that
3 CIGNA had lost a form, and that because they lost the form,
4 they denied a claim.
5        What would EDS do if it found there was
6 substantial reason to believe that CIGNA had lost a form and
7 had denied a claim as a result?
8       MR. PIATAK:  Objection.
9       You may answer.
10    A.  In 2004 procedures and philosophies were different
11 than they are currently.
12    Q.  (BY MR. CRONIN)  Okay.
13    A.  And I was not manager at the time.  In 2004 it was
14 the employee's responsibility to get the information to CIGNA,
15 and that was --
16    Q.  That was it?
17    A.  That was it.
18        Today, if I had gotten a request for lost
19 information, I would, depending upon the circumstances, ask for
20 more information.  If the employee came to me and requested
21 help, then I would ask CIGNA to reconsider.
22    Q.  Why was this change in policy made from 2004 to when
23 you became in charge of this group?
24    A.  We had a change in leadership, in senior leadership.
25    Q.  Meaning you or somebody above you?

Page 32

1    A.  No.  Senior vice president of HR.
2    Q.  Okay.  Who is that?
3    A.  Her name is Tina Svinski.
4    Q.  All right.  And she issued some directive --
5    A.  She --
6    Q.  -- or how did that come about?
7    A.  -- requested that we be -- provide more assistance.
8    Q.  Okay.  Provide more assistance in what ways?
9    A.  To offer more help to the employees.
10    Q.  And why was that?
11    A.  Just a change in philosophy of the company, from
12 removing the burden from the employees to providing assistance
13 to the employees.
14    Q.  And when did this take effect?
15    A.  In -- sometime after May of 2005.  It was after I
16 became manager.
17    Q.  Okay.  Have you been involved in any other lawsuits
18 involving EDS where there's been at least a suggestion that EDS
19 hadn't done all it could do to help its employees trying to get
20 FMLA or short-term disability?
21    A.  No.
22    Q.  What training have you received with respect to the
23 FMLA?
24    A.  When FMLA came into existence in 1993, I was just
25 hired with EDS and spent six months studying the regulations

Page 33

1 with EDS legal and -- followed by classes and conferences and
2 continued education and have access to attorneys specializing
3 in FMLA situations.
4    Q.  Are there any documents that reflect any guidelines
5 that govern the operation of your department?
6    A.  My department?
7    Q.  Yeah.
8    A.  No.
9    Q.  And who do you report to?
10    A.  I report -- name or title, both?
11    Q.  Give me both.
12    A.  Doug Stover, S-T-O-V-E-R.
13    Q.  Uh-huh.
14    A.  He's director of U.S. benefits.
15    Q.  Okay.
16       MR. CRONIN:  Okay.  No further questions.
17       Thanks very much.
18       MR. PIATAK:  And we won't waive signature.
19       MR. CRONIN:  Okay.  Great.
20       THE REPORTER:  You won't waive signature?
21       MR. PIATAK:  We won't.
22       (End of proceedings at 1:49 p.m.)
23
24
25

9 (Pages 30 to 33)