**Affidavit of Laurence V. Cronin**                    **Exhibit U**

TRANSCRIPT OF TAPE OF
DIVISION OF UNEMPLOYMENT INSURANCE APPEAL
Hestal Lipscomb v. Electronic Data Services
Appeal Docket Number 156049

September 14, 2004 - 9:18 a.m.



DEPOSITION
EXHIBIT
EDS-2
RUKWR 4.12.06

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

HL-007



**WILCOX & FETZER LTD.**
Registered Professional Reporters

HL-008

2

1          THE APPEALS REFEREE:   This is the

2     unemployment (unintelligible) appeals hearing in the

3     matter of Lipscomb and Electronic Data Service.   The

4     hearing is being held September 14th, 2004, at about

5     9:18 a.m. at the Department of Labor, 4425 North

6     Market Street, Wilmington, Delaware.   The docket

7     number is 156049.

8          The hearing is being held by Bettina C.

9     Ferguson, Appeals Referee.

10          Present in person today for the hearing is

11     the claimant, Hestal Lipscomb, an employer's

12     representative, Tina Henderson.

13          Testifying by telephone will be employer's

14     witness Barbara Jackson.

15          This is the employer's appeal of the

16     deputy determination dated August 4th, 2004, and a

17     timely appeal was mailed August 16.   That was timely

18     because that was on a Monday.

19          And I'm going to read the findings of fact

20     that the claims deputy relied on for her determination

21     that there was no just cause to discharge the claimant

22     under the -- under unemployment insurance law.

23          The claimant filed her claim effective

24     July 11, 2004.   Electronic Data Services employed her



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**HL-009**

1    from July 29th, '02, through July 13th, '04, and she

2    states that she was unemployed due to termination

3    after she was told she was a no-call, no-show for 14

4    days from April 29th through May 17th, '04.

5              The claimant states that she was out due

6    to surgery and supplied medical documentation to the

7    employer when she returned to work, which the employer

8    denies receiving.

9              The claimant supplied a doctor's

10   certificate advising her to be absent from April 29th

11   through May 17th, '04.  Pardon me.  She is not totally

12   disabled but cannot perform any other work on a

13   full-time basis.

14             In the employer's rebuttal, the employer

15   states they never received any separation information

16   request and ask that we make our decision with the

17   information available.

18             In a discharge situation, the burden of

19   proof is the employer's to show just cause.  Just

20   cause (unintelligible) defined as an act of wanton and

21   willful misconduct on the part of the claimant that is

22   not in the employer's best interest or that is in

23   violation of the employee's expected standard of

24   conduct or the employee's duties.

1          Based on the information obtained, the
2   employer has not shown just cause in this case.
3   Therefore, she is entitled to benefits if otherwise
4   qualified.
5          The claims deputy applied Title 19 of the
6   Delaware Code, Section 3314(2).
7          So that's the issue before me today,
8   whether the claimant was discharged without just cause
9   and, therefore, is qualified for the receipt of
10  benefits.
11         The law of Delaware, Ms. Lipscomb and
12  Ms. Jackson, requires the testimony be under oath or
13  affirmation.
14                       -----
15          HESTAL LIPSOMB and BARBARA JACKSON
16             were duly sworn or affirmed.)
17                       -----
18          THE APPEALS REFEREE:  Thank you very much.
19          All right.  I've explained the procedure.
20  This is a discharge case.  And in all discharge cases
21  in the state of Delaware, the burden of proof is on
22  the employer to show that there was willful or wanton
23  misconduct directly leading to the discharge of the
24  employee.  And that means, Ms. Henderson, that your

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

HL-011

1  side is going to go first.  At the outset I'd ask you

2  to have Ms. Jackson give me the basic dates of

3  employment, rate of pay, and job title at the end of

4  Ms. Lipscomb's employment.

5           And then I have -- ask you to have

6  Ms. Jackson testify as to the reasons for discharge

7  and present any testimony or evidence that you feel

8  supports the employers contention that there was just

9  cause for discharge.

10          Now, Mrs. Lipscomb, in this kind of a

11  hearing, you have due process rights.  And one of

12  those rights is that you have the right to

13  cross-examine Ms. Jackson.  That means that after

14  she's testified you may ask her questions relating to

15  what she's testified about, if you have any questions.

16  Then it will be your turn to tell me your side of the

17  story.

18          When that's done, Ms. Henderson, of

19  course, you have right to cross-examine Ms. Lipscomb

20  as well.

21          Now, along the way I may have some

22  questions.  I'll then let each side add whatever they

23  may have forgotten the first time around.

24          I'll then conclude the hearing.  I will

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**HL-012**

1  issue a written decision. I have 30 days to do that.

2  It is extremely unlikely that I will take that long,

3  but things do happen. And that decision is given --

4  sent out in writing, not orally, and it will be sent

5  to Hestal Lipscomb and to Electronic Data Service.

6  And if you want a separate copy, Ms. Henderson, let me

7  have a business card or something else.

8  　　　　MS. HENDERSON: That's fine. Thank you,

9  ma'am.

10  　　　　THE APPEALS REFEREE: Okay. And that

11  decision is appealable. At this point the next step

12  in the appeals process is the Unemployment Insurance

13  Appeals Board.

14  　　　　Finally, these proceedings are tape

15  recorded. What that means to you, Ms. Jackson, is a

16  couple things, also, driven by the fact that I'm on

17  speaker phone. And that is to take a breath once in a

18  while. Your representative may be trying to direct

19  you in a different way than where you are answering

20  your question. Or you may be trying to talk when

21  somebody else is trying to talk and you won't be able

22  to hear us. And for some reason, I don't know why the

23  phone works that way.

24  　　　　Since we do have someone on the phone,



1    everyone please wait until a person is done speaking

2    before you begin your next question.

3              Do you have any questions about the

4    procedure, Ms. Henderson?

5              MS. HENDERSON:  No, ma'am.

6              THE APPEALS REFEREE:  And, Ms. Lipscomb,

7    any questions about the procedure?

8              MS. LIPSCOMB:  No, ma'am.

9              THE APPEALS REFEREE:  Okay.  Thank you

10   very much.

11             Ms. Henderson, you're up.

12             MS. HENDERSON:  Yes.  Ms. Jackson, what

13   we're going to do is we're going to provide the

14   background information for the record prior to

15   providing reason for separation.

16             So if you could provide the record, first

17   of all, with the claimant's rate of pay at the time of

18   her separation.

19             MS. JACKSON:  Her rate of pay was

20   $21,000.24.

21             MS. HENDERSON:  And what was her hire

22   date?

23             MS. JACKSON:  The hire date was 7/29/02.

24             MS. HENDERSON:  And what was her job

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

HL-014

1    title?

