IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HESTAL LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  05-477 SLR |
| | ) | |
| ELECTRONIC DATA SYSTEMS | ) | |
| CORPORATION, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

### AFFIDAVIT OF HESTAL LIPSCOMB

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | ss. |
| COUNTY OF NEW CASTLE | ) | |

HESTAL LIPSCOMB, being duly sworn, states:

1. I am the plaintiff in this action and I provide this affidavit in support of my opposition to defendant's motion for summary judgment. The facts set forth in this affidavit are based on my personal knowledge.

2. During the period that I was employed by defendant Electronic Data Systems Corporation ("EDS"), I resided in the first floor apartment in the building located at 3111 W. 2d Street in Wilmington, Delaware.

3. The building located at 3111 W. 2d Street is a "row house," connected to several other similar buildings extending over several blocks in all directions. The mail was delivered to that address by deposit into an unlocked mailbox attached to the front of the building. During the period that I lived there, I did not regularly receive mail at that address

10015370.WPD

related to my employment. My paychecks from EDS and other employers were always either given to me at work or deposited directly into my bank account.

4. During the period that I lived at 3111 W. 2d Street, I considered the surrounding neighborhood to be relatively unsafe. Many of the people who lived in the neighborhood did not appear to have jobs, and it was common to see people loitering around the houses in the neighborhood at all times of the day, often drinking alcoholic beverages and even selling drugs. If I had known that documents critical to my future employment were being sent to my apartment by my employer or a third party, I would have been very concerned that I might not receive them, particularly if they were sent in an envelope that suggested that a check was enclosed.

5. My daughter, Timika Boyd, lived with me at 3111 W.2d Street during all of 2004. She and her infant daughter were on public assistance for at least a portion of that year. I know that one of the checks she was to receive at that address was not delivered, and she needed to have a new one issued. In addition, it was a fairly common occurrence for our mailmen to deliver the wrong mail to our home. I never called the post office to complain, since I had never failed to receive anything that seemed to be important. Aside from junk mail, the only other mail I routinely received at that address were bills. On occasion when I did not receive a bill that I thought might be due, I would call the utility company involved and ask them what I owed. I chose to rent my apartment in that neighborhood because it was inexpensive and close to public transportation since I do not own or have access to a car.

6. During the period from April 21, 2004 through July 13, 2004, I had no reason to believe that mail from EDS or any insurance company was being mis-delivered or stolen

because I did not know anything was being sent to me in connection with my medical leave in April and May.

7. When Barbara Jackson began telling me during the last couple of days of June 2004 that I needed to get my doctors to send documentation to CIGNA, I was not aware that there was a particular form that needed to be filled out. I was also surprised she was raising it six weeks after I had returned from leave, since I had already submitted doctors' notes both before I left and when I returned to work. I called the surgical office at Wilmington Hospital and told the nurse that it was important for them to get the information to CIGNA. The nurse assured me the documents had been sent. If I had known there was a specific form that needed to filled out, I would have taken it to Wilmington Hospital myself to have it filled out or I would have faxed it to them. This is particularly true if I had known my job depended on submission of that form. On the two occasions that Ms. Eaddy told me to bring in a note from my doctor (before going out on leave and then when I was ready to return) I quickly complied with her requests. The first time I had the note faxed to me directly at work, while the other time I picked it up directly from my doctor.

8. Attached as Exhibit A is the note that I submitted to Tracey Eaddy in 2003 when I went out for surgery. I did not submit any other medical records to EDS (or anyone else) in connection with that leave. Attached as Exhibits B and C are the two notes I gave to Tracey Eaddy in 2004 when I went out for surgery. I never understood that there was any change in procedure between 2003 and 2004 as to what I was supposed to do if I needed time off from work for medical reasons.

9. No one that I worked with at EDS ever told me I would be terminated or subject to any form of discipline if I did not submit medical documentation to CIGNA in 2004 or at any other time. I never understood my job was at risk either before or after the three brief meetings I had with Barbara Jackson in late June/early July when she told me to have my doctors submit medical documentation to CIGNA. She never told me that EDS would regard my twelve days off in March and April for surgery as "unexcused" if the medical documentation was not provided to CIGNA. She also never told me that my leave would not be covered by the FMLA if I failed to provide a medical certification to CIGNA. If she had made such a statement, I would have asked for clarification since I had already provided the doctor's notes requested by my supervisors.

10. I suffer from a medical condition known as granular cell tumors. It is my understanding that these are pre-cancerous tumors. I have had surgery on my doctors' recommendation in 2003 and 2004 to remove some of them. On both occasions that I had the surgery, I was only out from work to recover from the effects of the surgery as directed by my doctors. Attached as Exhibit D is a copy of the doctor's certificate provided on my behalf to the Delaware Department of Labor by my physician, Medhi Jadali, M.D., relating to my leave in March and April 2004.

11. During this case, I have been shown a 166 page document entitled the 2004 EDS Benefits Handbook. I was never given a copy of this document while I was employed by EDS, nor did I understand such a document existed. I always understood that if I needed time off, I was to contact my team leader (Linda Jackson). If I needed time off for medical reasons, I was to contact both Linda Jackson and my supervisor, Tracey Eaddy.

_____
HESTAL LIPSCOMB

SWORN AND SUBSCRIBED on this 30th day of June, 2006 before me, the undersigned, a Notary Public for the State and County aforesaid.

_____
Notary Public

KATHARINE MARY DENNEY
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Jan. 18, 2008

Commission Expires:_____