2              MS. JACKSON:  Specialized support clerk.

3              MS. HENDERSON:  All right.  Was that full

4    time or part time?

5              MS. JACKSON:  Full time.

6              MS. HENDERSON:  Do you happen to known

7    what her shift was?  Did her shift vary, or was it the

8    same every week?

9              MS. JACKSON:  Her shift was eight on five.

10             MS. HENDERSON:  Okay.  8:00 a.m. to

11   5:00 p.m.?

12             MS. JACKSON:  Right.

13             MS. HENDERSON:  Five days a week?

14             MS. JACKSON:  Yes.

15             MS. HENDERSON:  Monday to Friday?

16             MS. JACKSON:  Yes.

17             MS. HENDERSON:  All right.  Now, what was

18   the actual last day that she performed duties for your

19   company?

20             MS. JACKSON:  I'm sorry.  I didn't hear

21   you.

22             MS. HENDERSON:  What was the actual last

23   day that she performed duties for your company?

24             MS. JACKSON:  That was 7/13/04.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1          MS. HENDERSON:  Okay.  All right.  And why

2     is she no longer working for you?  Did she resign her

3     position, or did you have to terminate her position?

4          MS. JACKSON:  I terminated her position.

5          MS. HENDERSON:  And what was the reason

6     for that termination?

7          MS. JACKSON:  Due to her unexcused

8     absence.

9          MS. HENDERSON:  All right.  Was there a

10    particular day or sequence of days for which you're

11    alleging she had no verification for absence?

12          MS. JACKSON:  Yes.

13          MS. HENDERSON:  What were those days?

14          MS. JACKSON:  She had indicated that she

15    was going out for surgery 4/29/04, and returned on

16    5/15/04.

17          MS. HENDERSON:  All right.  So the days

18    that you terminated her for, if I'm hearing you

19    correctly, would be from April 29th through and

20    including May 14th, is that correct, for the record?

21          MS. JACKSON:  That's correct.

22          MS. HENDERSON:  Okay.  All right.  Now,

23    we're going to backtrack a little bit, Ms. Jackson.

24    Now, if you can start from the beginning, I will try

1  to guide you through so that we don't miss anything

2  important.

3         Did the claimant come to you or anyone

4  from the company prior to this requested leave of

5  absence in April to make you aware that she wanted to

6  have some days off for surgery?

7         MS. JACKSON:  Yes, she did.

8         MS. HENDERSON:  All right.  Do you have an

9  approximate date or an exact date when she made the

10 company aware that she would be out from April 29th

11 until at some point in May?

12        MS. JACKSON:  I have an approximate date.

13        MS. HENDERSON:  All right.  What was that

14 date she made the company aware of that request?

15        MS. JACKSON:  That would have been early

16 in April.

17        MS. HENDERSON:  All right.  And was that

18 done verbally or in writing?

19        MS. JACKSON:  It was done verbally.

20        MS. HENDERSON:  All right.  Were you made

21 aware ultimately verbally that the claimant desired to

22 have these days off?

23        MS. JACKSON:  Yes.

24        MS. HENDERSON:  All right.  And did she

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**HL-017**

1   ultimately take those days off from April 29th through

2   and including May 14th?

3            MS. JACKSON:  She did.

4            MS. HENDERSON:  All right.  Now, did she

5   ultimately return back to work?

6            MS. JACKSON:  Yes.

7            MS. HENDERSON:  All right.  Do you have a

8   return date?

9            MS. JACKSON:  Yes.  5/15/04.

10            MS. HENDERSON:  All right.  And did she

11   provide you with any type of a verbal or written

12   clearance to enable her to return to work on May 15th?

13            MS. JACKSON:  Yes.

14            MS. HENDERSON:  All right.  Let me back up

15   one moment.  Prior to her going out April 29th for the

16   surgery, had she provided you with any type of either

17   short-term disability documentation or FMLA

18   documentation?

19            MS. JACKSON:  No.

20            MS. HENDERSON:  Okay.  So she returned to

21   work on May 15th, and you had received clearance from

22   her physician that she's able to return to work?

23            MS. JACKSON:  Yes.

24            MS. HENDERSON:  As of that date had you

1    still received or had you received as of that date,

2    May 15th, any short-term disability or FMLA

3    documentation from the claimant?

4             MS. JACKSON: No.

5             MS. HENDERSON: All right. So she -- does

6    she start to perform duties on or about May 15th?

7             MS. JACKSON: Yes.

8             MS. HENDERSON: All right. What happens

9    after that?

10            MS. JACKSON: Well, in June the 2nd of

11   '04, I received notification by CIGNA that the

12   employee's request for short-term disability was

13   denied due to failure to provide medical information

14   to support her time off from work.

15            MS. HENDERSON: All right. Now, let me

16   stop you for one moment. To the best of your

17   knowledge, was this information provided by you to

18   (unintelligible) UC Express who faxed that information

19   to the referee for this particular hearing?

20            THE APPEALS REFEREE: We're here. It's

21   not -- it's not relevant.

22            MS. HENDERSON: Okay.

23            THE APPEALS REFEREE: We're here.

24   Otherwise we would be here on a different section.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     MS. HENDERSON: Will do. Okay.

2     All right. So you received the denial for

3  the short-term disability on June 2nd, correct?

4     MS. JACKSON: Correct.

5     MS. HENDERSON: All right. What if

6  anything did you do at that point, once you received

7  that denial for the short-term disability?

8     MS. JACKSON: I did nothing.

9     MS. HENDERSON: Okay. All right. Does

10  the claimant continue to perform duties?

11     MS. JACKSON: Yes.

12     MS. HENDERSON: All right. Continue.

13     MS. JACKSON: On June the 17th, I received

14  a copy of a letter sent by CIGNA to Hestal notifying

15  her that her request for family and medical leave,

16  known as FMLA, was denied as they did not receive a

17  completed medical certification within the required

18  time.

19     MS. HENDERSON: All right. Now, once

20  again, did you do -- what if anything did you do after

21  you received this particular denial for the FMLA?

22     MS. JACKSON: I did nothing.

23     MS. HENDERSON: Okay. Was there a moment

24  or a date after June 17th where you spoke with Hestal

1    about either or both of these denials?

2              MS. JACKSON:  Yes.

3              MS. HENDERSON:  When was that first

4    meeting.

5              MS. JACKSON:  Yes.

6              MS. HENDERSON:  When --

7              MS. JACKSON:  It was June 30th of '04.

8              MS. HENDERSON:  All right.  And if you can

9    explain to the referee, what was the content of that

10   conversation between you and the claimant on June

11   30th?

12             MS. JACKSON:  I met with Hestal and

13   Hestal's immediate supervisor, Tracy Eadie, to advise

14   her of the importance of complying with CIGNA's

15   request.  I advised her to contact her doctor

16   immediately and also to make contact with CIGNA to let

17   them know she was working on obtaining the

18   information.  Hestal indicated that she would follow

19   up with the doctor's office and CIGNA.

20             MS. HENDERSON:  All right.  So that was

21   the end of your conversation with her on June 30th,

22   correct?

23             MS. JACKSON:  Correct.

24             MS. HENDERSON:  Did you ultimately have

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    any other conversations with her in the following

2    days?

3                MS. JACKSON:  Yes.

4                MS. HENDERSON:  All right.  When was the

5    next conversation that you had with the claimant

6    regarding the required documentation for either or

7    both of these leaves?

8                MS. JACKSON:  It was the following day,

9    which was July the 1st of '04.

10               MS. HENDERSON:  And what was the content

11   of that meeting between yourself and the claimant.

12               MS. JACKSON:  I went to see Hestal myself

13   to ask her if she was able to reach her doctor and the

14   representative from CIGNA.  She said she was unable to

15   reach her doctor.  I stressed the importance of

16   providing the medical documentation and suggested that

17   she use one of the conference rooms to make the

18   contact and have her doctor fax the information to her

19   in EDS so she could intercept the paperwork and fax it

20   to CIGNA herself.  She said she would follow up.

21               MS. HENDERSON:  Okay.  All right.  And did

22   you provide her with a secure room and secure fax in

23   order to do that on July 1.

24               MS. JACKSON:  I gave her the option of



1    using one of the conference rooms.

2              MS. HENDERSON:  So did you ultimately have

3    any other conversations or follow up with the

4    claimant, once again, regarding this required

5    documentation for either or both leaves after July 1?

6              MS. JACKSON:  I did.

7              MS. HENDERSON:  When was the next time you

8    spoke with her?

9              MS. JACKSON:  It was the following day,

10   July the 2nd of '04.  I followed up with Hestal a

11   third time.  She indicated that the doctor said it

12   would be faxed.  I urged her to follow up with CIGNA

13   to be sure that they received it.

14             MS. HENDERSON:  All right.  And what was

15   the ultimate -- what was the end of the conversation

16   on July 2nd as you knew it?  What was the status of

17   the required documentation?

18             MS. JACKSON:  That they still had not

19   received it.

20             MS. HENDERSON:  Okay.  All right.  After

21   July 2nd, did you ultimately have any other

22   conversations with the claimant regarding this

23   documentation?

24             MS. JACKSON:  I did not.



1      MS. HENDERSON:  All right.  Did you have

2  any conversations with the claimant on or about

3  July 6th?

4      MS. JACKSON:  On July the 6th, no, I do

5  not believe I did.

6      MS. HENDERSON:  All right.  Did you have

7  any conversations with --

8      THE APPEALS REFEREE:  You're leading, you

9  know.  She's already said she doesn't have any more.

10  If she remembers one later, you want to ask her, are

11  you sure?  (Unintelligible)

12      MS. HENDERSON:  Absolutely.

13      Ms. Jackson, if you just take one moment

14  and just confer with your records, perhaps I have the

15  incorrect date.  Let me rephrase the question.

16      Did you have any other conversations with

17  the claimant after July 2nd, but before her last day

18  of July 13th regarding the required paperwork?

19      MS. JACKSON:  Not with the claimant, no.

20      MS. HENDERSON:  Okay.  Did you sit down

21  and confer with anyone other than the claimant prior

22  to separating the claimant with regard to this issue?

23      MS. JACKSON:  Yes.

24      MS. HENDERSON:  Who did you meet with?



1          MS. JACKSON:   On July the 6th, I had a

2     conversation with CIGNA with regards to the paperwork

3     they had been waiting for to see if, in fact, they had

4     received any of the paperwork from Hestal.  And they

5     confirmed on that date that no paperwork had been

6     received.

7          MS. HENDERSON:  All right.  So ultimately,

8     these -- these two requests, the short-term disability

9     and FMLA, do they have any type of deadlines

10    associated with them?

11         MS. JACKSON:  They did.  They both had

12    indicated in their paperwork and notification to

13    Hestal that she had 15 days in which to supply the

14    paperwork --

15         MS. HENDERSON:  Okay.

16         MS. JACKSON:  -- for an appeal process.

17         MS. HENDERSON:  All right.  So, as of this

18    date, as of July 5th, had those appeal deadlines

19    expired?

20         MS. JACKSON:  They had.

21         MS. HENDERSON:  Did you ultimately have to

22    confer with anyone from your -- from your firm to

23    determine what -- what you would be doing as far as

24    Ms. Lipscomb's future employment?

1          MS. JACKSON:  Yes.

2          MS. HENDERSON:  All right.

3          MS. JACKSON:  I had a conversation with

4    our human relations department.

5          MS. HENDERSON:  All right.  And ultimately

6    did you sit down with human resources and the

7    claimant --

8          MS. JACKSON:  No.

9          MS. HENDERSON:  -- with regard to her

10   future employment?

11         MS. JACKSON:  No.

12         MS. HENDERSON:  Okay.  How was the

13   claimant informed that she was terminated?

14         MS. JACKSON:  I had a meeting with Hestal

15   on the very last date of her employment which was July

16   the 13th of '04, along with the account manager from

17   EDS, Lance Rodgers, and we had indicated to Hestal the

18   reasoning for her termination.

19         MS. HENDERSON:  And do you recall what you

20   told her at that time.

21         MS. JACKSON:  Yes.

22         MS. HENDERSON:  What (unintelligible).

23         MS. JACKSON:  That it was as a result of

24   an unexcused absence for these 14 days that she was

1    out.

2              MS. HENDERSON:  Okay.  All right.  Did the

3    claimant have any response to the best of your memory?

4              MS. JACKSON:  Yes.  She asked why, and

5    again, we had reiterated the fact that she had not

6    supplied the necessary documentation for it -- to make

7    it an excused absence.

8              MS. HENDERSON:  All right.  Now, had the

9    claimant either provided the necessary documentation,

10   whether it be for the short-term disability or FMLA,

11   either to verify the leave and/or -- well, let me

12   rephrase the question.

13             Had the claimant provided the proper

14   documentation as you requested multiple times, would

15   she have permitted to remain employed by your firm?

16             MS. JACKSON:  Yes.

17             MS. HENDERSON:  All right.  I have nothing

18   further for Ms. Jackson at this time.

19             THE APPEALS REFEREE:  Okay.  I have a

20   couple before we get to the cross-examine.

21             Ms. Jackson, just for the record, what's

22   your job title?

23             MS. JACKSON:  I'm the claim operations

24   manager.



1          THE APPEALS REFEREE:  Prior to the

2   claimant going out for the op -- form her surgery, was

3   she told about the need to supply documentation?

4          MS. JACKSON:  Yes, ma'am, she was.

5          THE APPEALS REFEREE:  Who told her?

6          MS. JACKSON:  We have a process.  Once the

7   employee notifies that they are having a procedure

8   done, we then go ahead and we report it to our vendor

9   so that the short-term disability paperwork can begin

10  and also any possibility for the FMLA.  At that time

11  the employee is sent a packet by the vendor that she

12  needs to take to her doctor for completion in

13  preparation for those days of being absent.

14          THE APPEALS REFEREE:  Okay.  And what

15  consequences is a person told will result if they

16  don't do this?

17          MS. JACKSON:  I -- they are not -- we

18  don't have a conversation with them in advance about

19  the consequences.

20          THE APPEALS REFEREE:  Okay.  Subsequent to

21  the claimant coming back to work after the surgery,

22  did you have any times when you told her that her job

23  was depending on her producing the documentation?

24          MS. JACKSON:  I had no way of knowing that



HL-028

1   the documentation had not been provided until we

2   received notification from the vendor.

3                    THE APPEALS REFEREE:  Okay.  And at that

4   point did you tell the claimant that her job depended

5   on her supplying documentation?

6                    MS. JACKSON:  No.

7                    THE APPEALS REFEREE:  Okay.  Hold on just

8   a second.

9                    Did the claimant provide you any kind of

10  documentation separate from what she would have

11  provided CIGNA?  Did she supply you with any

12  documentation that she had, in fact, been in surgery?

13                   MS. JACKSON:  No.

14                   THE APPEALS REFEREE:  Okay.  Did you ever

15  ask her for any documentation personally?

16                   MS. JACKSON:  No, ma'am.  We do not ask

17  for that documentation.  That's handled by the vendor.

18                   THE APPEALS REFEREE:  Okay.

19                   Okay.  All right.  Ms. Lipscomb, this is

20  your opportunity to cross-examine if you have

21  questions.  I don't want your testimony yet.  I just

22  want any questions that you have.

23                   MS. LIPSCOMB:  I don't know where to

24  begin.

1          When I -- Ms. Jackson, when I returned to

2    work on 5/17, did I supply you all with a note from

3    the doctor stating that I was released to come back to

4    work?

5          MS. JACKSON:  Yes, you did.

6          MS. LIPSCOMB:  Before the surgery, were

7    you aware that Tracy Eadie asked me to supply her with

8    a note from the hospital stating what day I was

9    supposed to go off to surgery?

10          MS. JACKSON:  No, I am not.

11          MS. LIPSCOMB:  I think that's pretty much

12    all.

13          THE APPEALS REFEREE:  Okay.

14          MS. LIPSCOMB:  I don't have anything,

15    ma'am.

16          THE APPEALS REFEREE:  Okay.  Okay.

17    Redirect?

18          MS. HENDERSON:  No, ma'am.

19          THE APPEALS REFEREE:  Okay.  Ms. Lipscomb,

20    it's your turn to tell me your side of what they said.

21          MS. LIPSCOMB:  Okay.  I had to go out for

22    surgery on May 29.

23          THE APPEALS REFEREE:  May?

24          MS. LIPSCOMB:  I mean -- sorry.  Excuse

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**HL-030**

1  me.   Correction.   April 29th of 2004.

2           I informed my supervisor and my team

3  leader that this had to be done.   My supervisor then

4  in turn asked me, could I have something faxed over to

5  EDS stating what day that I was going out for surgery,

6  and basically they wanted to know how long I was going

7  to be out and everything, but that couldn't be

8  determined until after the procedure was done, which I

9  did, which I have the fax.

10          THE APPEALS REFEREE:   Do you have a copy

11  of fax that you had sent?

12          MS. LIPSCOMB:   Yes.   Yes.

13          (Unintelligible)

14          THE APPEALS REFEREE:   This is all one

15  piece.

16          MS. LIPSCOMB:   That's the confirmation and

17  the cover sheet, and that's the actual letter that I

18  gave to Tracy Eadie stating when -- the day I was

19  supposed to go out for the surgery.

20          THE APPEALS REFEREE:   Let me show this to

21  Ms. Henderson.

22          Ms. Henderson, take look at that document

23  and let me know if you have any objection to it being

24  made a part of the record in this case.   It's three

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    pages, has a cover sheet.  It looks like a message and

2    the transmittal -- transmission form is attached.

3                    Any objection?

4            MS. HENDERSON:  Well, yes.  I would have

5    one objection.  Obviously, Ms. Jackson would have to

6    be able to somehow verify, first of all, the fax

7    number on this cover sheet.  I wouldn't be able to

8    verify that.

9            THE APPEALS REFEREE:  Okay.  You may --

10   you may ask her that question.  But read her the

11   number and ask her if that's a proper fax number.

12           MS. HENDERSON:  Now, bear with me,

13   Referee.  This is a different type of a confirmation

14   sheet.  I'm guessing that -- is that --

15           THE APPEALS REFEREE:  Let me take a look.

16           MS. HENDERSON:  -- the receipt?  I've

17   never seen one look like that.

18           THE APPEALS REFEREE:  Well, the other

19   problem I have with this document as I look at it is

20   the two pages that are attached to the confirmation

21   don't show the fax information.

22           MS. HENDERSON:  Correct.

23           THE APPEALS REFEREE:  (Unintelligible)

24   always show fax -- do you know why it doesn't have



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    that fax information at the top?

2            MS. LIPSCOMB:  No, I don't, ma'am.

3            THE APPEALS REFEREE:  No.

4    (Unintelligible)

5            MS. LIPSCOMB:  Actually -- actually this

6    stuff, this paperwork is actually I went to the

7    hospital and got out of -- had them give me

8    documentations out of my chart cause -- you know, to

9    show that this letter was -- being certain things were

10    faxed over.  So that actually is not -- it was the

11    actual paper that was sent through the machine.  It

12    wasn't -- the actual fax part was given to the

13    supervisor.

14            MS. HENDERSON:  Right.  But there's --

15    there's no way to authenticate that those pages from

16    the physician, the two pages at issue, that they ever

17    went through.  All that we could tell possibly would

18    be that the confirmation sheet went through.

19            So I would have an authentication

20    objection, obviously, since the employer has already

21    testified that they were not in receipt.

22            THE APPEALS REFEREE:  Well, but there's --

23            MS. LIPSCOMB:  Well, I have --

24            THE APPEALS REFEREE:  Well, there's been



1    no testimony that it was sent to Ms. Jackson.

2            I'm going on admit it.  Your objection

3    goes to weight, what weight I'm going to give it.  I'm

4    going to admit it as Claimant's Number 1, mindful of

5    concerns, and we'll have an opportunity in

6    deliberating to take a look at the document more

7    closely.

8            All right.  Go ahead, Ms. Lipscomb.  Did

9    you have any other documentation (unintelligible)?

10            MS. LIPSCOMB:  (Unintelligible) this

11   probably maybe would help go with that --

12            THE APPEALS REFEREE:  What is it?

13            MS. LIPSCOMB:  Because this is --

14            THE APPEALS REFEREE:  Let's see it.

15            MS. LIPSCOMB:  Pretty much --

16            THE APPEALS REFEREE:  Just tell me what it

17   is.

18            MS. LIPSCOMB:  I called in to the

19   hospital.  They made notes into my chart stating that

20   I called, and it says --

21            THE APPEALS REFEREE:  What is that?

22            MS. LIPSCOMB:  So that I --

23            THE APPEALS REFEREE:  What is the piece of

24   paper?

28

1       MS. LIPSCOMB:  Oh, I'm sorry.  It's a -- a

2   chart note out of my -- actually --

3       THE APPEALS REFEREE:  It looks like an

4   e-mail from here.  So I'm asking, what is it?  Is it

5   an e-mail?

6       MS. LIPSCOMB:  Oh, no, ma'am.  It's a --

7   this is their print-out on -- from the doctor's

8   office.  You know, it's just showing that I was having

9   surgery on 4/29, and I called and asked for a letter

10  to be faxed.

11      THE APPEALS REFEREE:  (Unintelligible) who

12  wrote me the note?

13      MS. LIPSCOMB:  This note was signed by

14  (unintelligible) it's an RN nurse.

15      THE APPEALS REFEREE:  How did you get a

16  copy of it?

17      MS. LIPSCOMB:  I requested the information

18  from the hospital.

19      THE APPEALS REFEREE:  Okay.  Show it to --

20  to Ms. Henderson.

21      Ms. Henderson, any objection to that

22  document?

23      MS. HENDERSON:  Yeah.  I would also have

24  an objection also with regard to the fact that

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**HL-035**

1    Ms. Jackson has been or is testifying by phone.

2    Obviously. She is not --

3                THE APPEALS REFEREE: That's not --

4                MS. HENDERSON: Okay.

5                THE APPEALS REFEREE: She could have been

6    here.

7                Certainly you could describe it to her. I

8    could describe it to her. But she's not the one makes

9    objection. You are.

10                MS. HENDERSON: All right. Ma'am, if you

11   could just -- this letter is -- what is this letter

12   again? What is -- what is this?

13                MS. LIPSCOMB: Basically when I -- when

14   Tracy said something to me about me going out for

15   surgery, she asked me, could I supply them with a

16   letter stating what day I would be going out for

17   surgery and how long I would be out in time or date or

18   something like. I called to the physician's office

19   which they, in turn, put into my chart that I called

20   them on that day, which is dated up underneath it and

21   requested the information to be faxed over to EDS.

22                (Unintelligible).

23                MS. LIPSCOMB: The lower portion of it --

24                THE APPEALS REFEREE: Okay.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1          MS. LIPSCOMB:  It has --

2          THE APPEALS REFEREE:  Okay.

3          MS. LIPSCOMB:  -- the date --

4          THE APPEALS REFEREE:  Okay.

5          MS. LIPSCOMB:  -- that it was actually

6    faxed.

7          MS. HENDERSON:  So I would -- yeah --

8    obviously have authentication and hearsay as well to

9    this, and foundation, so...

10         THE APPEALS REFEREE:  Yeah.  Okay.  I

11   think -- what it looks like is that you request the

12   letter April 13th and then called again on the 19th

13   and didn't get it and this fax is the 19th.

14         So your objection goes to weight.

15   Generally we can't rely on -- I cannot rely on

16   hearsay, but I can at least look at it and see if it's

17   substantiated by something else.  So I'm going to

18   admit it.  I'm not quite sure what it does, but we'll

19   find out.

20         I'm going to mark that as Claimant's

21   Exhibit Number 2.

22         What else do you have, Ms. Lipscomb?

23         MS. LIPSCOMB:  Okay, ma'am.  I was out

24   for -- I was out for the two weeks from April 29th

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

HL-037

1   to -- it was actually 5/17 when I returned to work.  I

2   presented them this note right here which basically

3   everything I got I went to the hospital and I got

4   copies of everything that I was -- I had.  Okay?

5           THE APPEALS REFEREE:  Let me show this --

6   hold on.

7           MS. LIPSCOMB:  Okay.

8           THE APPEALS REFEREE:  Let me show to

9   Ms. Henderson.

10          Ms. Henderson, any objection to that?  I

11  think that might be the note that's already been

12  testified to by Ms. Jackson.

13          MS. HENDERSON:  I will object to it

14  based -- once again, based on authentication and

15  hearsay.

16          THE APPEALS REFEREE:  (Unintelligible).

17          MS. HENDERSON:  But, you know, again I

18  would have to ask Ms. Jackson.

19          THE APPEALS REFEREE:  I would say that

20  your witness already opened the door to this document.

21          MS. HENDERSON:  If that is, in fact,

22  (unintelligible).  It sounds like it may be, but

23  without having Ms. Jackson --

24          THE APPEALS REFEREE:  Ms. Jackson, do you

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

**HL-038**

1    have a copy of the return to work note that you

2    testified about?

3              MS. JACKSON:  Yes, I do.

4              THE APPEALS REFEREE:  And is it dated

5    5/10/04 and then says, Lipscomb, comma, Hestal, was

6    seen in the Wilmington Hospital student or clinic

7    services on, may return to school work on May 17th,

8    '04.  Remarks:  May return to work on above day.  Any

9    questions please call 428-4413, and it's signed

10   (unintelligible).

11             MS. JACKSON:  Yes, I do.

12             THE APPEALS REFEREE:  Is that the same?

13             MS. HENDERSON:  (Unintelligible).

14             THE APPEALS REFEREE:  Is that the same,

15   Ms. Jackson?

16             MS. JACKSON:  Yes, ma'am, it is.

17             THE APPEALS REFEREE:  Okay.  Any objection

18   then?

19             (Unintelligible).

20             THE APPEALS REFEREE:  I'm sorry?

21             MS. HENDERSON:  No objection to that.

22             THE APPEALS REFEREE:  I'm going to mark

23   that note as Claimant's Exhibit Number 3.

24             MS. HENDERSON:  Just the usual hearsay

1    objection that I would have with any --

2              THE APPEALS REFEREE:   (Unintelligible) but

3    with medical, we don't, correct?

4              MS. HENDERSON:   Correct.

5              THE APPEALS REFEREE:   It's the only one we

6    don't do with hearsay.

7              What else do you have, Ms. Lipscomb?

8              MS. LIPSCOMB:   Okay.   Basically, like I

9    said, I went out.   I came back and I presented them

10   with that note.

11             If I can say one thing, I went out last

12   year, and I had the same -- actually the same surgery

13   done.

14             MS. HENDERSON:   Objection.   That would not

15   be relevant.

16             THE APPEALS REFEREE:   Well, I don't know

17   whether it is or not yet.   I'll find out in a minute.

18             Go ahead.

19             MS. LIPSCOMB:   The reason I brought that

20   up is that, when I went out, I actually did not have

21   to do anything at all.   My supervisor handled the

22   short-term, you know, FMLE thing.   She -- I'm sorry.

23   Excuse me.

24             THE APPEALS REFEREE:   That's all right.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    That's fine.

2              MS. LIPSCOMB:  She handled all of that.  I

3    was given the same kind of note, and I returned to

4    work when I was told.

5              THE APPEALS REFEREE:  Okay.

6              MS. LIPSCOMB:  I didn't have to -- I

7    didn't have any contact with the hospital or CIGNA

8    when I had that surgery.  So, therefore, if I was

9    supposed to do this this time, I wasn't aware of it.

10              THE APPEALS REFEREE:  Okay.

11              MS. LIPSCOMB:  But when I was spoke to

12    about it, I did, in fact, call the hospital and try to

13    have them, you know, fax these papers over to CIGNA.

14              THE APPEALS REFEREE:  What about like you

15    after?  Okay.  So you came back, and then at some

16    point did you have a conversation with Ms. Jackson

17    where she stressed the importance of you getting in

18    touch with your doctor and CIGNA?

19              MS. LIPSCOMB:  Yes, she did.  When she --

20    when she called me to her office and she asked me

21    about the paperwork, I told her that I would contact

22    the hospital.  It's a little hard contacting them

23    because I always get to the nurse's messages and then

24    the -- they'll give the nurse the message and then



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    she'll return my phone call.

2              THE APPEALS REFEREE:  Why wouldn't you go

3    to your doctor, not the hospital?  Why wouldn't you

4    talk to your doctor.

5              MS. LIPSCOMB:  The doctor is at Wilmington

6    Hospital, Wilmington Christiana hospital on -- on 14th

7    and Washington there.

8              THE APPEALS REFEREE:  Okay.

9              MS. LIPSCOMB:  I contacted them.  They

10   said that they would fax the paper over.

11             This also doesn't have -- this is just a

12   copy of the fax that was refaxed to them on 6/21.

13   That paper was sent from CIGNA to the hospital, which

14   was in my chart.  So they took it out of the chart and

15   they refaxed it back over to them on 6/21.

16             THE APPEALS REFEREE:  Now, this does have

17   a fax thing at the top.

18             MS. LIPSCOMB:  That's what was faxed to

19   them.  CIGNA faxed that to the hospital.

20             THE APPEALS REFEREE:  So they could

21   (unintelligible).

22             MS. LIPSCOMB:  The hospital in turn took

23   it out to be faxed back to CIGNA.

24             THE APPEALS REFEREE:  Okay.  Let's show

**W&F**

1     this to Ms. Henderson to see if she has any objection

2     to these three pages.

3          The problem I have with this one is -- the

4     middle page is the transmittal certification because

5     it says one page plus cover, so the one page would be

6     that second page then.

7          Her testimony is that this is something

8     that she understands that the doctor sent to CIGNA.

9     Correct?

10         MS. LIPSCOMB:  Yes.

11         THE APPEALS REFEREE:  Okay.

12         MS. HENDERSON:  All right.  And it's

13     your --

14         MS. LIPSCOMB:  I didn't know if -- I'm

15     sorry.

16         (Unintelligible)

17         THE APPEALS REFEREE:  It's not in order

18     (unintelligible).

19         MS. HENDERSON:  Right.  That was my

20     concern that there's actually two pages.

21         (Unintelligible).

22         THE APPEALS REFEREE:  That's the

23     transmittal.  Two pages went through.  The top page --

24         MS. HENDERSON:  Okay.

1          THE APPEALS REFEREE:   -- and the bottom

2     page.

3          MS. HENDERSON:   Okay.   And you're -- the

4     purpose of this document is to show what, ma'am?

5          MS. LIPSCOMB:   This is --

6          THE APPEALS REFEREE:   (Unintelligible).

7     Wait.   You are allowed voir dire, but that's not a

8     proper voir dire question.   Okay?   She's not being

9     cross-examined yet.

10          MS. HENDERSON:   Okay.   All right.

11          THE APPEALS REFEREE:   If I have a question

12    about the purpose, I'll ask her.   If you have an

13    objection as to relevancy, you can make it.   Any

14    objection to this document?

15          MS. HENDERSON:   Yeah.   I would have.

16    Again, authenticity as well as relevance.   Just as

17    with the other.

18          THE APPEALS REFEREE:   Well, it's certainly

19    relevant because it -- it would show -- it shows two

20    things possibly.   One is that there was some contact

21    that caused CIGNA to send this to -- apparently to the

22    hospital or to the claimant.   That shows some kind of

23    contact, and then the second thing is it does show

24    that something was actually filled out by a doctor.

1   So I'm going to mark it as Claimant's Number 4, and

2   again, how much weight it gets will depend what I

3   conclude during my deliberation.

4            All right.   What else do you want to tell

5   me, Ms. Lipscomb?

6            MS. LIPSCOMB:   Okay.   So basically, I did

7   try to follow up on what was requested of me by

8   Ms. Jackson to the best of my ability as far as

9   calling them and finding out and I did get a phone

10  call back saying that she did fax the paper.

11  Ms. Jackson said, well, I did not have her fax the

12  paper to the job.   Well, I did state (unintelligible)

13  she said she would fax it to CIGNA because this is who

14  really needed the paperwork.   And that's -- this is

15  where it was left off at.

16           THE APPEALS REFEREE:   Okay.

17           MS. LIPSCOMB:   And then a few days later I

18  came in.   I worked a full day.   And around four-thirty

19  that afternoon --

20           THE APPEALS REFEREE:   When was this?

21           MS. LIPSCOMB:   This was -- excuse me --

22  July 13th.

23           THE APPEALS REFEREE:   Okay.

24           MS. LIPSCOMB:   After I completed a full

1    day -- day's work, approximately four-thirty, I was

2    called in to her office and notified that I was

3    terminated --

              THE APPEALS REFEREE:  Okay.

5                  MS. LIPSCOMB:  -- for basically not being

6    there from 4/29 to --

7                  THE APPEALS REFEREE:  Do you have any

8    documentation today that you were unable to work from

9    4/29 to May 17th.

10                 This is -- of course, this document here

11   that's included in the last exhibit said something

12   about hospitalized 4/29, 517, and disabled.

13                 MS. LIPSCOMB:  (Unintelligible) left the

14   paper at home by mistake.  I actually have a paper

15   that -- I had to be filled out by --

16                 THE APPEALS REFEREE:  Okay.  Well, this

17   paper here does -- says some of that same stuff.  So

18   that's okay.  (Unintelligible)

19                 MS. LIPSCOMB:  I also had one that had to

20   be filed out by Cheryl Price.  And I'm sorry.  I left

21   that -- I left the --

22                 THE APPEALS REFEREE:  Let me see if we got

23   a copy in the file.

24                 MS. LIPSCOMB:  -- copy at home.

1          THE APPEALS REFEREE:  Yeah.  We got a copy

2     in the file of that.

3          MS. LIPSCOMB:  Okay.

4          THE APPEALS REFEREE:  So --

5          MS. LIPSCOMB:  Yes.  It had to be filled

6     out twice because the doctor filled it out wrong and

7     made me totally disabled and couldn't return to work.

8          (Unintelligible)

9          THE APPEALS REFEREE:  Unfortunately --

10         (Unintelligible)

11         THE APPEALS REFEREE:  Well, two things.

12    First --

13         (Unintelligible)

14         THE APPEALS REFEREE:  Wait.

15         MS. LIPSCOMB:  I'm sorry.

16         THE APPEALS REFEREE:  Don't talk to her.

17    You don't talk to her.  You talk to me unless I tell

18    you you can ask questions.

19         Now, the fact that you claimed it was a

20    mistake the first time, unfortunately, you're not a

21    doctor, so either none of these are going to be

22    admitted or both of them are going to be admitted.  So

23    let me show them to...

24         Ms. Henderson, as far as hearsay is

1    concerned, we don't worry about hearsay on medical

2    certificates, especially on Department of Labor forms.

3            MS. HENDERSON:  Obviously we would, just

4    as at any other time, as far as authentication,

5    relevance.

6            This goes more towards the able and

7    available issues for that time frame.

8            THE APPEALS REFEREE:  It might be relevant

9    to the employer.

10            MS. HENDERSON:  And it still does not --

11    the employer is not -- the employer is not challenging

12    that they were aware of when she was released to

13    return to work.

14            THE APPEALS REFEREE:  Right.  It's really

15    only coming in to show whether they was, according to

16    a doctor, able to work during those days.  That's

17    really what it's coming in for.

18            MS. HENDERSON:  We won't object to that.

19            THE APPEALS REFEREE:  Okay.  I'm going to

20    mark those two pages, which are both Department of

21    Labor medical doctor's certificates, will be marked as

22    Claimant's Exhibit Number 5.

23            Anything else, Ms. Lipscomb?

24            MS. LIPSCOMB:  No, ma'am.  Basically.

1     THE APPEALS REFEREE:  All right.

2    MS. LIPSCOMB:  That was it.

3    THE APPEALS REFEREE:  Okay.

4 Cross-examine.

5    MS. HENDERSON:  Yes.  C-4 -- I'm not sure

6 where that is.

7    THE APPEALS REFEREE:  That is C-4.

8    MS. HENDERSON:  Okay.  Thank you, ma'am.

9    Now, this document which is the three

10 pages -- it's actually two-page fax from CIGNA to your

11 doctor dated June 21, I believe it was.  The fax is

12 June 21.  The actual note is May 7th up on the top

13 and --

14    THE APPEALS REFEREE:  (Unintelligible) it

15 was faxed from CIGNA on May 7th.

16    MS. HENDERSON:  Right.  That's the

17 transmittal.  Okay.  And then to your physician on

18 June 21.

19    When did you become aware that this

20 document went --

21    THE APPEALS REFEREE:  From the physician

22 on June 21.  To the physician?  From the physician.

23    MS. HENDERSON:  I --

24    THE APPEALS REFEREE:  Let me take a look

1    at it.

2                    MS. HENDERSON:  The (unintelligible).

3                    THE APPEALS REFEREE:  (Unintelligible)

4    asking.

5            Who's Mary Beth (unintelligible)?

6            MS. LIPSCOMB:  I believe that's the

7    doctor -- the doctor.  I'm not sure who Mary Beth is.

8            THE APPEALS REFEREE:  All these -- all

9    these faxes (unintelligible) Mary Beth's

10   (unintelligible).

11                   (Unintelligible) 1-800.

12           MS. LIPSCOMB:  That was from the hospital.

13           THE APPEALS REFEREE:  To -- to CIGNA?

14           MS. LIPSCOMB:  Yes.  (Unintelligible).

15           THE APPEALS REFEREE:  (Unintelligible).

16           All right.  Wait for the question now.

17           MS. HENDERSON:  All right.  So this

18   document is going from the doctor to CIGNA?

19           MS. LIPSCOMB:  Yes.

20           MS. HENDERSON:  Right.  Now, when did you

21   become aware that this document supposedly went from

22   your physician to CIGNA?

23           MS. LIPSCOMB:  It was -- it was faxed on

24   the 21st to my -- to my knowledge.

44

1          MS. HENDERSON:  And when did you become --

2     you obviously came here to the hearing with it.  So

3     when did you become aware that this document went to

4     CIGNA from your doctor.

5          MS. LIPSCOMB:  I called the hospital, and

6     I asked them could I get copies of things out of my

7     chart because I had to come to this --

8          THE APPEALS REFEREE:  When?  The question

9     was when.

10         MS. LIPSCOMB:  September 10th, I

11    (unintelligible) I signed a release form.

12         THE APPEALS REFEREE:  So you did not have

13    any evidence yourself, ma'am, up until September 10th

14    that it had been faxed to CIGNA.

15         MS. LIPSCOMB:  Other than -- other than

16    what would be considered hearsay because the nurse --

17         THE APPEALS REFEREE:  Telephone

18    conversation.

19         MS. LIPSCOMB:  Conversation.  She told me

20    that she did indeed fax --

21         THE APPEALS REFEREE:  Okay.  Thank you.

22         MS. HENDERSON:  But my question to you

23    was, you didn't become aware that this form was faxed

24    to your -- or to CIGNA until after you were separated?

1          THE APPEALS REFEREE:  No.  No.  That's not

2     what she said.  Don't put words in her mouth.  She

3     just said that she had a phone conversation with

4     the -- the secretary, whoever was going to fax it,

5     saying that she had faxed it.

6          MS. HENDERSON:  Oh, thank --

7          THE APPEALS REFEREE:  She's calling that

8     hearsay.

9          MS. HENDERSON:  All right.  On or about

10    what date did you become aware that this went to --

11         MS. LIPSCOMB:  That would have been about

12    two -- two to three days after my termination because

13    I came -- after my -- day after my termination, I came

14    to unemployment and --

15         THE APPEALS REFEREE:  Okay.  Fine.  You've

16    answered the question.  After termination.  All right.

17         MS. HENDERSON:  So if I'm understanding

18    you, then, through all of these different -- you do

19    acknowledge you did have several conversations with

20    Ms. Jackson where she was repeatedly telling you that

21    they did not have the required paperwork for the STD

22    or FMLA, correct?

23         MS. LIPSCOMB:  Yes.

24         MS. HENDERSON:  All right.  And during

1    those various meetings prior to you being terminated,

2    you ultimately never obtained the documentation and

3    provided it to Ms. Jackson prior to being fired,

4    correct?

5             MS. LIPSCOMB:  Ms. Jackson personally did

6    not request the documents.  She wanted the documents

7    to go to CIGNA so that it could be processed for the

8    FMLA.  I always --

9             THE APPEALS REFEREE:  Try to focus on what

10   the question was.  That wasn't the question I don't

11   believe.

12            MS. HENDERSON:  All right.  Prior to you

13   being terminated, you never provided the documentation

14   for the STD or FMLA to Ms. Jackson?

15            THE APPEALS REFEREE:  (Unintelligible) you

16   did answer the question.

17            MS. LIPSCOMB:  She did not request it.

18            THE APPEALS REFEREE:  Hold on.  Hold on.

19   I misunderstood your question.  She didn't request --

20   Ms. Jackson's testimony was that she have never asked

21   for it from the claimant, so I --

22            MS. HENDERSON:  What did Ms. Jackson tell

23   you to do with the paperwork?

24            MS. LIPSCOMB:  Ms. Jackson said to get the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**HL-053**

1  paperwork to CIGNA, that they had needed the paperwork

2  so that it could be processed.

3             THE APPEALS REFEREE:  Have the doctor

4  (unintelligible).

5             MS. LIPSCOMB:  Yes.  To have the doctor

6  get it to them, you know, as soon as possible because

7  this -- it had to be processed.

8             MS. HENDERSON:  All right.  Now, does July

9  5th, July 6th sound about right as far as the last

10  time you spoke with Ms. Jackson regarding this

11  paperwork?  Does that sound like that could be a

12  fair --

13             MS. LIPSCOMB:  I would say so.

14             MS. HENDERSON:  (Unintelligible).

15             MS. LIPSCOMB:  I didn't write -- I didn't

16  write down the date because I didn't know -- I wasn't

17  aware that I was going to be terminated.

18             MS. HENDERSON:  I understand.  I

19  understand.

20             Now, if we were to assume that July 5th,

21  for example, is what Ms. Jackson testified her last

22  conversation with you prior to terminating you, does

23  it sound, again, accurate that Ms. Jackson would have

24  told you during that conversation that you needed to

1    call the vendor to make sure, meaning CIGNA, that they

2    did ultimately get the paperwork that you were all

3    hoping they would get for these leaves?  Do you

4    remember her saying that as she testified?

5         MS. LIPSCOMB:  No.

6         MS. HENDERSON:  You don't remember her

7    saying that?

8         MS. LIPSCOMB:  No, I don't.

9         MS. HENDERSON:  Do you have any --

10        MS. LIPSCOMB:  Only thing she said to me

11   is ask me did I get in touch with the hospital?  And I

12   told her I got in touch with them, and they said that

13   they -- they had, in turn, faxed the document over to

14   CIGNA, which is the one that they faxed out on 6/21.

15        MS. HENDERSON:  All right.  But you don't

16   recall Ms. Jackson telling you to call the vendor

17   yourself?

18        THE APPEALS REFEREE:    (Unintelligible)

19   answered.  She answered.

20        MS. HENDERSON:  On your own -- on your own

21   doing, did you ever make any attempts to call or try

22   to contact CIGNA directly to find out if the doctor

23   did what you requested him to do, send in the papers.

24        MS. LIPSCOMB:  No, I didn't.

1          MS. HENDERSON:  Okay.  All right.  I have

2    nothing further.

3          THE APPEALS REFEREE:  Okay.  Anything

4    further from the employer?

5          MS. HENDERSON:  Ms. Jackson --

6          MS. JACKSON:  Yes.

7          MS. HENDERSON:  You've heard

8    Ms. Lipscomb's testimony, ma'am?

9          MS. JACKSON:  Yes.

10          MS. HENDERSON:  And I have to do this a

11    little bit differently than if you'd be sitting here

12    with me.  Normally I could see your reactions a little

13    bit.

14          Do you have any rebuttal testimony?

15          THE APPEALS REFEREE:  I don't think you

16    need to be that loud (unintelligible)

17          MS. HENDERSON:  That you've not already

18    testified to that you wish to correct or add to for

19    the record before the Referee closes the record in

20    response to the claimant's testimony?

21          MS. JACKSON:  No, I do not.

22          THE APPEALS REFEREE:  Anything else

23    (unintelligible) anything else then?

24          MS. HENDERSON:  No, ma'am.

1        THE APPEALS REFEREE:  Anything else,

2  Ms. Lipscomb?

3        MS. LIPSCOMB:  No, ma'am.

4        THE APPEALS REFEREE:  This hearing is

5  concluded.  I'll issue a written decision.  As I say,

6  that decision is appealable to the Unemployment

7  Insurance Appeals Board.

8        Thank you for your cooperation and

9  participation.  Have a good day.  Bye-bye.

10       MS. HENDERSON:  Thank you.

11       (End of tape.)

12

13

14

15

16

17

18

19

20

21

22

23

24


**WILCOX & FETZER LTD.**
Registered Professional Reporters

HL-057

State of Delaware    )
                     )
County of New Castle )


                    C E R T I F I C A T E


        I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that the
foregoing record, pages 1 to 50, inclusive, is a true
and accurate transcription to the best of my ability
of the tape recording of the argument in the above
referenced matter.

        IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 31st day of October, 2005, at
Wilmington.


                            _____
                            Ann M. Calligan, RMR
                            (Certification No. 186-RPR)
                            (Expires January 31, 2008)




**WILCOX & FETZER LTD.**
Registered Professional Reporters